Mattiebelle **HARRIS**, et al., Plaintiffs,

v.

**John O. MARSH, Jr., Defendant.**

**Leonza LOFTIN, Plaintiff,**

v.

**John O. MARSH, Jr., Defendant.**

**Nos. 81–60–CIV–3, 80–168–CIV–3.**

United States District Court,
E.D. North Carolina,
Fayetteville Division.

Dec. 28, 1987.

---

6. In light of the holding above, the Court need not reach Woodworth's other arguments.

J. LeVonne Chambers, NAACP, New York City, Gilda Glazer, Geraldine Sumter, Ferguson, Watt, Wallas, Adkins, & Fuller, P.A., Charlotte, N.C., Penda Hair, Legal Defense Fund of NAACP, Washington, D.C., J. LeVonne Chambers, Ronald L. Gibson, Gilda F. Glazer, Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A., Charlotte, N.C., and Jack Greenberg, Charles Steven Ralaron, New York City, for plaintiffs.

Cressie Thigpen, Raleigh, N.C., for Beulah Mae Harris.

Chris Godwin, Fayetteville, N.C., for Amon Harris.

Peter B. Loewenberg, Asst. U.S. Atty., Lt. Col. Robert B. Williams, JAGC, Dept. of the Army, Washington, D.C., Capt. Stephen L. Berry, JAGC, Ft. Bragg, N.C., for defendant.

## OPINION AND ORDER

JAMES C. FOX, District Judge.

### I. OVERVIEW AND OPENING COMMENTARY

Racism, and all its collateral effects, is a doctrine abhorrent to any modern, civilized society. "At its core, it is an act of violence—a denial of another's right to equal dignity." *Goodman v. Lukens Steel Co.,* — U.S. ——, 107 S.Ct. 2617, 2629, 96 L.Ed.2d 572 (1987) (Brennan, J., concurring in part, dissenting in part). Unfortunately, in the not very distant past, racism "was openly acknowledged as official policy of the United States government." R. Kluger, *Simple Justice* 84 (1977). Laws designed to assure the inferiority of black citizens remained on the books until well into this century. *Id., Johnson v. Halifax County,* 594 F.Supp. 161, 164–65 (E.D.N.C. 1984) *citing Gingles v. Edmisten,* 590 F.Supp. 345, 359–61 (E.D.N.C.1984), *aff'd in part, rev'd in part, sub nom. Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *See also* B.D. Adams, *The Survival of Domination: Inferiorization and Everyday Life,* 21–24 (1978). Indeed, discrimination as a matter of state policy continues to flourish in many parts of the world.

Fortunately, the policy of the United States government has changed. Notwithstanding that fact, however, significant effects and results of the previous policy linger. Prior state-condoned racism encouraged similar attitudes among our citizens which have persisted long after state policy has been reversed. *Snell v. Suffolk County,* 611 F.Supp. 521, 530–31 (E.D.N.Y. 1985), *aff'd,* 782 F.2d 1094 (2d Cir.1986). Many claims of discrimination today deal with systemic, subtle and stereotypical practices which developed when overt discrimination was lawful and remain imbedded in basic institutional or organizational structures. Belton, *Burdens of Pleading and Proof in Discrimination Cases: Toward a Theory of Procedural Justice,* 34 Vand.L.Rev. 1205, 1224 (1981). To understand why this has occurred, one need only consider the definition of racial prejudice.

Invidious discrimination, in the form of racial prejudice, is the "result of subjective, irrational perceptions, which drain individuals of their dignity because of their perceived equivalence as members of a racial group." *Shaare Tefila Congregation v. Cobb,* 785 F.2d 523, 528 (4th Cir.1986) (Wilkinson, J., dissenting). "Misperception lies at the heart of prejudice and the animus formed of such ignorance sows malice and hatred wherever it operates without restriction." *Id.* at 529.

It is not surprising that prejudice and racial stereotyping have, at times, "severely impaired the operating effectiveness of our society." J. Levin, *The Functions of Prejudice* 33 (1975). Yet, discrimination persists, in part because of its function in the lives of certain members of the minority and majority groups involved. *Snell v. Suffolk County,* 611 F.Supp. at 529. For members of the perceived majority group, prejudice may be used to displace aggression, protect self-esteem, define self-image, and reduce uncertainty about the world as they view it. *Id. citing The Functions of Prejudice* at 61–62. For members of the perceived minority group, prejudice directed against it "often exerts pressure for group cohesiveness and pride, forces emphasis in its history and achievement, and brings about the development of organizations which further its interests as a group." *Id.* at 100.

However, racial prejudice is not strictly limited to members of the "majority." Unfortunately, persons of any color or national origin are susceptible to the misperceptions and animus referred to by Judge Wilkinson. No segment of our society's population possesses a monopoly on morality in this regard. Reverse racial discrimination by blacks against whites can be and, on occasions, has been as virulent and diseased as the discrimination by whites against blacks. One need only recall the race riots which engulfed our inner cities in the 1960's and 1970's to comprehend this phenomenon.

Notwithstanding the above, however, this nation can generally point with some pride to the remarkable progress that has been made in the last four decades in eliminating the effects of past discrimination. Some of the improvement is directly attributable to anti-discriminatory laws passed by Congress and the state legislatures, such as the Civil Rights Act of 1964, upon which this action is predicated, and the strict enforcement of those laws by the courts. But much of the change has stemmed from educative institutions substantially more powerful than the courts or the political branches of government. Progress has most significantly occurred through the schools, churches and synagogues of this nation as well as from the example of enlightened public leaders representing all aspects of our society. With notable exceptions, widespread segregation in the nation's academic institutions, public facilities, and places of employment has ended. Racial discrimination at the ballot box, in the halls of justice, and in the legislative chambers is no longer tolerated. Equal academic and employment opportunity has become the rule rather than the exception. Racial tensions in this country, by anyone's definition, have diminished in recent years through the persistent and cooperative efforts of hundreds of thousands of our citizens.

By the above statements, the court does not blithely suggest that racial discrimination in this nation has been eradicated. To the extent that dream can ever be realized, it certainly has not yet come true. Race remains this nation's most divisive problem. Subtle vestiges (and some not so subtle) of heretofore overt discrimination and racism continue in many aspects and segments of our society as the frequent and disgusting marches of the Klu Klux Klan and the recent incidents in Howard Beach, New York and Forsyth County, Georgia, make all too clear.[1] Fort Bragg, North Carolina, site of the litigation at bar,

---

1. "[Unlike years ago], overt and blatant discrimination is [today] a relatively rare phenomenon.... It is intentional discrimination in its covert, hidden form that now poses the real problem." Bartholet, *Proof of Discriminatory Intent Under Title VII: United States Postal Service Board of Governors v. Aikens,* 70 Calif.L. Rev. 1201, 1202–03 (1982).

being a microcosim of that society, is not immune from this disease of the heart and mind. Nonetheless, comparing the status of race relations in the United States, in general, and at Ft. Bragg, in particular, one cannot help but notice the progress which has been achieved over the last twenty years.[2]

Whatever prejudice continues to manifest itself in society at large, Congress has flatly ruled that it will not be allowed, in any form or degree, in the workplace of the United States. Prejudice, whether blatant or subtle, practiced by black or white, invoked by those wearing blue collars or white collars, or wearing officers' uniforms or grey flannel suits, will not be tolerated when directed against employees in the workplace. *Snell v. Suffolk County,* 611 F.Supp. at 531. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as enacted, serves as a check on the legitimate exercise of an employer's discretion vis-a-vis the improper exercise thereof. To this end, the statute promotes the national policy of equality of treatment between persons of different races, colors, religions, sexes, and national origins. "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed. 2d 668 (1973).

Title VII, thus, provides a comprehensive federal remedy for employees injured by the use of "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications." *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853,

28 L.Ed.2d 158 (1971). Simply stated, Congress enacted Title VII as a broad remedial statute of the highest priority, designed "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Consistent with this purpose, and mindful of the crucial role played by the private litigant in the statutory scheme, many procedural provisions of the Civil Rights Act have been liberally construed by the courts in favor of the complaining employee in a determined effort to reach the merits of any cognizable allegation of discrimination. *See Love v. Pullman Co.,* 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972); *Shehadeh v. Chesapeake & Potomac Telephone Co.,* 595 F.2d 711, 727 (D.C.Cir.1978); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 462–63 (5th Cir.1970); *Dickey v. Greene,* 603 F.Supp. 102, 105 (E.D.N.C.1984).

■ Notwithstanding all of the above, however, the mere fact that an individual may hold the keys to the courthouse door does not imply that he may enter with disregard for his actions therein or disdain for the rights of all other parties to the litigation. As the court has taken pains to note, the issue of racial discrimination in this nation is long-standing and remains a terribly serious one. Charges of racism, if proved, carry an enormously stigmatizing effect. Accordingly, such charges should only be leveled after careful investigation, thoughtful deliberation, and never without a reasonable basis in law and fact.[3] This admonition becomes increasingly true as the number and intensity of the charges increase.

Unfortunately, like all humanitarian remedies, Title VII is subject to abuse by those

---

**2.** With reference to Ft. Bragg, *see, e.g,* March 4, 1985, "Agreement" of the parties at 1 (Tab 359) which recognizes "the progress that has been made to date by the defendant in implementing its Affirmative Action Plan (AAP) and Federal Equal Opportunity Recruiting Plan (FEORP)."

**3.** The court recognizes that evidence of illicit intent may be extremely difficult to obtain, whether because employees are conscious of their bias and therefore likely to hide it, or

because they are exercising unconscious bias through a discretionary decision-making process. Bartholet, *supra* fn. 1 at 1203. Nonetheless, litigation complaining that a defendant has engaged in racist or discriminatory practices cannot reasonably be initiated on just the "gut" reaction of an employee or simply because the employee is black, employer is white and an adverse employment decision has been issued.

for whom the remedy was recognized and enacted. It is with the greatest of disappointment that this court finds itself in the unavoidable position of having to declare that this litigation represents a paradigm of such abuse.

*Harris, et al. v. Marsh,* 81–60–CIV–3, and *Loftin v. Marsh,* 80–168–CIV–3, are employment discrimination actions brought under Title VII of the Civil Rights Act of 1964. *Harris* was filed on September 14, 1981, and was brought as a class action by plaintiffs Mattiebelle Harris, Samuel Sheppard, Sandra Blue, Edward Humphrey and Robert Evans. *Loftin* was initiated by complaint filed August 29, 1980, as an individual lawsuit. The two actions were consolidated for discovery and trial on March 31, 1982. Broadly stated, plaintiffs alleged that they and other black civilian employees at Ft. Bragg, North Carolina, had been discriminated against in numerous employment opportunities by the defendant because of their race and color.

After an extraordinary amount of discovery was exchanged, (this exchange being generally one-sided with plaintiffs doing the discovering and defendant doing the disclosing), a hearing was held on May 17, 1983, to determine whether the litigation would proceed as a class action. After review of the extensive evidence presented, the court rendered its decision denying class certification. *Harris v. Marsh,* 100 F.R.D. 315 (E.D.N.C.1983). *See also* discussion *infra* at 1227–1228. Subsequently, forty-four (44) individuals were allowed to permissively intervene into the action. Eleven (11) of the intervenors withdrew their claims prior to trial. Motions to dismiss most of the claims of the remaining plaintiffs and plaintiff-intervenors (hereinafter simply "plaintiffs"), on procedural grounds were denied and trial of this case began on January 23, 1984. During trial, a number of plaintiffs moved to dismiss their claims and these motions were granted with prejudice upon the condition that sanctions might issue at the termination of all proceedings due to the bad-faith post-trial

abandonment of claims and their frivolous nature.

The enormity of this massive litigation may be gleaned from a review of a few representative statistics. The trial of this action, prior to a July 31, 1985, final settlement which essentially dismissed with prejudice nearly all of the substantive claims at issue,[4] *see* discussion *infra* at 1237, required ninety-three (93) days of testimony and evidence. Two hundred and fifty-six (256) witnesses testified during these proceedings, some more than once. At the court's request, over thirteen thousand (13,000) select pages of transcript have been produced by a veritable host of court reporters. Over twelve hundred (1,200) exhibits were admitted into evidence, many containing fifty (50) plus pages. One hundred forty-nine (149) depositions were filed with the court and the court file in this case is now contained in fifty-eight (58) 12″ x 16″ boxes in a separate room of the federal courthouse in Fayetteville. The docket sheet for this litigation, now thirty-seven (37) pages in length, reflects that the court has issued ninety-five (95) written orders of substance during the course of this proceeding and the parties have filed more briefs and memoranda than the court has time or the inclination to count. In sum, this case represents an expenditure of an extraordinary amount of time and resources for all concerned, with millions of dollars spent on its defense and prosecution. It is the largest civil rights action ever tried by the Department of the Army.

The charges of discrimination in this case were nearly unlimited in their geographic and legal scope. Plaintiffs attacked, broadside, every aspect of the defendant's merit promotion process. The judicial complaint alleged, often in scathing and conclusory terms, that defendant engaged in racially discriminatory employment practices in the following areas: (1) promotions, (2) pay for similar work by comparatively qualified black and white employees, (3) merit pay increases, (4) assignment of black employ-

---

**4.** The only plaintiff whose substantive claims remain at issue for disposition in this opinion is

Sandra Blue.

ees to lower level positions, (5) underrepresentation of black employees at higher general schedule and supervisory positions, (6) job performance evaluations, (7) discipline, (8) use of subjective employee selection criteria, (9) reductions-in-force (RIF), (10) retaliation for exercising rights under Title VII, and (11) harassment.[5] Engrafted upon these base-wide issues were the individual claims of the plaintiffs.

Two final pre-trial orders were filed in this action, totalling four hundred thirty (430) pages. Plaintiffs contended there were forty (40) legal issues to be determined at trial, with defendant arguing the existence of one hundred twelve (112) triable issues. Disregarding any allegation of discrimination for which evidence was to be introduced solely for background purposes, plaintiffs alleged one hundred fifty (150) *specific* claims for relief. Plaintiffs' proposed list of witnesses for trial totalled two hundred seventy-five (275) while defendant's list totalled approximately eleven hundred (1,100). Between the parties, the proposed exhibits numbered for trial was in the thousands.

Given the breadth of the charges leveled against defendant, the court doubts that any functional or geographic area of Ft. Bragg was left untouched. A review of the pleadings and discovery in this case reveals that *hundreds* of military and civilian officials were charged with racially discriminatory actions. Indeed, the allegations were stunning in their pervasiveness and tenor for nary a corner of Ft. Bragg

was rendered unaffected by the claims at bar.

Considering the magnitude of this action and its obvious potential for (1) impacting on the entire civilian personnel process at Ft. Bragg, (2) disrupting the working environment and, indeed, lives of many of the officials named in the plaintiffs' charges of discrimination, and (3) inflaming the passions of all the participants in this litigation on both sides of the issue, the court reasonably expected plaintiffs and their counsel to not only zealously advocate their claims, but also to properly temper their enthusiasm with careful regard for the obligations of truth, candor, accuracy, and in counsel's case, the exercise of sound professional judgment. To the court's profound dismay, the latter corollary obligations were not fulfilled.

Although the court did not hear testimony on a number of claims initially raised due to the July, 1985, settlement of much of this case, the 93 days of testimony encompassed all the prosecuted substantive allegations of six plaintiffs, as well as testimony on a number of individual claims of other plaintiffs heard for the express purpose of determining, *inter alia*, whether sanctions for the filing of frivolous and abandoned allegations were appropriate. A review of the evidence in this case—and the court has exhaustively reviewed its trial notes, the record, the transcript and the admitted exhibits—reveals that many of the plaintiffs' claims for relief were frivolous and without foundation.

---

**5.** Plaintiffs' 1980 EEOC administrative class complaint alleged that defendant discriminated against blacks in the following personnel policies and practices:

(1) blacks are disproportionately non-selected for promotion due to race;

(2) whites are given temporary promotions and detailed to positions which enhance their promotability, whereas blacks are not;

(3) job qualifications are tailored to enhance the pre-selection of white applicants;

(4) merit promotion review panels are not properly trained to evaluate personnel files;

(5) employees do not have an adequate opportunity to complete applications for promotion;

(6) blacks are denied equal training opportunities;

(7) blacks are not proportionately selected for the Upward Mobility program;

(8) blacks are more frequently and severely disciplined than whites;

(9) the Ft. Bragg EEO office is grossly understaffed adversely affecting black employees;

(10) blacks are adversely affected by RIF's;

(11) blacks are usually selected only for positions with little or no promotional potential;

(12) blacks are not reinstated as promptly as whites;

(13) blacks are not converted from temporary to permanent status as promptly as whites; and

(14) blacks are non-selected for promotion in reprisal for filing EEO complaints.

*See* plaintiffs' Exhibits 1 and 8(a).

■ The absolute lack of credible evidence supporting so many of the allegations heard is deeply troubling. There were claims tried where the individual plaintiff was unable to produce *any* evidence of discrimination or retaliatory conduct on the part of defendant. *See, e.g.,* Sheppard's promotion claims under Merit Promotion Announcements 200–79 and 201–79, Blue's promotion claims under Merit Promotion Announcements 273–79 and 303–79. To be sure, the court is cognizant of the fact that instances will occur where individuals will be passed over for a particular promotion and, in such situations, it is not an uncommon experience for that person to feel he was more deserving of the promotion or perhaps even more qualified than the selectee. *Edwards v. Marsh,* 644 F.Supp. 1564 (E.D.Mich.1986). Nevertheless, because there are often a myriad of considerations that accompany a promotional decision, the burden must rest on a plaintiff to show at least some modicum of impropriety in the decision in order to raise an inference of discrimination. Yet, time after time in this case, plaintiffs' evidence, shorn of all its incredible underpinnings, simply came down to an assertion by the plaintiff that she/he was black, the supervisor or selecting official was white, and an adverse employment action had occurred. Such minimal evidence clearly does not meet the *McDonnell Douglas* test for establishing even a *prima facie* case of disparate treatment. *See Holmes v. Bevilacqua,* 794 F.2d 142 (4th Cir.1986) (*en banc*).

Just as disturbing, however, was the utterly incredible nature of a number of the plaintiffs' testimony. The testimony of plaintiffs Sheppard, Blue, Ballew and Beulah Mae Harris, in particular, was astounding for its lack of candor and truthfulness. These plaintiffs consistently testified either out of shocking ignorance or stunning disregard for the veracity of their allegations.[6] Inconsistencies and evasiveness abound in their testimony and self-serving lapses of memory are fatally pervasive. Some of the factual allegations can most charitably be termed "fantasies." The court cannot honestly recall another witness with whom it has been less favorably impressed than these four in all its years on the bench and in practice. Reading the transcript of their testimony, particularly the government's devastating cross-examination, leads to one undeniable conclusion —on a number of occasions, Sheppard, Blue, Ballew and Harris lied.[7]

In addition, contributing to plaintiffs' problems in this litigation was their unyielding and erroneous view of what constitutes discrimination in a promotion decision. By way of example, plaintiff Sheppard testified that in a promotion action, if blacks are "underrepresented" within a particular organization based upon an undifferentiated labor market and a black is among those referred for selection, the black referee must be "strongly considered" for the position. Upon being asked how one would know if one had been "strongly considered" he testified, "If you're not selected, you haven't been strongly considered."

The apparent disseminator of this view is the former Equal Employment Opportunity (EEO) officer, James Canady, a witness for the plaintiffs, who incredibly testified that

---

**6.** Facts supporting the court's credibility determinations with respect to Blue and Harris appear *infra* since their claims are the only ones remaining at bar. Ballew's credibility is considered at length as she was a major witness in Blue's case. As for Sheppard, *see, e.g.,* all relevant testimony regarding the 1977 reassembly of the YC–7K Caribou elevator, service of the landing gear on the U21 in 1978–79, and the mushroomed bolt on the UIA.

**7.** The court is not suggesting that all of the plaintiffs' claims were meritless or that all of their witnesses were incredible. Such is not the case. In fact, if all of the claims tried had gone to adjudication, the court would have been inclined to find in favor of plaintiff Mitchell McKeller and, quite possibly, on *one* of plaintiff Mattiebelle Harris' claims. Further, the court found the testimony of certain of plaintiffs' witnesses entirely credible, *e.g.,* Ernest Carter, McKeller, Reinhard Witiak, Sandra Lee, whereas some of defendant's witnesses were patently not credible, *e.g.,* Robert Ives, Donald Holleman. Nonetheless, the rule rather than the exception in this case was that plaintiffs' claims were often left dangling in the wind, unsupported by any credible factual basis.

it is *deliberate* discrimination if, where blacks are "underrepresented" according to the Ft. Bragg Affirmative Action Plan (AAP) and Federal Equal Opportunity Recruitment Program (FEORP), a black on the referral list is either not selected or the selecting official does not set out in writing that he has given "great weight" to the underrepresentation consideration. Canady admitted on cross-examination that this view of discrimination was not written anywhere nor was he able to cite any authority for this creative proposition.

■ Testimony similar to Sheppard's and Canady's can be found in plaintiff Mattiebelle Harris' case, where she testified that in her opinion the AAP *required* the selection of a black where underrepresentation was noted. In her case, Canady went even further to suggest that in his opinion blacks should be represented throughout the workforce in the same proportions that they are found in the local *undifferentiated* labor market. To assert that any ethnic group should be represented in *skilled* positions such as engineers or physicians in proportion to their overall general representation in the community, regardless of education, experience and merit, is absurd. *See Johnson v. Transportation Agency, Santa Clara County, California,* — U.S. ——, 107 S.Ct. 1442, 1454, 94 L.Ed.2d 615 (1987); *Hazelwood School District v. United States,* 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742 n.13, 53 L.Ed.2d 768 (1977); *EEOC v. Western Electric Co.,* 713 F.2d 1011, 1018 (4th Cir.1983); *Paxon v. Union National Bank,* 688 F.2d 552, 564 (8th Cir.1982); *Woodard v. Lehman,* 530 F.Supp. 139, 145 (D.S.C.1982); *Jones v. First Federal Savings & Loan Assoc.,* 546 F.Supp. 762, 774 (M.D.N.C.1982). Canady then reiterated his view that a showing of underrepresentation obligated management to give what amounted to a preference for black applicants and, where this preference

was not effected, discrimination under Title VII was presumed. These views were echoed throughout this litigation by plaintiffs and, to a great extent, their counsel. Although this concept will be discussed more thoroughly *infra,* it suffices to state that Canady's theory is without support in the law. *See, e.g., Valentino v. United States Postal Service,* 674 F.2d 56 (D.C.Cir.1982); *Frink v. United States Navy,* 16 FEP Cases 67 (E.D.Pa.1977). "The fact that the [Army] itself in its Affirmative Action Plan has made comparisons to general labor force statistics to determine if minorities are underrepresented is not binding [under Title VII]. Whether or not the [Army] makes a pointless comparison to general labor force statistics, a violation of Title VII can only be established with probative statistical evidence utilizing comparisons to an *appropriate labor market." Frink,* 16 FEP Cases at 71 (emphasis added). *See generally Hazelwood School District v. United States, supra; EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633 (4th Cir.1983), *rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984).

■ As to statistical evidence in general, the record is shocking not so much for what is shows as for what it fails to show. In some claims, like those of Sandra Blue, there simply was no statistical presentation made by the plaintiffs, *see* findings and conclusions *infra,* even in support of her disparate *impact* allegations. In other cases, where statistics were presented, the analysis was so fraught with inaccuracies, inconsistencies, and inappropriate methods of comparison that the evidence was rendered totally unreliable and incredible. *See, e.g.,* testimony of plaintiffs' expert Dr. Alan Parrow in claims of Mattiebelle Harris and Samuel Sheppard.[8]

---

**8.** Since the claims of these plaintiffs have been settled, it is unnecessary for the court to make detailed findings and conclusions regarding the testimony of Dr. Parrow. He did not testify in the claims remaining at bar and the court's comments in text are meant to be of a general nature.

Notwithstanding this point, however, I note that Dr. Parrow did not attempt to model the promotion process at Ft. Bragg nor was the court convinced that he thoroughly studied or understood the process. Parrow attempted to compare the "utilization" of blacks at Ft. Bragg in job categories occupied by the respective plaintiffs for whom he testified to the availabili-

Finally, the court comes to the issue which ultimately led the defendant to move, in a number of cases, for the imposition of sanctions, including attorney's fees and costs. For various reasons, after trial of this action began, thirteen (13) plaintiffs moved to withdraw and dismiss their claims. *See* discussion *infra.* In some cases, the reasons were financial; in other cases, personal. In all cases, defendant argued that the real motive behind the plaintiffs' respective motions was that their claims were groundless and frivolous and, as such, plaintiffs simply wanted out of the lawsuit. Thus, defendant moved the court to impose an award of fees and costs upon the plaintiffs for abuse of the judicial process which defendant claimed resulted in monetary loss to the defendant, interference with the proper defense of other claims, and a waste of judicial resources. Although many of these claims likewise were settled in July of 1985, defendant's motion with respect to the claims of Beulah Mae Harris remains for disposition.

In addition, with respect to those plaintiffs whose cases were heard by the court, allegations of discrimination which had been set forth as claims for relief in the final pre-trial orders were abandoned prior to trial of each plaintiff's case and never pursued. Defendant, having spent enormous amounts of time and resources preparing to defend these claims was, needless to say, perturbed by this startling change of events. So was the court, for the final pre-trial order in any case must be viewed as binding on all parties to the litigation. Defendant had a right to rely on the pre-trial orders *sub judice* and to prepare accordingly. Yet, when the time came to try each plaintiff's claims, defendant was legitimately surprised by what claims that plaintiff was not pursuing. Plaintiffs' view appeared to be that since defendant effectively "won" on any claim not prosecuted, defendant could not be heard to complain— no harm, no foul. This cavalier attitude toward the physical and fiscal resources of the defendant and the court (which also prepared for the trial of these claims) was and remains shocking. *See* findings and conclusions *infra* at §§ VI and VII.

In sum, background claims (some never denominated as such) and claims for relief were abandoned and merged with lightening speed (time being relative in this lawsuit) at the whim of the plaintiffs and without any advance notice to defendant or the court. One was never certain, even on the eve of trial, of exactly what claims plaintiffs were pursuing, whether designated claims would be expressly waived, or whether claims, clearly designated for trial in the pre-trial order, would simply creep slowly and silently away into the night never to be heard from again. Such litigation practices are intolerable and patently unfair to the opposing party, regardless of his relative resources.

All of the above circumstances lead the court to the inexorable conclusion that as a

---

ty of blacks in the Fayetteville Standard Metropolitan Statistical Area (SMSA) in the United States Census Bureau job series that Parrow felt were the appropriate equivalent of the Office of Personnel Management categories. This "utilization" analysis has little, if any, probative value in a promotion case. In a promotion case, the only question is the ability to get promoted from *within* the workforce, *not* the ability to get *into* the workforce from an external labor pool. Parrow essentially admitted on cross-examination that his analysis failed to show any statistically relevant fact analysis about whether blacks at Ft. Bragg had been discriminated against in the promotion process; only whether they had compared favorably or unfavorably with employers in the SMSA. A statistical analysis of an employer's promotion practices should compare the race of those employees promoted with the racial composition of the *qualified labor pool* from which the employer promotes his employees. Where, as in this case, the nature of the employment involved strongly suggests that the pool of people qualified to fill the position is not likely to be fungible with the general population, the relevant labor market must be separately and distinctly defined. It was not. *See generally EEOC v. Federal Reserve Bank of Richmond, supra; Garcia v. Rush Presbyterian–St. Luke's Medical Center,* 660 F.2d 1217 (7th Cir.1981); *Ste–Marie v. Eastern Railroad Association,* 650 F.2d 395 (2d Cir.1981); *Castaneda v. Pickard,* 648 F.2d 989, 1002 (5th Cir.1981). Aside from further errors in Parrow's analysis, including a failure to do a thorough job analysis, defendant's statistical rebuttal to plaintiffs' presentation was convincing, reliable and wholly credible. *See* testimony of Dr. James Beckett.

whole, defendant has been forced to defend an extraordinary lawsuit that was, with rare exceptions, groundless from the beginning. Plaintiffs seemingly viewed every adverse employment decision by agents of the defendant as racially motivated, regardless of the merits of the decision. This was true, even in cases where the plaintiff obviously was not qualified for the position sought, deserved the discipline rendered, or was a disruptive and unproductive employee. It is with great reluctance that the court finds it must hold that to the extent any racism was proven in this case, such discrimination was generally perpetrated by the plaintiffs upon the defendant, not the reverse, for it was the plaintiffs who consistently saw every criticism and action in a blindly racial context.

The defense and trial of this case involved an enormous expense to the taxpayers of the United States. Such a needless drain on the manpower and public coffers of this nation cannot be viewed lightly. Plaintiffs and their counsel blatantly disregarded the cost of this litigious exercise to both the defendant and to society. As a result, the most extensive, and quite probably costly, litigation this district has ever seen took place over a span of four years—litigation which will end in this court today with no real winners and some very real losers.

Although the court has touched upon some of the background of these proceedings in this opening commentary, a preface to the court's findings of fact and conclusions of law with respect to the claims of plaintiff Blue and defendant's motion for sanctions and fees against Blue and Harris is required in the form of a more detailed

## II. HISTORY OF THE PROCEEDINGS

As previously noted, this action was commenced by complaint filed September 14, 1981. Plaintiffs contend that they and other similarly situated black civilian employees at Ft. Bragg, North Carolina, were discriminated against and denied equal employment opportunities on the basis of race in violation of Section 717(a) of Title VII, 42 U.S.C. § 2000e–16(a). Plaintiffs seek in-

junctive relief, back pay, and other equitable relief for themselves and a class of all past, present and future black employees of the defendant who were employed by defendant at any time since March 24, 1972, and who were discriminatorily denied civilian employment opportunities on the basis of race.

The defendant, John O. Marsh, is Secretary of the United States Army, and in that capacity, is responsible for the various employment practices challenged at Ft. Bragg; this location being a facility of the United States Department of the Army comprising the HQ XVIII Airborne Corps and Ft. Bragg and Tenant Units.

Ft. Bragg and neighboring Pope Air Force Base comprise one of the world's largest military installations. Indeed, Ft. Bragg's population of 157,000 ranks it as the fifth largest "city" in North Carolina. As might be expected, an installation of this size requires significant "support" services and, in that capacity, defendant employs approximately 4,000 civilian employees annually. The civilian employees are assigned to various units or divisions of the base and provide clerical, technical and professional assistance for the armed forces' personnel assigned to the facility. Plaintiffs are or were all employed in this capacity.

Shortly after the initiation of this lawsuit, what was to be a long and exhausting discovery process commenced. Between November of 1981 and February of 1983, an extraordinary amount of information was exchanged between the parties with a maximum of effort and a relative minimum of motions, as evidenced by the sheer number of depositions filed with the court, documents produced in response to various requests, and interrogatories answered.

Trial was originally scheduled for May 9, 1983. On February 23, 1983, defendant requested a determination that the case not proceed as a class action. The court denied the motion, but directed plaintiffs to move for class certification by April 18, 1983, and continued the trial date to August 1, 1983.

Plaintiffs properly filed their motion and defendant timely responded. A hearing was conducted on May 17, 1983, at which plaintiff adduced further evidence. Following the hearing, supplemental pleadings were filed by both sides. By order dated June 30, 1983, the court denied plaintiffs' motion, holding that plaintiffs had failed to meet the factual burden established in *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), for class claims and a memorandum opinion followed. *Harris v. Marsh*, 100 F.R.D. 315 (E.D.N.C.1983).

As an initial matter, the court observed that plaintiffs' primary challenge was to defendant's promotional process and, absent any specific attack on an isolated, facially neutral requirement within that process, plaintiffs' general promotion claims were most properly analyzed under the disparate treatment theory. *Id.* at 322. Although as this case progressed, certain individual adverse impact claims arose, such as one of Blue's claims still in issue, this finding has generally retained its validity.[9] The court's review of the anecdotal and documentary evidence presented by the plaintiffs failed to establish "that a significant number of the alleged class members have been discriminated against in the same way as have the named plaintiffs." *Id.* Furthermore, the court found that plaintiffs' statistical presentation failed to raise any compelling inference of discrimination. Indeed, defendant's unrefuted evidence demonstrated that blacks have been favored in promotions:

| PROMOTION OF BLACKS AT FORT BRAGG | | |
|---|---|---|
| | Blacks in Ft. Bragg Work Force | Actual Promotions |
| 1979 | 22.9% | 21.6% |
| 1980 | 22.8% | 24.2% |
| 1981 | 23.5% | 23.9% |

*Id.* at 323.

In reviewing the requirements of Rule 23(a) of the Federal Rules of Civil Procedure, the court held that "[p]laintiffs have offered scant evidence as to the alleged claims of fifty-five employees ... [with] most of these individuals [failing to] to present a *prima facie* case of discrimination." *Id.* at 324.[10] As a result, the court found that plaintiffs failed to meet the numerosity requirement. *Id.*

With regard to typicality, the court held that "[t]he statistics tend to reveal that black employees at Ft. Bragg are, in general, promoted in proportion to their numbers in the work force, receive awards in that proportion, and are trained in the same manner as their counterparts.... The statistics ... suggest that [ ] discrimination is the exception rather than the rule." *Id.* at 324–25.[11] Accordingly, the court found that plaintiffs failed to meet the typicality and adequacy of representation requirements of Rule 23(a). *Id.* at 325.

Immediately after class certification was denied, forty-four (44) members of the disappointed class plaintiffs sought to represent moved to intervene as party-plaintiffs.[12] Over strenuous opposition of the defendant, the court allowed the movants to permissively intervene, pursuant to Rule 24(b)(2), holding that "while classwide relief may not be available.... [t]here is a

9. The court also notes that, after considerable additional research, its view of excessive subjectivity claims has changed somewhat and it no longer finds that analysis of these claims is *necessarily* limited to review under a disparate treatment theory. *See* Conclusions of Law nos. 38–47 at § V(C), *infra.*

10. Once again, this finding has proved to be accurate.

11. *Id.*

12. For identification purposes, the movants were: Beulah Mae Harris, Leonetta Bibby, Annetta Todd, William Kincy, James Love, Mattie McLaurin, Manuel Early, Bernard Fields, Roberta Thomas, Betty Reid, Barbara Speller, Lynn Stiler, Leila Walker, Thelma Curry, John Smith, Annie G. McLaughlin, James Fleming, Geraldine Ballew, Robert Bronson, Omie White, Carlton Giles, Edith B. McMillan, Mitchell McKeller, Carol J. Anderson, Bessie Campbell, Veola McLean, Norma McLeod, Alicia Chisholm, King S. Cameron, Jr., Jeane Hendon, Joyce Malone, Shirley Thomas, Deborah McMillan, Maxine Robinson, Doris Turner, Violet Henderson, Nancy Alexander, Janet Gwinn, Patricia Anthony, Catherine Gutierrez, Nancy McGlone, Mary F. Headon, Jessie Williams and Diane Sheppard.

common nucleus of law and fact among [the proposed intervenors'] claims." Order of August 25, 1983, at 2. *See Hill v. Western Electric Co.*, 672 F.2d 381 (4th Cir.1982) (holding that upon denial of class certification, motions for intervention by members of the putative class should be liberally allowed). Upon order of the court, an Amended Complaint-in-Intervention was filed on August 25, 1983, and the trial date was eventually re-scheduled for January 23, 1984.

For the next several months, discovery regarding the intervenors was conducted at a rapid pace with omnibus pre-trial motions being advanced by both sides, particularly the defendant.[13] As a result of all this activity, the court entered a responding omnibus order disposing of all pending motions at the final pre-trial conference in December of 1983. In sum, the court held that:

(1) The motion of eleven (11) intervenors for leave to withdraw as plaintiffs, filed within approximately one month of their initial motion to intervene, was allowed;[14]

(2) Counsel for plaintiffs satisfactorily resolved a host of potential conflicts among the plaintiffs by agreement of various intervenors and named plaintiffs not to pursue fifteen (15) competing promotion claims;[15]

(3) Defendant's motion for summary judgment as to plaintiff-intervenor Catherine Gutierrez was allowed as her claims turned out to be wholly atypical and therefore not the proper subject of permissive intervention;

(4) Although plaintiffs' motion to compel the production of a computer readable database prepared by the defendant's experts for trial was denied, all of the raw data upon which the base was predicated, *i.e.*, all of the relevant promotional files at Ft. Bragg, was ordered made available to the plaintiffs for inspection and copying. Of course most of this material had already been disclosed to plaintiffs long before this order;

(5) Defendant's motion for partial summary judgment against some of the claims of twelve (12) plaintiffs on grounds that these claims were previously administratively resolved and settled was denied. The court found the existence of a factual dispute as to the validity and effect of any such release, *see Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), and established a procedure to hear evidence on these disputes prior to the start of each plaintiff's claim;[16]

(6) Defendant's motion for partial summary judgment against sixty-seven (67) claims of twenty-two (22) plaintiffs on grounds that these claims were not ripe, *i.e.*, that these plaintiffs filed suit prior to any final agency decision on their EEO complaints and prior to the passage of 180 days, as required by 42 U.S.C. § 2000e–16(e), thus, failing to exhaust their

---

**13.** At the time intervention was permitted, discovery had been closed for some time. It was re-opened for the claims of the intervenors who carried with them, in terms of potential scope, literally hundreds of new claims. As an example, Beulah Mae Harris had, at the time of intervention, unsuccessfully applied for more than one hundred fifty (150) positions at Ft. Bragg. Defendant had to prepare for all of the potential claims in a very short period of time. Indeed, the only way to narrow the possible claims for relief, for preparation purposes, was to rely on plaintiffs' administrative claims and many of those were conclusory and vague. The court has no doubt that through its own errors of omission in failing to have the plaintiffs precisely define their claims for relief and background claims well in advance of trial, hundreds of hours were unnecessarily wasted by defendant's litigation team preparing for claims that were never heard or never would have been heard even if the trial had been completed.

**14.** No reason was articulated for the mass withdrawal. These plaintiff simply decided not to pursue their claims.

**15.** Included within this resolution were decisions by plaintiff Blue not to pursue two promotion claims (MPA 278–79 and 442–80); by plaintiff-intervenor Ballew, one of Blue's eventual witnesses at trial, not to pursue two promotion claims (MPA 273–79 and 440–80); and by plaintiff-intervenor Beulah Mae Harris not to pursue a discriminatory performance evaluation claim stemming from an informal July 23, 1983 EEO complaint.

**16.** Included within this category were a number of claims of Beulah Mae Harris.

administrative remedies, was denied.[17] The court held that exhaustion of administrative remedies was not required where, as in this case, the named plaintiffs exhausted their administrative remedies and exhaustion by the intervenors similarly situated, would have been futile. *Lilly v. Harris–Teeter Supermarket*, 720 F.2d 326 (4th Cir.1983); *Foster v. Gueory*, 655 F.2d 1319 (D.C.Cir.1981);[18]

(7) Defendant's motion for partial summary judgment against thirty-five (35) claims of eleven (11) plaintiffs on grounds that these claims were not presented to an EEO counselor within thirty (30) days of the alleged discriminatory act, as required by 29 C.F.R. § 1613.214(a)(i) (1983), was denied.[19] Extending the logic of *Lilly v. Harris–Teeter Supermarket, supra*, the court found that as long as the alleged act

of discrimination occurred after March 3, 1980, the claim need not have been the subject of any EEO complaint. In addition, each claim in this category was held subject to equitable tolling;[20] and

(8) Defendant's motion for summary judgment against twenty-four (24) claims of thirteen (13) plaintiffs[21] was granted on grounds that these claims arose more than thirty (30) days prior to the filing date of the administrative class complaint.[22] *See* n. 18, *supra.*

Upon further ruling June 30, 1983, as the forward cut-off date for any claim at bar and bifurcating the trial on issues of liability and damages, the final pre-trial orders, as previously described *supra* at 1223, were filed. Trial of this action commenced, most appropriately, at high noon on January 23, 1984, in Fayetteville.[23]

**17.** *Id.*

**18.** In this regard, the court also held that any claim occurring more than thirty (30) days prior to the initiation of plaintiffs' Mattiebelle Harris and Sheppard's informal administrative class complaint, *i.e.,* March 3, 1980, was untimely. *See American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).

**19.** Again, included within this category were a number of claims of Beulah Mae Harris.

**20.** Defendant argued the thirty day period expired on August 1, 1983—thirty days from the date plaintiffs' motion for class certification was denied. However, the court found reasonable plaintiffs' assumption that the thirty days ran not from the short order denying class certification entered July 1, 1983, but rather from the entry of the memorandum opinion on August 30, 1983. All of the plaintiffs had filed an informal EEO complaint by August 7, 1983, thus, the court's decision to alternatively invoke equitable tolling.

**21.** Neither Blue nor Harris had any claims within this category.

**22.** Plaintiffs attempted to tack onto Loftin's formal class complaint filed on April 14, 1978. The problem with this theory was that Loftin's complaint was denied by final agency decision on July 10, 1978, with no further action by Loftin until suit was filed in August of 1980. Accordingly, reliance by the intervenors on Loftin's exhaustion of remedies was not proper or justified during the lapse of time between July

10, 1978, and March 3, 1980. Of course, this back cutoff date of March 3, 1980, did not apply to any claims of the *named plaintiffs* pending administratively at the time. the informal class complaint was filed. *See* Order of April 3, 1984.

**23.** With respect to the manner in which the trial would proceed, the court stated that the litigation would be developed in three phases, with phase I clearly consisting of the presentation of *all relevant evidence* regarding each individual claim of the plaintiffs. *See* Orders of August 30, 1983; December 14, 1983; July 5, 1984; August 27, 1984. Through the progressive phases, plaintiffs would be allowed the opportunity to present evidence of all individual instances of discrimination and subsequently any pattern or practice of discrimination. *Id.* Without question, the parties understood from the onset that all claims and defenses, and all anecdotal and statistical evidence, with respect to each individual's claims were to be fully litigated in phase I. *Id. See also* the Final Pre–Trial Orders and claims for relief listed. Phases II and III were discretionary in that they were predicated on at least some initial showing of discrimination by the plaintiffs in phase I. Absent that base showing, phases II and III became unnecessary since plaintiffs clearly could not establish an evidentiary foundation for any further inquiry into the existence of a pattern or practice of discrimination or systemic impact or excessive subjectivity claim. Phase III, predicated on some affirmative finding in phase II, was designed solely to reconsider the court's class certification decision. *Id.* To the extent the July 5, 1984, Order changed any rules with respect to phase I proceedings, plaintiffs were allowed to move to re-open theretofore litigated claims (M. Harris, Sheppard, and Blue). No credible request in

According to the final pre-trial orders, trial time for the claims of the remaining thirty-eight (38) plaintiffs was estimated by the parties at nine (9) weeks. This case, among others, has since convinced the court never to trust trial counsel's view of how long their case will take. From the onset, it became apparent to everyone that this prediction of trial length was vastly understated. Significant evidentiary and procedural problems surfaced immediately, an omen of events to follow. Questions were raised concerning (1) the applicability of the forward cut-off date to allegedly on-going claims of retaliation and harassment; (2) what claims were specifically designated for relief and what claims were introduced solely for background purposes;[24] (3) the order of witnesses and the scope of their testimony; (4) the scope of cross-examination and of re-direct; (5) redaction of contested exhibits; (6) the use of cumulative and repetitive testimony; (7) the use of statistics within the Ft. Bragg AAP; (8) the evasiveness of witnesses; (9) the attempted impeachment of witnesses by collateral contradiction; (10) the admissibility and weight to be given findings and recommendations of the EEOC and the intermediate findings of the agency's administrative bodies; (11) the admissibility of evidence of alleged discriminatory acts committed by supervisory personnel at Ft. Bragg against third party civilian employees, where the supervisor is not charged by the plaintiffs with being an alleged discriminatory official (ADO); (12) the time-consuming process of reading, line by line, portions of exhibits introduced into evidence; and (13) the admissibility, pursuant to Fed.R.Evid. 801(d)(2)(D), of statements offered against the defendant, made by ADO's and non-ADO's while employed at Ft. Bragg concerning personnel decisions rendered by that official.

In addition to these problems, simply attempting to master the merit promotion process at Ft. Bragg, the terminology employed by both civilian and military personnel at the installation, and the organizational structure of the base itself became a challenging and time-consuming, if less than exciting, daily adventure into the unknown for the court. Complicating the trial process even further was the simple fact that plaintiffs' case was, from its initiation, poorly prepared with essential groundwork for important testimony never laid.[25] Often, testimony in plaintiffs' case-in-chief was left hanging and wholly ambiguous until the defendant could fill in (and over-run) the gaps with his own witnesses.

All of the above factors, of course, led to an exorbitant increase in trial time per plaintiff per claim. The final pre-trial order listed nine (9) specific claims for the first plaintiff, Mattiebelle Harris. Three (3) weeks after the trial started, the court was still listening to testimony in the claim of Mattiebelle Harris. Indeed, Ms. Harris herself testified for over five (5) days.

Faced with the intolerable prospect of trying the remainder of the case at the pace established by the Harris claims, the court, on March 20, 1984, issued a lengthy procedural order re-defining the rules of the game from that date forward.[26] Individual trial briefs were required for each plaintiff's case. Particularized identification of claims, witnesses, their testimony, and exhibits was mandated.[27] Deadlines for proposed findings of fact and conclusions of law were established. Additional pre-trial stipulations were strongly encouraged. Background organizational and com-

this regard was ever made. *See* Order of August 27, 1984.

**24.** Despite repeated orders attempting to solve this problem, the court was *never* able to pin down some of the plaintiffs on this issue. *See, e.g.,* Orders of March 20, 1984 and May 16, 1984.

**25.** As plaintiffs' lead counsel openly acknowledged, plaintiffs assumed this case was going to be tried as a class action, *see* July 5, 1985, Affidavit of Julius Chambers at 2–3, and, in the

court's opinion, when class certification was denied, the plaintiffs simply were not prepared to try their individual claims as was then required.

**26.** In addition, trial of the action was relocated from Fayetteville to Wilmington, the court's home division.

**27.** Further, identification of plaintiffs' claims was required by court order filed May 14, 1984. Plaintiffs' response in compliance with this order was filed June 1, 1984.

mand structure evidence was ordered at the introduction of each claim.

Time limitations per plaintiff and written direct testimony were threatened. All ongoing evidentiary disputes were resolved, many in favor of the position advanced by the plaintiffs. *See* Order of March 20, 1984, at Section XIII, paras. C, G, L, N, and O, pp. 13–16.[28]

Evidence on the claims of Mattiebelle Harris concluded on February 17, 1984, and the Sheppard claims began, after a delay, on March 26, 1984.[29] The court notes that the plaintiffs' process of abandoning claims during trial began early with the Sheppard case. Just by way of example, Sheppard alleged seven (7) claims for relief in the Final Pre-Trial Order, *see* p. 23, including claims for the discriminatory denial of Merit Promotion Announcement (MPA) 33–80, discriminatory detailing, denial of training, and evaluation. Yet, when Sheppard's pretrial brief of March 26, 1984, was filed, only three (3) claims for relief were alleged —MPA 33–80 and the detailing, training, and evaluation claims were not among them. *See* Sheppard's Brief at 3–4. When the omission of MPA 33–80 was brought to plaintiff's attention, plaintiff's counsel stated that this claim had recently been converted to a background claim. In contradiction with this statement, Sheppard was later to testify at his sanctions hearing that he assumed it was a background claim all along.[30]

Although the Sheppard case proceeded at a slightly faster pace, evidence was not completed until April 18, 1984. Testimony on plaintiff Blue's claims began on April 19, 1984. In the interim, on April 17, 1984, defendant filed his first motion for sanctions alleging abuse of judicial process by the bad-faith abandonment, without notice, of final pre-trial claims for relief in the cases of Mattiebelle Harris,[31] Sheppard, and Blue (as proposed in Blue's pre-trial brief of April 3, 1984).[32] As defendant stated at the time:

Plaintiffs made broad allegations of racial discrimination in their initial complaint, subsequent multiple answers to defendant's interrogatories, and several pre-trial orders. In these documents plaintiffs expanded and amplified upon their allegations and cited specific merit promotion announcements and issues which they asserted they would litigate. Plaintiffs in effect placed defendant on notice that almost every personnel action involving plaintiffs and/or intervenors would be litigated. Defendant was therefore, forced to be prepared to rebut such issues.... As can be seen, however, such allegations [with many now abandoned] were a mere smoke screen to divert the time, energies and money of the defendant away from what would turn out to be the actual issues....

Defendant bilieve [sic] that the sudden dropping of these claims damaged them....because plaintiffs either deliberately or carelessly made grandiose alle-

---

**28.** *E.g.,* Evidence of Ft. Bragg's AAP and findings and recommendations of the EEOC, as well as the intermediate agency bodies, were ruled admissible. *See Georator v. EEOC,* 592 F.2d 765 (4th Cir.1979); *Abrams v. Johnson,* 534 F.2d 1226 (6th Cir.1976). Statements by ADO's, while employed at Ft. Bragg, concerning any aspect of any personnel decision made by that official within the scope of his authorized responsibilities was deemed an admission by party-opponent and admitted. *See United States v. American Telephone & Telegraph Co.,* 498 F.Supp. 353, 356–58 (D.D.C.1980). Later, the court extended this ruling to include situations where a superior officer ratified or knowingly acquiesced in an ADO's admission. Order of March 28, 1984.

**29.** Two witnesses were heard in the Sheppard case at the close of February 17, 1986.

**30.** Sheppard testified on April 8, 1985, that "he did ... not recall that he sought relief ..." for the MPA. Amazingly, during this same testimony, after a luncheon recess, Sheppard changed his story again, stating that MPA 33–80 was abandoned because he wanted to concentrate on his other claims and it "wasn't the only one he could have prevailed ..." upon.

**31.** The court would later find in favor of Harris on defendant's limited motion for sanctions against her.

**32.** As for claims alleged to have been abandoned by Blue, *see* Findings and Conclusions *infra* at §§ VI and VII.

gations without any evidentiary support. This method of recklessly making charges [ ] distracted defendant from refining their defenses on the real causes of action that plaintiffs intended to pursue. .

Plaintiffs contended that they dropped these claims pursuant to the court's desire to speed up the litigation.

Such an excuse cannot be credited when closely scrutinized. Either plaintiffs believed these claims were meritorious to begin with, in which case it is difficult to believe that they would spontaneously drop them now solely to shorten trial time or they were deliberately inserted with the intent to mislead the defendant. . . .

It is inconceivable that the plaintiffs maintained a good faith belief that they had been discriminated against in these claims but dropped them merely to shorten the proceedings. . . .

Obviously what occurred in reality was that these were dubious claims to begin with and that they were dropped when the court required plaintiffs to further specify the facts in each and every case. . . . [Thus], the most baseless of these claims were quickly abandoned.

Defendant's Memorandum of April 17, 1984, at 2–6. Unfortunately, as this opinion will later find, the court is forced to agree with much of what defendant wrote in April of 1984.

Defendant's motion for sanctions was taken under advisement and a briefing schedule established. Shortly thereafter (April 25), trial of the Blue claims was recessed until August due to the press of other litigation and certain unavoidable and exigent personal matters.[33]

On May 7, 1984, plaintiffs Jeanne Hendon, James Fleming and Beulah Mae Harris moved for voluntary dismissal of all their claims, pursuant to Fed.R.Civ.Proc. 41(a)(2).[34] Plaintiffs contended that, although their claims were meritorious, various legitimate reasons now necessitated their withdrawal from the lawsuit. Hendon asserted time, expense and health reasons. Fleming argued that he was financially unable to pursue the litigation any further and, in any event, his most important claims had been dismissed by the court in its December 8, 1983, Order.[35] Harris alleged that she was harassed and retaliated against due to her participation in this lawsuit and that she would pursue her continuing claims in this regard in another forum. *See* Findings and Conclusions *infra* at §§ VI and VII.

Defendant responded to plaintiff's motion, arguing that plaintiffs' claims were frivolous and pursued in bad faith. Although defendant did not oppose dismissal of the claims, defendant moved for sanctions and an award of fees and costs. On June 6, 1984, the court granted plaintiffs' motion with prejudice, *but* expressly conditioned the dismissal by reserving its right to render a decision on defendant's motion for sanctions and enter judgment against plaintiffs at that time.[36]

---

**33.** Prior to recess, Blue's case-in-chief was completed. Upon the conclusion of plaintiff's evidence, defendant moved to dismiss one of Blue's claims—an allegation of disparate impact—and that motion was granted by order filed May 16, 1984. *See* Findings and Conclusions supporting this decision *infra* at pp. 145–58 and 195–208.

**34.** In the Final Pre–Trial Order, these three plaintiffs requested relief on a total of eleven (11) claims—nine (9) by Harris.

**35.** Fleming's financial burden assertion was and remains wholly incredible given the minimal financial obligation placed upon the individual plaintiffs in this action. The court would subsequently hear testimony on defendant's motion for fees and costs against Fleming and, although

this claim was settled by reason of the July, 1985, Agreement, the court notes that it would have found Fleming's reasons for withdrawal to be a total sham.

For the reasons aptly stated in defendant's Final Argument on the Sanctions Hearing Concerning James Fleming, the court, without doubt, would have imposed the sanctions requested in this case.

**36.** Federal Rule of Civil Procedure 41(a)(2) provides that where dismissal is requested after the filing of an answer and is not requested by joint stipulation, the action "shall not be dismissed at the plaintiff's instance save upon order of the court *and upon such terms and conditions as the court deems proper.*" (emphasis added). Invoking the emphasized language, the court reserved

Motions similar to that filed by Hendon, Fleming and Harris were subsequently filed by Violet Henderson and Leonetta Bibby on July 26, 1984, Alicia Chisholm on July 30, 1984, and Carlton Giles, King Cameron, Viola McLean, Manuel Early, Jessie Williams, Nancy Alexander, and Joyce Malone on September 14, 1984. Reasons for the proposed dismissals varied with each plaintiff: some personal, some financial, some ambiguous. It would serve no useful purpose to recite them all here. Defendant filed a similar response in each case and the court issued orders identical to that filed on June 6, 1984. Sanctions hearings were eventually held in 1985 with regard to these motions to dismiss, and all of these disputes, except with respect to Blue and Beulah Mae Harris, eventually settled in July of 1985.[37]

Deeply concerned about the four month delay in proceeding with the trial of Blue's claims, the court, in an effort to effectively utilize at least a portion of this time, referred all of the collateral settlement issues which remained open after the court's December, 1983, order to United States Magistrate Wallace Dixon for hearing as a master pursuant to Fed.R.Civ.P. 53(b) and 42 U.S.C. § 2000e–5(f)(5).[38] A three day evidentiary hearing was subsequently held by the Magistrate in Fayetteville on the claims of plaintiffs Robert Evans and Mitchell McKeller.[39] On August 1, 1984, the Magistrate issued his report concluding that neither plaintiff was barred from asserting any claim for relief as the disputed claims were never legally resolved by means of the administrative complaint process. After objections were filed by the defendant,

the court indicated orally that with some modification in the Magistrate's findings of fact, the court adopted the report's extensive conclusions of law *in toto*.[40]

One other incident of significance needs to be mentioned prior to a return to the trial of Blue's claims in August of 1984. James Canady, a witness for the plaintiffs, filed an informal EEO complaint alleging that defense counsel retaliated against him because of his testimony in this case and intimidated him during a public speech at an Army EEO seminar in May of 1984. Defense counsel emphatically denied the charge and requested an immediate evidentiary hearing, which the court held on June 8, 1984, in Raleigh. As a result of this hearing, the court found that defense counsel's comments at the seminar, concerning the history of this litigation and plaintiffs' view of the effect of AAP's, were not intended nor could they reasonably be perceived as direct or indirect threats or attempts to intimidate Canady. Indeed, Canady stated at the hearing that he did not feel intimidated with regard to any future testimony. Accordingly, the court found no misconduct on counsel's part and no threat to the integrity of the litigation. *See* Order of July 27, 1984.

On August 27, 1984, the trial resumed in Wilmington. As befits this case, testimony was soon thereafter interrupted by Hurricane Diana, which hit Wilmington in early September of 1984 not once, but twice. Thankfully, all participants to the litigation survived the lady's double onslaught and testimony in Blue's case was completed on

ruling on defendant's motion until the end of the litigation and, accordingly, judgment was not entered under Rule 54(b).

37. Again, although findings and conclusions are not required due to the settlement, the court notes that some of the reasons given for withdrawal were credible, *e.g.,* case of Leonetta Bibby, while others were patently incredible or frivolous on their face, *e.g.,* cases of Manuel Early and King Cameron.

38. 42 U.S.C. § 2000e–5(f)(5) provides that whenever a judge cannot schedule a case (or claim) for trial within 120 days after issue has been joined, a master may be appointed by the court

to conduct evidentiary hearings and prepare findings and conclusions in any employment discrimination case under Title VII. *See Cooper v. Williamson Board of Education,* 587 F.Supp. 1082 (M.D.Tenn.1983); *Frye v. Pioneer Logging Machinery, Inc.,* 555 F.Supp. 730, 734 (D.S.C. 1983); *EEOC v. Local Union No. 3,* 416 F.Supp. 728, 736 (N.D.Calif.1975).

39. All other disputed settlement issues were resolved by the parties after the court's reference order was filed.

40. A written order to this effect was never filed as an initial settlement of these issues in March of 1985 rendered said order moot.

September 4, 1984.[41] I note that one good thing did come of Diana's visit(s) to Wilmington and that was the break in trial which allowed the court to re-assess the status of the litigation, then in its ninth week. As furious acts of nature have a way of doing, hurricanes can make a person realize his own mortality. Deciding that it was quite possible I didn't have enough time remaining in my lifetime to complete this case at the pace then in progress, the court, pursuant to Fed.R. Evid. 611(a), established time limitations for all of the remaining claims, beginning with the next plaintiff, Geraldine Ballew. Each party was allowed a total block of hours for direct and re-direct examination of their witnesses as well as cross and re-cross examination of the opposing party's witnesses.[42] In Ballew's case, each side was allotted twenty-three (23) hours and neither party reached their limit.[43] Evidence in the Ballew case was completed on September 14, 1984; testimony on the claims of Robert Evans began on September 17, 1984, and ran through September 21, 1984. Again, due to pending criminal litigation which has priority, trial recessed and was not resumed until February 25, 1985. In the interim, the parties filed proposed findings and conclusions with respect to completed claims, pre-trial materials for upcoming cases, and cross-motions for sanctions on a series of discovery disputes. From the events that occurred in early March of 1985, it is also apparent that counsel engaged in extensive settlement negotiations over this break, as the court had long been urging.

Trial again resumed on February 25, 1985, and quickly thereafter both the claims of Robert Evans and Mitchell McKeller were completed. As the court was preparing to hear the next series of claims, those of plaintiff Edward Humphrey, counsel informed the court that a partial settlement of this action had been reached.[44] Although the terms of the agreement took a few days to iron out, an "Agreement" was signed and filed on March 4, 1985. The terms of the accord were as follows:

(1) The defendant agreed to continue to implement its AAP and FEORP in good faith, attempting to achieve the goals and time-tables specified therein. Plaintiffs conceded, however, that both plans were based on an undifferentiated labor market

---

**41.** Findings and conclusions with respect to this case are the subject of Part III of this opinion.

**42.** For opinions establishing similar limitations, see *United States v. Reaves,* 636 F.Supp. 1575 (E.D.Ky.1986); *SCM Corp. v. Xerox Corp.,* 77 F.R.D. 10 (D.Conn.1977); *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 85 F.R.D. 28 (N.D.Ill.1979), *aff'd as to this issue,* 708 F.2d 1081, 1172 (7th Cir.1983), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Juneau Square Corp. v. First Wisconsin Bank,* 475 F.Supp. 451 (E.D.Wis.1979). *See also* Westmoreland v. CBS, cited in Leval, *From the Bench,* Litigation 7 (1985). As Judge Bertelsman stated in *Reaves, supra:*

> ... a court has the power and duty to manage its docket and the individual cases before it to 'secure fairness in administration, [and] elimination of unjustifiable expense and delay.' Fed.R.Evid. 102. Modern courts recognize that the court's time is "a public commodity which should not be squandered." D. Louisell and C. Mueller, 2 *Federal Evidence* § 128 (1985). There is an unnamed party in every lawsuit—the public. Public resources are squandered if judicial proceedings are allowed to proliferate beyond reasonable bounds....

> There is a tendency [by counsel] to want to present the evidence not once, but many times over, and to adduce needlessly cumulative evidence not only on the controverted issues but also on those which are all but uncontested. Advocates tend to confuse quantity of evidence with probative quality. Nothing lulls an attorney to the passage of time like the sound of his or her own voice. Few attorneys can tell you what time it is without describing how the clock was made....

> [The court's docket does] not belong to the attorneys or litigants, nor even to the courts themselves, but to the public.

636 F.Supp. at 1578–79.

**43.** The court notes that the order worked well in practice and the time limitations established in the remaining plaintiffs' claims (Evans and McKeller) were likewise generous enough that neither side feared overrun.

**44.** Numerous previous attempts at settlement or partial settlement, including several within the preceding few days, had failed for a variety of reasons, so this notice came as something of a surprise to the court—albeit a pleasant surprise.

and, thus, if the goals of the plans were not met as scheduled, plaintiffs agreed not to bring a proceeding against the defendant alleging that defendant's failure violated the agreement;

(2) All of the plaintiffs with cases remaining to be decided, except Mattiebelle Harris, Sheppard, Blue, Ballew and Evans, agreed to dismiss their claims with prejudice, as well as any pending EEO or other administrative charge or grievance which formed the predicate of the claims at bar or which were raised subsequent to June 30, 1983. In return, defendant agreed to pay the sum of $75,000.00 to the plaintiffs as a group, with certain discovery expenses incurred by the defendant set-off from that figure;

(3) Those claims heard by the court—Harris, Sheppard, Blue, Ballew and Evans—were to be adjudicated by the court, with both parties waiving any right to appeal said ruling. In addition, plaintiffs agreed not to pursue any claim for class relief or seek reconsideration of the denial of class certification;

(4) All pending motions for sanctions, filed by either party, were to be decided by the court with both sides reserving the right to appeal any decision rendered thereto; and

(5) Defendant agreed to waive any claims to costs, expenses or fees in the Ballew case. Plaintiffs agreed to the same in all cases, except those of Harris, Sheppard, Blue and Evans.

Upon filing of the "Agreement," trial was recessed until March 11, 1985, to allow the parties to prepare for the sanctions hearings to follow. The sanctions hearings were divided and sub-divided in the following manner. First, the court entertained testimony and argument with respect to a series of cross-motions regarding alleged discovery and procedural abuses not direct-

ly linked to any individual claim. Second, defendant's motion for sanctions, fees and costs with respect to each of the individual plaintiffs was heard in a bifurcated setting, with evidence as to "liability" in each case coming initially and evidence as to "damages," i.e., requested fees and costs, being heard last.[45] In addition, at the liability stage of the proceeding, the court specifically directed that two questions be addressed: (1) whether the claim(s) at issue were frivolous, meritless or vexatious under *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) and 28 U.S.C. § 1927; and (2) whether any claims for relief designated as such in the final pre-trial order were abandoned after the start of trial and, if so, whether the abandonment occurred for a legitimate and good-faith reason. *See* Order of May 29, 1985. Defendant's request for costs, expenses and fees against the individual plaintiffs exceeded $220,000.00.

After expeditiously resolving most of the discovery disputes between the parties, evidence on the defendant's motions against the individual plaintiffs began on March 11, 1985. Trial on the liability aspect of the defendant's motions took place on March 11–15, March 26–29, and April 8–10, 1985.[46] Upon completion of the evidence, court was recessed to allow briefing by the parties, a decision by the court on the liability issues, and preparation for any required hearing on damages.

During April, May and early June, the parties filed extensive proposed findings of fact and conclusions of law. Upon review of those materials, the court's trial notes, and significant portions of the record, the court informed counsel that it would find in favor of plaintiffs Mattiebelle Harris and Leonetta Bibby and, therefore, testimony as to damages in those cases was rendered moot. As for the remaining plaintiffs, the

**45.** Defendants moved for sanctions against the following plaintiffs: Mattiebelle Harris, Bibby, Hendon, Fleming, Giles, Cameron, McLean, Early, Williams, Malone, Beulah Mae Harris, Alexander, Henderson, Chisolm, Sheppard and Blue.

**46.** In addition, the remainder of the evidence as to liability on the claims of Beulah Mae Harris was completed at the final session of court commencing July 8, 1985. This delay was necessitated due to a change in counsel for Harris and a further conflict over discovery of some of her financial records.

court indicated to counsel that it was seriously considering imposing at least partial sanctions on a number of claims against those individuals and, potentially, against counsel. Accordingly, defendant was ordered to file a fee and cost application with the court by claim, indicating a breakdown of the reasonable hours expended by counsel and their litigation staff, as well as counsel's hourly rate requested. Order of June 6, 1985, *citing Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319 (D.C.Cir.1982); and *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980) (*en banc*).[47] Plaintiffs were ordered to present any evidence contesting the reasonableness of the hours claimed or rate requested at the July 8 session of court. *See* Order of July 5, 1985. Plaintiffs were also ordered to present any evidence at that time indicating a financial inability to pay the requested amount. *Id.*

Prior to the start of the July 8 hearings, one of the plaintiffs, Alicia Chisholm, who had retained independent counsel, reached an agreement with the defendant resolving defendant's motion for sanctions against her. This agreement was approved by the court on July 3, 1985.

Hearings on the issue of damages were held for eight (8) days, commencing July 10, 1985. During this process, the parties were simultaneously conducting late night negotiations aimed at resolving the entire dispute. These negotiations reached fruition on July 31, 1985, with the filing of the "Final Agreement," previously mentioned in this opinion, disposing of all substantive claims, save those of Sandra Blue, and all sanctions motions, save those of Blue and Beulah Mae Harris.[48]

Specifically, the Agreement dismissed with prejudice all individual and class claims of race discrimination and retaliation against the defendant, except Blue's, which arose from plaintiffs' employment at Ft. Bragg up to June 30, 1983, "known or unknown," "matured or unmatured," that were raised or could have been raised in this lawsuit under Title VII. Further, all EEO and administrative charges and grievances forming the basis of any claim at bar or raised between June 30, 1983, and March 4, 1985, were dismissed. All motions for sanctions, fees, and costs were dismissed, except those against Blue and Harris. This Agreement superceded the March 4, 1985, settlement and constituted a "full and complete resolution of all matters alleged in this litigation," except for the claims heretofore mentioned. *See also* Orders of August 6 and 7, 1985. By order of August 6, 1985, the court interpreted the Agreement as a stipulation of dismissal with prejudice under Fed.R.Civ.P. 41(a)(1)(ii), thus, rendering the document immediately effective and obviating the need for judicial approval. *McCall–Bey v. Franzen,* 777 F.2d 1178, 1184–85 (7th Cir.1985); *American Cyanamid Co. v. McGhee,* 317 F.2d 295, 297 (5th Cir.1963); Wright and Miller, *Federal Practice & Procedure:* Civil § 2363 (1971).

Following filing of the "Final Agreement," both sides submitted numerous briefs, affidavits and materials on the remaining claims and motions at issue. Evidence was deemed closed as of August 23, 1985, and final pleadings were filed by November 5, 1985.

Accordingly, the court will now consider *seriatim* the substantive claims of plaintiff Sandra Blue and defendant's motion for sanctions against plaintiffs Blue and Beulah Mae Harris. The credible evidence adduced at trial in this case supports the following.

## III. FINDINGS OF FACT AS TO DEFENDANT'S PERSONNEL POLI-

---

**47.** Defendant complied with this order in a timely fashion filing an extensive fee application contained in two notebooks, supported by dozens of affidavits and exhibits.

**48.** The record will reveal that both Blue and Harris had ample opportunities to settle their claims as well, but through their own actions and omissions, failed to do so. *See, e.g.,* Transcript of July 31, 1985 at 29–31.

CIES AND METHODOLOGY OF PROMOTION [49]

Both sides introduced extensive evidence as to the organization and promotion processes utilized at Ft. Bragg. Because knowledge of the institutional structure and the merit promotion system is vital to an informed evaluation of plaintiffs' claims and defendant's motion for sanctions, the court includes the following findings.

A. *Ft. Bragg's Civilian Personnel System* [50]

1. The Ft. Bragg Civilian Personnel Office (CPO) has authority and direction over employment practices at the installation subject to regulations and directives from the Office of Personnel Management (OPM) and Department of Defense (DOD). CPO is under the supervision of the Civilian Personnel Officer, a position held since January 27, 1980, by Jerry W. Horne, a white male. Horne, as well as a number of members of his staff, testified at length during various claims in this trial. Horne appeared to the court to be a dedicated professional and a competent manager, surrounded by an excellent, hard-working staff. The court was impressed by the CPO staff's careful explanations of the personnel and promotion processes at Ft. Bragg and their sincere demeanor. Accordingly, the court credits the testimony of Jerry Horne and his staff with the following findings predicated, in large part, upon their testimony. *E.g.*, Testimony of Ronald Woodard, Kathryn Hamilton, Jean Byrd, Laura Howard, and John Parham. [51]

2. CPO's authority includes:

(a) the administration of all legal, regulatory and procedural controls, established within the federal personnel system, effecting apportionment, assignment and separation of civilian employees at the installation;

(b) the assignment of positions to appropriate grades;

(c) approval of training requests for civilian employees in non-governmental facilities;

(d) serving as the principal contact point for conducting business with the civilian labor union on base; and

(e) providing personnel management advice and assistance to senior staff and line managers in areas such as: (1) management-employee relations; (2) leave administration; (3) employee discipline; (4) the merit promotion selection process; and (5) administration of negotiated labor contracts.

3. CPO consists of a Technical Services Office and four functional divisions: Recruitment and Placement, Management-Employee relations, Position Management and Classification, and Training and Development.

4. The Technical Services Office analyzes directives by the command structure and outside federal agencies; provides expert assistance in the implementation of regulatory requirements affecting civilian personnel administration; coordinates internal audits of personnel actions and civilian personnel records; processes personnel actions; develops systems for data collection; and maintains official personnel folders (OPF's) for all civilian employees. [52]

5. The Recruitment and Placement Division analyzes civilian personnel staffing requirements and determines sources of potential employees to meet staffing needs; administers all in-service placement; provides assistance to managers in meeting staffing needs; and advises employees regarding opportunities for advancement, development and relocation.

6. The Management-Employee Relations Division assists management in its day-to-day relations with employees and the employee labor union. The Division is

---

**49.** To the extent that any finding of fact is more appropriately deemed a conclusion of law, it shall be so considered and *vice versa.*

**50.** Abbreviations used throughout the court's findings of fact and conclusions of law include:
"PX___" means Plaintiffs' Exhibit ___.
"DX___" means Defendant's Exhibit ___.

**51.** All of these witnesses are white.

**52.** An OPF (or 201 file) is the standard folder maintained in CPO that includes an employee's official performance and employment records. *See, e.g.,* DX201.

responsible for dealing with adverse personnel actions, developing policies on grievances and appeals by employees, enhancing employee-management communications, and advising managers and supervisors on their responsibilities for counselling and evaluating employees.

7. The Position Management and Classification Division advises management on the establishment and maintenance of Ft. Bragg's position structure. The Division classifies and evaluates all civilian positions and determines the structure's effectiveness in light of the installation's changing physical, manpower, and fiscal needs.

8. The Training and Development Division provides technical advice and assistance to all levels of management concerning the determination of training needs, sources of training, presentation of training programs, and evaluation of results.

9. In addition, CPO, in accordance with DOD and OPM regulations, conducts a continuing recruitment program for minorities and women designed to eliminate their "under-representation" in various categories of employment in the civilian work force at the installation. It is clear from the record that Ft. Bragg has long made a significant commitment in the area of equal employment opportunity. In addition to having a formalized AAP and FEORP, Ft. Bragg has developed a number of credible and seemingly effective individual programs to assist minorities.

(a) The *Worker Trainee Program* is used to employ individuals at levels lower than trainee levels. In this program, individuals are usually recruited from outside the normal recruiting process. It is specifically designed to assist those individuals with no skills and enhances affirmative action goals by providing increased opportunities for the employment of underrepresented groups;

(b) The *Career Intern Program* allocates positions to train individuals in certain career fields, particularly career management occupations, which tend to lead to higher level positions within the Department of the Army. The entry level of these positions is usually GS–5 with a target level of GS–9;

(c) The *Student Employment Program* is a series of programs designed to meet affirmative action goals by acquainting temporary employees with permanent employment opportunities; [53] and

(d) The *Upward Mobility Program* is an integral part of Ft. Bragg's AAP and provides accelerated developmental opportunities to lower level employees. Since one of the major impediments to promotions is that the experiences gained in low grade positions fail to meet the entrance requirements for positions with career potential, the Upward Mobility Program provides for selection criteria in a number of designated vacancies, to be expressed in terms of employee interest in a career field, likelihood of success in an intensive training setting, and sufficient potential to learn the duties of the target job.

10. Defendant's FEORP, (PX13) consists of external and internal recruiting and staffing strategies designed to accomplish affirmative action goals. A key element of the FEORP is the assessment of "under-representation" which serves to trigger targeted recruiting efforts. "Underrepresentation" is defined as the disparity between the participation rate of a racial group by sex in the appropriate civilian labor force and its participation in the agency work force. *See* EEOC Management Directive (MD) 707. For the relevant multi-year FEORP, generalized civilian labor force (CLF) statistics were used to compute underrepresentation.[54] As EEOC MD 707 states, "under law, FEORP determinations of underrepresentation are based

---

53. Programs within this category, at one time or another, include the Federal Junior Fellowship Program, the Cooperative Education Program, the Stay–In–School Program, and the Summer Aid Program.

54. During the course of this litigation, this process was undergoing change as EEOC MD 707 further required the defendant to *begin* to collect and maintain applicant data flow for *future use* in determining underrepresentation and setting affirmative action goals.

on *undifferentiated* CLF data." (emphasis added).[55]

Thus, "underrepresentation" determinations in the FEORP (and AAP), based on CLF data, are made without regard to the availabilities of minorities and women in the labor force identified as having (or potentially having) the skills needed to perform in various occupations and grade levels. In other words, the FEORP simply compares black representation in virtually all job groups to the percentage of the black population in the North Carolina workforce. Accordingly, for many jobs that require skills held statistically less often by blacks, there will appear to be FEORP underrepresentation, when, in fact, the utilization of blacks at Ft. Bragg may be at parity, or above, compared to the qualified (and relevant) labor markets. Given this use of statistics, no valid conclusion of underrepresentation for Title VII purposes can be made simply by referring to either the AAP or the FEORP.[56]

### B. *The Merit Promotion Process at Ft. Bragg* [57]

11. There are essentially two types of promotion at Ft. Bragg: competitive and non-competitive. Promotions at Ft. Bragg are generally awarded in accordance with the base Merit Promotion Plan; however, there are instances in which positions must be filled by other non-competitive methods. The following placement actions are *excluded* from the competitive merit promotion procedures by OPM and DOD directives and are considered mandatory in that when a vacancy arises for which a registrant in any of the programs listed below is qualified and available, that registrant must be offered the position:

(a) placement actions required in connection with a RIF;

(b) placement of individuals having statutory, regulatory, or administrative reemployment or restoration rights, or to whom a like employment obligation exists (*e.g.*, employees returning from overseas assignment);

(c) placement of Priority 1, 2 and 3 employees registered in the DOD Stopper List (*e.g.*, DOD employees separated, or about to be separated or downgraded through no fault of their own);

(d) placement of an individual directed by an appropriate outside authority, provided the placement does not violate law or existing regulation (*e.g.*, placement ordered by OPM, EEOC, or the courts);

(e) promotion to positions upgraded without significant changes in duties and responsibilities on the basis of either a new classification standard or the correction of a classification error.

12. In addition, the following "special consideration" placement actions are likewise exceptions to competitive procedures. Unlike the placement actions listed above, placement in the following categories is *not* mandatory; however, consideration of employees in the following categories precedes all efforts to fill the vacancy by competitive means:

(a) repromotion of an employee to grade(s) or position(s) from which the employee was demoted without personal cause; [58]

---

**55.** The determinations of underrepresentation in the time relevant AAP's are likewise based on *undifferentiated* CLF data in accordance with Forces Command (FORSCOM) guidance at the time of each plan's development. *See* PX12(c)–12(h)(2); DX157–161.

**56.** In this regard, the court notes that defendant's essentially unrefuted pre-trial, class certification statistical presentation established that there had been a steady increase in black representation at Ft. Bragg between 1975 and 1982, despite the fact that during the same period of time, the size of the overall Ft. Bragg workforce decreased. In addition, defendant's evidence proved that blacks were generally promoted at a rate higher than their representation, for the

period 1979–81, in spite of the fact that white applicants had higher average tenure than black applicants and the black average grade was lower than the white's at the time of application. *Harris v. Marsh*, 100 F.R.D. at 323.

**57.** The court's discussion will generally be limited to General Schedule (GS) rather than Wage Grade (WG) positions because no evidence at trial was adduced on the WG promotion system.

**58.** If a selecting official considers an employee under this provision but decides not to select him/her for promotion, specific reasons for denying the promotion must be stated by the official. This decision must then be reviewed by

(b) priority consideration of any employee after failure to receive proper consideration; [59]

(c) former employees on Reemployment Priority Lists (*e.g.*, former employees separated in a RIF);

(d) medical reassignment eligibles.

13. The decision to utilize a non-competitive method for promotion is made by the supervisor or manager requesting the position and the CPO. This choice of method used to fill the position is *not* excessively subjective, rather it is based on specific, detailed and mandatory federal personnel and DOD directives. No evidence was adduced to support the plaintiffs' position that the decision to use one method over another was "often made with the purpose and intent of discriminating against black employees." Final Pre–Trial Order at 11.

14. The present merit promotion procedures became effective in June of 1982 and are set forth in Ft. Bragg's Recruitment and Placement Plan. Prior to that time, the procedures were slightly different and were set forth in the Civilian Personnel Policy and Procedures Manual, Chapter III—Merit Promotion and Internal Placement Plan. The following discussion focuses first on the merit promotion process prior to 1982, since most of Blue's and Harris' claims of discrimination fall within that time frame. The June, 1982, changes will then be briefly examined in order to complete the overview of the Ft. Bragg promotion process.

15. To initiate a competitive promotion, a supervisor or manager requests that a vacant position be filled by forwarding to CPO a general position description on a Standard Form (SF)–52. The SF–52 is then routed through the appropriate manpower and budget office for a determination that the position is authorized and funded. Subsequently, the request is sent to CPO's Position Management and Classification Division, where a classification specialist reviews the initial job description to ensure that it accurately describes the job, that job is properly classified under OPM regulations, and that it is assigned the proper federal personnel grade. As a final preliminary step, the request goes to the Recruitment and Placement Division of CPO, where it is assigned to a staffing specialist servicing the organization from which the request originated. Assuming that all noncompetitive mandatory and non-mandatory priority placements have been cleared, the merit promotion process begins.

16. There are three (3) principal tasks involved in the merit promotion process: job analysis and preparation of a job announcement, evaluation of applications, and selection.

17. A CPO staffing specialist writes a vacancy announcement by first referring to the position description and setting forth the "minimum qualification standards" for that position as established by OPM Handbooks X–118 and X–118–C. Minimum OPM qualification standards are used to determine basic eligibility for a position. Every candidate who meets or exceeds the minimum requirements is deemed "eligible" for the position; any candidate who does not meet these standards is deemed ineligible for further consideration. In some instances, a particular job or job environment necessitates an additional basic or minimum qualification requirement that must be met if minimum satisfactory performance is to result, *e.g.*, fluency in a foreign language or willingness to travel. These additional basic requirements are called "selective placement factors."

18. The next step for the staffing specialist involves discussions with subject matter experts (generally the manager or supervisor requesting the position) in order to develop a series of "High Qualifying Criteria" (HQC) for the position. Prior to 1982, OPM regulations required that evalu-

the chief of the activity where the vacancy exists and approved by the CPO before any further action may be taken to fill the vacancy.

**59.** If an employee fails to receive proper consideration in a promotion action and the erroneous promotion is allowed to stand, the employee must be considered for the next appropriate vacancy to be filled through the merit promotion process.

ation methods be designed to identify "highly qualified" and "best qualified" eligibles. The Merit Promotion and Internal Placement Plan of the Civilian Personnel Policy and Procedures Manual defined "highly qualified" candidates as "those eligible candidates whose experience, training and potential substantially exceed the qualification standards for the position ... to a degree that indicates they are likely to perform in a superior manner." Thus, the HQC for a position amounted to the four or five principal and specific requirements for the position. Prior to the release of any job announcement, all HQC were independently reviewed by CPO to determine that they were job-related.

19. Upon the development of all of the above information, the job opening is posted in a document entitled "Merit Promotion Vacancy Announcement," which is distributed in all areas open to consideration, e.g., post-wide, DOD-wide, etc. Information contained in Merit Promotion Vacancy announcements includes, *inter alia*, the job title, location, announcement number (MPA #), area of consideration, closing date for applications, job description, minimum standards of eligibility, including all general and specialized experience required, HQC, and the methods of evaluation that will be utilized to review all applications. *See, e.g.,* DX205 and 210. Again, contrary to plaintiffs' pre-trial argument, no evidence was introduced establishing even one incident of discriminatory failure to post a vacancy announcement.

20. Generally, prior to June of 1982, a person applied for a vacancy by filling out a one-page, pre-printed form with blocks for basic information such as name, social security number and MPA number. *See, e.g.,* DX305 at 15 and 19. In addition, although it remains unclear to the court whether this was required, most applicants attached a qualifications statement (SF–171) to their application or, where appropri-

ate, updated their existing SF–171 in their OPF.

21. After consideration for the vacancy closes, all applications are reviewed by the assigned CPO staffing specialist to determine whether the applicant meets the minimum eligibility requirements for the position. As previously stated, all those applicants who are determined to be qualified are designated as "eligible." There is no limit on the number of applicants who may be so designated. If an applicant is deemed "not qualified" or "ineligible," s/he is so informed. *Id.* at 10–11.

22. The personnel staffing specialist's job of determining an applicant's basic eligibility is not merely mechanical. The determination involves judgment and discretion as to whether the applicant's qualifications are comparable or equal to the basic qualifications. The matching-up of what is an applicant's SF–171 with the general X–118 and 118–C requirements obviously involves the exercise of some professional judgment. Nonetheless, this process is similar to that used at most federal agencies and the court finds no evidence that staffing specialists abused their discretion in performing this responsibility nor has there been any credible showing of discriminatory evaluation by CPO in this regard.

23. All applicants determined to be eligible by the staffing specialist are referred to a rating and ranking panel which, prior to June of 1982, rated applicants as Qualified, Highly Qualified and Best Qualified, ranked the applicants and determined which applicants to refer to the selecting official.[60] These panels are made up of subject-matter experts in the functional area of the job vacancy. Panel members are required to have personal knowledge of the job requirements, and must be employed at a grade level equal to or higher than the job being filled. Assisting the rating and ranking panel in performing its job is a CPO staffing specialist.[61]

**60.** Candidates for positions in grades GS–4 and below and Wage Grade (WG)–7 and below are not referred to a rating and ranking panel. These candidates are rated, ranked, and referred to selecting officials by a staffing specialist.

**61.** In addition, a union representative was allowed to sit in on panel discussions as an observer.

24. Prior to June of 1982, the rating and ranking panel basically performed three (3) tasks. First, the panel reviewed each applicant's OPF to determine whether the applicant met the HQC. If an applicant failed to meet any HQC, that information was noted on the panel's rating sheet and no further consideration was given to that applicant.[62]

25. All applicants meeting the HQC and, thus, determined to be "highly qualified," were then rated and ranked by the panel in the following manner. Applicants were ranked based on evidence in their OPF of:

(a) experience

(b) supervisory appraisals

(c) education and training; and

(d) awards.

However, these factors were not all equally weighted. Weights were assigned to each criterion, points given to each candidate for each criterion, and results combined to determine a final numerical rating for each applicant.

The weighting process was predicated on a crediting plan developed for each vacancy by the CPO staffing specialist, in conjunction with subject matter experts, prior to the time the panel convened. The crediting plan is the yardstick the panel used in order to determine the points that would be given to each candidate for each criterion. For example, three levels of quality were usually identified for each item of specialized experience and points were assigned under the "experience" factor based on the number of years experience that was required and the quality level the applicant was determined by the panel to possess. Additional points in that category would then be added for each year of experience above the minimum that the applicant possessed.[63]

26. Once each "highly qualified" candidate received a rating, the scores were then placed in numerical order, ranking the applicants high to low. However, not every candidate on this list was subsequently referred to the selecting official. Two rules in effect until 1982 specifically limited the number of referees.

First, 1975 OPM regulations (FPM 335.3–7) allowed only for the referral of three (3) to five (5) "best qualified" candidates and up to a maximum of ten (10) if meaningful distinctions between the candidates' scores could not be made. In addition, consistent with OPM guidelines, the negotiated Contract Agreement between management and labor at Ft. Bragg, in effect from August, 1974, to May, 1978, limited the "best qualified" list to five (5) candidates for a single vacancy and allowed the addition of only one (1) name to the best qualified list for each additional vacancy. PX33(b) at 31. When the labor contract was re-negotiated in 1978, the new 1978–1982 Agreement eliminated the Rule of Five and replaced it with a Rule of Ten—only the top ten (10) candidates could be referred for any single vacancy.[64] PX33(b) at 39.

The second rule limiting the number of referees also stemmed from the 1978 Contract Agreement, which mandated that the "best qualified" list include only those candidates who received 85% of the score of the top qualified candidate. *Id.* Plaintiffs contend that both the Rule of Ten and the 85% Rule were applied in a discriminatory manner and effected an adverse impact on black applicants. Evidence on this issue was taken in the cases of both Blue and Ballew and the court's findings and conclusions appear *infra.*

27. Once the ranking was completed, the CPO staffing specialist prepared a form entitled "Referral and Selection Register" (DA Form 2600) listing the names of

---

**62.** *E.g.*, the panel sheet would show the applicant was "qualified," but "lacked HQC # 3" and, therefore, was deemed not "highly qualified." *See, e.g.*, DX205 at 10 and 11.

**63.** Plaintiffs contend that the rating and ranking process allowed the panel unguided discretion in determining whether an applicant met the HQC and in assessing points for the applicant's experience, training, etc. The Court disagrees and its additional findings and conclusions are set forth *infra* in Sections IV and V.

**64.** Obviously, the provisions in the labor contracts did not apply to those positions excluded from the union's bargaining unit.

those found "best qualified" alphabetically. Neither the scores given to the candidates nor their race were placed on the DA Form 2600, which was then given to the selecting official.[65] See, e.g., DX205 at 103.

28. Upon receipt of the Referral and Selection Register, the selecting official may select any of the persons listed on the Register. From 1974 to 1978, the selecting official was required to interview all referred candidates, if available, unless a statement of personal knowledge of qualifications of each referred candidate was submitted by the selecting official. The 1978 Contract Agreement required the selecting official interview all referred candidates, if available, but eliminated the personal knowledge statement previously allowed. PX33(b) at 39.

29. Prior to 1982, the selecting official received guidance from CPO in interviewing techniques, if requested, and was always strongly encouraged to (1) review the OPF's of the referees, (2) conduct a structured interview of the referees and (3) consider affirmative action objectives. The 1978 Contract Agreement required that the selecting official state his or her reasons for selection on the DA Form 2600 which was returned to CPO post-selection. Id. Thus, after completion by the selecting official, all Selection Registers included the name of the selectee, the merit factors considered by the selecting official in making his/her selection, the reasons for the selection, whether each candidate was interviewed, and the date of selection. See, e.g., DX205 at 103. Plaintiffs contend that the selecting official was vested with too much discretion under the pre–1982 system and that the standards for selection were vague and excessively subjective. See Final Pre–Trial Order at 16. The court's findings on this issue are set forth later in this opinion.

30. As a result of the adoption of the 1982 Recruitment and Placement Plan and re-negotiation of the Labor Contract Agreement, the following changes occurred in the merit promotion process at Ft. Bragg:

(a) The "highly qualified" category of eligibility was eliminated. In preparing the Vacancy Announcement, instead of developing HQC, the staffing specialist now identifies the four or five major functions to be performed on the job and, further, identifies the "knowledge, skills, and abilities" (KSA's) required to perform those functions. The post–1982 Vacancy Announcements thus contain the OPM minimum eligibility requirements, in terms of general and specialized experience, and a list of the KSA's necessary for the job. See, e.g., DX230 at 6.

(b) In applying for the merit promotion vacancy, all applicants must fill out a basic application form together with supplemental experience sheets on which the applicant must demonstrate how s/he possesses the KSA's for the job. Id. at 17–25.

(c) Basic eligibility is still determined by the staffing specialist, but the rating and ranking panel now determines the "best qualified" candidates by use of a crediting plan developed for each vacancy which evaluates the candidate's possession of the required KSA's and other characteristics, as evidenced by the rating elements, e.g., training, awards, etc. This rating process scores each applicant on a matrix, assigning to each KSA a point value between one (1) and four (4), representing the degree to which the KSA is possessed. Id. at 26.

(d) The "best qualified" applicants' names are then placed on the DA Form 2600 in alphabetical order, as before, without scores or any race identifier. Furthermore, the 1982 Plan eliminated the 85% Rule and placed no limit on the minimum or maximum number of candidates referred to a selecting official. The number referred is determined by the rating panel and staffing specialist who consider the scores of the candidates and the breakpoints or gaps between the scores.

---

**65.** All of the panel's work is kept in the Merit Promotion File accumulated for each vacancy at CPO. This file includes, inter alia, a copy of the vacancy announcement, a list of all applicants who applied for the vacancy, copies of the results of their application as tabulated and compiled by the panel (including the panel's worksheets for each applicant) and the DA Form 2600.

(e) Accompanying the DA Form 2600 when given to the selecting official is a Disposition Form from CPO which clearly indicates, *inter alia,* that for the selection, the selecting official should (1) review the OPF's of all referees, (2) conduct a structured interview for each referee, (3) articulate the specific reasons for his selection, and (4) consider all affirmative action obligations. The selecting official then makes his/her selection from among the "best qualified" list based on the requirements of the position, impression of the applicants during interview, and other job-related factors, including "underrepresentation" considerations as expressed in the AAP and FEORP.

Plaintiffs contend that even after the 1982 changes, defendant's merit promotion plan remained "vague, subjective and susceptible of discriminatory manipulation" in virtually every phase of the process. Final Pre–Trial Order at 16–18. Because all of Blue's substantive claims and most of Harris' claims arise under the pre-June, 1982 process, the court need not and will not make any findings in this regard, except as are narrowly required to deal with defendant's motion for sanctions against Blue and Harris for their post-June, 1982, claims.

31. Training, awards, and supervisory appraisals play a part in the merit promotion process as previously described, whether as a factor in the auditing plan utilized by a rating panel to determine the "best qualified" candidates or, post-June, 1982, as part of the determination of the level of each KSA reached by the applicant. However, the court notes that training, awards and supervisory appraisals play a minor role in the promotion process compared to job related experience and do not come into play at all until the applicant has met the minimum OPM eligibility requirements.

32. As for training, defendant's policy is to provide all training required, within physical and fiscal constraints, to assure maximum efficiency of civilian employees in the performance of their officially assigned duties and to encourage employees in their efforts for self-improvement.

Training requests are initiated by supervisors and forwarded to CPO, which conducts a review of the employee's eligibility for training. Evidence at trial indicated the denial of training opportunities to certain plaintiffs, *e.g.,* Mattiebelle Harris, but said denials were invariably grounded upon legitimate fiscal or regulatory reasons. No credible evidence was adduced by plaintiffs creating even an inference of discrimination in their respective denial of training claims.

33. There are two types of incentive awards at Ft. Bragg—honorary and cash awards. The Awards Program provides a means of demonstrating the high value the supervisor places on superior performance, exceptional achievement, and constructive ideas. Honorary awards include DOD, Department of the Army and Presidential awards. Cash awards include Sustained Superior Performance Awards (SSPA's) and Quality Step Increases (QSI's). The SSPA is awarded to GS and WG employees for individual performance for a period of at least twelve (12) months given in recognition of high-level performance significantly above that ordinarily found by employees in that position. QSI's are recognition for GS employees whose performance is of such a high quality above that ordinarily found in the type position concerned that special salary recognition is warranted. An employee may receive only one (1) cash award within any given thirty-six (36) month period. The award process is initiated by the employee's supervisor. The court received no credible evidence supporting plaintiffs' pre-trial contention that supervisors engaged in "racially motivated denials of awards." Final Pre-Trial Order at 18.

34. Like incentive awards, there are two types of appraisals given to civilian employees at Ft. Bragg: (1) annual performance appraisals and (2) supervisory appraisals of current performance. The annual performance appraisal is what it purports to be—an annual evaluation of performance, written by the employee's first-line supervisor, and reviewed by the second-line supervisor, that becomes a permanent part of the employee's OPF. Prior to

1982, only three (3) ratings were possible. Outstanding, Satisfactory and Unsatisfactory. *See, e.g.,* DX201 at 141. The new system, General Performance Appraisal System (GPAS), contains five (5) possible ratings: Exceptional, Highly Successful, Fully Successful, Marginal and Unsatisfactory. Each rating is tied to accomplishment of job standards and performance in a number of job elements. *Id.* at 122–25.

A supervisory appraisal of current performance is a rating rendered in connection with an employee's promotion application and is placed in an employee's OPF for one year. The form consists of two (2) parts. Part I is a listing of twenty (20) "attributes," *e.g.,* "takes initiative," "works well under pressure," etc. A grade of A, B, C, D or E ("A" being the highest) is then assigned for the employee's performance of each attribute or, if the attribute is not required in the job, an "N" is assigned. Part II of the form is a statement of overall performance. Six (6) options are available to the supervisor; *e.g.,* "[h]as little of what it takes to do an acceptable job" (lowest) and "[t]he very highest level of performance" (highest). *Id.* at 135–37.

With rare exception, the court received little credible evidence indicating discriminatory use of either appraisal method. Evaluations, in the court's estimate, tended to be accurate and well supported by the employee's work record. In some instances, the employee received a very high overall· rating but complained that the rating was discriminatory because it did not give her a perfect or maximum score. *E.g.,* claim of Mattiebelle Harris. The court can say with great confidence that none of the plaintiffs appearing before it were deserving of a "perfect" employee performance score. As for Blue's substantive allegation in this regard, findings of fact are set forth, *infra,* at pp. 128–33.

35. Plaintiffs also contend that Ft. Bragg's disciplinary system "puts black employees at the mercy of their individual supervisors and invites discriminatory application." Final Pre-Trial Order at 20. Disciplinary action is divided into two (2) categories: formal and informal. Informal discipline includes oral reprimands, the most common of the disciplinary actions taken by supervisors at Ft. Bragg, which may be undocumented or documented by a supervisor's "Memorandum for Record" (MFR), *see, e.g.,* DX267, or an entry on the employee's "Employee Records Card" (SF–7B or "Seven Card"). *See, e.g.,* DX237. The main purpose of informal discipline is to make certain the employee understands what is required of him or her in an attempt to immediately correct the problem before it worsens, thus, precluding the need for more drastic action at a later time.

Formal disciplinary action consists of written reprimands, *see, e.g.,* DX237, suspensions and removals. A schedule of punishments for certain offenses is outlined in the federal personnel manual.

Disciplinary actions have no effect on an employee's promotion prospects at any stage of the process shy of the selecting official's review of the applicant's OPF. The rating and ranking panel does not consider discipline nor does CPO in screening for minimum eligibility requirements. However, a selecting official clearly has the right to consider any disciplinary action recorded in an applicant's OPF. Notwithstanding that fact, not a single incident of discriminatory discipline was proved at trial by credible evidence. Indeed, in a number of cases, disciplinary actions taken against particular plaintiffs were extremely lenient and fully justified on their face by the employee's conduct. *See, e.g.,* claims of Sandra Blue, findings, *infra,* at § IV.

36. As for defendant's RIF policies and procedures, the court incorporates by reference its description of the process set forth in *Harris v. Marsh,* 100 F.R.D. at 319. After hearing considerable testimony in this aspect of Ft. Bragg's personnel policies during the claims of Mattiebelle Harris, the court finds its pre-trial statement of defendant's methodology remains correct. No substantive claim regarding a discriminatory RIF remains at issue and no evidence was adduced at trial indicating that RIF's were systematically effected, in practice, in a discriminatory manner. Notwithstanding that general statement, the court

notes that Mattiebelle Harris' individual RIF claim was a close issue and one in which the plaintiff clearly presented a *prima facie* case of discriminatory application.

37. With rare exception, the court finds that plaintiffs were not limited intentionally nor affected adversely in their employment opportunities at Ft. Bragg on the basis of race.

## IV. FINDINGS OF FACT FOR PLAINTIFF SANDRA BLUE'S CLAIMS OF DISCRIMINATION

The court received evidence in connection with the claims of Sandra Blue on April 19-25 and August 27–September 4, 1984.[66] Based on the credible evidence adduced at trial, the pleadings, briefs and arguments of counsel, the court makes the following findings of fact:

*Plaintiff's Complaints of Discrimination*

1. Sandra Blue is a black citizen of the United States and now a resident of the state of California. At the time this litigation was instituted, she was a resident of Cumberland County, North Carolina, employed at Ft. Bragg in a civilian capacity.

2. Blue filed an informal complaint of discrimination in December, 1979, an informal complaint of discrimination in April, 1980, and thereafter a formal complaint of discrimination in June, 1980, and July, 1982. Blue's complaints of discrimination related to an alleged discriminatory denial of promotion, discriminatory supervisory appraisal, and discriminatory discipline and harassment. PX6(a) and 6(b). Plaintiffs Harris and Sheppard filed their formal class charge of discrimination on May 15, 1980. PX1. Accordingly, this proceeding was instituted more than 180 days after plaintiff's various EEO charges were filed. Plaintiff has exhausted her administrative remedies under Title VII and has timely instituted this proceeding.

3. Plaintiffs' complaint initiating this action, filed September 1, 1981, simply says "Ms. Blue has been limited in employment and promotion opportunities by the defendants (sic) because of her race." Complaint at 2. The extensive and general violations of law alleged in the complaint to have been committed against all black civilian employees, including Blue, are set forth in this opinion *supra* at pp. 10–11 and need not be repeated here. It is reasonable to assume that the defendant prepared his defense to meet each of these allegations with respect to Blue.

4. According to the Final Pre–Trial Order, filed December 8, 1983, plaintiff specifically contends she was discriminatorily denied the following positions: Dental Assistant, MPA # 285–78; Dental Assistant, MPA # 273–79; Dental Assistant, MPA # 274–79; Dental Assistant, MPA # 277–79; Dental Assistant, MPA # 303–79; Dental Assistant, MPA # 440–80; and Dental Assistant, MPA # 67–83. In addition, plaintiff claims she was discriminatorily denied equal training and opportunities for details to job-positions which would enhance her ability to promote, discriminatorily disciplined, given discriminatory evaluations of her job performance, and harassed due to her efforts to enforce and exercise her rights under Title VII. Final Pre–Trial Order at 23–24. In sum, the Final Pre–Trial Order lists elev-

---

**66.** The following five (5) witnesses testified during plaintiff's case-in-chief and on rebuttal: plaintiff, Geraldine Ballew, Shirley Thomas, Ernest Carter and William Dickerson. The following twenty-three (23) witnesses testified during defendant's case-in-chief and on surrebuttal: SGT. Wayne Jones, Martha Soehren, SFC Debra Kurz, SGT. Otis Matlock, MJR. Fred Sykes, CPT. Monroe Grinsburg, Carolyn Cave, CPT. Richard Howell, Suzanne McPherson, Anita Hutchins, Carol Hutchinson, SGT. Linda Garner, COL. Stephen Soehren, Marilyn Roach, Dr. Joseph Harmon, Charles Hill, COL. Samuel Morgan, SSG Oscar Ramos–Rivera, Ann Randall, COL. Shel-

don Jacobsen, Dr. George Cohen, Joseph Vincent and Jerry Horne. Where appropriate the court will refer to specific testimony of these witnesses as "Test. of ____ at ____," meaning Testimony of witness ____ at page ____ of the transcript of plaintiff Blue's case. The transcript is contained in six sequential volumes (pp. 1–1840) and in a seventh independent volume, dated September 4, 1984 (pp. 1–149). Unless otherwise specified by the notation "Vol. VII," transcript references will be to pages in the six volume "set." Findings as to credibility of the witnesses will be included in the court's findings of fact, where necessary.

en (11) particularized claims for relief for Blue.

5. In plaintiff's Pre-Trial Brief, filed with the court on April 3, 1984, plaintiff listed only the following claims for relief:

1. whether Sandra Blue was discriminatorily denied promotion to the job position announced under Merit Promotion Announcement No. 273–79 because of her race and color.

2. whether Sandra Blue was discriminatorily denied the job position announced under Merit Promotion Announcement No. 303–79 because of her race and color, because of the defendant's discriminatory use of the "85% Rule" for referral of candidates for promotion which impacted adversely on minority candidates and was not validated, and in retaliation for Blue's efforts to challenge defendant's racially discriminatory employment practices. Brief at 3.

Aside from the obvious abandonment of a number of claims for relief set forth in the Final Pre–Trial Order, plaintiff's Pre–Trial Brief itself is inconsistent. On page 2 of the same brief, plaintiff states she "is seeking relief" for the additional claims of (1) denial of promotion under MPA 273–79 because of retaliation; (2) denial of promotion under MPA 273–79 because she was adversely affected by the 85% Rule; and (3) denial of promotion under MPA 303–79, in part, because of a discriminatory supervisory appraisal given to plaintiff in retaliation for her prior complaints of racial discrimination. *See also* Court's Discussion with Counsel at 244–251; plaintiffs' November 19, 1984, Proposed Findings of Fact and Conclusions of Law for Sandra Blue at 3–4.

6. From the pre-trial pleadings, trial, and post-trial briefs and argument, the court finds plaintiff's final claims for relief to be decided in this litigation are:

(a) whether plaintiff was given a discriminatory supervisory appraisal in December, 1979, because of her race (disparate treatment);

(b) whether plaintiff was discriminatorily denied promotion to the job position announced in MPA 273–79 because of her race (disparate treatment);

(c) whether plaintiff was discriminatorily denied promotion to the job position announced in MPA 303–79 because of her race (disparate treatment);

(d) whether plaintiff was discriminatorily denied promotion under MPA 303–79 because of the effect of the "85% Rule" (disparate impact);

(e) whether plaintiff was discriminatorily denied promotion under either MPA 273–79 or 303–79 in retaliation for plaintiff's efforts to challenge defendant's alleged discriminatory employment practices; and

(f) whether plaintiff was discriminatorily denied promotion under either MPA 273–79 or 303–79 because of the excessive subjectivity of the defendant's merit promotion process or a particular component of that process.

*Plaintiff's Employment History*

7. Plaintiff was employed by defendant from July 30, 1973, through July, 1983. Upon application in July of 1973, Blue received a temporary appointment as a Nursing Assistant, GS–4, at Womack Army Hospital at Ft. Bragg. She was later converted to career status on September 23, 1973.

8. Blue became dissatisfied with the evening hours of her nursing positon at Ft. Bragg and sought to move into the dental field because it offered more regular hours. In July of 1975, plaintiff applied for and was selected as a Dental Assistant, GS–3. Blue had no prior experience or training in the dental field and, thus, accepted the demotion in grade in order to learn the skills of a new career field.[67]

---

**67.** At the time Blue entered the dental field, all Dental Assistants were either GS–3 or GS–4. The entry level position, GS–3, afforded employment opportunity to individuals who had *no* prior training or experience in the field. GS–5 positions were not created until late 1978. With the creation of these positions, GS–4 then became the entry level. Thus, individuals with no prior dental training or experience could no longer enter the field. A few Dental Therapy Assistant (DTA), GS–6, positions existed, but they required professional certification. Mili-

9. On September 19, 1976, Blue was promoted to Dental Assistant, GS–4, under MPA 129–76. From May of 1976 through the end of her employment with the defendant in 1983, plaintiff rotated through the various departments at Dental Clinic # 6 (DC–6) at Ft. Bragg. Blue terminated her service with Ft. Bragg as a Dental Assistant, GS–4, Step 7, having remained in her current grade since her initial promotion in 1976.[68]

10. At the time of Blue's promotion to GS–4 in 1976, there were fifty-two (52) dental assistants at Dental Activities (DENTAC). Sixteen (16), or 31%, were black. The breakdown was as follows: 0 white and 1 black GS–5, 22 white and 11 black GS–4's, and 14 white and 3 black GS–3's. When Blue terminated her employment in 1983, 29% of all dental technicians and assistants in DENTAC were black, with the following breakdown: 37 whites and 18 black GS–4's, 13 white and 3 black GS–5's, and 18 white and 8 black GS–6's.[69]

11. Prior to plaintiff's employment with the defendant, Blue worked as an obstetrics (OB) technician at a private hospital (St. Luke's) in Newberg, New York, after having undergone a one year program of combined work and study. Blue's testimony that she served three (3) years as an OB technician, from 1966 to 1969, (Test. of Blue at 345) was in direct contradiction to a previous qualifications statement she had entered in her OPF, on which she listed only two (2) years experience as an OB Technician. *See* DX201 at 84. Further, there is some considerable doubt about the type of schooling Blue received in New York, whether the program was accredited,

the exact positions plaintiff held at the hospital (*see, id.*, where Blue states she served as a "Nurse's Assistant" and at 104, "Nurse's Aide") and the experience she gained. Blue's testimony in this regard is, at best, inconclusive.

12. Blue also worked as a laundry worker, WG–2, at West Point Academy from July 6, 1970, through June 14, 1973, and concurrent with her employment at the Academy, as a part-time bar-maid from March, 1971, to September, 1971. Academically, plaintiff has completed the eleventh grade of high school. Incident to her federal employment, Blue has taken a number of training and correspondence courses.

13. At all times during her employment at Ft. Bragg, Blue received "satisfactory" annual performance appraisals until the rating system was changed.[70] In 1982, under the new system, she received a "fully successful" rating.[71] In addition, plaintiff received four (4) official[72] and one (1) unofficial letters of appreciation and commendation for her services between 1976 and early 1979 while employed at DC–6.

### Background Evidence and Claims Not Designated for Relief

14. The organizational structure of the dental clinics in DENTAC, and particularly DC–6, is generally undisputed. The Non–Commissioned Officer–In–Charge (NCOIC) of the clinic was plaintiff's "technical" supervisor; *i.e.*, s/he would give assignments, approve leave, maintain time cards, propose discipline, render performance evaluations, etc. In carrying out these duties, the NCOIC routinely consulted with the dentists for whom the dental assistants

---

tary personnel have been phased into these positions since early 1975.

**68.** Since Blue was not a certified DTA, it was impossible for her to be promoted further in the dental field until the GS–5 positions were created in October of 1978. *See* fn. 67, *supra.*

**69.** The court notes these figures take on even greater significance in light of the fact that blacks occupy only 6.73% of the dental assistant positions in the relevant labor market. (*See* 1980 U.S. Census, EEO/Special File).

**70.** Employees were rated either "outstanding," "satisfactory," or "unsatisfactory."

**71.** Employees are now rated "exceptional," "highly successful," "fully successful," "marginal," or "unsatisfactory."

**72.** Plaintiff's OPF contains a fifth official letter of commendation from a COL. Crase, Director of Dental Clinic # 1, dated May 14, 1976, but it refers to the same achievement evidenced by another letter of commendation written the same day by plaintiff's direct supervisor, CPT. Marvin Taragin.

and staff actually worked.[73] The clinic Officer–In–Charge (OIC) was responsible for the overall operation of the clinic and was the second-line supervisor of the civilian dental assistants and staff.[74] The OIC set the policies for the clinic and the NCOIC's job was to ensure the OIC's directives were carried out. The OIC was also the first-line supervisor of the dentists. The clinic OIC reported to the DENTAC Commander.[75] The commander was in charge of all Dental Activities and, as such, was the third-line supervisor of all civilian employees at each clinic. Generally, the DENTAC Commander, in consultation with appropriate subordinates, made the promotion selections within DENTAC. Finally, with respect to the relationship between the dental assistants and the dentists, contrary to the plaintiff's testimony, it is clear that the assistants worked *for* the dentists, not *with* them as equal participants, providing care for each patient. If a dentist gave an order to an assistant, it was expected to be carried out; unfortunately, plaintiff was very selective in her application of this principle.

15. Blue claims that numerous NCOIC's, OIC's and dentists were involved in a "conspiracy" against her during much of her employment at DC–6. She attempted to adduce evidence to support this allegation and stated that such evidence was offered for background purposes to demonstrate the discriminatory animus of a number of her superiors. Included within this conspiracy and named as alleged discriminatory officials (ADO's) were SGT. Wayne Jones (black), SGT. Tuanquin, COL. Paquette, MJR. Sykes (black), SGT. Matlock (black), LTC. Cressler,[76] Joseph Vincent, CPT. Richard Howell, Dr. Joseph Harmon, Jean Byrd of CPO and "DENTAC Management." *See, e.g.*, Test. of Blue at 87, 102,

104, 118, and 138–40. In addition, where testimony of witnesses conflicted with Blue's, she simply claimed these witnesses were lying, either to support the conspiracy or for other discriminatory or personal reasons. Included within this category were, *inter alia*, SGT. Jones, MJR. Sykes, SSG Ramos, CPT. Howell, Dr. Harmon and Anita Hutchins. *See, e.g.*, Test. of Blue at Vol. VII, pp. 84–89, 100–01.

Contrary to plaintiff's assertion, the court finds the record is void of any credible evidence supporting the existence of a conspiracy against the plaintiff. Far from being the best dental assistant in DC–6, as plaintiff claimed, nearly all of plaintiff's peers and supervisors painted a similar portrait of her, generally describing Blue as unprofessional, discourteous, confrontative, borderline insubordinate, average in her skills, and as an employee who had the ability to do a much better job if she had ever cared to do so. *See* Findings of Fact 30–48 *infra*. Detailed evidence to support each of these characterizations was presented at trial. *Id.* Blue was, as defense counsel stated in his opening argument, (Loewenberg at 603), a "problem child" that management constantly had to deal with in a careful, by-the-rules manner. Plaintiff may indeed have been discriminated against by her peers and superiors, but it was due to her own personality, her conduct, her attitude and her performance —not because she was black.

16. Blue claimed that she first encountered racial problems in 1978 with LTC Cressler (white) OIC, and his NCOIC, SGT Ramos (Hispanic). Specifically, she testified that Cressler once said, after hearing that plaintiff had complained to the labor union about an annual performance ap-

---

73. During plaintiff's employment at DC–6, plaintiff served under the following NCOIC's: SFC Varner, SSG Frank Williams, SSG Oscar Ramos, SSG Joseph Vincent, SSG Celso Tuanguin, SGT Wayne Jones, SGT James Queen, and SGT Otis Matlock. DX257B.

74. During plaintiff's employment at DC–6, plaintiff served under the following OIC's: MJR. Rossi, LTC John Cressler, COL. Omer Paguette, MJR. Fred Sykes, and COL. Steve Sochren.

75. During a majority of plaintiff's employment at DC–6, plaintiff served under the following DENTAC Commanders: COL. Allen Brown and COL. Samuel Morgan.

76. *See* findings *infra* at pp. 89–90, indicating plaintiff was inconsistent in her testimony regarding whether Cressler was an ADO.

praisal, that he "would crucify anyone that ever went to the Union or EEO."

In the only substantial finding of fact the court will make in favor of the plaintiff on a background claim or claim for relief, the court finds the above statement was uttered in part by Cressler.[77] The court finds Cressler stated he "would crucify anyone that ever went to the union." For this statement, Cressler should have been reprimanded and was not.

Notwithstanding that finding, however, the statement by Cressler clearly had no effect upon any action by the plaintiff, upon any promotion attempt by the plaintiff, and there is not a shred of evidence to suggest the statement was racially motivated.

Both Blue and her co-plaintiff and witness, Geraldine Ballew, admitted, when confronted with their own affidavits, that neither had previously alleged that Cressler had ever mentioned the "EEO" in his statement. *See* PX365(d) at 3–5.[78] This exaggeration by both witnesses at trial seriously undercuts their credibility with regard to the incident in general and certainly taints their conclusory statements to the effect that Cressler's comment was racially motivated.

Furthermore, Blue and Ballew immediately went to the Union office about the statement and their testimony at trial was that the matter was settled to their satisfaction. The fact that Blue and Ballew were not intimidated by the statement is evidenced by the fact that they immediately went to the Union to report the incident and, further, by the twelve (12) to fifteen (15) subsequent grievances and complaints

plaintiff admits having filed with the Union and the EEO office. The record is void of any evidence that Cressler later retaliated against Blue in any manner for her exercising her right to file grievances and complaints of discrimination.

17. Blue's only other allegation regarding Cressler concerned entries made on her "7 Card" following her refusal to sign her performance appraisal. But even plaintiff admitted at trial that this problem was resolved to her satisfaction after a grievance was filed. At most, these two incidents can be seen as evidence of a personality conflict between Cressler and Blue, but again, the court repeats, no evidence of discrimination can be found in the record. Indeed, Cressler was simply part of a lengthy list of peers and superiors, black and white, who suffered through personality problems with Blue. Cressler may not have handled either situation well, but that does not make him a racist or mandate a finding that his actions were racially motivated. There simply is no evidence in the record that Cressler treated Blue, Ballew or any other black employee differently on the basis of race. Ironically, Blue all but admitted this fact during cross-examination when she stated that she did not remember if Cressler had discriminated against her. Test. of Blue at 139.[79] Later plaintiff changed her testimony and stated that Cressler *may* have discriminated against her and, finally, after defense counsel referred the plaintiff to her pre-trial deposition, plaintiff stated that she wanted to amend her answer to state that Cressler did discriminate against her. *Id.* at 163 and 171–72.[80]

---

77. Cressler did not testify at trial.

78. The fact that Cressler limited his comment to the "Union" is made even more plausible by a review of the cirumstances under which it was uttered. Cressler apparently found out Blue had gone to the *union* to file a grievance over her appraisal—a frequent occurrence with both Blue and Ballew. The EEO office was not involved in this incident, so it would have been somewhat far afield for Cressler to have simply thrown the EEO into his statement.

79. Q: Did Dr. Cressler discriminate against you on the basis of race?

A: I don't remember.

80. Q: Ms. Blue, yesterday you recall we were going over a list of people that you allege had discriminated against you and you said that Dr. Cressler had not discriminated against you, do you remember that?

A: No, I don't remember if I said he did or didn't. I said I didn't think he did.

Q: You didn't think he did.

A: Uh-huh.

Q: Now, I would like to show you your deposition. Well, let me ask you, maybe you recollect without it. Did you ever accuse him of

18. Blue also complained about the treatment accorded her by SSG Ramos, an NCOIC at DC–6. Plaintiff claimed that on one occasion he used profanity with her and that as a result of the incident, he was required to attend an EEO class on human relations. Test. of Blue at Vol. VII, pp. 33–39.

Ramos' version of the incident was much different and the court finds Ramos to be an extremely credible witness. Ramos testified that he directed Blue to work with a dentist (Dr. Lamb) and that she refused. Test. of Ramos at 1355–57. He asked her two or three more times and she still refused. He admits that after her final refusal he was frustrated and while walking away from her uttered the words "damn it." [81] He testified that she began to dial the telephone and yelled something to him. He instructed her to make the call later and to get to work.

Ramos also atempted to discuss the incident with her later in the day and during the discussion she shouted that she "worked for the United States Government, not him." *Id.* at 1359–60. *See also* Test. of Kurz at 1098.[82] Ramos then proposed a letter of reprimand for Blue. *Id.*

Ramos emphatically denies that he was ever required to take a human relations course due to this incident. Test. of Ramos at 1375. The court finds this clearly to be the case. Even plaintiff later confessed that her earlier testimony might have been mistaken as she based that testimony primarily on (1) part of an overheard conversation between Ramos and Cressler and (2) her assumption that since she had demanded Ramos take the course in her initial grievance about the incident, he must have been required to take it. Test. of Blue at Vol. VII, pp. 77–84 and 103–04.[83]

saying or doing anything that involved race in an improper way?
A: Not that I can recall. If you can show me that—
Q: Did you ever tell me that he made a statement that involved race? Do you recall whether you ever told me that?
A: I probably did. I don't know the exact words.

\* \* \* \* \* \*

Q: Okay. Now going back to what we discussed about Major Cressler, I want to show you on page 30 of your deposition, when you talked about Major Cressler, did you make a statement in there that he made a statement to you that involved race?
(Document handed to witness)
Q: Does that refresh your recollection, Ms. Blue?
A: Oh, yes.
Q: So, do you want to amend your statement from yesterday that Major Cressler, I guess Lt. Col. Cressler didn't discriminate against you but that he did? Do you care to amend that?
A: Yes.
The inconsistencies marked in this and the plaintiff's earlier testimony regarding Cressler, on a *basic* issue—did the officer discriminate against you—epitimizes Blue's testimony throughout.

81. Plaintiff claims that the day in question was a snow day and that she was one of the few staff members at work at DC–6 on time. She states that she had previously asked Dr. Lamb if he needed assistance before she saw Ramos and that Lamb declined her offer. Thus, plaintiff claims Ramos was wrong in telling her to go assist Lamb.

Of course, the primary answer to Blue's claims is that even assuming everything she says is true, and assuming that the court agrees that it is, it simply was not Blue's place to disregard her NCOIC's command. Perhaps since Blue first saw Lamb, a situation had arisen where the dentist now needed assistance and had informed Ramos of that fact. Blue certainly didn't know if this had occurred when she defied Ramos' orders. Her job was to comply with her NCOIC's orders, not question them, when they dealt with an assignment to assist a dentist. And her subsequent conduct, *see* text, regardless of whether she was right or wrong about Lamb, was uncalled for. *See also* Test. of Ramos at 1364–65.

82. SFC Kurz was in a position to observe and hear this conversation between Blue and Ramos and her trial testimony fully corroborated that of Ramos. Blue's contrary version of her discussion with Ramos simply lacks credibility. This is particularly true, not just because of Kurz's testimony, but also due to the overwhelming amount of testimony, *infra*, concerning Blue's repeated refusals to perform certain tasks and follow particular directives.

83. Excerpts from this portion of the transcript highlight Blue's complete lack of credibility, not only on this issue, but during her testimony in general:
*Direct Examination at 37–39*
Q. Now you filed a union grievance on that?
A. Yes, I did.
Q. Which was resolved?
A. Yes, it was.

Q. Now what were the resolutions of the grievance? .... Now, was there any remedial action that required Sergeant Ramos to attend a supervisory course or human relations course or an EEO Course? .... As a result of this grievance?

A. As a result of this grievance, it was recommended that Sergeant Ramos attend this class and Martha Stanley typed a letter to that effect.

Q. Do you remember the name of the class?

A. Human Relations.

*Cross Examination at 76–84*

Q. Okay. Now, you stated that Sergeant Ramos was given, as a result of the grievance that you filed ... was required to take a course in Human Relations?

A. I am saying that was one of our resolutions, one of our remedies for resolution.

Q. What do you mean? You testified that that was one of the things that was a *result* of the settlement of the grievance? (emphasis added).

A. No, that was one of the resolutions we sought.

Q. Oh, wait a minute. I understood your testimony that as a result of the grievance, Sergeant Ramos was required to take a course in Human Relations. Now are you saying it was something you sought?

A. That was what I thought and then later on found out that this was what was going to be, that this was what he was going to do was take this course.

\* \* \* \* \* \*

Q. Well, let me show you Plaintiff's Exhibit 187E5 and ask you if, in fact, it says anything about Sergeant Ramos taking such a Human Relations course?

(Witness examines exhibit.)

A. This is not my grievance. This is just an answer to it.

Q. Ms. Blue, that is a decision on the Step Two grievance and that is how far that grievance went?

A. No, sir.

Q. Really? Okay, how much farther did it go?

A. As far as Sergeant Ramos being required and did take the Human Relations course.

Q. Now, do you have any documents that show that, at all?

A. I know of—I do not have any documents, no.

Q. You heard Sergeant Ramos testify that he did not take such a course, do you recall that?

A. No, I do not.

Q. On Cross-examination, you do not recall your counsel asking him that question?

A. No, I do not.

\* \* \* \* \* \*

Q. Is it not a fact, Ms. Blue, that the decision of Fort Bragg did not require Sergeant Ramos to take an EEO Human Relations course?

A. Recommended, I would say.

Q. Recommended? Well, who recommended it?

A. I guess his MER representative, I guess.

\* \* \* \* \* \*

Q. Where did he say that in writing?

A. He may have said it orally.

\* \* \* \* \* \*

Q. I see, so your testimony is that, on the basis of you [over]hearing Sergeant Ramos say [to Col. Cressler], "you mean I may have to take this Human Relations course again" that you believe he was ordered to take it? Was that the source of your information?

A. Well, Colonel Cressler told him, "yes."

Q. Say that again?

A. Colonel Cressler told him, "yes," when he asked him, he said, "yes."

Q. Okay, so in response to the question "you mean I may have to take that course again?" he said, "yes" and that is the basis of it? That is the basis of your testimony?

A. Well, being that was one of the remedies we had sought, yes.

Q. But do you understand that the word "may" does not mean it is going to happen? It is just a possibility but not a definite thing? Do you understand that?

A. You are saying "may"; I am saying it did happen.

Q. Do you mean you saw Sergeant Ramos take this course?

\* \* \* \* \* \*

Q. Now, let me show you something, Mrs. Blue, on Plaintiff's Exhibits 187E7 and 187E4. 187E7 although it is sort of numbered backwards, is the Step One Grievence and on Page Two, Remedial Action Sought, you seek that Sergeant Ramos take this course, do you see that?

(Plaintiff examines exhibit.)

A. Do I see what?

Q. Over here.

A. Oh yes, yes.

Q. Okay, now look and I am going to show you the Step Two Grievance, and look at the Remedial Action there, that you seek, and do you see that, in fact, your representative and/or you dropped the request?

A. No, I never dropped anything.

(Plaintiff examines exhibit.)

Q. Well, let me direct your attention to 187E4, and look at the Remedial Action sought, toward the bottom of that page, Ms. Blue?

(Plaintiff examines exhibit.)

A. I see this.

Q. Now, do you see that you do not ask for it anymore?

A. Because he agreed to it during the Step One Grievance.

Q. So, what you are saying is that Sergeant Ramos was not telling the truth when he said

19. Again, despite her complaints about Ramos, Blue admitted on cross-examination that Ramos did not discriminate against her on the basis of race.[84] Test. of Blue at 140. Thus, as with the background evidence offered against Cressler, the court finds no basis for inferring that the actions of Ramos were motivated by a racial animus.

20. As further background evidence, Blue testified about COL. Paquette and SGT. Vincent, who occupied the positions of OIC and NCOIC, respectively, during approximately the same period of time (1979–80). Testimony concerning these two officials is important since they were involved in the alleged discriminatory annual appraisal for which Blue seeks relief.

Blue claimed that Paquette (white) treated blacks differently than whites. She charged that he treated them like "nothing" and "looked down his nose at them." Test. of Blue at 29. In support of this allegation, plaintiff testified that she observed Paquette treat a black NCOIC, SGT. Wayne Jones, poorly and that Paquette refused to promote a black sergeant, Linda Garner, to NCOIC.

21. The two alleged victims of Paquette's discriminatory actions testified in this case. In stark contrast to Blue's version, both Jones and Garner stated that Paquette treated them no differently than he treated anyone else, although Garner admitted that she and Paquette had non-racially based differences of opinion. Furthermore, Garner said that she voluntarily chose to forego the NCOIC position at DC–6 to obtain more chair-side experience as a dental therapy assistant (DTA) and that the only reason she raised the question about becoming NCOIC at all was because Blue and Ballew pressured her into it. Test. of Garner at 1700–01 and 1711–12. The court finds both Garner and Jones were extremely credible witnesses, particularly Jones, who was on the witness stand for over two days and whose testimony was extraordinarily candid and honest under very difficult circumstances.

22. In addition, two other factors are salient with respect to plaintiff's claim that Paquette refused to promote Garner on the

he never attended such a course, on direct and cross examination?
A. Yes.
Q. Well . . .
A. I understood him to say he did take the course.
A. That he took an EEO Course or something relating to management and supervising.
Q. As a result of this Complaint?
A. No, I did not say it was as a result of that. I said he said that he took a course such as this.
Q. What is the relevance of your mentioning it when . . .
A. Because . . .
Q. I am not trying to confuse you Ms. Blue. I am trying to avoid confusion myself. What is the relevance of mentioning that he took such a course if it is not related to this?
A. No, I am saying that I understood his testimony, while he was here in Court, to say that he did take that course.
Q. Do you remember, though, that he did not take any course as a result of this Complaint, though, do you remember that?
A. I do not quite remember him saying "no". I think he said he took a course, but I do not know.
* * * * * *
Q. Ms. Blue, let me just understand your testimony about Sergeant Ramos and how you know he attended this course.

Do you know, for a fact, that Sergeant Ramos attended a EEO Human Relations Course as a result of your Complaint?
* * * * * *
A. Do I know this for a fact?
Q. Yes?
A. Did I see him at the class? No, I cannot testify to that. . . .
* * * * * *
*Cross Examination (continued) at 103.*
Q. Now, Ms. Blue, did you not say that you had seen Martha Stanley, contrary to what you just told me a few minutes ago, did you not say that Martha Stanley had typed a letter that required Sergeant Ramos to go?
A. No, sir.
Q. Oh, you did not say that this morning?
A. Martha Stanley was there at the typewriter. I do not know what she was writing.
Q. Let me ask you, do you deny that this morning you said that Martha Stanley typed a letter that told Sergeant Ramos to go to EEO Training?
A. I did not say that.
Q. You deny that?
A. I did not say that. I do not think I said that. I know I did not say that, because I do not know what she was typing. I did not see what she was typing. . . .

**84.** Q. Did Oscar Ramos discriminate against you?
A. Not that I can recall.

basis of race. First, a black (Jones) was placed in the position that Blue claims Paquette discriminatorily denied to Garner. Second, Garner had just completed DTA School and by regulation was required to spend two years at chairside.

Based on all of the above, the court finds that plaintiff's opinion with respect to Paquette is predicated on nothing more than pure conjecture. The court specifically credits the testimony of Garner and Jones and finds absolutely no evidence that Paquette treated DC-6 employees differently on the basis of race.

23. Blue related two incidents involving Vincent, the white NCOIC, that she contends demonstrated his discriminatory animus. The court notes that these events took place after the alleged discriminatory appraisal had been rendered by Vincent and Paquette in 1979.

The first incident occurred on April 3, 1980. Blue testified she had parked adjacent to the back entrance to DC-6 and Vincent told her to move her car. She admitted she told him she would only do so when a space became available. Blue claimed that within a few minutes Vincent presented her with a statement of counseling for her refusal to obey his order. She refused to sign the statement and Vincent allegedly recorded the matter on her "7 card."

Blue claimed Vincent's actions were discriminatory because a few days earlier Ann Randall, a white dental assistant, had parked in the same place, and though she refused to immediately move her car, no disciplinary action was taken against her. Blue testified further that she had not been previously told she could not park in the

spot, nor that the area was a fire lane or for supply vehicles only.

24. Plaintiff's testimony about the April 3, 1980, incident is in *severe* conflict with that of numerous witnesses. First, there is absolutely no doubt that Blue had been told on a number of *prior* occasions she was not to park in the fire lane or the area adjacent to the exit. *See, e.g.,* Test. of Vincent at 1472–74; Test. of Martha Soehren at 1071–72; Test. of Kurz at 1100; Test. of Roach at 1763; Test. of Jones at 661.[85] Yet, Blue consistently and directly disobeyed the continuing directives of her OIC's and NCOIC's in this regard (as did Ballew). Second, Randall flatly denied ever being directed to move her car because it was parked adjacent to an exit. Test. of Randall at 1408. Randall's testimony is corroborated by Vincent who stated that he had no recollection of ever requiring Randall to move her car.[86] If Randall parked her car by the exit, it occurred one time and she immediately moved it to a proper parking area without an order from Vincent. Test. of Vincent at 1492–93. The court finds Randall to be a credible witness.

25. What adds significantly to the credibility of Vincent and Randall with regard to the parking incident, is that despite the prior warnings and the April, 1980, counseling, Blue incredibly continued to defy command orders not to park in the fire lane area. If anything, her decisions to park illegally became more flagrant. Sergeant Jones stated that he had problems with Blue parking adjacent to the exit before Vincent became NCOIC and also after Vincent left the clinic. Jones notes that for as long as he was at DC-6, *all* employees had

---

**85.** In light of the overwhelming nature of this testimony, the court finds plaintiff's comment to the effect that she was *never* directed not to park her car in the fire lane utterly incredible. Test. of Blue at 146–152.

**86.** Although Vincent was not a completely credible witness in all respects (he suffered from some timely and selfserving lapses of memory), his testimony with regard to this incident, the one which follows in text *infra*, and the 1979 annual appraisal all ring true—particularly since each incident is corroborated by strong, unimpeached testimony of other witnesses or by

admissions of the plaintiff. The court also notes that despite its misgivings about some of Vincent's testimony, it does not find any evidence indicating the existence of racial animus on Vincent's part, either in his actions while at Ft. Bragg or through his trial testimony. Rather, the court chalks up Vincent's omissions as ones stemming from a continuation of his substantial personality conflict with Blue and a rather misguided decision not to say anything on cross-examination which might have assisted Blue in her case.

been *routinely* reminded not to park adjacent to that exit. *See, e.g.*, Test. of Jones at 659–664 ("[T]he only people that I had problems with parking there was Ms. Blue and Ms. Ballew."); Test. of Matlock at 1130–31; Test. of Hutchinson at 1675–76 (Blue stated at staff meetings "she would park where she wanted to park."); Test. of COL. Soehren at 1723–27.

26. In sum, a host of witnesses, including one OIC and three NCOIC's, established that warnings continued after the April, 1980, incident, yet Blue continued to park her car in blatant disregard of instructions. The evidence relating to the parking incident hardly established a racial animus on the part of Vincent. On the contrary, it indicates a contemptuous disregard for authority on the part of Blue.[87] From the evidence, it is clear that more severe disciplinary action than was ever taken against Blue (and Ballew) would have been warranted. Vincent, Jones, Matlock, Soehren and others showed excessive restraint in their handling of Blue's deliberate misconduct.

27. The other incident Blue related about Vincent occurred the day after the confrontation over parking. Blue claimed that she had been assisting in the treatment of a black patient and that the patient needed help in getting to her car after treatment. Blue testified she escorted the patient out of the building and that while she was answering the patient's questions Vincent called from an upstairs window for her to come inside. She admitted she ignored him and continued her conversation. Blue claimed when she did return inside Vincent counseled her about being absent from her duty station and made an entry about the incident on her "7–card."

In addition, Blue claimed Vincent had observed her similarly escort white patients to their cars and had never questioned or stopped her about those instances. Thus,

plaintiff felt Vincent had discriminated against her on the basis of race.

28. Vincent admitted he counselled Blue on this occasion, but denied that race had anything to do with it. He stated Blue was only counselled because she had left the next patient alone in the dental chair when she went outside,[88] and because she compounded the problem by ignoring his request to come back inside to her work site.

■ 29. The conflicting evidence concerning this incident reveals far less about any possible discriminatory animus on the part of Vincent than it does about the propensity of the plaintiff to ignore the rules of and authority at DC–6. The court finds it probable that the events of April 4, 1980, were simply a continuation of the confrontation between Blue and Vincent from the day before, with both parties acting out of anger and frustration. Vincent's decision to counsel Blue, whether the most appropriate response to the situation or not, certainly was not without some justification. It is not discrimination when a supervisor decides to act firmly, even if a more lenient response might have avoided further confrontation.

30. Blue next testified about her black OIC, MJR. Sykes, and one of the NCOIC's that served with him, SGT. Tuanquin. Blue stated that Sykes, like the black NCOIC Jones, is an "Uncle Tom" who harassed her solely because of her involvement in this litigation. Test. of Blue at 87 and 102. As an initial matter, while the court recognizes that persons of the same race may discriminate against each other, that did not occur in this case. Sykes, like Jones, was an extraordinarily credible witness. Indeed, these two witnesses received the highest credibility ratings on a rating scale kept by the court throughout the trial. The court seriously doubts that ei-

---

87. As MJR. Sykes testified:
Q. You heard testimony this morning regarding whether parking in a fire lane was a big deal. Was it a big deal?
A. The deal of the matter seemed to be whether an employee is going to do as she is directed or whether she is going to go her own way, and with Ms. Blue it's a matter of

doing what she wanted to do. It's a big deal when a supervisor says, you are not to park there, and the assistant continues to do so.... Test. of Sykes at 1193.

88. It was against DENTAC policy to leave a patient unattended in the dental chair.

ther man has ever acted in a discriminatory manner toward any employee, black or white, civilian or military.

Notwithstanding Blue's name-calling, the lack of evidence to support any allegation against either officer is total. The real problem lay not with Sykes and Jones, but with Blue in her attitude, her conduct, and her personality. Perhaps better than anyone who testified, Sykes summed up what it was like having to work with Blue at DC–6:

> A: [i]f she's told to do something by her doctor who was supervising her, she'd say, no, I won't do it; then the NCOIC would have to come and tell her, do it, or the doctor would come to me, as has been done on occasion, and say, why won't Ms. Blue come to work, she's supposed to be at the chair working with me and she's not;
>
> So I'd have to say, well, go back and tell her that she is supposed to be there working with you.
>
> So she just required constant guidance and she just taxes you, taxing to the spirit is what she is. You always had to prod her to do what she was told.
>
> Q. How does Ms. Blue take criticism?
> A. Not well. She is usually defensive about it, she just doesn't take criticism well. It's just a matter, whenever she is corrected the person who is correcting her is always wrong. It's one of those things, if you're black you're going to be an Uncle Tom; if you're white, you're going to be prejudiced. You can't win.

Test. of Sykes at 1191–92.

31. Blue claimed that shortly after Sykes arrived at DC–6, he called her into his office and questioned her about her involvement in this lawsuit. He allegedly told her that he was aware she was prohibited from discussing the details, but he wanted to inform her that she was wasting her time because "you can't fight the government." Sykes denies ever making this statement or questioning plaintiff about the case at bar. Reviewing the testimony, the demeanor, and the motive and bias of both witnesses, the court fully credits Sykes' testimony and finds plaintiff's version unworthy of belief.

32. Blue also contends Sykes discriminatorily disciplined her for disrupting a clinic meeting. Blue testified she wanted to make a phone call just before the start of a meeting and Sykes prevented her from doing so. When she persisted, believing Sykes had changed his mind and would now allow her to call, he haled her into his office to discuss the incident. Plaintiff also claimed other employees were allowed to make such phone calls and that she was singled out in this instance for unjustified discipline. Sykes subsequently presented Blue with a proposed letter of reprimand. PX188(g).

33. Blue's recollection of this incident was at sharp variance with that of Sykes and other employees who attended the meeting. Sykes testified that Blue attempted to use the phone *during* the meeting, that he stopped her, and requested she wait until the meeting was over. Blue responded that it was an important call and started to dial the telephone again. For the second time, Sykes asked Blue to wait, but she flatly ignored him and started to dial the phone a third time. At that point, Sykes interrupted her and directed her to go with him to his office because of the disruption the incident was causing at the meeting. After reviewing what had occurred, Sykes proposed the letter of reprimand. Test. of Sykes at 1189; PX188(g).

34. The substance of Sykes' testimony was corroborated by witnesses Hutchinson and Roach, both of whom attended the meeting and were co-workers of Blue. Test. of Hutchinson at 1668–69; Test. of Roach at 1783–84 and 1793. The court credits the testimony of Sykes, Hutchinson and Roach and finds the plaintiff's actions were not only disruptive and discourteous, but unprofessional as well.

Plaintiff alleges in a conclusory manner that Sykes took reprisals against her because of her participation in this litigation and that his proposed reprimand in this instance was an example of his actions against her. In fact, however, the evidence

showed exactly the opposite. Sykes proposed to reprimand her precisely because she deserved it. Plaintiff was insubordinate; she disobeyed her OIC's order, disrupted the meeting, and embarrased Sykes. Frankly, plaintiff's allegations against Sykes in this instance (at trial and in pretrial grievances) provide just another glaring example of the consistent pattern and practice plaintiff engaged in of harassing management officials while using race as a subterfuge. Plaintiff's claim against Sykes is nothing short of frivolous.

35. Sykes acknowledged that the DENTAC Commander (who had only been at Ft. Bragg a few weeks) chose not to finalize the reprimand. PX188(a). However, the fact that the reprimand was not finalized does not mean the events did not occur, or that there was not ample evidence to support the proposed discipline—there clearly was. Many factors may influence a decision to settle a dispute as was done here. Indeed, the testimony of COL. Jacobsen, the deputy DENTAC Commander, reveals that during his meeting with Blue, she did not dispute the facts related by Sykes; rather, she simply felt she should not be reprimanded. Test. of Jacobsen at 1415–16. Jacobsen stated that he supported the reprimand. *Id.* Colonel Brown, the new DENTAC commander eventually found that "although ... management's position was meritorious and procedurally sound ...," PX188(a), and that the proposed reprimand was warranted, enough time had already been consumed in dealing with the matter and the reprimand should not now be enforced.

36. Like so many of the incidents that Blue attributed to racial animus, the events involving Sykes reveal far more about Blue's personality, attitude and demeanor than they do about the ADO's racial animus. The court is convinced that Sykes was an honest and professional OIC, who was motivated solely by his responsibilities to keep order in the dental clinic and to provide competent care for all patients. What these incidents reveal is that *any* attempt to effectively supervise the plaintiff was deemed by her to be discrimination

and never an honest or reasonable attempt to provide direction and guidance.

37. One other major incident involving Sykes was discussed at some length, for background purposes, and the court finds plaintiff's testimony describing the incident to be such a perfect example of the frustrating, evasive and inconsistent nature of her testimony throughout the trial (as well as that of Ballew), that portions of the transcript are duplicated herein. Setting the scene, on December 17, 1982, Blue filed an EEO complaint (PX6(b)) alleging that Sykes had retaliated against her because of her continued participation in this litigation. Plaintiff's statement at the time was as follows:

A. On or about 1 May 1981 a Formal Class Action Complaint of discrimination was filed with the District Court in Fayetteville, N.C., alleging a continuing pattern of race discrimination by past and present officials and other agents of the Department of Army and Fort Bragg. Such complaint is in pre-litigation stages.

B. On or about 1 May 1981 I joined the Class as an agent representative of the claims of the Class.

C. On or about 12 May 1982 a newspaper article was posted in my work location, Dental Clinic # 6, *such article, at enclosure 1 hereto, clearly states my involvement as* agent of the Class.

D. On the date the article was posted the Clinic Officer in charge, Major F. Sykes, became visibly upset, called a group meeting of Clinic employees and made statements to the group concerning *persons, (visitors) coming to the clinic in retaliation to the Complaint....* no one was to talk to them but rather they (visitors), should be referred to his, (Sykes') office....

\*　　\*　　\*　　\*　　\*　　\*

F. Following my joining the Class I was, on 25 July 1982, the subject of a proposed disciplinary action. Such discipline, initiated by Major Sykes was rescinded through a Union grievance. Such proposed discipline was a reprisal against me as stated above.

PX6(b) at 2 (emphasis in original). This complaint was signed by Blue on the date it was filed.

38. Plaintiff's testimony at trial (on cross-examination) concerning her complaint follows, in pertinent part, and the credibility level of the evidence is self-apparent:

(Document handed to the witness)

"Q. I believe that is a complaint that you filed on December 17, 1982, is that correct?

"A. Yes. I didn't file it, that was the day I—

"Q. —Signed it.

"A. No. that was the day I complained over an incident. I had a complaint after that.

"Q. Now, you allege in your complaint that on or about, Your Honor, I'm looking at not an exhibit, a complaint that she filed, a newspaper article was posted at my work location, Dental Clinic No. 6, an enclosure here, that clearly states my involvement as agent of the class. Do you recall that?

"A. (No response).

"Q. And then you said that Major Sykes, on the date the article was posted the clinic officer in charge, Major Sykes became visibly upset. And it's your testimony that Major Sykes became upset because you were part of this class action, right?

"A. I don't think he was upset with me, he was upset that there was a class action suit going on at Fort Bragg. I'm not saying he was upset with me personally.

"Q. Well, let me ask you, when you say in the complaint, became visibly upset, what did you think that Major Sykes was upset about?

"A. That there was such a lawsuit going on at Fort Bragg and that possibly someone would be coming around asking questions.

"Q. But you did allege that Major Sykes discriminated against you, didn't you?

"A. Right.

"Q. Now, then you allege that Major Sykes disciplined you as a result of your involvement in the class action, don't you, Ms. Blue?

"A. I don't remember if that's part of that one or not. I'd have to read it.

(Counsel confer)

"Q. I want to show you a copy of your complaint, this is her very own complaint, Your Honor.

"MR. CHAMBERS: We have an exhibit 6–B, Your Honor, that I think is the same as the charge; you're not showing her the whole file, are you?

"MR. LOEWENBERG: No, I'm just showing her that charge.

(Document handed to the witness)

"Q. You notice, Ms. Blue, looking at page 2 of Plaintiff's 6–B, do you see the page, facts bearing on my complaint are as follows?

"A. Yes.

"Q. And if you look at E and F; do you see that?

"A. Yes.

"Q. And then you notice, look at F, it says, filing my complaint on July 25, 1982, I was the subject of discipline. Do you see that?

"A. Right.

"Q. Now, I take it that it's your testimony, your opinion that Dr. Sykes waited almost a year; by the way, Your Honor, the copy that she has and the copy of 6–B are not quite the same. I can approach the bench and show you. I think they made corrections.

"THE COURT: Plaintiff's Exhibit 6–B?

"MR. LOEWENBERG: Yes. Maybe I can ask a couple of questions, Your Honor, to clarify the matter.

"THE COURT: All right.

"Q. Ms. Blue, if you look on that second page, on A, B and C, your copy has some penciled or handwritten item?

"A. Yes.

"Q. And let me show you the Plaintiff's 6–B where those marks are not made, do you see that?

"A. Yes.

"Q. Now, tell me, which is the correct version, which is correct, do you know?

"A. I don't know.

"MR. CHAMBERS: Do you mean which date is correct?

"MR. LOEWENBERG: You see, on the handwritten copy, it says, on or about 14 September '81 the newspaper article was posted; in the copy that has no corrections it says, on or about May 12, 1982.

"MR. CHAMBERS: May 1st.

"Q. Which is correct, Ms. Blue?

"A. Which what is correct? I have '81 on both. I don't have a '82.

"Q. Plaintiff's 6–B.

"A. This says '81 on both.

"Q. On C? Look at the letter C.

"A. That says '82.

"Q. Look at the copy that is handwritten, it says 14 September '81.

"A. I didn't write it here.

"Q. Is the copy 6–B correct?

"A. I'd have to look at my notes. I don't know.

"Q. You don't have any idea when that newspaper article appeared, do you?

"A. Not without looking at my notes.

"Q. Which notes would you like to look at?

"A. The ones pertaining to '81 and '82.

"Q. Go ahead and look at them.

"A. You have them, don't you?

(Documents handed to the witness)

"MR. LOEWENBERG: I will assist you just a little bit; I believe the lawsuit was filed in September of '81.

"A. It's '81 then.

"Q. Well, I'm asking you. If you'd like to agree with me, that would be fine. Why don't you look at your notes and see if you can find it.

"A. I don't believe the '82 date is the correct one.

"Q. You don't believe the handwritten copy is correct?

"A. I don't know if that's the correct one. I know the '82 date is wrong.

"Q. Is wrong?

"A. Uh-huh.

"Q. Now, which note did you look at, by the way, when you were looking at them?

"A. I wasn't looking at anything, I was just thinking in my head.

"Q. You said you wanted to look at your notes. Now, I wonder if you could tell me which notes would assist you in finding the date?

"A. I don't have any notes for '81.

"Q. Although you said you had to look at your notes to help you decide?

"A. Well, like I said, I didn't know which years I didn't write and which years I did and which months I wrote. No, I don't know everything that's in my notebook to my memory."

\* \* \* \* \* \*

"Q. So you wanted to look at your notes to see if that would refresh you?

"A. Yes.

"Q. September '81 was the right date, wasn't it?

"A. I don't know if that was the right date.

"Q. You know the other one is wrong, don't you?

"A. (No response)

"Q. You know the '82 date you see is wrong, don't you, Ms. Blue?

"A. I don't know that for a fact, no.

"Q. You don't know that for a fact?

"A. No.

"Q. Moving along to E and F, I take it your testimony is that this article was posted in September '81 or thereabout and that Dr. Sykes waited from September '81 to July 25th then to impose discipline as a reprisal, impose discipline on you as a reprisal?

"A. Excuse me. Dr. Sykes was not working in our clinic when that notice was posted on the bulletin board.

"Q. He was not working in your clinic?

"A. No. That's some kind of an error.

"Q. Ms. Blue, look at D then. It says, on the date the article was posted the clinic officer in charge, Major F. Sykes, became visibly upset.

"Now, you say he wasn't even there?

"A. Right, he wasn't there when it was posted, no.

"Q. Well, I'm a little confused. Why did you write that he became upset?

"A. Well, see, I didn't write this. I gave information to my representative and then I was out of town, then I moved out of the state, and what I know of it is that the article was posted before Major Sykes, that somehow or other something came up about the class act, the lawsuit, and he went up to the bulletin board where it was posted and then he was, there was something about him finding out about this lawsuit and then he was visibly upset about it, but he did not, he was not in the clinic when the article was posted because I didn't even post the article.

"Q. Well, let's go back over that. You stated you were what, out of state?

"A. This is ahm, an amendment or something that had to do with my complaint because before it was finished I moved out of the state and I left authorization for my union representative to carry on with my EEO complaint.

"Q. Now, where did you move to?

"A. San Francisco, California.

"Q. Okay. So you moved out to San Francisco, California in something like July, 1983, right?

"A. Right.

"Q. Okay. Now, the date of this complaint, is December 17, 1982.

"A. Yeah. But it didn't just go one, two, three, I mean, there were periods of time that they would go over this and they'd send something back to us and we'd send something to them and by '83 of June I was gone, so I didn't get this final paperwork.

"Q. Let me understand your testimony. Do you have Plaintiff's 6–B in front of you, Ms. Blue?

"Now, that complaint is dated December 17, 1982. Right?

"A. Right.

"Q. And your signature appears to the right of that?

"A. Right.

"Q. And this is your complaint, right?

"A. Right.

"Q. And then we turn to the second page and you say, somebody wrote on your complaint here, typed, on the date the article was posted and the clinical officer in charge, Major Sykes, became visibly upset.

"A. Well, he misunderstood what I said.

"Q. Who misunderstood?

"A. My representative.

"Q. Who is that?

"A. Mr. Ron Witiak.

"Q. Mr. Witiak typed all this up?

"A. He was my representative so this is where it came from.

"Q. Did you read this?

"A. I haven't, this is the first I've seen of it. Because like I said, I was gone. When I left it was still in the stages of being investigated by Mr. Cortis.

"Q. So you signed a blank complaint?

"A. No, no, no. This is my original complaint here.

"Q. That's the front page, right? But the second page, was that done afterwards?

"A. No, I'm not saying that either.

"Q. Well, did you read the second page before you signed the first one?

"A. This has been amended to many times. I wrote first page. I know things have been amended because I was getting correspondence back and forth. I don't know if that's the original or what.

"Q. Let me call your attention to block ten. Look at block ten. It has A, do you

see that, block 10? I was issued a proposed letter. Do you see that, Ms. Blue?

"A. No, I don't.

"Q. Block 10, first page. [Court: this block establishes that the complaint has an "attached sheet."]

"A. And you said A or B?

"Q. A, Block 10.

"A. Don't have a A.

"Q. I think you're looking at the second page, Ms. Blue.

"A. First page, okay.

"Q. Do you see Block 10?

"A. Block 10.

"Q. Do you see No. A?

"A. Okay.

"Q. Turn to the second page, B; then C.

"A. Uh-huh.

"Q. Okay. Now when you signed this complaint did it only have one page?

"A. No.

"Q. Had two pages?

"A. Yeah or more.

"Q. Well, actually had four pages, isn't that true?

"A. It might've had more than that. I'm telling you it was amended several times.

"Q. Now, let me ask you this, you say that when the article was posted, you're shaking your head.

"A. Because I did not say that.

"Q. I see. I haven't finished my question, but tell me what you didn't say.

"A. I didn't say when the article was posted Major Sykes got visibly upset.

"Q. Okay. My question was, you say that's not correct, and that was because Major Sykes was not there, is that your testimony?

"A. He wasn't there when that article was posted. It was posted before he even came to our clinic.

"Q. Okay. The article was posted before he came to the clinic.

"A. Right.

"Q. Turning to C then, it says 14 September '81, is that when the article was posted?

"A. Here it was 12 May '82 on my C.

"Q. Look at the other one.

"A. On or about, it has 12 May '82 crossed out and then parentheses 14 September '81.

"Q. I'm asking you, Ms. Blue, which date is correct?

"A. Which date what was correct?

"Q. Approximately when was it posted? Do you understand my question?

"A. When was the article posted approximately?

"Q. Approximately?

"A. Sometime during, I don't know when the article was posted. Somebody posted it though.

"Q. So you don't know which date is correct, right?

"A. Right.

"Q. And you in fact didn't prepare this?

"A. I gave my side of what was going on and it was typed up by someone else.

"Q. Now, when was it that Major Sykes who is black got visibly upset, when was that?

"A. After being at the clinic for a while and finding out about the lawsuit; when it was exactly I do not know.

"Q. So, could you look at page 2 of this complaint and tell me what is incorrect about the complaint that you would not have said?

"A. Which one am I looking at?

"Q. Page 2.

"A. Either?

"Q. It doesn't matter. What else is incorrect about those allegations?

"A. Nothing that I can see.

"Q. Nothing else besides that?

"A. That I can tell, no.

"Q. Do you remember the month when this happened, by the way, Ms. Blue?

"A. The month what happened?

"Q. Major Sykes got upset?

"A. I just said I didn't know. I couldn't remember."

* * * * * *

"Q. Okay. Before I get into that I want to ask you one other thing. You remember on yesterday you said that you had never seen your EEO complaint that you filed and that you were gone at the time, do you recall that?

"A. No, I didn't say I never saw it, I never saw the amended ones.

"Q. Well, what amended complaints did you file and when?

"A. I didn't file a amended complaint; I'm saying when I filed the complaint it was amended after I was gone.

"Q. Who amended your complaint?

"A. Ron Witiak, my representative.

"Q. Okay. Now, when you say Ron Witiak amended your complaint, you're referring to the letter that he sent to Pat Crain? Is that what you're talking about?

"A. I don't know.

"Q. Well, what are you talking about when you say he amended it?

"A. I don't know if that is the one he amended or what. I know he had amended part of my EEO complaint and then he did some more amending after I was gone.

"Q. Let me just ask you, you had seen the—

"A. —The original.

"Q. You didn't see the original?

"A. I saw the original.

"Q. So—

"A. —And it was later amended.

"Q. In fact, you gave a statement, didn't you?

"A. Gave a statement to who?

"Q. Beula [sic] Mae Harris.

"A. I gave her plenty of statements, yes.

"Q. You gave her a statement about this complaint?

"A. She was my representative.

"Q. And in fact she found there was no discrimination, didn't she?

"A. She didn't tell me that."

* * * * * *

"Q. Now, Ms. Blue, did you get a copy of the letter that Witiak sent to Patricia Crain?

"A. I may have.

"Q. You may have?

"A. (No response).

"Q. Well, let me show you the letter that is dated December 29, 1982, and ask you if that is the letter that Witiak sent to the union, sent to Patricia Crain about correcting those dates?"

* * * * * *

"A. Possibly, but like I said before, the article was posted before Major Sykes even came to the clinic.

"Q. But we're talking about the fact that you said yesterday you were gone when all this happened, and if you notice the date on that letter, it's 29 December 1982 and you were there?

"A. That was one of the amendments. I didn't say I was gone through all the amendments.

"Q. What amendments are you talking about? Who filed an amended complaint?

"A. I said Mr. Ron Witiak filed amendments after I was gone also.

"Q. You mean he filed and you—

"A. —He had a notarized statement to act on my behalf.

"Q. And you didn't even see these statements?

"A. I couldn't see them if I wasn't here.

"Q. Well, let's look at this letter here. You were there when that letter was written weren't you?

"A. Yes.

"Q. Now if you turn to the next page of that document you gave a statement to George Portis, didn't you?

"A. Yes.

"Q. And that statement was given to Mr. Portis who investigated the complaint for USACARA?

"A. Right.

"Q. Do you remember when you gave that statement?

"That is Defendants' 257, your Honor.

"A. (No response)

"Q. You signed that statement in March 1982, isn't that true?

"A. Was it March? I don't know if it was March or April, I can't recall.

"Q. Look on page 42 which is page 14 of your affidavit; the 30th day of March?

"A. Okay, yeah.

"Q. Are you saying that after USA-CARA did its investigation you changed the complaint, is that what you're saying?

"Is that what you're telling this Court?

"A. Did I change the complaint?

"Q. Yes. Did Mr. Witiak change your complaint after USACARA did its investigation?

"A. There was amendment to this, also.

"Q. I'd like you to answer my question. Are you—

"A. —Yes.

"Q. I see. And where is that recorded and with whom?

"A. I don't know. He sent it up to whoever he was supposed to send it to.

"Q. What did you amend in the complaint? What did you tell Mr. Witiak he should do, what did you authorize Mr. Witiak to do that you hadn't done before?

"A. To act on my behalf while I was gone.

"Q. That isn't what I'm asking you, Ms. Blue. I'm asking you what did you want him to do to change the complaint that you hadn't done before? What did you ask him to add?

"A. To add? I told him to subtract.

"Q. What did you tell him to subtract.

"A. Major Sykes was not in the building when the article was posted.

"Q. I see. So that is the one thing you told him to do, that is one thing you told Ron Witiak that he should see is deleted from your complaint.

"Now, if you look at that letter that I just showed you from Mr. Witiak on December 29th, doesn't he in fact do that in there?

"It's on page 28.

"A. I have that page. I am still saying that the article was not in the building. What I'm saying is he became upset when investigations were starting toward the class complaint. The article had been posted on the bulletin board long before he came."

Test. of Blue at 121–133 and 163–170. For other examples of plaintiff's extraordinary testimony, *see* pp. 95–101, 156–61 and 172–74 of the transcript.

39. Blue's testimony regarding SGT Tuanquin was sketchy and strained. He rendered an annual performance rating of the plaintiff in July of 1982, finding her "fully successful" under the new GPAS.[89] Blue felt she deserved the highest rating possible. Blue testified that when she received the rating she questioned Tuanquin about it and asked whether he had checked with all the doctors that she worked with prior to signing the appraisal. She claims he said no. Subsequently, plaintiff filed an EEO complaint about the rating, (PX6(b)), contending that the rating was unfairly low because of her race.[90]

40. In contrast to Blue's evidence, Sykes, once again, provided a very cogent explanation of the rating.[91] He pointed out that the GPAS was a new system and that both he, as reviewer, and Tuanquin, as rater, had procedural difficulties with the form. In fact, he stated the rating complained of by Blue was one of the first to be conducted under the new system and it

---

**89.** As previously indicated, five overall ratings were possible: Exceptional, Highly Successful, Fully Successful, Marginal and Unsatisfactory.

**90.** Plaintiff also claimed that the rating was unfair because she wasn't provided an opportunity to discuss the appraisal with Tuanquin and was forced to sign it without any "input" into the process. *See* PX6(b) at 2–3.

**91.** Tuanquin did not testify at trial.

had to be redone at least once. He also stated that Tuanquin asked him for input and that he was aware of at least one or two other doctors who were asked about Blue's performance. Finally, Sykes explained that he agreed with the rating because contrary to Blue's assessment of herself as the "best" dental assistant from the day she arrived to the day she left, Blue was only an average employee, in terms of career skills, and that was accurately reflected in her rating. *See* Test. of Sykes at 1233–39.

41. Two other points regarding the July, 1982, rating demand mention. First, as Sykes pointed out, Tuanquin had rated other black employees at DC–6 higher than Blue and higher than some whites at the clinic. Test. of Sykes at 1238–29. Second, the "fully successful" rating was entirely consistent with *every* other annual performance rating Blue received at Ft. Bragg. Prior to 1982, Blue had been rated "satisfactory," the middle grade on a three-grade scale, in all her annual performance appraisals. A number of these appraisals pre-dated any informal or formal allegation of discrimination by Blue and were never the subject of a grievance or complaint. "Fully Successful" under the present GPAS system totally equates to a "Satisfactory" rating under the old system.

42. In conclusion, the court cannot attribute any racial animus to the rating rendered by NCOIC Tuanquin. Rather, Sykes' testimony persuasively explained the limited procedural irregularities that occurred in developing the plaintiff's rating and demonstrated the fact that rating was accurate.

43. Finally, for background purposes, the court finds plaintiff's problems with her supervisors and co-employees at DC–6 stemmed not from any racial bias on their part, but rather from plaintiff's personality, her unique view of a supervisory-subordinate relationship, and her narrow vision that seemingly saw all employment disappointments or adversities solely in racial terms, yet attributed any favorable consideration she received as being merely her just dues. Plaintiff, in fact, performed her job duties properly, perhaps even very well, but only when she wanted to do so. On a number of occasions, Blue was simply unreliable and unproductive. In sum, the court finds that plaintiff believed she should be allowed to freely challenge authority because she is black, with the result being inexcusable conduct directed against supervisors, dentists, and co-employees alike—conduct which could not be condoned if DC–6 was to perform its function. Examples of testimony supporting this finding follow *seriatim.*

44. Martha Soehren testified that Blue had a terrible attitude and that she did not enjoy working with her. She testified that she observed occasions where Blue disagreed with an NCOIC, actively solicited a letter of appreciation from a dentist, was loud and obnoxious in the clinic, disrupted clinic operations, and slammed doors and acted in an unprofessional manner. Test. of Soehren at 1070–76. Although the court recognizes that Soehren is the wife of COL. Soehren, an ADO, the court credits this portion of Soehren's testimony. The probative value of the evidence increases because it is consistent with the testimony of a number of other disinterested witnesses.

45. SSG Ramos testified that Blue often read newspapers and magazines while assisting patients, refused to clean around her dental chair area as all dental assistants were required to do, never volunteered for assignments, showed little initiative, left patients alone in the dental chair so she could smoke a cigarette or take a break, and exhibited little or no respect for his authority. Test. of Ramos at 1357–62. Blue was a "freelance dental assistant [who] did what she wanted whenever she wanted." *Id.* at 1357. The court fully credits Ramos' testimony.

46. Like Ramos, SGT. Kurz (a DTA) testified that plaintiff read newspapers while assisting patients and rarely volunteered for any assignments. Test. of Kurz at 1094–1101. Carolyn Cave, a dental assistant, testified that plaintiff was not professional in her conduct, acted condescendingly to CPT. Howell, a dentist, while he was suturing a patient, and observed

Blue and Ballew yelling at each other across the bay area of the clinic in front of a number of patients. Test. of Cave at 1555. Although the court does not credit all of Cave's testimony,[92] again the court finds this aspect of her testimony unimpeachable and fully corroborated by a host of witnesses.

47. CPT. Howell testified that plaintiff refused to assist him on a least two or three occasions, a situation shocking to him given his capacity as plaintiff's superior and a dentist at DC–6. The court recognizes that Howell's testimony, as well as that of some other witnesses, refers to incidents occurring after the promotion claims at issue. *See also, e.g.,* Test. of Jones and Harmon. Accordingly because of its remoteness in time to plaintiff's conduct in 1979, it has minimal substantive relevance, if any, as to Blue's competence, skills and even attitude at that time. Subsequent acts rarely show lack of animus at a previous time, particularly as the time gap between events increases. Indeed, if plaintiff had been discriminated against in 1978, 1979 or 1980, her later conduct, no matter how bad, could not be used against her as employees understandably turn bitter and hostile if they have previously been mistreated by their employer.

Notwithstanding that fact, Howell's testimony is very relevant on the issue of plaintiff's credibility, as Blue specifically denied ever not assisting Howell or any dentist, denied any unprofessional conduct, denied all acts of misconduct and insubordination, cast herself in the light of being the best dental assistant at DC–6 throughout her tenure, and charged a number of post–1979 NCOIC's, OIC's and dentists with being ADO's. Thus, as to credibility, the court considers the post 1979/1980 testimony relevant and findings of fact on those incidents are therefore included herein.

48. SGT. Jones testified that plaintiff was a good dental assistant, when she performed her job, but that encouraging her to properly perform her job was the difficult part. Blue generally had a bad work attitude, rarely volunteered, left patients in the dental chair on occasion, was late to work a number of times, fell asleep while at work on one occasion, refused to clean her dental chair area, and watched a television she brought to work *while* tending to patients. *See generally* all of Jones' testimony. As for the number of times Jones had to counsel, discipline or talk to Blue about her conduct, Jones stated "I couldn't write all the statements concerning the issues and times that I had to deal with Ms. Blue, and I mean, I would have a big book, and there's no way I could keep up with them." *Id.* at 903–04.[93]

49. Other DTA's and dental assistants fully corroborated the above testimony. Ann Randall stated that plaintiff read newspapers and watched television while assisting patients, left patients alone in her dental chair, refused to clean her chair area, refused to work with certain dentists because they were slow and complained of working at the front desk (reception) area of the clinic because "it was not in her job description." Test. of Randall at 1383–90. The result of Blue's (and Ballew's similar) conduct was a "tension-filled" atmosphere between plaintiff and the dentists. *Id.* at 1385.

Marilyn Roach testified that plaintiff was disrespectful to supervisors, read newspapers and magazines while patients were in her dental chair, refused to clean her chair area, interrupted staff meetings and was less than punctual. Test. of Roach at 1758–65. Although Roach's testimony was more general in nature, lacking details in certain aspects, the basis of the testimony was not impeached.

---

**92.** Ms. Cave, as did a few of defendant's witnesses, suffered from selective memory on cross-examination. *See* fn. 86, *supra* at 1255.

**93.** Jones testified that because of Blue's numerous complaints and grievances, etc., he decided to make a note for the file every time he encountered a significant problem with the plain-tiff or was involved in a confrontation with her. Jones' decision was further reinforced because Blue kept a diary at work for a number of years, in which she kept notes of incidents she viewed as important or discriminatory. *See, e.g.,* Test. of Jones at 658–59 and 981–82.

Similar evidence can be found in Suzanne McPherson's testimony at 1615–16, Anita Hutchin's testimony at 1656–57 (told CPT. Howell he was "stupid" while patient was in dental chair), MJR. Sykes' testimony at 1189 (played on intercom like a child), and Dr. Harmon's testimony at 1797–1800 (plaintiff rude to patients, refused to pull medical records when requested by dentist, and rebutted Harmon's advice to a patient.) [94]

50. Referring back to plaintiff's claim of conspiracy, the court simply cannot ignore the overwhelming weight of the evidence and accept at face value plaintiff's unsubstantiated, self-serving, contradictory, and inconsistent claims of discrimination. Blue may sincerely believe that nearly all her co-workers and supervisors, be they black or white, colluded against her because of her race, but credible evidence to support any such allegation is non-existent.

### Claims for Relief

■ The court will first consider the 1979 supervisory appraisal and then the two merit promotion attempts.

### A. The 1979 Supervisory Appraisal of Current Performance

51. Blue claimed that she was an outstanding dental assistant; indeed, as indicated, she testified that she was the best dental assistant at DC–6.[95] She also testified that the supervisory appraisal of December 1979[96] was the worst rating she ever received. She contended that her inability to be promoted was in part due to this appraisal. Blue testified she believed the rating was motivated by discrimination for two reasons: (1) because COL. Paquette had discriminated against other blacks and he was "behind" the rating, and (2) because whites received higher ratings. According to plaintiff, since she was the

best assistant at DC–6, it follows that her rating had to be discriminatory.

52. The appraisal rated Blue on twenty (20) attributes, grading "A" (highest) to "E" (lowest) with "N" meaning not relevant. See Finding of Fact # 34, Section III, supra. Blue received two B's, eleven C's, five D's and two N's. The court notes that C means the employee requires "about the same supervision as others." All told, the appraisal indicated a satisfactory, but certainly not exceptional performance by the employee. The rating was signed by then SFC Vincent, NCOIC, and reviewed by Paquette, OIC.

53. As previously discussed, Blue's "evidence" that Paquette discriminated against other blacks was completely negated by the testimony of the alleged victims of his discriminatory actions. Furthermore, Blue seemed to attribute the rating, in large part, to Paquette, when he was only the reviewer, not the rating supervisor. PX181(h)(1). Vincent testified he was responsible for the rating, as plaintiff's NCOIC, and that the rating was prepared only after a meeting with all the dentists at DC–6. Their opinions were substantially relied upon since they observed Blue's professional abilities first-hand. Test. of Vincent at 1478–86 and 1507–08. He recollected that some dentists would have rated Blue higher in certain categories, and others lower, but the end product was generally a consensus opinion. Id. In rating Blue, Vincent and the panel of dentists followed the instructions set forth on the rating sheets and exercised their best professional opinion concerning her skills and job performance. Id.

54. Vincent denied that race played any factor at all in the evaluation. He also pointed out that at the time Blue first complained of the appraisal, she said it was in retaliation for her Union activities, not because of race, and that race only became an issue months later. Id. at 1508. See

---

94. The court finds Howell, Sykes and Harmon's testimony particularly credible.

95. Ballew disagreed and claimed that she, not Blue, was the best dental assistant in DC–6. Test. of Ballew at 414.

96. As heretofore indicated, this rating is rendered in connection with an employee's promotion application and is placed in the applicant's OPF.

*also* PX181(h)(1) at 3—the appraisal—where plaintiff commented "I disagree with every part of this appraisal.... I feel this appraisal is in reprisal for my Union activities."

55. Ernest Carter, the EEO counselor who investigated plaintiff's complaint about the appraisal, testified that Paquette unflinchingly adhered to his position that the appraisal was fair and accurate. Test. of Carter at 508. Carter also stated that he interviewed SGT. Jones, the NCOIC at DC–6 both before and after Vincent and that Jones would have rated Blue higher in three (3) areas: "Accepts responsibility for assigned work"; "Ability to present ideas logically, clearly and concisely in writing"; and "ability to present ideas orally." However, Jones testified that Carter apparently did not understand the nature of Jones' comments. Jones testified he agreed with the rating and that all he meant was that Blue would not hesitate to express her opinions, orally or in writing, about her supervisors, dentists, and co-workers. *See, e.g.,* Test. of Jones at 757–58 and 978–81. He also pointed out that he would have given Blue a lower rating on cooperativeness. In support of his opinion, Jones cited numerous instances where Blue refused to do what he asked, claimed she was not required to perform a certain task, or was disruptive and contentious throughout the clinic. *See generally* Jones' testimony.

56. In addition, Blue testified that the discriminatory nature of the appraisal was allegedly exposed because two less competent white employees were rated higher: Martha Soehren and Randall. At the outset, the court finds it difficult to compare Blue with Soehren, since Soehren was the clinic receptionist, not a dental assistant. Little meaningful comparison can be made when the job responsibilities are so dissimilar.

However, even if the two could be compared, the comparison would not favor Blue. The opinion of all supervisors and employees who testified on the issue was that Soehren was an excellent and cooperative receptionist. *E.g.,* Test. of Morgan at 1307–09; Jones at 743–44. Unlike Blue.

there was no evidence of any personality conflict or attitude problem on the part of Soehren.

57. Evidence concerning Randall is more probative. Blue offered nothing more than her opinion that she was a better assistant than Randall. Rebutting Blue's opinion was the testimony of a number of dentists, supervisors and co-workers, all of whom stated that Randall was a better dental assistant than Blue, despite certain medical problems that resulted in a number of absences by Randall from work. *See, e.g.,* Test. of Ramos at 1363; Cave at 1556; Kurz at 1096. *See also* Test. of Jones at 745; Roach at 1760; Harmon at 1798–99; Morgan at 1322.

58. Randall testified that she had been in the dental field for seven (7) years and had been a GS–6 DTA for three (3) years prior to coming to Ft. Bragg in 1978. She had to accept a downgrade to GS–4 in order to get the job at Ft. Bragg. Randall clearly possessed a number of dental skills that plaintiff did not. Test of Randall at 1389–90.

Randall stated that she cleaned her dental chair and the area around it because she felt a good assistant should do so. She testified that Blue told her it wasn't in her job description and she was crazy for doing so. *Id.* at 1384. She also stated that she did not watch or listen to television nor did she read magazines and newspapers while attending to patients—such actions being totally unprofessional. *Id.* at 1385 and 1390. Furthermore, the court finds Randall was a cooperative employee, who volunteered to work when not required to do so, obviously a virtue in sharp contrast to that of Blue. Test. of Jones at 745.

59. In conclusion, Blue did not prove that she was entitled to a better rating than Randall or any other dental assistant. Blue's testimony regarding her own job performance was filled with half-truths and severe misstatements of fact. Blue testified that she never turned the picture on her television on while attending to patients (*i.e.,* listened only to the sound), yet a number of credible witnesses convincingly testified they had seen her do so. Blue

testified that she was the only one asked to clean the base of her dental chair and that she did so. Again, the truth is the opposite —Blue did not clean her chair area nor was she the only assistant asked to do so. *Id.*

The evidence at bar overwhelmingly discredits Blue's opinion that she was an outstanding employee. Even her prior annual performance ratings, by supervisors with whom she had no problems, belie that fact. While Blue may genuinely have believed she was the best dental assistant at DC–6, that opinion was shared by no one else. The court finds plaintiff's 1979 supervisory appraisal claim frivolous, vexatious, and without merit.

### B. *MPA 273–79*

60. Again to reiterate and summarize, under the pre–1982 merit promotion process, applications for promotion were first screened by a personnel staffing specialist to insure that the candidate possessed the basic qualifications according to OPM guidelines. The applications of those who were declared eligible were then provided to the rating and ranking panel for a review to determine which of the candidates met the HQC specified in the job announcement. The applications of those meeting all HQC were then evaluated by the panel. A numerical score was ascribed to each application according to a rating guide and a roster of candidates was then prepared for the selecting official. The roster included only the best qualified candidates or those whose score was at least 85% of the highest score, up to a maximum of ten candidates.

The roster (DA Form 2600) provided to the selecting official included only the names, in alphabetical order, of those referred for interview. No scores, ranking, or race of any referee was indicated. The selecting official was generally required to interview all applicants, although in some special circumstances, selection could be based on a review OPF's. Using the requirements of the position as a guide, s/he then selected the person best suited for the individual job. It is, of course, a necessary component of the selection process that the selecting official exercise his or her best judgment and discretion in selecting from among those referred.[97]

61. Blue applied for a position as a Dental Assistant, GS–5, under MPA 273–79 on November 7, 1979. This position was as an assistant to a board certified specialist in general dentistry. Some general understanding of the practice of dentistry at DC–6 is imperative before any informed determination can be made with respect to the merit promotion process under MPA 273–79. Thus, the court digresses to briefly discuss the operations at DC–6.

62. Extensive testimony was taken about dental specialists. In essence, a dentist may be certified as a specialist only after completing a two year program beyond the DDS degree and upon successful completion of a certification exam. The unrefuted professional testimony (contrary to plaintiff's opinion) established that DC–6 was only a general practice clinic.[98] It had *no* certified specialists assigned to it who practiced their specialty, prior to COL. Soehren in 1983. Test. of Sykes at 1154–56 and 1167; Test. of Morgan at 1274–83. There was testimony that, on rare occasions, a *reservist,* who was a certified oral surgeon, practiced at the clinic for one or two week stints each summer, but that was the extent of any specialized practice until Soehren.

---

**97.** In addition, other personnel decisions at Ft. Bragg depend, at least in part, upon supervisors properly exercising their discretion. For example, supervisors initiate the merit promotion process for vacant job positions. They generally conduct the annual and supervisory performance appraisals. Supervisors decide whether an employee may apply for or attend training and nominate employees for incentive awards. Disciplinary actions also lie in the hands of the employee's supervisor. Thus, although the overall direction of the personnel system is under the supervision of CPO, many of the key initiatives begin with or decisions are made by the supervisory staff with guidance, and often review, by CPO.

**98.** Although it was not entirely clear to the court, it appears that during Blue's tenure in DENTAC, there were approximately six to eight dental clinics in operation at Ft. Bragg during any given period of time. *E.g.,* Test. of Morgan at 1274–75.

The dentists who were assigned to DC–6 practiced general dentistry with some very limited work in five (5) sub-specialty areas: pedodontics,[99] periodontics,[100] endodontics,[101] prosthodontics,[102] and exodontics.[103] Although each of these areas (with the exception of exodontics) constitutes a specialized form of dentistry, the practice in these functions was limited to very basic cases. Test. of Sykes at 1167–68 and 1174. Thus, while practicing general dentistry at DC–6, the dentist could begin to get some limited exposure to these areas in relatively routine cases. Any complex case was immediately sent to another dental clinic at Ft. Bragg where the specialty was routinely performed. As defense counsel aptly summarized this practice, "every area of dentistry, every specialty is on a continuum [with the general dentist on one end and the specialist on the other]." (Question of defense counsel at 1278). Indeed, general dentistry still is a specialty, Test. of Morgan at 1281, so perhaps it is best to look at DC–6 as performing mainly the following functions: examinations, x-ray, exodontia, and stabilizing emergency treatment.

63. MPA 273–79 was originally announced on October 29, 1979, and amended and re-announced on February 6, 1980. The job description states, in pertinent part:

Assists dentist, who has *advanced training at the graduate level,* in the more *intricate* aspects of restorative dentistry and the *various specialty areas of dentistry.* Assists the dentist in the treatment of patients *requiring complex restorative and difficult oral surgery, prosthedontic, periodontic, endodontic or orthodontic treatment.* This assistance is provided at the chairside and in the hospital operating room ... Assists dentist in oral surgery procedures to include extractions and periodontal and endodontic surgery. Assists the dentist in the management of patients under general anesthesia or intraveneous sedation, and in their immediate post-operative care....

DX210 at 2 (emphasis added).

The minimum standards of eligibility required two (2) years of general experience and one (1) year of specialized experience. The general experience involved some knowledge of the basic nursing, hospital, medical, and dental environment or of general clinical procedures with the specialized requirement mandating experience in dental assistance to restorative, surgical or prosthetic dentistry, x-ray work, or any combination of these appropriate to the position. *Id.*

Four (4) HQC were listed for the position, as amended:

1. Ability to deal with people of varied backgrounds and personalities.

2. Knowledge of equipment material [sic] used in oral surgery, pedodontic, periodontic, endodontic, prosthodontic, oral medicine and pathology *at specialty level.*

3. Knowledge of skill and dexterity in manipulating materials and instruments intra- and extra-orally to assist in general dentistry functions....

4. Knowledge of anatomy of hard and soft tissue landmarks about head and neck.

*Id.* at 4 (emphasis added).

64. Blue was rated qualified for the position, but not highly qualified, as the panel

---

**99.** Pedodontics is the science dealing with the dental care of children.

**100.** Periodontics is the treatment of the supporting structures of the teeth, including the gums and bone surrounding the teeth. Test. of Morgan at 1279.

**101.** Endodontics involves the treatment of root canals and similar procedures. *Id.*

**102.** Prosthodontics involves the replacement of missing teeth with artificial teeth, usually by porcelain fused to metal. *Id.* at 1277.

**103.** Exodontics involves the simple extraction of teeth. This really is not a specialty or subspecialty area, since every dentist is capable of performing exodontia. At DC–6, this rotation was called "oral surgery." In fact, the rotation was clearly misnamed for oral surgery involves those serious cases requiring maxillofacial surgery or reconstruction in and around the oral cavity, and oral surgery was *never* performed at DC–6. Almost all oral surgery was *never* performed at Womack Army Hospital with the practice at DC–6 clearly limited to exodontia. Test. of Sykes at 1167–68; Morgan at 1278–81.

found her lacking HQC # 2. *Id.* at 5. Interestingly, Blue testified she did not know why she was not referred for the position until *after* she filed this lawsuit. Test. of Blue at 220–221.

65. Plaintiff contended she possessed the requisite knowledge and that she gained this information through experiences at DC–6 and St. Luke's Hospital in New York. Since she had the mandated experience, Blue assumed that her failure to be referred must have been due to racial considerations. Unfortunately for plaintiff, she adduced not a scintilla of evidence supporting this conclusion.

First, Blue introduced absolutely no evidence regarding any discriminatory animus on the part of the four rating and ranking panel members. Indeed, the record is void of any mention of the panel members. True to form, Blue admitted on cross-examination that she did not know whether the panel discriminated against her. *Id.* at 218–221. Significantly, Blue acknowledged that thirty-five (35) of the forty-three (43) applicants for the position were similarly screened out because they lacked HQC # 2.[104] *See* DX210 at 5–8. Most of the 35 were white. If anything, this evidence would tend to show a lack of racial animus on the part of the panel. Since plaintiff was not referred by the panel, and the panel determined the existence of the HQC, even if plaintiff was mistakenly denied credit for HQC # 2, plaintiff's claims of disparate treatment and retaliation must fail given the absence of any proof of intentional discrimination by the panel members.

66. This finding is buttressed by other factors as well. Blue claimed that she should have been credited for HQC # 2 based upon her prior experiences. However, the evidence clearly established that she could not have gained experience at the *specialty level* while at DC–6 because there were no practicing specialists there prior to her applying for the position. The panel members, DENTAC dentists themselves, were apparently aware of this fact and thus ruled her not highly qualified.

Blue claimed that even if she had not received credible experience in oral surgery at DC–6, she had gained such experience during her tenure at St. Luke's Hospital when she worked in the obstetrics/delivery room. Aside from the court's prior difficulties with this experience, *see* finding of fact # 11, *supra* at 1240, the obvious problem with plaintiff's argument is that surgical experience in obstetrics is vastly different from surgical experience in dentistry. MPA 273–79 required the latter specialized knowledge, not the former. As MJR. Sykes stated, "Oral surgery is just not related to OB. Oral surgeons don't do OB ... they are at completely different ends." Test. of Sykes at 1197.

Furthermore, assuming *arguendo*, that Blue should have received credit for oral surgery experience at the specialty level, the position required knowledge at that level in five additional areas, which neither St. Luke's nor DC–6 provided. Blue admitted she had not worked with specialists in these areas and cited no other experience which would qualify her under HQC # 2.

67. With respect to plaintiff's qualifications for MPA 273–79, Blue also claimed that staffing specialist Jean Byrd discriminated against her because Byrd, not the panel, improperly calculated her experience and letter of appreciation. The short answer to Blue's argument is that the rating panel, not Byrd, determined plaintiff lacked HQC # 2. The staffing specialist screens only for minimum eligibility requirements and Blue was determined to be eligible. Staffing specialists do not actively participate in a rating panel's review and discussion.[105]

---

**104.** It appears that all applicants were numerically rated by the rating and ranking panel despite the fact that many were rated not highly qualified. This is a variance with established procedure whereby only applicants who meet all the HQC are to be rated. Nevertheless, the variance does not support any discriminatory motive on the part of any official at Ft. Bragg

and, in essence, the variance is irrelevant to plaintiff's claim.

**105.** There is no evidence that Byrd either attempted to interfere with the rating process or that the panel in 273–79 deviated from standard procedure. The court notes that a Union observer sat in on the panel's deliberations,

68. Furthermore, no credible evidence was introduced from which the court might even infer that Byrd was racially motivated to intervene or improperly deny plaintiff credit for her prior experience. Plaintiff attempted to show that Byrd was aware of plaintiff's knowledge of operating room protocol from plaintiff's prior application for MPA 285–78, a dental assistant's position in oral surgery. Byrd was the staffing specialist for that position and Blue at first did not receive credit for a HQC encompassing operating room and scrub technician functions. Upon complaint to Byrd, Blue's record was re-reviewed by the panel and plaintiff was rated best qualified and referred. Blue was not selected for the position.

Defendant's additional response to plaintiff's contention was fourfold. First, even assuming a mistake was made by Byrd, that in and of itself is not probative of racial discrimination. Second, proceeding a step further and, assuming *arguendo*, Byrd discriminated against plaintiff by somehow disallowing credit for her oral surgery experience, that does not change the fact that Blue did not have sufficient experience at any of the other specialty areas.

Third, panel member Dr. George Cohen's explanation of Blue's re-review in 285–78 puts to rest any notion that Byrd discriminated against the plaintiff. Dr. Cohen testified that on initial review the panel determined that Blue had no experience in oral surgery, only general dentistry, thus, she failed to meet the HQC. Test. of Cohen at 1431. Upon request to re-evaluate the plaintiff, the panel reviewed Blue's OPF and decided, despite significant reservations, to give the plaintiff credit for her New York experience. Cohen stated, quite frankly, that the panel did not believe plaintiff's SF–171 in her OPF listing her job duties and experience at St. Luke's Hospi-

(DX210 at 5), thus, the panel and Byrd were under the scrutiny of an independent third party throughout the rating and ranking process.

**106.** Contrary to the defendant's statement at p. 25 of his Proposed Findings of Fact and Conclusions of Law for the Claims of Sandra Blue, the

tal. *Id.* at 1437. However, the panel decided to accept plaintiff's OPF at face value for rating purposes, and let the selecting official make his determination of her qualifications.

Thus, it was the panel's decision to accept plaintiff's SF–171 the second time around, despite serious concerns regarding its veracity, which allowed plaintiff to be considered under 285–78. If Byrd was aware of those reservations, neither she nor the 273–79 panel were required to give Blue the same leniency as was given by the second panel review in 285–78.

Finally, as to plaintiff's claim that Byrd discriminatorily denied her additional credit for a fifth letter of appreciation, defendant argues and the court agrees that (1) credit for the letter was irrelevant in plaintiff's non-referral for 273–79 since that credit goes only toward points in her final rating and Blue never made it that far, having failed to meet HQC #2, and (2) the "Awards" credit for four letters was correct, since credit could only be given for "official" letters of appreciation and commendation and Blue's fifth letter in her OPF was clearly "unofficial." *See* Finding of Fact #13, *supra* at 61.

69. In addition to all of the evidence above, defendant introduced testimony through COL. Morgan, COL. Jacobson and MJR. Sykes, that Joan Brocki, the white selectee under 273–79, was a very qualified applicant for the position.[106] Test of Jacobsen at 1426–27; Test. of Sykes at 1182–87.

Morgan, the selecting official for MPA 273–79, testified that he had Jacobsen, a General Dentistry Specialist, compile a list of expert questions which he asked of all applicants during their interview with both he and Jacobsen. Based on Jacobsen's professional recommendation, Morgan selected Brocki for the position. Morgan's statement of his reasons for the selection is set forth in DX210 at 178:

court does not find that Morgan *expressly* stated he would have chosen Brocki over Blue, although that inference is fairly obvious from his testimony, nor does the court find any evidence to suggest he ever compared Blue's OPF to Brocki's.

In my opinion, [Brocki] has the best qualifications for the job. During the interview this candidate displayed the most interest and initiative for the job.

Sykes also testified that he knew the abilities of Brocki and Blue from having worked with both, and that were he the selecting official, and had Blue been referred for consideration, he would have selected Brocki over Blue. Test. of Sykes at 1184.

With regard to the relative qualifications of Brocki and Blue, plaintiff initially testified on direct examination that she was "more qualified than Joan Brocki ... [b]ecause I had more experience." Test. of Blue at 26. However, on cross-examination, Blue changed her testimony by stating she didn't know Brocki and didn't know her qualifications. *Id.* at 217.

From the above evidence, the court finds that even if Blue had been referred for 273–79, it is extraordinarily unlikely she would have been selected for the position and her non-selection would have been predicated on legitimate, non-discriminatory grounds.

70. In a further attempt to prove pretext, Blue claimed that Morgan, the selecting official, selected very few blacks during his tenure as DENTAC Commander and that he was a major conspirator against her. In support of this assertion, she offered only brief, uncorroborated conjecture and speculation.

Morgan, on the other hand, testified that of the fourteen (14) times he had the opportunity to select a black applicant for promotion from a DA Form 2600, he selected a black candidate on six (6) occasions. Test. of Morgan at 1287.[107] In addition, the record is void of any evidence indicating Morgan ever requested, ordered, or coerced any NCOIC or OIC into taking any action against Blue—discriminatory or non-discriminatory in nature.

71. No statistical presentation was made by either party with respect to any claim regarding MPA 273–79.

### C. MPA 303–79

72. Blue applied for a position as a Dental Assistant, GS–5, under MPA 303–79 on November 26, 1979. This position was as an assistant in oral surgery. The job description states, in pertinent part:

Assists dentist in *major oral* and *maxillofacial surgical procedures performed in hospital operating* room and in dental clinic. . . . Assists oral surgeon while patient is under general anesthesia or intraveneous sedation in operations. . . . *Serves as first surgical assistant.*

DX205 at 3 (emphasis added). The court finds the full job description contained in DX205 accurate and detailed.

The minimum standards of eligibility for this position were substantially the same as those required under MPA 273–79. *Id.* Six (6) HQC were listed for the position:

1. Must be knowledgeable of medical terminology associated in all oral surgery practice.

2. Must have had previous experience in assisting oral surgeon.

3. Must have knowledge of operating room protocol and be able to function as an operating room scrub technician.

4. Must be able to physically endure up to six hours of continuous assisting in an operating room.

5. Must be thoroughly familiar with monitoring sterilization technicians during surgical procedures; in addition, must assure that surgical instruments are properly cleansed and prepared for sterilization.

6. Must be familiar with maintenance and operation of dental x-ray equipment.

*Id.* at 4. The court finds the HQC job-related and detailed.

73. Initially, Blue was rated qualified for the position, but not meeting HQC # 3. Blue complained to Jean Byrd, once again

---

**107.** Morgan made thirty-seven (37) promotion selections during his tenure as DENTAC Commander. However, twenty-three (23) Referral and Selection Registers contained no black candidate. Test. of Morgan at 1287.

the Staffing Specialist for this MPA, and told her that she had operating room experience, as reflected in her OPF. As was the case in MPA 285-78, Blue's application was re-rated on December 10, 1979, and found to meet all the HQC. No member of the Rating and Ranking Panel for this MPA testified at trial and it is unclear what prompted the panel to change its initial decision.

74. Despite the fact that Blue met all the HQC on reconsideration, plaintiff was not referred by the panel for an interview because her final rating of 72.42 was not within 85% of the top score received by a candidate, 86.95. *Id.* at 10-11. Thus, application of the 85% Rule barred her from further consideration by the selecting official.

■ 75. Plaintiff contends that she was discriminated against by virtue of the alleged adverse impact of the 85% Rule. She also contends that she would have scored high enough to be referred for interview but for the 1979 discriminatory appraisal by Vincent and Paquette. Plaintiff further claims that had she been referred, she would have been selected because she was the most qualified for the job. And, finally, Blue alleges that she was denied promotion because she was harassed and retaliated against due to her attempts to complain about defendant's discriminatory practices.

76. Plaintiff's claim of adverse impact concerning the 85% Rule was dismissed by the court, upon motion of the defendant, at the close of plaintiff's evidence, pursuant to Fed.R.Civ.P. 41(b). Orders of May 16, 1984, at 3-4 and November 2, 1984. The

basis for this ruling was quite simple— Blue failed to present any meaningful evidence that the 85% Rule affected blacks any differently than it did whites.

First, Blue incredibly presented absolutely no statistical evidence to support her claim of disparate impact. Plaintiffs' statistical expert, Dr. Alan Parrow, did not testify during Blue's case despite being listed as a witness in plaintiff's Pre–Trial Order of Witnesses, filed April 3, 1984. Plaintiffs attempted to argue to the court that Parrow's testimony in future cases, *e.g.,* Geraldine Ballew, should be retrospectively applied to Blue's claims, but the court denied that motion at trial, relying on its oral rulings from earlier in the proceeding to the effect that testimony and exhibits could be used prospectively, (*i.e.,* applied forward from cases already heard to the case then pending), but not retrospectively, in order to achieve some semblance of finality for each claim heard at the conclusion of testimony received on that claim. *See* Order of May 16, 1984, at 3. *See also* court's discussion with counsel at 572–592. Thus, any expert testimony subsequently heard with regard to the "85% Rule" issue during the claims of Geraldine Ballew was deemed inadmissible and will not now be considered in the claim at bar.[108]

■ 77. Plaintiff also attempted to introduce an exhibit, PX31(a), which purports to establish the race of all civilian employees at Ft. Bragg. Plaintiffs' lead counsel suggested to the court that he or the court could take the race codes on 31(a) and use them to identify all those adversely impacted by the 85% Rule as listed in a series of DENTAC MPA's.[109] The result would al-

---

**108.** Assuming *arguendo,* that the court were to consider Parrow's testimony in *Ballew* toward Blue's claim, the result would be the same. The court similarly granted defendant's Rule 41(b) motion in *Ballew* and dismissed her "85% Rule" disparate impact claim. Orders of December 10, 1984, and February 15, 1985. Parrow's analysis in *Ballew* was so flawed that it was unworthy of credence. Parrow radically amended his testimony concerning the number of MPA's he considered between direct, cross-examination, and re-cross-examination; failed to distinguish those who were not referred because of the "top ten" Rule from those not referred due to the 85% Rule; utilized an incomplete

database for his projections; and never attempted to control for the disproportionately negative effect that Blue and Ballew had on the DENTAC "flow" statistics due to their multiple applications and non-referrals. Furthermore, plaintiff's statistical evidence failed to establish any meaningful statistical disparity between blacks and whites under the 85% Rule. *See, e.g.,* defendant's October 12, 1984, Memorandum of Law and defendant's February 4, 1985, Brief.

**109.** Plaintiff's counsel also wanted to utilize 31(a) in this fashion to establish statistical evidence of discrimination on the part of COL. Morgan in his 37 selections at DENTAC.

legedly show how the 85% Rule impacted adversely against highly qualified black applicants. Problems with this proffer were numerous.

As an initial consideration, defendant objected to PX31(a), a document allegedly prepared by Dr. Parrow from pretrial data provided by the defendant during discovery.[110] Defendant's objection was one of authenticity and plaintiffs were well aware of this long-standing objection even before trial of the case began in January of 1984. Since the document was prepared by Parrow, *see* Admission by plaintiff's counsel at 572, it was incumbent upon plaintiff to produce Parrow to meet the defendant's objection. Parrow did not testify, no witness associated with the document in Blue's case testified, thus, no foundation was ever established for its admissibility. Defendant's objection to PX31(a) was and is therefore SUSTAINED.

Assuming *arguendo*, that 31(a) was admitted, plaintiff produced no evidence indicating even the numbers · of the MPA's involved in DENTAC where the 85% Rule barred highly qualified applicants from being referred, let alone evidence of the names of persons not referred under those MPA's. Thus, even if 31(a) was admitted, the court had no further documentary or anecdotal evidence upon which to base any statistical inquiry of its own to determine the possibility of adverse impact under the 85% Rule.[111]

78. The only anecdotal evidence to support plaintiff's adverse impact claim came briefly from the plaintiff and from plain-

tiff's witness from CPO, William Thomas Dickerson.[112] Plaintiff correctly testified that she was denied referral in 303–79 due to application of the 85% Rule. Blue then stated, in conclusory fashion, that this non-referral meant, *ipso facto*, that the Rule adversely impacted upon her and other blacks due to their race. This was the extent of Blue's testimony on the 85% Rule.

As for Dickerson, he testified at trial, that upon review of preliminary data gathered by Recruitment and Placement at CPO in 1981 and early 1982, his office had initially concluded that the 85% Rule "may" have had an adverse impact on minority candidates. Test. of Dickerson at 526–29. Plaintiff subjected Dickerson, a hostile witness, to essentially strenuous cross-examination on this topic, yet Dickerson remained firm in his conviction that (1) the data reviewed was preliminary; (2) the conclusion arrived at was preliminary; and (3) the conclusion itself was, at best, tenuous. Plaintiff attempted to impeach Dickerson with his deposition, but that effort failed because his statement there in June of 1982, was "[w]e have identified certain provisions [the 85% Rule and Top Ten Rule] of the union contract, in some of the preliminary work that we have done, that indicates there *may have been* some adverse impact." Deposition of Dickerson at 24–25 (emphasis added). This was the extent of Dickerson's testimony on the 85% Rule and the end of plaintiff's evidence on the issue.[113]

110. Plaintiffs claimed 31(a) was an exact printout of defendant's CIVPERSINS (civilian personnel) computer tape run by Parrow, while defendant claimed it was not a dump from CIVPERSINS and questioned its authenticity.

111. Plaintiffs did submit an unverified document entitled, "List of Witnesses of Plaintiffs and Plaintiff–Intervenors Who Were Affected by the 85% Rule and the Rule Limiting the Number of Referrals to Ten," on June 1, 1984. This two-page document lists ten (10) plaintiffs and/or witnesses purportedly affected by both rules. The document obviously is not evidence for the court to consider in Blue's case and, even if it were, it alone contains essentially useless information. For example, the list contains a number of plaintiffs and witnesses out

side of DENTAC. And, the list is limited in scope—it only purports to list a select few affected by the rules at Ft. Bragg and fails to provide the court with any overall information such as the number of whites and blacks generally, let alone in DENTAC, who were affected by these rules.

112. Even Ms. Ballew, who was listed on plaintiffs' 85% Rule filing referred to in fn. 111, *supra*, did *not* testify in Blue's case as to her alleged non-referrals for positions in DENTAC under the Rule.

113. The court denied plaintiff's motion at trial to introduce Dickerson's deposition into the substantive evidence, instead allowing plaintiff to attempt to impeach Dickerson with the doc-

Although the court does not fully credit all of Dickerson's testimony, finding him unnecessarily evasive and hostile at certain points, there is nothing in the record that causes the court to disbelieve his testimony on the 85% Rule. Plaintiff did not seek to admit any additional proof on the issue or even to suggest to the court that CPO had final data or a study indicating adverse impact under the Rule. If such evidence existed, plaintiff had ample opportunity to discover and introduce it. Dickerson's deposition was taken six months prior to trial. Plaintiffs never filed a discovery motion with the court indicating defendant was withholding documentary evidence on this issue. No witness testified in contradiction to Dickerson. The court has even independently reviewed all of the depositions filed in this case and finds no statement contraverting Dickerson's testimony. *See, e.g.*, January 26, 1982, Deposition of Jerry Wayne Horne at 57–59.

Thus, when all is said and done, plaintiff's adverse impact claim rests solely on plaintiff's conclusory allegation of discriminatory impact and Dickerson's statement that the 85% Rule "may" have impacted adversely, predicated on a review of preliminary data at CPO—data not before the court.[114] To suggest that this evidence even comes close to presenting a *prima facie* case of disparate impact is ludicrous.

79. As for plaintiff's 1979 supervisory appraisal argument, the court has previously issued its findings of fact on this issue, *supra*, and those findings are incorporated by reference for this claim as well. The court finds that the appraisal was not the product of racial discrimination and, therefore, Blue's contention that she would have overcome the "85% Rule" hurdle, but for the appraisal, must be rejected.[115]

80. Plaintiff's third argument under 303–79 was that if she had been referred, she would have been selected for the position. Of course, this contention is meaningless since plaintiff was not improperly denied referral by the Rating and Ranking Panel. Nonetheless, assuming plaintiff was referred, the court finds no basis to assume plaintiff would have been selected for the position. Other than Blue's own opinion that she was best qualified, Blue offered only the testimony of Ballew to support her claim. Ballew's testimony on this issue consisted of the conclusory statement that Blue was the best dental assistant in DC–6 in "oral surgery." The court, for reasons hertofore detailed, finds this testimony incredible and, even if viewed as credible, wholly insufficient to support plaintiff's contention.

Defendant, on the other hand, offered the testimony of numerous witnesses establishing that Blue was something considerably less than the best dental assistant, even in exodontia, at DC–6. To summarize, defendant's witnesses opined that Blue had the ability to do a good job, but rarely did so because of her insubordinate attitude, preoccupation with going "by the book," her attempts to evade work, and generally her confrontative personality. To borrow the words of a witness in the Mattiebelle Harris case, Blue's supervisors, co-employees, and the dentists at DC–6 were all in agreement that she was not a "cherished and valued employee that a boss would fall on his sword for in order to keep."

81. In contrast to Blue's lack of experience in oral surgery, the selectee in 303–79, Ginette Moreau (white), had extensive experience working with a board certified oral surgeon. Both COL. Morgan, the selecting official, and MJR. Sykes testified

---

ument. In its discretion, the court reverses this ruling and hereby ALLOWS the deposition into evidence as substantive evidence. Even given this ruling, however, the deposition provides no additional evidence of adverse impact.

**114.** The court further notes that of the six referees for MPA 303–79, two (2) were black, Linda Feeley and Jerald Turner. Test. of Blue at 265.

**115.** The December, 1979 supervisory appraisal by Vincent was used by the Rating and Ranking Panel to evaluate Blue under MPA 303–79. Blue's total score was 72.42. The cut-off score was 73.9075 (85% of 86.95, the top score). Had Blue received the maximum number of points allowed for supervisory appraisals she would have been within 85% of the top score.

that Moreau had assisted an oral surgeon, Dr. Allwine, for *at least three years,* and that she had a reputation for excellence among the dentists for whom she worked. Test. of Morgan at 1289–93; Test of Sykes at 1174–81; DX205 at 103. As in the case of MPA 273–79, Sykes testified that between Moreau and Blue, had he been the selecting official and had Blue been referred, he would have chosen Moreau because of her greater experience and qualifications. *Id.* at 1181.

Ironically, just as Blue testified with regard to 273–79 selectee Joan Brocki, she testified on direct examination that, *having reviewed Moreau's qualifications,* she was better qualified for the position than Moreau. Test. of Blue at 41–42. Yet, on cross-examination Blue conceded that she really had *no knowledge* of Moreau's qualifications and experience—although incredibly she still contended she was better qualified.[116] *Id.* at 222–27. It is difficult for the court to understand how Blue could claim to be the best qualified for the position when she had not the foggiest notion of the skills of the selectee.

82. Finally, with respect to plaintiff's retaliation argument, Blue traces this claim back to the actions of LTC Cressler, SSG Ramos, Vincent, and COL. Paquette. The court's prior findings with regard to the actions of these individuals are incorporated by reference into plaintiff's 303–79

claim. The court finds plaintiff was not retaliated against by any of these officers.

Blue claims that evidence of defendant's retaliation can be found by the fact that she was not placed on a regular rotation schedule at DC–6 by Cressler,[117] the proposed letter of reprimand by Ramos, the 1979 "low" supervisory appraisal by Vincent, the counselling imposed upon her due to allegations that she illegally and frequently parked in the DC–6 fire zone, and other unidentified incidents of harassment. *See* Plaintiff's November 19, 1984, Proposed Findings of Fact and Conclusions of Law for Sandra Blue at 22–23. The short answer to plaintiff's contention is that plaintiff clearly was at fault in all of the above disciplinary incidents and the 1979 evaluation was a legitimate appraisal of her productivity. Thus, these examples show absolutely no evidence of harassment.

Furthermore, disregarding the 1979 appraisal, already commented upon at length by the court, even if all of the other incidents proved true, they had no effect on plaintiff's 303–79 promotion attempt. Plaintiff was denied referral due to a facially, and so far as the court can determine from the evidence, factually neutral promotion standard—the 85% Rule. There is no evidence the Rating and Ranking Panel retaliated against the plaintiff in compiling her score. Indeed, as with 273–79, the record is void of any mention of the

**116.** *Direct Examination of Blue:*

Q: Have you had a chance to look at Ms. Moreau's qualifications for this position?

A: *Yes, I have.*

Q: Did you form an opinion whether you were qualified, as qualified, or better qualified than Ms. Moreau for this position?

A: I feel like I was more qualified than Ms. Moreau.

Q: Why do you say that you were more qualified than Ms. Moreau?

A: I had more experience as far as operating room protocol and also my working as dental assistant in oral surgery.

*Cross–Examination of Blue:*

Q: Isn't it true that Ginnette Moreau worked for three years as an assistant to an oral surgeon?

A: I *don't know.*

Q: You don't know.

A: *No.*

\* \* \* \* \* \*

Q: Well, do you know Ginnette Moreau's qualifications?

A: *No.*

Q: So how do you know you're better qualified than she?

A: I was going by what was in the, her application, her grade versus my grade.

(emphasis added).

**117.** Although the evidence on the rotation system for dental assistants at DC–6 was somewhat inconclusive and contradictory, the court finds no credible evidence to support plaintiff's assertion that she was discriminated against in the rotation schedule. Indeed, it appears that for the most part, all of the dental assistants rotated between jobs on an equal basis, (sometimes contrary to plaintiff's wishes), and when Blue was pulled from the rotation system, it was generally at her own request.

panel or its members.[118] Accordingly, the court finds no evidence that alleged retaliation or harassment by the defendant played any role in plaintiff's non-referral for MPA 303-79.

83. In sum, the anecdotal and documentary evidence in this case utterly fails to support plaintiff's claims that she was subjected to intentional race discrimination, harassed for exercising her Title VII rights, or adversely impacted by defendant's employment practices. Rather, the court finds plaintiff was a witness totally unworthy of belief and one who brought numerous charges of race discrimination against the defendant, often simply because she felt she should not be disciplined for failure to perform her duties properly and for being insubordinate, or denied promotion even when unqualified for the postion.

## V. CONCLUSIONS OF LAW FOR PLAINTIFF SANDRA BLUE'S CLAIMS OF DISCRIMINATION [119]

1. This action was instituted by plaintiffs under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, with the court having jurisdiction over the litigation pursuant to 28 U.S.C. § 1343.

2. Likewise, the court entertains jurisdiction over the parties to the action and all conditions precedent to the maintenance of the litigation have been met.

For ease of analysis, the court's conclusions of law will issue in the following order: plaintiff's disparate treatment claims, disparate impact claim, excessive subjectivity claim, retaliation claim, and finally, an analysis of Blue's "affirmative action" preference argument.

### A. *Disparate Treatment Claims*

### 1. *General Framework for Analysis*

3. The Title VII provisions establishing employment discrimination liability are Sections 703(a)(1) and 703(a)(2), which state:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1982). From this statute, the Supreme Court has recognized two basic theories of recovery: disparate *treatment* and disparate *impact*. See *Palmer v. Shultz*, 815 F.2d 84, 90 (D.C.Cir. 1987); *Goodman v. Lukens Steel Co.*, 777 F.2d at 130.

4. In a disparate treatment case, § 703(a)(1), the plaintiff attempts to demonstrate that he is the victim of intentional, often covert, discrimination. " 'Disparate treatment' ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin...." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed. 2d 396 (1977). Proof of discriminatory intent is critical. *Id.* The ultimate factual inquiry in this type of case is whether the defendant intentionally discriminated against the plaintiff, *United States Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983), with the plaintiff having the burden of establishing proof from which

---

**118.** In addition, plaintiff's re-rating by the panel belies any possible inference of discrimination against Blue.

**119.** The ultimate determination of discrimination *vel non* is properly characterized as a

"mixed question of law and fact." *See, e.g., Wiggins v. Spector Freight System, Inc.*, 583 F.2d 882, 885 (6th Cir.1978); *Causey v. Ford Motor Co.*, 516 F.2d 416 (5th Cir.1975).

the factfinder can infer—if the conduct remains unexplained—that more likely than not, defendant's action was "based on a discriminatory criterion illegal under the Act." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). *See also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In other words, to establish employment discrimination on the basis of disparate treatment, it must be shown that the employer bore a racially discriminatory animus against the employee, and that this animus manifested itself in some challenged action, whether it be dismissal, failure to hire, or failure to promote. *Lewis v. University of Pittsburgh*, 725 F.2d 910, 914 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984).

On the other hand, in a disparate impact case, § 703(a)(2), the plaintiff attempts to demonstrate that a neutral rule, fair on its face and objectively applied, has a significantly greater effect on persons protected under Title VII than on the majority group. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Disparate impact analysis is directed at the "consequences of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. at 854. Thus, unlike disparate treatment, proof of discriminatory intent is not required under disparate impact theory. The ultimate factual inquiry under impact analysis is whether the challenged criterion has a disproportionate impact on a protected class which cannot be excused by business necessity. Viewed

in this light, *Griggs* and its progeny stand for the proposition that Title VII prohibits any conduct which operates as the functional equivalent of intentional discrimination. *See International Brotherhood of Teamsters, supra.*

5. The basic analytical framework governing claims of disparate treatment was originally set forth in the seminal case of *McDonnell Douglas Corp. v. Green, supra.* This pronouncement was subsequently elaborated upon and clarified in *Furnco, supra; Burdine, supra;* and *Aikens, supra.* These cases suggest several different ways in which a plaintiff may show, and a court may find, liability for disparate treatment under Title VII.

First, a plaintiff may prove the discriminatory intent of the defendant through direct evidence of discriminiation, *e.g.*, by introducing invidious statements of the defendant. *Holmes v. Bevilacqua*, 794 F.2d at 196; *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir.1985), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985); *EEOC v. Maxwell Co.*, 726 F.2d 282 (6th Cir.1984). If the fact finder believes the direct evidence presented by the plaintiff, a presumption is created that the adverse employment action taken against the plaintiff was a product of that discriminatory intent. *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir.1985); *Hill v. Seaboard Coastline Railroad Co.*, 767 F.2d 771, 775 (11th Cir. 1985); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556–57 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).[120] At this point, the

---

**120.** This distinction between direct and circumstantial evidence raises the issue of what constitutes "direct" evidence. *See Dybczak v. Tuskegee Institute*, 737 F.2d 1524, 1528 (11th Cir.1984), *cert. denied*, 469 U.S. 211, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985) (statistics are not direct evidence); *Johnson v. Allyn and Bacon, Inc.*, 731 F.2d 64, 69 n. 6 (1st Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984) (same); *Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 724 (8th Cir.1984). As a general definition, [c]ircumstantial evidence is that which establishes the fact to be proved only through inference based on human experience that a certain circumstance is usually present when

another certain circumstance or set of circumstances is present. Direct evidence establishes the fact to be proved without the necessity for such inference.

*Radomsky v. United States*, 180 F.2d 781, 783 (9th Cir.1950). *Cf. United States v. Henderson*, 693 F.2d 1028, 1031 (11th Cir.1982) (direct evidence defined as when witness testifies to fact being asserted on basis of his or her personal knowledge of fact). With direct evidence, the only inference needed is the assumption that the witness or document is credible. Direct evidence is always relevant; circumstantial evidence must be weighed for its relevance.

burden shifts to the defendant to prove by a preponderance of the evidence, that the adverse action would have been taken even in the absence of a discriminatory motive. *Bell* citing the standard established in *Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See also Terbovitz v. Fiscal Court of Adair County, Ky.*, 825 F.2d 111, 114–115 (6th Cir.1987); *Fields v. Clark University*, 817 F.2d 931, 935–37 (1st Cir.1987); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875–76 (11th Cir.1985).

■ Since discriminatory intent is seldom capable of proof by direct evidence, *Warren v. Halstead Industries, Inc.*, 802 F.2d 746, 752 (4th Cir.1986), indirect or circumstantial evidence can also be used to prove state of mind. *Aikens*, 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3; *Conway v. Electro Switch Corp.*, 825 F.2d 593 (1st Cir.1987) ("[i]ndeed, discrimination can be of such a subtle, insidious character that a plaintiff may only be able to offer circumstantial evidence to buttress his or her claim."); *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 20 (7th Cir.1987). Accordingly, plaintiff's second method of establishing a *prima facie* case is through the use of indirect evidence whose cumulative probative force, apart from the operation of any presumption, suffices under the controlling standard to support, as a reasonable probability, the inference that but for the plaintiff's race he would not have suffered an adverse employment action. *Holmes v. Bevilacqua*, 794 F.2d at 146; *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 242 (4th Cir.1982). The Supreme Court has provided explicit guidance for the order of proof and the allocation of burdens in such cases:

> First, the plaintiff has the burden of proving by the preponderance of the evidence, a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination.[121]

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 *citing McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. *See also Moore v. City of Charlotte*, 754 F.2d at 1105.[122]

■ The burden of going forward and establishing a *prima facie* case is not a

---

Although these general definitions are easy to enunciate, it is quite another thing altogether to apply the definition in the Title VII context to any given set of facts. Indeed, a review of circuit authority indicates that the circuits are in hopeless disagreement over exactly what constitutes "direct evidence of discriminatory intent." *See* Edwards, *Direct Evidence of Discriminatory Intent and the Burden of Proof: An Analysis and Critique*, 43 Wash & Lee L.Rev. 1, 13–17 (1986) and cases cited therein. Notwithstanding this confusion, at least in this circuit the law is clear on one point—statements of a defendant can be direct evidence if they take the form of a race-conscious explanation of the employment action or a racist remark. *Moore v. City of Charlotte*, 754 F.2d at 1105.

**121.** This allocation of proof represents a method for analyzing evidence and is not a trial procedure by which the parties must present their respective cases. The formula does not compartmentalize the evidence so as to limit its use to only one phase of the case. For example, plaintiff's evidence might serve both to establish a *prima facie* case and discredit a defendant's explanation. *Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir.1984).

**122.** It is important to recognize that this framework does not in any way relieve the plaintiff of his basic burden of proof. As the court further explained in *Burdine*, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.... The *McDonnell Douglas* division of intermediary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question." 450 U.S. at 253, 101 S.Ct. at 1093. At each stage in the procedure, the issues are winnowed and narrowed, and the factual inquiry proceeds to a heightened level of specificity. *Id.* at 255, 101 S.Ct. at 1094. When the litigation reaches the third and last stage, the plaintiff's burden of showing pretext "merges" with the plaintiff's ultimate burden of proving unlawful discrimination. *Id.* at 256, 101 S.Ct. at 1095.

heavy one. *Young v. Lehman*, 748 F.2d 194, 197 (4th Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985). To satisfy the requirement, plaintiff need only raise an inference that the defendant acted with discriminatory intent, *i.e.*, plaintiff's adverse employment action occurred "under conditions which, more likely than not, were based upon impermissible racial considerations." *Gairola v. Commonwealth of Virginia Department of General Services*, 753 F.2d 1281, 1286 (4th Cir.1985); *Young v. Lehman*, 748 F.2d at 196.

■■■ Various circumstances may give rise to this inference of discrimination. *See Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 618 (11th Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984). Evidence of irregular or suspect employment procedures may suffice. 748 F.2d at 147. Certainly, evidence of a general pattern of racial discrimination within the defendant's workforce will meet this standard. *Moore v. City of Charlotte, supra; Warren v. Halstead Industries, Inc.*, 802 F.2d at 753. In addition, an inference of discrimination adequate to create a *prima facie* case of disparate treatment can be established by meaningful statistical evidence or by a showing that decisions made by the defendant depended largely on excessively subjective factors. *Palmer v. Shultz*, 662 F.Supp. 1551, 1568–69 (D.D.C.1987). *See also* fn. 131 and Conclusions of Law 38–47 *infra*.

More frequently, however, plaintiffs establish their *prima facie* case using the Supreme Court's model of motivational inferences in *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. This formula, which if met eliminates the most common non-discriminatory reasons for any disparate treatment, requires a plaintiff to show: (1) that he is a member of a protected class; (2) that he applied and was qualified for the job; (3) that though qualified, he was re-

jected, and (4) that after his rejection, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications. *Id. See also Holmes v. Bevilacqua*, 794 F.2d at 146.

As the Court noted in *McDonnell Douglas*, "[t]he facts necessarily will vary in Title VII cases" and, therefore, the elements outlined in the Court's four-part test for establishing a *prima facie* case of disparate treatment will vary according to the facts in each case. Although *McDonnell Douglas* had to do with hiring discrimination, an adapted burden of production has been imposed on plaintiffs seeking to establish *prima facie* cases of discrimination in promotions, job assignments, compensation and training. *See, e.g.*, cases cited in B. Schlei and P. Grossman, *Employment Discrimination Law* 36, 1317–1321 (1983). The *McDonnell Douglas* test is not meant to be applied in a rigid, mechanized or ritualistic manner; it was never intended to be a Procrustean bed within which all disparate treatment cases must be forced to lie. *See Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949.

The *McDonnell Douglas* method of establishing a *prima facie* case addresses two evidentiary problems common to most Title VII cases: (1) as stated earlier, direct evidence of discriminatory intent is always difficult to find and often non-existent; and (2) the employer enjoys greater access to proof of its reasons for its own employment decisions. *See Loeb v. Textron*, 600 F.2d 1003, 1014 (1st Cir.1979). *McDonnell Douglas* therefore allows the plaintiff to shift the burden of production from himself to the defendant once plaintiff negates "the two most common legitimate reasons" for an employment decision: lack of qualifications or absence of a job vacancy. *International Brotherhood of Teamsters*, 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44. *See also Bell v. Birmingham Linen Service*, 715 F.2d at 1556.[123]

**123.** The burden of production, or as it also referred to, the burden of going forward with the evidence, is the obligation imposed upon a litigant during trial to present evidence on the element at issue. The evidence presented must be of sufficient substance to permit the factfinder to act upon it.

The burden of production is met, not by convincing the factfinder of the truth of the fact, but by satisfying the court that such a finding

Accordingly, proof of the *McDonnell Douglas* elements establishes a *prima facie* case of illegal motivation. These objective elements create "an inference of discrimination because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949. This showing, of course, is not conclusive proof of discriminatory motive. If the plaintiff establishes these elements, the burden of production then shifts to the defendant to articulate some legitimate non-discriminatory reason justifying the employment action. However, failure of the defendant to articulate a reason that is both legitimate and non-discriminatory will result in a judgment, as a matter of law, for the plaintiff.[124] *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. This is because when "all legitimate reasons for rejecting an applicant have been eliminated [or no reasons have been articulated] ... it is more likely than not the employer, whom we generally assume acts with *some* reason, based his decision on an impermissible consideration." *Furnco, supra.*[125]

*could be made.* This burden aids the court in determining whether if the trial were halted at the conclusion of the party's case-in-chief, the court would immediately decide the case against the party or, instead, require all the evidence to be presented. Thus, the burden of production determines the timing of the presentation of the evidence. It provides that when the evidence is inadequate, the party with the burden loses and it operates in a jury setting to remove the issue from the jury.

The burden of persuasion, on the other hand, refers to the risk of uncertainty about an element's resolution. When the parties contest an element of a case, the party having the burden of persuasion on that element will lose if the factfinder's mind is in equipoise after he has considered all of the evidence. Thus, the burden of persuasion contains the dual elements of location and weight: the location specifies the party who will lose if the burden is not met, and the weight mandates how persuasive the evidence must be to sustain the burden (preponderance of the evidence, clear and convincing evidence, etc ...).

In this case, unless otherwise stated, the party with the burden of persuasion must prove the element(s) at issue by a preponderance of the evidence. Belton, *Burdens of Pleading and Proof in Discrimination Cases: Toward a Theory of Procedural Justice,* 34 Vand.L.Rev. 1205, 1207–08 and 1216 (1981). *See also* Player, *The Evidentiary Nature of Defendant's Burden in Title VII Disparate Treatment Cases,* 49 Mo.L.Rev. 17, 23–24 (1984).

**124.** Prior to *Burdine,* there was some question concerning whether the *prima facie* case merely *allowed* a finding on behalf of the plaintiff, or whether in the absence of contradicting evidence, a *prima facie* case *required* a finding for the plaintiff. *See, e.g., Olson v. Philco–Ford,* 531 F.2d 474 (10th Cir.1976). *See also* Mendez, *Presumptions of Discriminatory Motive in Title VII Disparate Treatment Cases,* 30 Stan.L.Rev. 1129, 1149–50 (1980). However, the Court in *Burdine* held that plaintiff's *prima facie* case established a "legally mandatory, rebuttable presumption" of discrimination. 450 U.S. at 255, n. 7, 101

S.Ct. at 1094 n. 7. Thus, the decision in *Burdine* means that the "inference" created by a *prima facie* case is not merely a "permissible" one that allows for the inference of the fact in issue, but rather is a "rebuttable presumption" that *requires* a finding in favor of the party who has the benefit of the presumed fact. Player, *Defining "Legitimacy" in Disparate Treatment Cases: Motivational Inferences as a Talisman for Analysis,* 36 Mercer L.Rev. 855, 861 n. 26 (1985). For more detailed discussions of the differences between presumptions and inferences, *see generally* C. McCormick, *McCormick's Handbook of the Law of Evidence* §§ 336–347 (2d ed. E. Cleary 1972) and 9 J. Wigmore, *Evidence* §§ 2483–2540 (Chadbourn rev. 981). *See also* fn. 157 *infra.*

**125.** The *McDonnell Douglas* formula proceeds under the assumption that a single motive explains the employer's decision to effect an adverse employment action against the plaintiff. *See Haskins v. United States Department of the Army,* 808 F.2d 1192, 1197 (6th Cir.1987). The shifting burdens inherent in *McDonnell Douglas* are designed to determine whether defendant was truly motivated by the alleged unlawful discrimination or its asserted nondiscriminatory justification. *Id.* at 1197; *Bibbs v. Block,* 778 F.2d 1318, 1320–21 (8th Cir.1985) (*en banc*). This formula, however, is inapplicable to cases wherein the plaintiff has presented credible, *direct* evidence of discrimination. *Terbovitz,* 825 F.2d at 114–115; *McCarthney v. Griffin–Spalding County Board of Education,* 791 F.2d 1549, 1553 (11th Cir.1986). "Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." *Blalock v. Metals Trades, Inc.,* 775 F.2d at 707. Direct evidence of discrimination, if credited, removes the case from *McDonnell Douglas* because the plaintiff no longer requires the assistance of an inference of discrimination arising from a *prima facie* case. If a plaintiff's direct evidence is credited, the court must, *a fortiori,* find that unlawful discrimination was at least "a motivating factor" for the defendant's actions. *Id.* at 707–710. Thus, if the employer

6. To rebut the presumption created by plaintiff's *prima facie* circumstantial case, the defendant's burden is to "articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. This description of the defendant's burden raises two questions. First, how much evidence must the defendant introduce in order to meet his burden of articulating a nondiscriminatory reason? Second, what sort of reason will the court recognize as a legitimate nondiscriminatory one?

■■■ The problem of how much the defendant must show was substantially resolved by the Court's decision in *Burdine, supra*. *Burdine* made explicit several points which were implicit in earlier disparate treatment cases. First, as previously noted, the Court made clear that the plaintiff's *prima facie* case under the four-part *McDonnell Douglas* test creates a presumption, not simply an inference, of intentional discrimination by the defendant. 450 U.S. at 254–55, 101 S.Ct. at 1094–95 n. 7. Second, the effect of this presumption is to shift the burden of production, not the burden of persuasion, to the defendant. *Id*. "The defendant need not persuade the court that it was actually motivated by the proffered reasons," *id*. at 254, 101 S.Ct. at 1094, nor present clear and convincing evidence of non-discrimination, *Felton v. Trustees of the California State Universities and Colleges*, 708 F.2d 1507, 1508 (9th Cir.1983), but simply must present evidence raising a "genuine issue of fact" as to whether "the plaintiff was rejected, or someone else preferred, for a legitimate non-discriminatory reason." *Burdine supra; Aikens*, 460 U.S. at 714, 103 S.Ct. at 1481. Third, the reason articulated must

contradict the *prima facie* case. It must be clear, specific, legitimate and articulated through the introduction of admissible evidence. 450 U.S. at 254–55, 101 S.Ct. at 1094.

Thus, the defendant's burden of production is met by producing sufficient evidence to undercut the presumption of discrimination even without ultimately persuading the court of the absence of any discriminatory motive. In the Court's view, this burden of production both requires the defendant to meet the plaintiff's *prima facie* case as well as providing the plaintiff a fair opportunity for rebuttal. *Id*. at 255–56, 101 S.Ct. at 1095. The amount or quality of the defendant's evidence must be "evaluated by the extent to which it fulfills these [two] functions." *Id*. *See* Furnish, *A Path Through the Maze: Disparate Impact and Disparate Treatment Under Title VII of the Civil Rights Act of 1964 After Beazer and Burdine*, 23 B.C.L.Rev. 419, 433–35 (1982).

Clearly then, the Court's description of the amount of evidence the defendant is required to produce at this second stage indicates that one of the goals of the *Burdine* standard is to provide plaintiffs with discovery, sufficiently detailed, so as to make it possible for them to prove illicit intent. The defendant cannot simply rest on conclusory allegations in the pleadings or argument of counsel. An articulation not admitted into evidence does not suffice. 450 U.S. at 255 n. 9, 101 S.Ct. at 1094 n. 9. Stage two is thus designed "to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id*. at 255–56, 101 S.Ct. at 1095.[126]

does not assert an alternative explanation for its actions, Title VII liability automatically follows.

If however, the employer does propose an alternative justification, the case becomes a "mixed motive" one and the crucial issue becomes that of causation. *See Haskins*, 808 F.2d at 1197. In a direct evidence case, as opposed to one under *McDonnell Douglas*, since discrimination has already been shown by plaintiff's evidence, the defendant must do more than merely articulate a non-discriminatory justification; rather, the defendant bears the burden of proving what amounts to an affirmative de-

fense, that the adverse employment action would have occurred for the legitimate reasons even in the total absence of any discriminatory motive. *Terbovitz*, 825 F.2d at 115.

**126.** Once the employer has articulated the required evidence under *Burdine*, the *prima facie* presumption "drops from the case" and the trier of fact is then "in a position to decide the ultimate factual issue," *Aikens*, 460 U.S. 715–16, 103 S.Ct. at 1482, which is: was the employer's action based upon impermissible discrimination. *Id*. Of course, no formal trifurcation of

▮ In sum, although an employer need not prove that legal reasons actually motivated its decision, it must do considerably more than simply plead the existence of a legitimate reason. Left unresolved after *Burdine*, however, with respect to the quantum of proof required, is whether the defendant's burden of production only requires introducing evidence of the existence of the reason or whether the defendant's burden also carries with it the necessity of proving the existence of the reason. *See* 49 Mo.L.Rev. at 17. Agreeing with the cogent law review article just cited, this court holds that the defendant's burden is to establish that the reason asserted actually exists. "It is only by convincing the trier of fact that the reason exists that the defendant meets its burden of going forward on the ultimate issue of motivation." *Id.* For the following reasons, the court finds this intermediate burden fully consistent with the established principle that plaintiff bears the ultimate burden of persuasion on the issue of motivation.

The ultimate factual issue in disparate treatment cases is the defendant's motivation. Intermediate factual issues may arise and they may create inferences that go to the ultimate issue.[127] To create a presumption of illegal motivation, a plaintiff must establish the factual existence of objective elements from which the pre-

sumption of illegal motive can be deduced. Similarly, since a defendant must create an inference of legal motive, it should be necessary for the defendant to establish the objective facts from which such motivation can be inferred. 36 Mercer L.Rev. at 862–63 n. 36. If the factfinder does not believe that the reason articulated actually exists, or that the defendant believed that it existed, *DeAnda v. St. Joseph Hospital*, 671 F.2d 850, 854 (5th Cir.1982), there is no premise from which the factfinder can infer that the articulated reason, rather than the proscribed criteria, motivated the employment decision.[128] Thus, the plaintiff's *prima facie* showing of illegal motivation has not been met and refuted by a legally sufficient counter-inference. *See Lewis v. Smith*, 731 F.2d 1535 (11th Cir.1984); *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir.1983); *Sylvester v. Callon Energy Service, Inc.*, 724 F.2d 1210 (5th Cir.1984); *Lanphear v. Prokop*, 703 F.2d 1311 (D.C.Cir.1983); *Mohammed v. Callaway*, 698 F.2d 395 (10th Cir.1983); *Miller v. WFLI Radio*, 687 F.2d 136 (6th Cir.1982). In sum, only by concluding that the defendant's proferred reason exists, or that the defendant believed it existed, can a trial court infer that the reason, rather than the illegal factor, motivated the particular employment action. 49 Mo.L.Rev. at 39; 36 Mercer L.Rev. at 862–63.

trial is required under *McDonnell Douglas* because it provides "merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Id.* *See* fn. 121, *supra*.

127. Resolving intermediate factual issues is necessary because the intermediate facts provide the foundation upon which the ultimate issue of motivation is based.

128. The word "reason" can be divided into both objective and subjective elements. By requiring a defendant to articulate a "reason," *McDonnell Douglas* and its progeny have made it clear that more is required than a subjective denial of illegal motivation. "Reason" necessarily presupposes the existence of underlying objective facts. 49 Mo.L.Rev. at 31. Motivation stems from facts. Accordingly, there must exist objective facts upon which defendant's subjective motivation is premised. *Id.* Proving a "reason" simply means establishing the existence of these facts or events upon which the defendant says his action was allegedly based.

When "reason" is defined in objective terms, a burden of persuading the factfinder that the articulated reason actually exists does not impose on the defendant the burden of persuasion on the ultimate issue of motivation. The two burdens can and do exist simultaneously. Defendant can be subjected to the burden of persuading a factfinder that an intermediate fact (reason) exists, which fact evidences the ultimate fact in issue (motivation), without requiring the defendant to persuade the factfinder of the existence of the ultimate fact. *Id.* at 32.

If the reason articulated by the defendant is found to exist, this is important, *not* because it conclusively establishes the legality of defendant's action, but because the court can now infer from the factual existence of the articulated reason that this reason motivated the defendant's decision. In effect, defendant has addressed the initially presumed fact of illegal motivation and placed it in issue through the inference of legal motivation properly deduced from the existence of basic facts. *Id.* at 33.

Turning to the second issue left open after *Burdine,* the court holds that for the employer's reason to be deemed sufficient to overcome the presumption against him, it must have a rational connection with the business goal of securing a competent and trustworthy work force. 23 B.C.L.Rev. at 437. Except in rare instances (*see* fn. 130, *infra,* at 1285–86), the defendant must produce evidence of a legitimate business-related reason which could explain behavior that otherwise appears discriminatory. *Id. See Jennings v. Tinley Park Community Consolidated School District No. 146,* 796 F.2d 962 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987); *Abrams v. Baylor College of Medicine,* 581 F.Supp. 1570 (S.D.Tex.1984), *aff'd. in relevant part,* 805 F.2d 528 (5th Cir.1986).

At a minimum, to be legitimate, a reason must be legal. On the other hand, a reason is not deprived of its legitimacy merely because it is not necessary. A wide gulf exists between legality and necessity. 36 Mercer L.Rev. at 877. Since the ultimate issue in disparate treatment cases is the defendant's motivation, the defendant's articulated reason should be examined to determine whether it can be inferred from the existence of the reason that the employer was properly motivated. *Id.* A reason cannot be legitimate if it fails to carry a defendant's evidentiary burden to meet and refute plaintiff's *prima facie* case. That is to say, a reason is legitimate only if it is capable of supporting an inference of legal motivation in the context of the case in which it is being alleged. If the reason articulated does not permit an inference of proper motivation to be drawn, or if drawn, the inference is so anemic that it does not refute the presumption in plaintiff's favor, it must be concluded that the reason lacks legitimacy. *Id. See also* 49 Mo.L.Rev. at 20 n. 10 ("A reason totally divorced from reasonable employer concerns could not

carry a factual inference that it was the articulated reason rather than the illegal concerns that motivated the employer's decision."). Legitimacy is, therefore, a legal term of art, sufficiently flexible to be judged in light of permissible motivational inferences. 36 Mercer L.Rev. at 877.

Thus, except in rare instances, a reason will be deemed legitimate only if it has a rational relationship to *bona fide* business concerns. In a phrase, the reason must have business rationality. *Id.* at 880. Reasons that are arbitrary and irrational are not legitimate as they fail to support any inference of legal motivation. *See Brown v. Tennessee,* 693 F.2d 600, 605 (6th Cir.1982); *United States v. City of Miami,* 614 F.2d 1322, 1345–46 (5th Cir.1980), *modified,* 664 F.2d 435 (5th Cir.1981). Such reasons would not be used by a reasonable businessperson similarly situated and, therefore, it cannot be inferred with any strength that the proferred reasons, in fact, motivated the employer's decision.[129] Arbitrary reasons leave the plaintiff's presumption of illegal motivation unrefuted. 36 Mercer L.Rev. at 878.

In sum, a defendant need not prove the reason articulated for its treatment of the plaintiff was "necessary" or even directly related to actual job performance, but the reason must be legal and not so devoid of rationality that it fails to support an inference of legal motivation. The list of legal, nonarbitrary reasons that have a rational relationship to *bona fide* employer concerns is nearly infinite. Common examples include an employee's lack of experience, skills or education, misconduct on or off the job, personality conflicts, and superior qualifications of selectees. *See* articulated reasons and cases cited *id.* at 881–83 and in Schlei and Grossman, *Employment Discrimination Law* at 249–50 (1983–84 Cum.Supp.).[130]

---

**129.** *E.g., Williams v. City of Montgomery,* 742 F.2d 586 (11th Cir.1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985); *Howard v. Roadway Express Inc.,* 726 F.2d 1529 (11th Cir.1984); *George v. Farmer's Electric Co-op, Inc.,* 715 F.2d 175 (5th Cir.1983); *Pirone v.*

*Home Insurance Co.,* 507 F.Supp. 1281 (S.D.N.Y. 1981).

**130.** One possible exception to the general rule requiring business rationality is nepotism. Although most employment decisions based on nepotism or friendship still encompass some

7. Once the defendant has produced admissible evidence that would allow a trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus, the initial presumption drops from the case, and plaintiff's ultimate burden of persuasion now includes the requirement that he establish defendant's proffered reason is a pretext for discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Graefenhain v. Pabst Brewing Co.,* 827 F.2d at 18.[131] Plaintiff may meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id. See also Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 898–99 (3d Cir.1987) (*en banc*); *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 513 (7th Cir.1986); *Fields v. Bolger,* 723 F.2d 1216, 1219 (6th Cir.1984); *Grabb v. Bendix Corp.,* 666 F.Supp. 1223, 1243 (N.D.Ind.1986). However, whichever method is chosen, plaintiff must show that an illegal motive influenced the decision, for only when defendant's articulated rea-

son is a pretext for accomplishing a discriminatory purpose will the plaintiff be entitled to recover under *McDonnell Douglas, Burdine* and *Aikens. Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.1987); *White v. Vathally,* 732 F.2d 1037 (1st Cir.), *cert. denied,* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984); *Clark v. Huntsville City Board of Education,* 717 F.2d 525, 259 (11th Cir.1983); *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76 (2d Cir.1983). A simple finding that the defendant did not truly rely on its proferred reason, without a further finding that the defendant relied on race, will not establish liability under Title VII. *Clark, supra.*[132] Thus it is not enough to show that the employer's reasons were not the real reasons, were false, or were merely a pretext. *Grabb v. Bendix Corp.,* 666 F.Supp. at 1244. Plaintiff must show that they were a pretext for discrimination. *Id. citing Johnson v. University of Wisconsin–Milwaukee,* 783 F.2d 59, 64 (7th Cir.1986).[133]

In determining whether plaintiff can meet his ultimate burden of proving pretext and discrimination, the court must

---

rational relationship to *bona fide* business concerns, a situation may occur where that is not the case, yet the selection was clearly not racially motivated. In this rare case, it would appear defendant has still met his burden of production.

---

**131.** Thus, the Court in *Burdine* utilized a modified version of Professor Thayer's bursting bubble theory of presumptions, adopted by Fed.R. Evid. 301. Once the presumption is met by contradictory evidence, it ceases to have any probative value. J. Thayer, *A Preliminary Treatise on Evidence at the Common Law* 346 (1898). The Court rejected the theory that a presumption flowing from the *prima facie* case shifted to the defendant a risk of non-persuasion on the presumed fact (motivation). But the Court did not hold that the presumption entirely "disappeared," as Thayer suggested. Rather, *Burdine* holds that in evaluating whether plaintiff has persuaded the factfinder of the employer's motivation, the factfinder should "consider evidence previously introduced by plaintiff to establish a *prima facie* case." 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. *See* 49 Mo.L.Rev. at 21 n. 12.

**132.** Of course, a reason does not have to be false to be pretextual—only discriminatory. *LaMontagne v. American Convenience Products, Inc.,*

---

750 F.2d 1405, 1414–15 (7th Cir.1984); *Golomb v. Prudential Insurance Co.,* 688 F.2d 547, 551 (7th Cir.1982); *Rogers v. Illinois Department of Children and Family Services,* 43 FEP Cases 1134, 1136 (N.D.Ill.1987) [Available on WESTLAW, 1987 WL 6630].

**133.** When an employer offers a pretextual explanation for its conduct, this permits, but does not mandate a finding of discrimination. *See Benzies v. Illinois Department of Mental Health & Development Disabilities,* 810 F.2d 146, 148 (7th Cir.1987). "If the employer is trying to hide its real reason, that effort—coupled with the evidence making up the employee's *prima facie* case—may convince the trier of fact that the real reason needed to be hidden and therefore probably was discriminatory." *Pollard,* 824 F.2d at 558–59. When the reason advanced at trial is nothing but a "pretext for discrimination," to show "pretext" is, *a fortiori,* to establish "discrimination." *Id.* at 559 *citing Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. However, there may be occasions where what the employer is trying to hide is not discrimination, but rather some other offense, such as a violation of a collective bargaining agreement. In such situations, courts must be careful lest they confuse "pretext for discrimination" with "pretext" in the more common sense, *i.e.,* "meaning any fabricated explanation for an action." *Id.*

analyze the evidence on a cumulative basis. *Roman v. ESB*, 550 F.2d 1343, 1350–51 (4th Cir.1976); *Ardrey v. United Parcel Service*, 615 F.Supp. 1250, 1298 (W.D.N.C. 1985), *aff'd.*, 798 F.2d 679 (4th Cir.1986). Several types of evidence may be probative of pretext. For instance, in the promotion context a plaintiff may produce evidence that the defendant departed from its usual business procedure, that the reason articulated was not uniformly applied, or that the procedures by which a decision was made were suspect or excessively subjective. *Warren v. Halstead Industries, Inc.*, 802 F.2d at 753; *Love v. Alabama Institute for Deaf and Blind*, 613 F.Supp. 436, 438 (N.D.Ala.1984); *Gerdom v. Continental Airlines*, 692 F.2d 602, 604 (9th Cir.1982) (*en banc*). Evidence of a general atmosphere of discrimination may also be considered with other probative evidence, as well as proof of historically-limiting opportunity or harassment. *Warren, supra; Holsey v. Armour & Company*, 743 F.2d 199, 207–08, (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985). *See generally Furnco*, 438 U.S. at 580, 98 S.Ct. at 2951. Therefore, evidence of racial slurs or threats, though not the subject of a distinct claim, is relevant to the determination of pretext and intent. *Warren, supra; Holsey, supra.*

■ Finally, statistical proof may be a substantial sign of pretext, even if it alone is not dispositive of the claim. *Warren, supra; Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 372 (7th Cir.1984); *Minority Employees at NASA v. Beggs*, 723 F.2d 958, 962 (D.C.Cir.1983); *Payne v. Travenol Laboratories*, 673 F.2d 798, 820 (5th Cir.1982); *Davis v. Califano*, 613 F.2d 957, 963 (D.C. Cir.1979). Statistics can demonstrate whether defendant's action in the case at issue conformed to a general pattern of discrimination. *Id.*[134] *See also McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1825.

Accordingly, defendant's proffered reasons must be viewed in the context of all of plaintiff's evidence of pretext. Plaintiff's initial *prima facie* evidence should be combined with the evidence arising from cross-examination in order to determine whether defendant's articulated reasons are legally sufficient or whether they should be discredited. *Warren, supra; Ardrey*, 615 F.Supp. at 1299. The trier of fact must consider the consistence and contradiction of the anectdotal and documentary evidence, as well as the credibility of all the witnesses, in determining whether the version of events as related by one party is internally plausible or whether the numerous inconsistencies and conflicting evidence renders the story told unreliable. *Beatty v. Chesapeake Center, Inc.*, 818 F.2d 318, 321–22 (4th Cir.1987); *Holsey*, 743 F.2d at 207. *See also Bechold v. IGW Systems, Inc.*, 817 F.2d 1282, 1285 (7th Cir.1987).

Application of these general disparate treatment principles to plaintiff's specific promotion and appraisal claims follows *seriatim*.

### 2. *MPA 273–79 Promotion Claim*

■ 8. Plaintiff presented neither direct evidence of racial discrimination nor indirect evidence whose cumulative probative force supports as a reasonable probability the inference that race was a determining factor in her failure to promote under MPA 273–79. Without this evidence, plaintiff must resort to the *McDonnell Douglas* proof scheme to establish a *prima*

---

**134.** A disparity between referral or selection rates of blacks and whites for a particular job benefit has one of three possible causes. *See* D. Baldus and J. Cole, *Statistical Proof of Discrimination* 291 (1980). First, the disparity may be the product of an unlawful discriminatory animus. Second, the disparity may have a legitimate and nondiscriminatory cause. Third, the disparity may simply be a product of chance. A statistical analysis of a disparity in referral or selection rates can reveal the *probability* that the disparity is merely a random deviation from perfectly equal referral or selection rates. However, if the disparity between rates for blacks and whites is sufficiently large so that the probability that the disparities resulted from chance is sufficiently small, then a court will infer from the numbers above that, more likely than not, the disparity was a product of unlawful discrimination. *Palmer v. Schultz*, 815 F.2d at 90–91. As to what constitutes a sufficient statistical showing allowing for such an inference to be made, *see* fn. 140, *infra*.

*facie* case.[135]

9. To establish a *prima facie* case of discriminatory non-promotion, plaintiff must demonstrate that (1) she is a member of a protected minority (2) she was qualified for and applied for the promotion (3) she was considered for and denied the promotion and (4) other employees of similar qualifications who were not members of the protected group were promoted at the time plaintiff was denied promotion. *Bell v. Bolger*, 708 F.2d 1312, 1316 (8th Cir. 1983); *Perryman v. Johnson Products Company, Inc.*, 698 F.2d 1138, 1142 n. 7 (11th Cir.1983); *Bundy v. Jackson*, 641 F.2d 934, 957 (D.C.Cir.1981); *Judge v. Marsh*, 649 F.Supp. 770, 779 (D.D.C.1986); *Machakos v. Meese*, 647 F.Supp. 1253, 1262 (D.D.C.1986). *Cf. Holmes v. Bevilacqua*, 794 F.2d at 146 (Fourth Circuit holding that fourth *McDonnell Douglas* element in failure to promote context is "that, after [plaintiff's] rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications.").

10. There is no question that plaintiff is black, that she applied for the Dental Assistant, GS–5, position under MPA 273–79, and that she was rejected by the rating and ranking panel. However, what plaintiff has convincingly failed to prove is that she was qualified for the position sought and that other *similarly situated* non-minority employees were promoted at the same time she was denied promotion.

11. Four HQC were listed for MPA 273–79. The panel found plaintiff lacked HQC # 2. Plaintiff presented no credible evidence to show that this determination

was incorrect. The court finds that plaintiff did not possess the required experience and, thus, was not qualified for the position sought. *See* Finding of Facts 64–69.[136]

12. Furthermore, plaintiff presented no evidence to satisfy the fourth prong of the *McDonnell Douglas* test. Thirty-five of the forty-three applicants for MPA 273–79 were screened out by the rating panel because they likewise lacked HQC # 2. Most of those rejected by the panel were white. Finding of Fact # 65. Candidates referred to the selecting official were considered because their qualifications met the job requirements and were superior to those of the plaintiff. *Id.* The record is void of any evidence indicating a white applicant lacking HQC # 2 or any HQC was referred by the rating and ranking panel.

Accordingly, the court finds that plaintiff has failed to establish a *prima facie* case of disparate treatment under *McDonnell Douglas* for her non-promotion in MPA 273–79.

13. However, since the court required the defendant to articulate a non-discriminatory reason for not promoting the plaintiff and the Supreme Court held in *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482, that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant," the court will assume *arguendo*, that plaintiff has, in fact, made out her *prima facie* case and will continue with the *Burdine/Aikens* analysis. *See Parker v. Board of School Commissions of City of Indianapolis*, 729

---

**135.** Plaintiff concedes this point and relies solely on *McDonnell Douglas* in her Proposed Findings and Conclusions of Law at 27.

**136.** The Court notes that plaintiff did not allege nor did she make any evidentiary presentation tending to show that her lack of experience came about as a result of any employment practice having a disparate impact upon blacks at Ft. Bragg. *See Segar v. Smith*, 738 F.2d 1249, 1270 (D.C.Cir.1984), *cert. denied sub nom. Meese v. Segar*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *Walker v. Jefferson County Home*, 726 F.2d 1554, 1558 (11th Cir.1984) (holding that where defendant had past policy or practice of favoring whites over blacks for promotions

to positions from which they could gain necessary supervisory experience to further promote, the supervisory experience requirement served to freeze the status quo of prior discriminatory employment practices and created a Title VII disparate impact violation even though the lack of supervisory experience may have been a legitimate non-discriminatory reason defeating the disparate treatment claim); 23 B.C.L.Rev. at 442 (a legitimate nondiscriminatory reason explaining a defendant's behavior, embodied in a neutral rule, may overcome plaintiff's *prima facie* case of disparate treatment, but still might result in an adverse impact on a protected class.).

F.2d 524, 526 n. 3 (7th Cir.1984); *Bell v. Bolger*, 708 F.2d at 1317 n. 7. *But see EEOC v. International Business Machines Corp.*, 583 F.Supp. 875, 906 (D.Md. 1984) (holding, after a full trial, that plaintiff failed to establish a *prima facie* case); *Minority Police Officers v. City of South Bend*, 617 F.Supp. 1330, 1355 (N.D.Ind. 1985), *aff'd.*, 801 F.2d 964 (7th Cir.1986).

■ The court finds that defendant has tendered two legitimate, indeed inter-related, non-discriminatory reasons for plaintiff's failure to be referred and, *a fortiori*, selected under MPA 273–79. First, as previously stated, the rating panel determined that Blue lacked HQC # 2. This requirement, of specialty experience, which plaintiff plainly did not possess, constitutes a valid, specific, job-related standard. Blue's lack of HQC # 2 was, without doubt, the sole and dispositive reason for her failure to be referred to the selecting official in 273–79. Second, those candidates referred by the panel for possible selection and the ultimate selectee were simply by the fact that they possessed HQC # 2, better qualified than plaintiff for the position. Indeed, even if plaintiff had met HQC # 2 and been referred, the testimony of Sykes and Morgan convinces the court that Joan Brocki still would have been selected over the plaintiff based on their comparative qualifications.

In sum, assuming Blue established her *prima facie* case, defendant has adequately rebutted the presumption of discrimination under *McDonnell Douglas* by articulating legitimate reasons for her non-referral and, thus, non-promotion.

■ 14. Equally significant, there is *overwhelming* evidence that defendant's articulated justifications are not pretextual. No credible evidence exists to show that the panel misapplied the HQC in Blue's case or failed to uniformly apply the criteria to all of the applicants in 273–79. The record is void of any evidence tending to show racial animus on the part of the panel, any panel member, or the staffing specialist. Furthermore, the court's independent review of the evidence leads it to the inexorable conclusion that plaintiff did objectively lack the experience mandated by HQC # 2. And, contrary to plaintiff's position, given these facts, Title VII does not require an employer to adopt a life of economic altruism and provide an automatic preference for protected class members by overlooking their inadequate qualifications. *Gairola*, 753 F.2d at 128.

■ To the extent plaintiff contends that defendant erred in failing to give her proper credit for prior experience, the court holds that plaintiff cannot prove the defendant's reason for her non-promotion was pretextual merely by claiming that the staffing specialist or the rating panel were mistaken in their respective evaluations. An employer's reason for his action may be a good reason, a bad reason or a mistaken reason, as long as the decision was not based on race or other unlawful discriminatory criteria. *Grier v. Casey*, 643 F.Supp. 298, 308 (W.D.N.C.1986) *citing, inter alia, Sanchez v. Texas Commission on Alcoholism*, 660 F.2d 658, 662 (5th Cir.1981); *Jefferies v. Harris County Community Action Association*, 615 F.2d 1025, 1036 (5th Cir.1980); *Silberhorn v. General Iron Works Co.*, 584 F.2d 970, 972 (10th Cir. 1978). An employer is not required to prove that its decision was correct. *Id.* Indeed, Title VII does not ensure the best candidates will be referred and selected—only that the selection process will be free from impermissible discrimination and, thus, that defendant's asserted reason for the employment action is not pretextual. *Grier*, 643 F.Supp. at 309. *See also Ledoux v. District of Columbia*, 820 F.2d 1293, 1306–07 n. 22 (D.C.Cir.1987) ("To recover under Title VII, the appellants must prove *illegal discrimination*, not flawed personnel practices."); *Kier v. Commercial Union Insurance Co.*, 808 F.2d 1254, 1259 (7th Cir.1987); *Casillas v. United States Navy*, 735 F.2d 338, 344 (9th Cir. 1984).

■ 15. In addition, the rule in this circuit is that where relative qualifications are advanced as the non-discriminatory reason for an employment decision, the plaintiff has the burden of establishing that she was better qualified than the successful

applicant (or referees). *Gairola,* 753 F.2d at 1287; *Young v. Lehman,* 748 F.2d at 198; *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d at 672. Blue has not satisfied this burden. No evidence exists to show that plaintiff was more qualified than any of the referees or the ultimate selectee in 273–79. Indeed, the record dispositively militates against any such conclusion. Blue's own testimony, where she admitted on cross-examination her lack of knowledge of Brocki's qualifications, fails to create even an inference of discrimination.

16. Plaintiff also presented no statistical evidence in support of this claim; thus, there is no evidence before the court of any significant statistical disparity in the treatment of comparably situated persons. *See Magee v. Jeffboat, Inc.,* 746 F.2d at 372; *Minority Police Officers v. City of South Bend,* 617 F.Supp. at 1354 n. 56.

▆▆ 17. Finally, defendant's reasons for not referring Blue were clear, specific and objective. She failed to meet a facially neutral, valid, job-related criterion. The HQC, particularly HQC # 2, were clearly related to the job description announced for 273–79 on February 6, 1980. In all candor, Blue should have recognized from the outset, and the record establishes beyond cavil, that she did not possess the requisite specialty knowledge of equipment and material used in oral surgery, pathology, pedodontic, periodontic, or prosthodontic treatment.

Although obviously the comparison of an applicant's OPF to a set of HQC involves some subjective determinations by the rating and ranking panel, as to whether the HQC have been met, such determinations are inherent in any promotion process as they provide one of the only means of carefully considering each person's record vis-a-vis the substance of the job. *See Casillas v. United States,* 735 F.2d at 345. No hiring, promotion or evaluation process can be wholly objective. Such an idyllic system is beyond the realm of possibility as it disregards the fundamental nature of

human beings and their complex inter-personal relationships. To the extent the panel made a subjective determination that plaintiff failed to meet HQC # 2, thus, that other candidates were more highly qualified than plaintiff, such limited subjective evaluations are not prohibited by Title VII. *Id.; Judge v. Marsh,* 649 F.Supp. at 781. *See also* discussion *infra* at 226–31. Title VII's promise is that employment actions will not be based on impermissible considerations, not that subjective criteria or evaluations will be eliminated. *Id.* Blue cannot render sound employment judgments illegal simply by labeling them "subjective." *Id.*

▆▆ An employer's subjective judgment in selecting and applying criteria may be poor, or even erroneous, but the only relevant inquiry for this court is whether the defendant's articulated reasons are pretextual and thereby mask unlawful discrimination. *See Clay v. Hyatt Regency Hotel,* 724 F.2d 721, 725 (8th Cir.1984). In this case, the panel's determination with respect to Blue's qualifications reflected only the subjectivity inherent in all such employment decisions. The court, having strictly scrutinized the panel's action, finds that their decision was neither poor, erroneous, nor discriminatory. *See Daniels v. Board of Education of Ravenna City School,* 805 F.2d 203, 208–09 (6th Cir.1986); *Love v. Alamance County Board of Education,* 757 F.2d 1504, 1505–06 (4th Cir.1985).

▆▆ 18. In conclusion, plaintiff's general assertion that she was discriminated against is wholly insufficient to show that defendant's stated reasons for her non-promotion were pretextual. The court finds that plaintiff has failed to establish her *prima facie* case in 273–79 and, even assuming she did so, defendant has articulated legitimate nondiscriminatory reasons for his employment action which plaintiff failed to rebut. The court further finds evidence supporting plaintiff's claim so utterly lacking that the only conclusion possible is that the claim is groundless and frivolous.[137] Accordingly, Blue's disparate

---

137. The fact that defendant failed to move for

summary judgment on the merits of Blue's

treatment claim for non-promotion in MPA 273–79 is hereby ordered DISMISSED.

### 3. *MPA 303–79 Promotion Claim*

19. Once again, plaintiff presented neither direct evidence of racial discrimination nor indirect evidence whose cumulative probative force supports as a reasonable probability the inference that race was a determining factor in her failure to promote under 303–79. Accordingly, resort must be had to the *McDonnell Douglas* test.

20. Without deciding the issue, the court assumes plaintiff has made a *prima facie* case on this claim. Although the first three elements of the *McDonnell Douglas* test are clearly met in this case, the court has serious questions about whether plaintiff presented sufficient evidence to meet the fourth prong under either the *Perryman/Bundy* standard or the *Holmes v. Bevilaqua* test. *See* Conclusion of Law # 9, *supra.* Nonetheless, the court will avoid this controversy, and under *Aikens,* proceed to review defendant's articulated reasons for the employment action.

██ 21. The court finds that defendant has established two legitimate and, again, inter-related non-discriminatory reasons for plaintiff's failure to be referred and, thus, her non-promotion under MPA 303–79. First, the rating panel did not refer plaintiff to the selecting official upon proper invocation of the 85% Rule—a facially neutral employment rule governing the merit promotion process at that time.[138] Second, even if plaintiff should have been or had been referred, the selectee was vastly more qualified for the position than the plaintiff. Both of these articulations are specific, job-related, legitimate reasons which contradict plaintiff's *prima facie* case. The court further finds that the 85% Rule actually governed the rating panel's conduct and the second reason would have controlled had it become necessary to make

that determination. *See Uviedo v. Steves Sash & Door Co.,* 738 F.2d 1425, 1429 (5th Cir.1984), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 791, 88 L.Ed.2d 769 (1984). Both reasons clearly meet the "business rationality" standard. Thus, defendant has adequately rebutted the *McDonnell Douglas* presumption and the question becomes whether defendant's reasons are pretextual.

22. As in 273–79, overwhelming evidence establishes that the defendant's articulated justifications are not pretextual. No credible evidence exists to show that the panel misapplied the 85% Rule in plaintiff's case or that it failed to uniformly apply the Rule to all of the applicants under the MPA. Whether the Rule was necessary or an appropriate yardstick is irrelevant, for the Rule was clearly in effect by provisions of the collective bargaining agreement at the time of plaintiff's application. The record is void of any evidence from which even an inference of discriminatory animus on the part of the panel or panel members can be inferred.[139] Based on the information before the panel, the court's review of MPA 303–79 indicates that the panel properly, if not overly credited plaintiff for her experience, appraisals, education and training, and awards. All of the candidates were rated using the same evaluation form, applying the same factors, following the same instructions, and considering the same criteria. No evidence remotely suggests any deviation from standard procedure with respect to any applicant, except for the beneficial re-evaluation of the plaintiff. The record is void of credible evidence indicating any manipulation of the promotion process by either the panel or CPO personnel. The factors considered in determining plaintiff's final numerical rating were predicated on a detailed crediting plan and were largely objective. *See, e.g., Minority Police Officers v. City of*

---

claims and, thus, proceeded to trial, does not preclude a finding of frivolity or bad-faith. *See LeBeau v. Libbey–Owens–Ford Co.,* 799 F.2d 1152, 1168 (7th Cir.1986) (Eschbach, J., dissenting) and seventeen cases cited therein.

**138.** Conclusions of law with respect to plaintiff's disparate impact, discriminatory appraisal, and retaliation claims as they affect her non-promotion under 303–79 are set forth *infra.*

**139.** In this regard, the court notes that one of three panel members in 303–79 was black.

*South Bend,* 617 F.Supp. at 1356. *See also* Conclusion of Law # 17, *supra.*

Again, as with 273–79, to the extent the rating panel made any mistake in their calculations, and the court finds none, it would have occurred without racial animus. *See* Conclusion of Law # 14, *supra.* Furthermore, plaintiff failed to provide any statistical showing to support her allegation of disparate treatment under 303–79.

In sum, even assuming the court were to find the 85% Rule had an adverse impact upon the plaintiff, there is no evidence to suggest that the Rule was used by defendant to intentionally discriminate against the plaintiff and deny her referral and possible selection under 303–79.

23. Finally, even if plaintiff should have been referred to the selecting official for consideration, the court finds plaintiff would not have been selected for the position as the selectee, Ginette Moreau, was substantially more qualified than the plaintiff. Findings of Fact # 80 and # 81, *supra. See Gairola,* 753 F.2d at 1287; *Young v. Lehman,* 748 F.2d at 198. Supporting this conclusion, are the numerous findings detailing the views of plaintiff's supervisors and co-workers to the effect that plaintiff was an uncooperative, difficult, disruptive, and unprofessional employee. Given plaintiff's personality problems and her erratic job performance, it defies reality to suggest that she would have been promoted to a position for which she was, unlike the selectee, at best barely qualified. *See Lyons v. Boorstin,* 44 FEP Cases 1006, 1014 (D.D.C.1986) [Available on WESTLAW, 1986 WL 15885] ("Title VII does not provide protection to an employee regardless of his or her behavior.")

24. Accordingly, as to plaintiff's claim that she was treated differently and non-promoted under 303–79 on the basis of race, the court holds that assuming plaintiff presented a *prima facie* case of disparate treatment, defendant has articulated legitimate non-discriminatory reasons for her non-referral and non-selection which plaintiff has failed to establish are pretex-

tual. The court further finds that evidence supporting plaintiff's claim is so lacking, quantitatively and in terms of credibility, that the only conclusion possible is that plaintiff's claim is meritless and frivolous. Based on these findings and conclusions, Blue's disparate treatment claim for non-promotion in MPA 303–79 is ordered DISMISSED.

### 4. *1979 Supervisory Appraisal Claim* [140]

25. Title VII is violated when a supervisor, acting in his official capacity, deliberately places an inaccurate, discriminatory performance evaluation into an employee's personnel file. *Stoller v. Marsh,* 682 F.2d 971 (D.C.Cir.1982). If the discriminatorily low evaluation reduces plaintiff's overall point rating and prejudices her with respect to an opportunity for promotion, it fatally and invidiously infects the promotion process at issue. *See id.; MacRae v. McCormick,* 458 F.Supp. 970, 974–75 (D.D.C.1978); *Stephenson v. Simon,* 427 F.Supp. 467, 472–73 (D.D.C.1976).

26. As with the previous two claims, the court finds no direct evidence of racial discrimination with respect to Blue's December, 1979, supervisory appraisal. Thus, plaintiff must resort to a *prima facie* showing based on indirect or circumstantial evidence. Whether one considers the following an adapted *McDonnell Douglas* test or simply a more defined indirect evidence-cumulative effect test, the court holds that in this context, plaintiff may establish a *prima facie* case by showing she (1) was a member of a protected group (2) was evaluated in a manner or procedure substantially different than that afforded similarly-situated non-minority employees, (3) resulting in a lower evaluation or rating for the plaintiff than the non-protected group employees. As an alternative, plaintiff may show she was given a lower rating than similarly-situated non-minority employees who performed at the same level as that of the plaintiff.

---

**140.** As plaintiff's Pre–Trial Brief and her Proposed Findings of Fact and Conclusions of Law suggest, plaintiff makes no argument of disparate impact with respect to this evaluation.

27. The court finds plaintiff has failed to establish a *prima facie* case as the record contains no evidence plaintiff was evaluated in any manner different from that of any other employee or that she received a lower rating than any other similarly-situated non-minority employee performing at substantially the same level. Blue was evaluated by her NCOIC on a standard form, using twenty standard factors, with grading based on a standard set of written instructions. The rating, following a formal established procedure, was in writing, was reviewed by Blue's OIC, and provided for her immediate post-rating review. No credible evidence was proffered indicating this procedure differed from that afforded any other employee in DENTAC.

28. As for plaintiff's contention that Martha Soehren and Ann Randall, two white employees, were less competent than she but received a higher rating, the court concludes that no meaningful comparison can be made of Soehren because of her entirely different job responsibilities and Randall was rated higher because all the evidence established she was a markedly better and *more* professional employee.

29. Even assuming plaintiff has made a *prima facie* case, the court finds defendant has articulated legitimate non-discriminatory reasons for plaintiff's evaluation and plaintiff has patently failed to establish pretext. Defendant maintains and the court finds that plaintiff's evaluation correctly reflected her frequent lack of cooperation, poor attitude, and mediocre job performance. The evaluation amounted to a satisfactory rating for, at best, a satisfactory employee. The opinions reflected in the appraisal, subjective though they were, were guided by fixed, defined criteria. The evaluation reflected the consensus of the professional judgment of plaintiff's medical and non-medical supervisors based on their personal observations of her job performance. The appraisal given Blue was not significantly different in its final rating than any previous or subsequent annual or supervisory appraisal— certainly not to the point that an inference

of discrimination could be drawn from any deviations in ratings alone. No statistical evidence was presented to support plaintiff's allegation of disparate treatment nor was there any credible anecdotal evidence from which the court could infer that other black employees had been given lower performance ratings or been appraised in a different manner by the ADO's in this case, Vincent and Paquette.

30. So, as in plaintiff's other disparate treatment claims, what remains of Blue's claim is her conclusory testimony that because she is black, her evaluators were white, and the evaluation was lower than she expected, she was discriminated against on the basis of race. *See, e.g.,* Complaint at IV(f)(4). In reality, this argument rests on the highly disturbing and racist presumption that white employers are inherently prejudiced and discriminate against blacks. The law on employment discrimination does not, never has, and never will recognize such a presumption or inference. *See Minority Police Officers v. City of South Bend*, 617 F.Supp. at 1357. *Cf. Autry v. North Carolina Department of Human Resources*, 820 F.2d 1384, 1386 (4th Cir.1987) (plaintiff must show she was not promoted *because* of her race, not simply that she was a member of the black race and was not promoted). Plaintiff's view refuses to recognize the fact that employment decisions are made in a multitude of contexts and are controlled by a myriad of factors, the vast majority of which constitute legitimate, non-discriminatory concerns, wholly independent of race and national origin.

Accordingly, based on the aforesaid, plaintiff's discriminatory appraisal claim predicated on a theory of disparate treatment is hereby ordered DISMISSED. Given the lack of any credible evidence to support this claim, the court has no alternative but to find it likewise is groundless and frivolous.

### B. *Disparate Impact Claim*

31. The essence of a disparate impact claim is the use of an employment practice to control employment opportunity

when the use of that practice adversely and disproportionately affects the employment opportunities of a class protected by Title VII. *Griggs, supra,* and its progeny have established a three-part analysis for disparate impact claims. To establish a *prima facie* case of discrimination, a plaintiff must show that a facially neutral employment practice, policy or standard operates in a discriminatory manner, disproportionately excluding a protected class from the employment benefit at issue. Once the plaintiff has met this burden of production, the employer must demonstrate that "any given requirement [has] a manifest relationship to the employment in question," in order to avoid a judgment for the plaintiff. 401 U.S. at 432, 91 S.Ct. at 854. Even in such a case, however, plaintiff may prevail if he shoulders the burden of proving that the employer was using the practice as a mere pretext for discrimination. *Connecticut v. Teal,* 457 U.S. 440, 448–49, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. at 425, 95 S.Ct. at 2375 (1975); *Griggs, supra.*[141] Unlike disparate treatment claims, there is no need to show proof of wrongful motive in an impact case. *International Brotherhood of Teamsters,* 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854 n. 15; *Griffin v. Board of Regents of Regency Universities,* 795 F.2d 1281, 1287 (7th Cir.1986). As the Court stated in *Griggs, supra,* "[g]ood

intent or the absence of discriminatory intent does not redeem employment procedures ... that operate as built-in head winds for minoritygroups and that are unrelated to measuring job capacity." 401 U.S. at 432, 91 S.Ct. at 854. The Court reasoned that Congress, by enacting Title VII, intended to achieve equality of employment opportunity and not merely to punish discriminatory motivation. *Id.*

■ 32. Disparate impact analysis under Title VII is intended to identify artificial, arbitrary and unnecessary barriers to employment where those obstacles operate invidiously to discriminate on the basis of racial or other impermissible classifications. *Teamsters,* 431 U.S. at 331, 97 S.Ct. at 1852. However, until *Connecticut v. Teal, supra,* it was unclear whether disparate impact claims were limited to cases involving the effect of an employment practice on an entire protected group or whether the theory could likewise be used to prove an individual claim of discrimination. *See* Welch, *Superficially Neutral Classifications: Extending Disparate Impact Theory to Individuals,* 63 N.C.L.Rev. 849 (1985). In *Teal,* the Court broadly and dispositively answered the question by holding that disparate impact theory can be used to remedy individual claims under Title VII and to eliminate employment practices that limit the employment access and opportunities of a protected individual.[142]

---

**141.** The impact formula announced in the cited cases provides a direct interface between disparate treatment and disparate impact claims. The Court has adopted an almost parallel method for analyzing evidence with *McDonnell Douglas* by allowing the plaintiff in both cases to have the final opportunity to rebut the defendant's claims. *See* 23 B.C.L.Rev. at 423; Schlei & Grossman, *Employment Discrimination Law* at 1325. However, some of the intermediate burdens on the parties differ and the proof requirements, of course, vary with the nature of the theories. *Segar v. Smith,* 738 F.2d at 1267.

**142.** In *Teal,* four black employees of the Connecticut Department of Income Maintenance were promoted provisionally to the position of welfare eligibility supervisor and served in that capacity for almost two years. To obtain permanent status as supervisors these employees had to participate in a selection process that required, as a first step, a passing score on a

written examination. The exam was administered to 329 candidates, 48 of whom identified themselves as black and 259 as white. The passing rate on the exam for the black candidates was 54.17%, approximately 68% of the passing rate for white candidates. The four employees were among the blacks who failed the examination; thus, they were excluded from further consideration for permanent supervisory positions. 431 U.S. at 443–44, 102 S.Ct. at 2528–29.

These employees brought an action alleging that the State of Connecticut, two state agencies, and two state officials had violated Title VII by requiring, as an absolute condition of consideration for promotion, that applicants pass a written test which disproportionately excluded blacks and was not job related. Promotions were made from the eligibility list generated by the written test. In choosing persons from that list, the Department considered past work per-

As Justice Brennan explained, "[t]he statute [§ 703(a)(2)] speaks, not in terms of jobs and promotions, but in terms of *limitations* and *classifications* that would deprive any individual of employment opportunities." 457 U.S. at 448, 102 S.Ct. at 2531 (emphasis in original). Section 703(a)(2) is governed not only by a concern for the process rather than the outcome, but also by a concern for individuals rather than groups. Thus, the majority opinion provided:

> The principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole. Indeed, the entire statute and its legislative history are replete with references to protection for the individual employee.

*Id.* at 453–54, 102 S.Ct. at 2534. In sum, *Teal* holds that any individual who is unfairly denied an employment opportunity will not be without recourse under Title VII. When a plaintiff is denied relief, the denial must be based on a finding that the evidence fails to establish that the employment practice in question violates the purposes of the statute. *See* 63 N.C.L.Rev. at 878.[143]

■ 33. Turning to proof of plaintiff's *prima facie case*, recent decisions have identified two distinct elements which must

be satisfied by the plaintiff. First, the plaintiff must identify the facially neutral practice or policy which gives rise to the alleged discriminatory impact. *Peters v. Lieuallen*, 746 F.2d 1390–1392 (9th Cir. 1984); *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 619 (11th Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984). Second, plaintiff must offer evidence showing a causal relationship between the challenged employment practice and the alleged discriminatory impact. *See Robinson v. Polaroid Corp.*, 732 F.2d 1010 (1st Cir.1984); *Carpenter v. Board of Regents*, 728 F.2d 911 (7th Cir.1984); *Jordan v. Wilson*, 649 F.Supp. 1038, 1047–48 (M.D.Ala.1986).

■ With regard to the second element of plaintiff's *prima facie* case, plaintiff must show that the employer's facially neutral rule disproportionately excludes members of his Title VII–protected group. *Griffin v. Board of Regents of Regency University*. 795 F.2d at 1287. The evidence must reflect a "significantly discriminatory impact." *Teal*, 457 U.S. at 446–47, 102 S.Ct. at 2530. *Prima facie* disparate impact is almost universally demonstrated by various statistical means,[144] depending on the nature of the challenged practice and employer. Although an employee's statistics need not prove disproportionate

---

formance, recommendations of the candidates' supervisors, and to a lesser extent, seniority. Forty-six persons were promoted to permanent supervisory positions, eleven of whom were black and thirty-five of whom were white. Thus, the overall result of the selection process was that 22.95% of the identified black candidates in the selection process were promoted while only 13.5% of the identified white candidates were promoted. The State urged that this "bottom-line" result, more favorable to blacks than to whites, should be considered a complete defense to the suit. *Id.* at 444, 102 S.Ct. at 2529.

The district court held that while the comparative passing rates for the examination indicated adverse impact, the result of the entire hiring process did not. Consequently, the court concluded that these "bottom-line" percentages precluded the finding of a Title VII violation and that the employer was not required to demonstrate that the promotional examination was job related. The United States Court of Appeals for the Second Circuit reversed, holding that the district court had erred in ruling that the results of the written examination alone were insuffi-

cient to support a *prima facie* case of disparate impact. 645 F.2d 133 (2d Cir.1983). The Supreme Court affirmed the court of appeals' decision, ruling that a nondiscriminatory bottom-line neither precluded the establishment of a *prima facie* case nor provided a defense to such a case. 457 U.S. at 452, 102 S.Ct. at 2533.

**143.** To the extent the Court's trial comments at Trans. 615–616 can be construed as requiring something more of the plaintiff, they should be disregarded, as the Court has reconsidered its bench analysis of plaintiff's claim at trial in light of much additional research and, specifically, a re-reading of *Teal.*

**144.** Although this is clearly so, the court sometimes questions the wisdom of such a heavy reliance on statistics. As Mark Twain wrote in his autobiography, "There are three kinds of lies—lies, damned lies and statistics." *See Wilkins v. University of Houston*, 654 F.2d 388, 395 n. 6 (5th Cir.1981). *See also Vuyanich v. Republic National Bank of Dallas*, 505 F.Supp. 224, 394 (N.D.Tex.1980).

impact with complete mathematical certainty, plaintiff must present supporting statistical data with some degree of precision and must establish disparate impact by a preponderance of the evidence.[145] *See New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Jordan v. Wilson,* 649 F.Supp. at 1048–49; *Shidaker v. Bolger,* 593 F.Supp. 823, 834 (N.D.Ill.1984). *Cf. Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986) (an employee's statistics in a Title VII suit need not prove intentional discrimination with scientific certainty, but only by a preponderance of the evidence). Even though statistics are almost always determinative, in limited circumstances, a court may project disparate impact from non-statistical data. *Dothard v. Rawlinson,* 433 U.S. at 330, 97 S.Ct. at 2727; *Carpenter v. Board of Regents,* 728 F.2d at 914. Regardless of the method chosen, however, plaintiff must show that the application of the policy resulted in a significant discriminatory pattern. *Carpenter, supra. See also Minority Police Officers v. City of South Bend,* 617 F.Supp. at 1350.

■■■ 34. If adverse impact can be inferred from plaintiff's data or other evidentiary showing, defendant can rebut this *prima facie* case on one of two levels.

First, the defendant may attack the accuracy, relevancy and reliability of plaintiff's statistical presentation or demonstrate how specific errors actually have affected the statistical results obtained from plaintiff's model. *Robinson v. Polaroid Corp., supra; Moore v. Hughes Helicopter, Inc.,* 708 F.2d 475 (9th Cir.1983); *EEOC v. Federal Reserve Bank, supra;* 23 B.C.L.Rev. at 441. This level of attack challenges the conclusion of disparate impact that would otherwise be drawn from plaintiff's *prima facie* case, just as the defense in a disparate treatment case attacks the presumption of discrimination by producing evidence of a legitimate nondiscriminatory reason. *Id. See also Eastland v. Tennessee Valley Authority,* 704 F.2d at 619.

■■■ Assuming, however, that the challenged employment practice has an adverse impact on a protected class, the employer must then prove that the practice is justified by "business necessity." *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853. A practice amounts to a "business necessity" only when it bears "a manifest relationship to the employment in question." *Id.* at 432, 91 S.Ct. at 854. The employer must demonstrate there is a compelling need to maintain the practice and that it, in fact, is substantially related to job performance. *Id. See also Williams v. Colorado*

---

**145.** If the statistics presented show only a slight disparity or none at all, that evidence is more probative of an absence of discrimination than the reverse. *See EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d at 622. In determining whether a plaintiff's statistical evidence is legally cognizable, *i.e.,* "markedly disproportionate," *Griggs,* 401 U.S. at 424, 91 S.Ct. at 852, the rule in this circuit requires the district courts apply a standard deviation analysis as approved by the Supreme Court in *Hazelwood School District v. United States,* 433 U.S. 299, 311–12 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768 (1977) and *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). *See EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d at 647; *Moultrie v. Martin.* 690 F.2d 1078, 1082 (4th Cir.1982). The "standard deviation" is a number that quantifies the degree to which disparities spread out above and below the mean of distribution, thus describing the probability that chance is responsible for any difference between an expected outcome and the observed outcome in a sample consisting of two groups (a binomial distribution). The greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the expected and observed results. *Coates v. Johnson and Johnson,* 756 F.2d 524, 536 n. 11 (7th Cir.1985). This analysis suggests that courts using a binomial distribution formula should be extremely cautious in drawing any legal conclusions from standard deviations of less than two, but that a statistical analysis revealing deviations over two, and clearly over three, can be used to infer disparity. *Id., EEOC v. Federal Reserve Bank, supra; Mountrie v. Martin, supra; EEOC v. American National Bank,* 652 F.2d 1176, 1192 (4th Cir.1981), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982); *Sobel v. Yeshiva University,* 566 F.Supp. 1166, 1173–74 (S.D.N.Y.1983). Of course, like any general rule, this one should be applied with caution as its particular applicability will vary from case to case and sample to sample. *Coates v. Johnson & Johnson, supra. See also* Baldus & Cole, *Statistical Proof of Discrimination* at 293–97 and 108–112 (Supp.1984); *Palmer v. Schultz,* 815 F.2d at 90–97.

*Springs School District No. 11,* 641 F.2d 835, 842 (10th Cir.1981) ("The practice must be essential; the purpose compelling"). Proving job relatedness requires evidence that the practice is necessary to the safe and efficient operation of the business or that it substantially furthers the employer's legitimate goal of efficient and trustworthy workmanship. *Griggs, supra; Beazer, supra; Griffin v. Board of Regents of Regency Universities,* 795 F.2d at 1287; *Walker v. Jefferson County Homes,* 726 F.2d at 1558; *Levin v. Delta Airlines,* 730 F.2d 994, 997 (5th Cir.1984); *Liberles v. County of Cook,* 709 F.2d 1122, 1132 (7th Cir.1983). *See also* 23 B.C.L.Rev. at 426–31 and 438–41. Thus, at this second level, the defense of business necessity accepts plaintiff's proof of disparate impact, but shows that the impact is the result of a necessary or valid practice.

Although the Supreme Court has not clearly indicated whether the defendant bears the burden of proof or only a burden of production at this second stage of analysis, this court is inclined to follow those cases holding that the shift is one of persuasion. *See, e.g., Segar v. Smith.* 738 F.2d at 1267; *Walker v. Jefferson County Home, supra; Moore v. Hughes Helicopters, Inc.,* 708 F.2d at 481; *Eastland v. Tennessee Valley Authority,* 704 F.2d at 619; *Johnson v. Uncle Ben's Inc.,* 657 F.2d 750, 752–53 (5th Cir.1981), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982); *Mister v. Illinois Central Gulf R.R.,* 42 FEP Cases 1710, 1719 (S.D.Ill. 1985). However, plaintiff's failure to make out a *prima facie* case, *infra,* renders this determination unnecessary.

■ 35. Even if defendant meets his burden, plaintiff may still prevail by showing that defendant was using the practice as a mere pretext for discrimination or that other selection devices without a significant discriminatory effect would also "serve the employer's legitimate inter-

est...." *Albemarle Paper Co. v. Moody,* 422 U.S. at 425, 95 S.Ct. at 2375. *See also Connecticut v. Teal,* 457 U.S. at 447, 102 S.Ct. at 2530; *Dothard v. Rawlinson,* 433 U.S. 329, 97 S.Ct. at 2726–27.[146] Application of the above guidelines to the case at bar now follows:

■ 36. Plaintiff's claim of disparate impact was dismissed by the court, upon motion of the defendant, at the close of plaintiff's evidence. Fed.R.Civ.P. 41(b). If a plaintiff has not established a *prima facie* case, dismissal of the claim at the close of the plaintiff's presentation is appropriate. Although adverse impact cases generally are not resolved on Rule 41(b) motions, *EEOC v. Radiator Specialty Co.,* 610 F.2d 178, 185 n. 8 (4th Cir.1979), Title VII and the liberality with which it must correctly be construed, does not override or pre-empt the procedural requirements of Fed.R.Civ.P. 41(b). When a plaintiff fails to submit sufficient proof of impact to withstand a Rule 41(b) motion, as in this case, the motion should be granted rather than putting the parties, the court and the public to the exercise of trying out a case doomed to failure from the outset.[147] *See, e.g., Amey v. Delta Air Lines, Inc.,* 24 FEP Cases 1477, 1482 (N.D.Ga.1980) [Available on WESTLAW, 1980 WL 316]; Schlei & Grossman, *Employment Discrimination Law* at 1325–26. *Cf. Holmes v. Bevilacqua,* 794 F.2d at 147–48 (disparate treatment case); *Klein v. Trustees of Indiana University,* 766 F.2d 275, 281–82 (7th Cir. 1985) (same); *Mitchell v. Baldridge,* 759 F.2d 80, 83–87 (D.C.Cir.1985) (same); *Gairola,* 753 F.2d at 1287 (same).

■ 37. The record in this case is astonishing for its lack of evidence to support plaintiff's claim. Blue presented absolutely no statistical evidence to support her adverse impact allegation. Not only did plaintiff fail to elicit expert testimony on the subject, there wasn't even a good faith attempt to produce the raw statistics.[148]

---

**146.** For an extended discussion of this phase of the analysis, *see* 23 B.C.L.Rev. 419.

**147.** In hindsight, a similar fate should have befallen two of plaintiff's disparate treatment claims as well as her retaliation allegation.

**148.** Any argument that plaintiff was barred from tendering such evidence at trial is wholly disingenuous. As both oral and written court orders prior to and during Blue's claim make clear, she was permitted to introduce any and

As plaintiff's counsel candidly conceded during argument on defendant's motion to dismiss, at the time Blue's claims were being tried, Dr. Parrow, plaintiff's statistical expert, had not even analyzed the impact of the 85% Rule. *Trans.* at 614–15. Thus, plaintiff had alleged in her complaint, in the final pre-trial order, and in her pre-trial brief that she had been discriminatorily impacted by the 85% Rule, yet even as late as the middle of her trial, Blue and her counsel had never properly reviewed the data to determine if her claim was statistically or legally cognizable. This stunning failure, in a disparate impact claim dependent on statistical evidence constitutes, *inter alia*, a blatant violation of the obligations imposed on counsel under 28 U.S.C. § 1927 and Fed.R.Civ.P. 11.[149]

In addition, aside from plaintiff's conclusory assertion that she was adversely impacted by the 85% Rule, and Dickerson's tenuous "may have impacted" statement, no anecdotal testimony was offered to support the impact claim.[150] And, in this regard, plaintiff and subsequently Ballew in her own case, were thoroughly impeached, leaving not a shred of non-speculative, credible evidence against the 85% Rule. To defense counsel's rhetorical questions during trial, *Trans.* at 583, "Where's the beef? Where have they demonstrated a disparate

impact?," the court finds the incredible paucity of evidence emphatically mandates the response, "There isn't any and, from this record, one would never know there ever was."[151] *See also* Trans. at 584, 593–94, 621, 626, 628.

Finally, the court notes that it has reviewed, *sua sponte*, plaintiff's OPF, the MPA's in evidence to which she applied, and all the other relevant documentary evidence submitted by both parties, the result being not a scintilla of evidence was found to support an inference of racially discriminatory adverse impact in DENTAC under the 85% Rule.[152] Even plaintiff's November 19, 1984, Proposed Findings of Fact and Conclusions of Law fails to point out any probative piece of evidence to support her impact claim and none was proffered by plaintiff's counsel during argument on the motion at trial. *Trans.* at 583–595 and 614–638. In sum, assuming any evidence existed to support plaintiff's claim, it was not presented at trial.

Accordingly, the court finds plaintiff has failed to extablish a *prima facie* case and Blue's claim of disparate impact under MPA 303–79 is therefore ordered DISMISSED. The court further finds that plaintiff's absolute lack of evidence, particularly statistical evidence, to support her

all relevant evidence, including, *inter alia,* statistical evidence regarding the impact of the 85% Rule. *See, e.g.,* Order of August 27, 1984, at 2. This fact is reflected in plaintiff's pre-trial listing of Dr. Parrow as an expert witness in their Pre–Trial Witness List of April, 1984.

**149.** To make matters worse, plaintiff's counsel never indicated the existence of even the simplest of statistical presentations on this issue during Blue's trial—evidence which could have been gathered, analyzed and graphically projected by counsel well before trial. In sum, the record is void of any statistics comparing the percentage of minority group members disqualified by the 85% Rule with the percentage of majority group members also rejected on that basis.

**150.** Assuming, *arguendo,* that the statistical presentation by Dr. Parrow in Ballew's case was admitted into evidence in this case and, assuming further, that Parrow's analysis did not suffer from the plethora of fatal defects which, in reality, infected it, the result would be unchanged. Application of a standard deviation analysis to Ballew's data reveals no legally sig-

nificant difference between the referral rates of white and black applicants in DENTAC. *See* defendant's February 4, 1985, Brief at 17–20.

**151.** In fact, with the exception of Blue and Ballew, not a single witness testified during this entire trial—in any of the claims—regarding their non-referral under the 85% Rule.

**152.** Although it is clear plaintiff was denied referral due to the effect of the 85% Rule, the other six highly qualified candidates in 303–79, including two black candidates, were not barred by the Rule. *See* DX205 at 10–11; fn. 114, *supra.* In this context, plaintiff's non-referral literally standing alone, provides no evidence of discriminatory adverse impact. And, without some statistical presentation, the fact that Blue was denied referral in a few other instances for the same reason, *see* DX206–209, is completely offset by the documentary evidence establishing she was referred in at least an equal number of other promotion attempts. *See, e.g.,* DX204 and 207.

claim mandates an additional finding of meritlessness and frivolity.

## C. *Excessive Subjectivity Claim*

38. Plaintiffs, in their complaint, attack nearly the whole of defendant's merit promotion process as excessively subjective, leading to rampant intentional discrimination against black employees. Plaintiffs allege that "The Civilian Personnel Office ... maintains and uses subjective criteria and other devices for making decisions to transfer, promote and assign employees, which criteria rely excessively on inadequately controlled supervisory discretion, and which have the intent and effect of discriminating against black employees." Complaint at IV(f). *See also* Final Pre–Trial Order at 11. Specifically plaintiffs complain that:

1. The choice of method used to fill a position is subjective;

2. Job descriptions are tailored to ensure the selection of pre-determined white employees;

3. The staffing specialist's determination of whether a candidate meets basic eligibility requirements under posted MPA's is subjective and left largely within the discretion of the specialist with little or no established objective guidelines;

4. The influence of the staffing specialist with the rating and ranking panel is extensive and, provides the opportunity for additional discriminatorily subjective judgments at that stage of the process;

5. The rating and ranking panel's determination as to whether a candidate meets the HQC is discretionary and excessively subjective;

6. Supervisory evaluations, rendered predominantly by white management personnel, play a crucial role in the promotion process and those evaluations are subjective, discretionary and discriminatory;

7. The decision whether an employee receives an award, training opportunity or detail assignment is left in the discretion of the employee's supervisor, subject to no substantive scrutiny, and governed by vague, general criteria;

8. The disciplinary system places black employees "at the mercy of their individual supervisors," "invites" discriminatory application, is governed by vague and incomplete standards, and is discriminatorily "manipulated" by white management personnel; and

9. Selecting officials are provided little or no training on how to effect their employment decisions, are provided no objective standards or procedures for selection and, as a result, the selection process is excessively subjective and discriminatory. Complaint at IV(f); Final Pre–Trial Order ad 11–16 and 20–21.[153]

Thus, it is readily apparent from these allegations that Blue, like her fellow plaintiffs, is attacking the merit promotion process for its discriminatory use of multiple, excessively subjective criteria and procedures.[154] The initial question for this court focuses on how best to analyze the claim. Because the answer to this question does not change the result in this case, the court's analysis of this complex issue will be somewhat truncated.

39. As previously noted, disparate treatment and disparate impact are the two

---

**153.** Presumably since Blue claims she was denied promotion under 273–79 and 303–79 because of the excessive subjectivity of the promotion process, she is alleging discrimination, at least in part, based on all of the above factors. Nowhere does plaintiff narrow the focus of her broad claim, so the court must assume the allegations in plaintiffs' Complaint and the Final Pre–Trial Order are controlling.

**154.** The leading case disapproving of the unguided use of excessively subjective criteria to the invidious disadvantage of blacks is *Rowe v. General Motors*, 457 F.2d 348, 356–59 (5th Cir.

1972). *Rowe* and its progeny recognize that, while subjective criteria are not *per se* illegal under Title VII, they are suspect when their application leads to a legally cognizable disproportionate rejection of candidates from a protected group. Particularly when vague, subjective standards are given to a large number of individuals to be applied in a wholly discretionary manner, with no systematic review to ensure fairness, the chances are substantial that conscious or unconscious racial bias on the part of some of those individuals will infect the selection process.

general analytical tools used in Title VII cases to resolve the ultimate issue of whether an employer has engaged in impermissible discrimination against an employee. Despite the language in *International Brotherhood of Teamsters, supra,* stating that either theory may be applied to a set of facts, courts have not uniformly determined how to handle excessive subjectivity claims. *See Atonio v. Wards Cove Packing Co., Inc.,* 810 F.2d 1477, 1480–81 (9th Cir.1987). (*en banc*). Differences have arisen from the conflicting views of whether impact analysis can be applied to evaluate employment practices and standards different from the clearly objective test and diploma requirement scrutinized in *Griggs, supra,* or the height and weight criteria analyzed in *Rawlinson, supra.* Two decisions, one from the Fifth Circuit Court of Appeals and the other from the District of Columbia Circuit, exemplify the respective positions on both sides of the issue of whether impact, as well as treatment, analysis should apply to subjective promotion procedures.

In *Pouncy v. Prudential Insurance Co. of America,* 668 F.2d 795 (5th Cir.1982), the plaintiff alleged that Prudential had discriminated against its black employees by systematically failing to promote them. He introduced four statistical comparisons to show that Prudential discriminated against black employees. First, plaintiff presented evidence showing that, for employees hired between 1973 and 1977, the mean weekly salary of white employees exceeded that of black employees hired in the same year. Second, he presented evidence showing that in each year, from 1973 to 1975, the percentage of blacks promoted to managerial and supervisory positions was less than the percentage of blacks in Prudential's workforce. Third, he demonstrated that before promotion to some jobs, black employees had a greater mean number of years of service with Prudential than did white employees. Finally, he introduced evidence showing that from 1973 to 1975 blacks were clustered in the lower levels of Prudential's workforce and underrepresented in upper levels when compared with their percentage in Prudential's workforce and with the workforce as a whole.

This over- and under-representation of blacks occurred although most jobs had no specific experience or educational requirements. Pouncy also argued that blacks remained at the lower levels, notwithstanding Prudential's policy of internal promotion, because of three employment practices: (1) Job vacancies were not posted or otherwise made known to employees; instead, supervisors selected the employees for promotion; (2) Prudential's "level system," through which clerical employees often were hired at entry level positions and subsequently promoted to better jobs, retained black employees at the lowest paying and least skilled jobs; and (3) Prudential used subjective criteria to evaluate employee job performance to determine promotions.

The district court in *Pouncy* found plaintiff's statistics flawed, 499 F.Supp. 427 (S.D.Tex.1980), and therefore held that plaintiff had not shown the adverse impact necessary to establish a *prima facie* case. In contrast, the Fifth Circuit found plaintiff's legal theory flawed. Stressing the limited nature of employment practices that a plaintiff may challenge under the disparate impact theory, the court stated that "[t]he discriminatory impact model ... is not ... the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices...." 668 F.2d at 800. According to *Pouncy,* disparate impact analysis applies only to situations involving specific procedures that a plaintiff can show has a causal connection to a class-based imbalance in the workforce. The court reasoned that because of its origins, the disparate impact theory is limited to overt, clearly identified, nondiscretionary selection criteria applied at a single point in an employment process. *Id.* at 800–01; Lamber, *Discretionary Decisionmaking: The Application of Title VII's Disparate Impact Theory,* 1985 U.Ill.L.Rev. 869, 880–84 (1985). *See also* Note, *Applying Disparate Impact Theory to Subjective Employee Selection Procedures,* 20 Loy.L.A. L.Rev. 375, 396–97 (1987). Support for this

theory is predicated on two basic assumptions: (1) discrimination which results from subjective decisions is inherently the result of disparate treatment and (2) because of the difficulty of proving the job-relatedness of subjective decisions, the application of a disparate impact theory effectively renders subjective selection practices *per se* unlawful if they result in a significant statistical disparity.

Representing the other side of the coin, *i.e.*, an expanded use of the disparate impact theory is *Segar v. Smith, supra*, a recent decision of the District of Columbia Court of Appeals. In *Segar*, plaintiffs launched a wide-ranging attack against the federal Drug Enforcement Agency (DEA), alleging racial discrimination in salary, promotion, initial GS grade assignments, work assignments, supervisory evaluations, and disciplinary actions. Plaintiffs presented a range of statistical and anecdotal evidence to show that DEA paid blacks less than whites that blacks were less likely than whites to be be hired at GS–9 rather than at GS–7, and that blacks fared worse in work assignments, supervisory evaluations, discipline, and promotions. The defendant argued that plaintiffs' evidence was insufficient to support an inference of intentional discrimination by challenging the accuracy and significance of plaintiffs' statistical evidence. The defendant also argued that even if the court accepted the plaintiffs' statistical evidence, DEA had effectively rebutted the plaintiffs' showing of discrimination.

In affirming the district court's liability determination, the court of appeals understood the plaintiffs as proceeding under both the disparate treatment and the disparate impact theories. Plaintiffs alleged intentional racial discrimination in the employment system as a whole and challenged a number of DEA's specific employment practices such as initial grade assignments, work assignments, supervisory evaluations, discipline, and promotion decisions. The court of appeals recognized the different aims and proof sequences of the two models but also noted that each claim involved a showing of disparity between the minority and majority groups in an employer's workforce. 738 F.2d at 1267; 1985 U.Ill.L. Rev. at 884.

Having found unlawful discrimination under the disparate treatment model, the *Segar* court did not need to decide plaintiff's adverse impact claim. However, the court affirmed the district court's finding that the "DEA's initial grade assignments, work assignments, supervisory evaluations, ... and promotion process had a disparate impact on black agents." 738 F.2d at 1288 (citation omitted). Thus, the *Segar* court endorsed the use of disparate impact theory to analyze employment processes involving subjective components. *Segar* soundly criticized *Pouncy's* assertion that complainants must initially pinpoint the specific cause of any disparate impact. *Id.* at 1271. "Such a requirement in effect permits challenges only to readily perceptible barriers; it allows subtle barriers to continue to work their discriminatory effects, and thereby thwarts the crucial national purpose that Congress sought to effectuate in Title VII." *Id.* at 1271–72.

In addition, the *Segar* court specifically endorsed extension of disparate impact analysis to the subjective selection procedure used to determine agents' grade assignments. *Id.* at 1288 n. 34. While the DEA contended that the one year "specialized experience" requirement was objective, the court found that the requirement comprised mainly subjective elements, making it more subjective than objective. The employer's policy defined "specialized experience" as experience enabling an agent to demonstrate subjective assets such as tact, discretion, initiative, resourcefulness and the ability to gain the cooperation and confidence of others. *Id.* at 1275. Because "subjective criteria may well serve as a veil of seeming legitimacy behind which illegal discrimination is operating," the *Segar* court concluded that it is proper to measure the "relation of such a subjective factor to an observed disparity." *Id.* Thus, the court concluded that the statistical analysis of disparate impact should *include* the "specialized experience" factor as a potential source of discrimination, rather than *removing* it as a lawful reason

to distinguish among employees. *Id. See also* 20 Loy.L.A.L.Rev. at 398.

40. Although few courts have attempted as comprehensive a study of Title VII jurisprudence as was written by Judge J. Skelly Wright in *Segar*, six other circuits have arrived at the same conclusion, that disparate impact analysis should be extended to review subjective employment practices and criteria: the Second, Third, Sixth, Ninth, Tenth, and Eleventh Circuits. *See, e.g., Coser v. Moore*, 739 F.2d 746 (2d Cir. 1984); *Zahorik v. Cornell University*, 729 F.2d 85 (2d Cir.1984); *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Wilmore v. City of Wilmington*, 699 F.2d 667 (3d Cir.1983); *Rowe v. Cleveland Pneumatic Co., Numerical Control*, 690 F.2d 88 (6th Cir. 1982); *Atonio v. Wards Cove Packing Co., Inc., supra; Hawkins v. Bounds*, 752 F.2d 500 (10th Cir.1985); *Lasso v. Woodmen of World Life Insurance Co., Inc.*, 741 F.2d 1241 (10th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2320, 85 L.Ed.2d 839 (1985); *Bauer v. Bailar*, 647 F.2d 1037 (10th Cir. 1981); *Maddox v. Claytor*, 764 F.2d 1539 (11th Cir.1985); *Griffin v. Carlin*, 755 F.2d 1516 (11th Cir.1985).

Two circuits, the First and the Seventh, have noted the *Pouncy/Segar* conflict, but have found it unnecessary to resolve the issue. *See, e.g., Robinson v. Polaroid Corp.*, 732 F.2d 1010 (1st Cir.1984); *Griffin v. Board of Regents of Regency Universities, supra; Soria v. Ozinga Brothers, Inc., supra. But see Shidaker v. Bolger*, 593 F.Supp. at 834–35 (district court in Seventh Circuit applying impact analysis). The three remaining circuits, the Fourth, Fifth and Eighth, have held that impact analysis does not apply to subjective criteria, yet panel opinions in all three have reached contrary, conflicting results, sometimes applying impact analysis and other times not. *Compare EEOC v. Federal Reserve Bank of Richmond, supra*, and *Pope v. City of Hickory*, 679 F.2d 20 (4th Cir.1982) (impact does not apply) with *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377 (4th Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246

(1972) and *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) (applying disparate impact model); and *compare Page v. U.S. Industries, Inc.*, 726 F.2d 1038 (5th Cir.1984 and *Rowe v. General Motors Corp., supra* (applying impact analysis) with *Trevino v. Holly Sugar Corp.*, 811 F.2d 896 (5th Cir.1987); *Watson v. Fort Worth Bank & Trust*, 798 F.2d 791 (5th Cir.1986), *cert granted*, — U.S. —, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987); *Bunch v. Bullard*, 795 F.2d 384 (5th Cir. 1986); *Vuyanich v. Republic National Bank*, 723 F.2d 1195 (5th Cir.), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed. 2d 507 (1984); *Pegues v. Mississippi State Employment Service*, 699 F.2d 760 (5th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983); and *Pouncy, supra* (refusing to apply impact analysis); and *compare Talley v. United States Postal Service*, 720 F.2d 505 (8th Cir.1983), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984), and *Harris v. Ford Motor Co.*, 651 F.2d 609 (8th Cir.1981) (same) with *Gilbert v. City of Little Rock*, 799 F.2d 1210, 1214 (8th Cir.1986) and *EEOC v. Rath Packing Co.*, 787 F.2d 318, 327–28 (8th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986) (utilizing impact analysis).

With the Fourth Circuit's not having ruled dispositively on this issue and its opinions emanating mixed signals, this court has thoroughly considered the weight and logic of the above authority and finds worthy of note the Ninth Circuit's recent *en banc* opinion in *Atonio v. Wards Cove Packing Co., Inc., supra*. Accordingly, that court's analysis of the issue briefly follows. *See Segar v. Smith, supra;* 1985 U.Ill.L.Rev. 869, *supra;* 20 Loy.L.A.L.Rev. 375, *supra;* Comment, *Disparate Impact and Subjective Employment Criteria Under Title VII*, 54 U.Chi.L.Rev. 957 (1987).

41. Title VII proscribes all forms of employment discrimination. It does so without reference to either objective or subjective practices. Section 703(a)(2) states it is unlawful to "limit, segregate, or classify ... employees or applicants for employ-

ment *in any* way." 42 U.S.C. § 2000e–2(a)(2) (emphasis added). The Supreme Court has construed this language as proscribing "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853. The Court in *Griggs* did not differentiate between objective and subjective barriers. In fact, the Court made frequent references to "practices" and "procedures," terms that clearly encompass more than isolated, objective components of the overall process. *Atonio,* 810 F.2d at 1482; *Griffin v. Carlin,* 755 F.2d at 1524. Even in the Court's most recent discussion of disparate impact analysis, *Teal, supra,* there was no indication of any conceptual limits on the theory as announced in *Griggs.* In sum, the Court's holdings do not bar a plaintiff from making an impact challenge to a promotional system as a whole. *Id. See also Teal,* 457 U.S. at 458, 102 S.Ct. at 2537 (Powell, J; dissenting) ("our disparate impact cases consistently have considered whether the result of an employer's *total selection process* had an adverse impact upon the protected group") (emphasis added).

Furthermore, the *Atonio* court notes that there is considerable evidence that Congress endorsed the *Griggs* decision, the cornerstone of impact jurisprudence, during discussion of amendments to Title VII in 1972. *Atonio,* 810 F.2d at 1482–83. The section-by-section analyses of these amendments submitted by both houses of Congress expressly stated that in areas not addressed by the amendments, existing case law remained dispositive. 118 Cong. Rec. 7166, 7564 (1972). Thus, although Title VII was not amended to explicitly extend impact analysis to subjective practices, decisional law incorporated at that time had interpreted and applied *Griggs* to invalidate certain subjective hiring standards and procedures. *Atonio, supra. See also* 54 U.Chi.L.Rev. at 966–969.

Additional authority for applying impact analysis to subjective criteria in the first instance is found in the announcement of the agencies charged with enforcing Title VII—the EEOC, OPM, Department of Justice and Department of Labor—holding that the law requires application of the impact model to subjective selection procedures. *Atonio,* at 1483; *Griffin v. Carlin,* 755 F.2d at 1525; 20 Loy.L.A.L.Rev. at 409–410. The Uniform Guidelines on Employee Selection Procedures, issued by the above agencies, prohibit "[t]he use of any selection procedure which has an adverse impact on ... members of any race, sex, or ethnic group ... unless the procedure has been validated in accordance with these guidelines...." 29 C.F.R. § 1607.3.A (1985). "Selection procedures" are broadly defined to include, *inter alia,* informal and casual interviews, probationary periods, and work experience requirements. *Id.* at § 1607.16(Q). Many of the procedures enunciated in the Guidelines involve subjective judgments. Because the statutory language and legislative history support the administrative interpretation, the Guidelines are "entitled to great deference" and can be treated as "expressing the will of Congress." *Atonio, supra, quoting Griggs,* 401 U.S. at 434, 91 S.Ct. at 855. *See also Griffin v. Carlin,* 755 F.2d at 1525; 1985 U.Ill.L.Rev. at 889–90.

42. Applying impact analysis to subjective practices and criteria is also supported by reference to the purposes of Title VII and policy considerations which pervade Title VII cases. Most employment decisions contain some element of subjectivity. Employers justifiably consider subjective, intangible qualities in their hiring, firing, promotion and performance appraisal decisions because subjective qualities do, in fact, affect job performance. However, the use of subjective systems and processes can create the potential for discriminatory results. *See, e.g., Coates v. Johnson & Johnson,* 756 F.2d at 543; *Gilbert v. City of Little Rock,* 722 F.2d at 1398; *Lilly v. Harris–Teeter Supermarkets,* 720 F.2d 326, 338 (4th Cir.1983). This potential for unfair results exists even where the employer and its decision makers lack discriminatory intent. 20 Loy.L.A.Rev. at 400.[155]

**155.** As stated in Note 202 of the law review cited in text:

To eliminate the "unintentional" variety of unlawful employment discrimination, application of impact analysis is essential. Since subjective practices can operate as "built-in" headwinds for minority groups as readily as can objective criteria, *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854, these practices must be exposed and eradicated when they cause discriminatorily adverse impact without proof of a redeeming business necessity. *Atonio, supra; Segar v. Smith*, 738 F.2d at 1271–72.

Decisions that adopt the *Pouncy* limitation presuppose that there exists a logical basis for a "distinction between objective and subjective practices and for the correlative categorization of the analysis of the proof of impermissible discrimination." *Atonio*, 710 F.2d at 1484. In their view, subjective practices are defined by intent and, thus, must be evaluated solely on that basis. In this regard, the court notes the following:

First, there is no bright line between objective and subjective employment criteria, as almost all criteria necessarily have both objective and subjective elements. *Atonio*, 810 F.2d at 1485. For example, while a written aptitude test may appear "objective," the choice of questions, of the skills to be tested and the testing instruments to measure the skills, all involve some subjectivity. The reverse is also true. "Subjective" requirements, such as leadership or inter-personal skills, necessarily include certain objective components. "Thus, the terms merely represent extremes on a continuum, and cannot provide a line of demarcation to guide courts in

choosing the appropriate analytical tool" under Title VII. *Id.*

Second, although subjective practices may be a covert means to effectuate intentional discrimination, they can often be "engendered by a totally benign purpose, or carried on as a matter of routine adherence to past practices whose original purposes are undiscoverable." *Id.* at 1484. Subjective practices are just as likely to be neutral in intent as objective ones. But, if in fact the practices are a cover for invidious discrimination, the employer's intent will be extremely difficult to unmask and prove. Exclusion of such practices from the reach of impact analysis, therefore, could serve only to encourage employers to use more highly subjective, rather than objective, selection criteria as a means of shielding their procedures from judicial scrutiny.

43. Accordingly, *Atonio* holds that a plaintiff may prove his claim of excessive subjectivity under either a disparate treatment or disparate impact analysis. However, to establish a *prima facie* case of disparate impact with respect to a subjective practice or criteria, plaintiff must (1) identify specific employment practices or selection criteria (2) show a legally significant disparate impact on a protected class and (3) show the causal relationship between the identified practices and the impact. *Atonio*, at 1482. *See also* 20 Loy.L.A.L.Rev. at 412–415. Obviously the burden of establishing this *prima facie* case will preclude certain excessive subjectivity claims from receiving disparate impact analysis. For example, the requirement that plaintiffs identify a specific practice or criteria prevents them from "launch[ing] a

---

When a candidate's background and reactions "appear to have been similar to his, the interviewer is presupposed to be biased in favour of him.... Judgment can be warped in this way without the interviewer being conscious of it." R. PLUMBLEY, RECRUITMENT AND SELECTION 145–46 (1981). Prejudices tend to be directed toward personal characteristics and immutable qualities such as race and color. *Id.*
[J]udgments developed in the course of an interview may be affected by factors of which the interviewer is unaware. All of us are undoubtedly influenced—often without recognizing the fact—by our conceptions of what a

criminal, a dilettante, or an honest man really looks like. We build up stereotypes of such people.... If we are not constantly on the alert, we may base an important inverview decision on the resemblance of an applicant to some preconceived stereotype.
R. FEAR, *supra* note 198 at 35. Merit ratings like interviews, may reflect the rater's prejudices. This is particularly true where only one person does a rating, without training or written instructions, and where abstract traits rather than concrete behavior are used in the rating. R. BELLOWS, PSYCHOLOGY OF PERSONNEL IN BUSINESS AND INDUSTRY 396–97 (3d ed. 1961)....

wide ranging attack on the cumulative effect of a company's employment practices." *Atonio*, 810 F.2d at 1489 (Sneed, J., concurring) *citing Spaulding v. University of Washington*, 740 F.2d 686, 707 (9th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). Absent this requirement, the impact test would place on employers the burden of proving the business necessity of every facet of their evaluation and selection process, even if the plaintiffs failed to demonstrate disparate impact with respect to some of the procedures or criteria. *Id.* In addition, the requirement of causation also prevents disparate impact analysis of other claims. At a minimum, it requires a demonstration by the plaintiff that significant numbers of plaintiff's protected group are qualified for the job benefit at issue. *Id.* at 1490.

44. Notwithstanding the above, the court declines to decide the legal issue presented for three reasons. First, it is unnecessary to do so since application of both disparate impact and disparate treatment analysis yields the same result in the case at bar. Second, it appears the Supreme Court will dispositively determine the question this term, having recently granted certiorari in *Watson v. Fort Worth Bank & Trust, supra.* Thus, how this court decides the issue is of little consequence. Finally, although *Atonio* and *Segar* are persuasive, meritorious arguments can also be tendered in specific instances for not broadly extending impact analysis to every excessive subjectivity claim.

Normally, recitation of the law on a particular topic is relatively easy with application of that law to the specific facts of a case being the much more difficult endeavor. Here, however, the reverse is true. Having reviewed the complex law governing plaintiff's excessive subjectivity contention, resolution of Blue's claim, applying both models of analysis, easily follows.

 45. As Finding of Fact, § III # 16, *supra*, indicates, there are three segments of the merit promotion process: job

analysis and preparation of a job announcement, evaluation of applications, and selection. Since Blue never reached the selection stage in either of her two claims for relief, she has no standing to raise any issues of excessive subjectivity as they relate to that part of the process. She suffered no injury-in-fact from any action of the defendant at the selection stage and, therefore, fails to meet the pre-eminent condition precedent to maintaining an action on that basis. *See Valley Forge College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

 46. Analyzing plaintiff's claim of excessive subjectivity under a disparate treatment theory first, the court holds that plaintiff has failed to produce any evidence from which this court might infer intentional discrimination on the part of the defendant in any facet of defendant's pre-selection merit promotion process. The court specifically incorporates here its prior Findings of Fact and conclusions of Law from section V as they relate to this conclusion.[156] Briefly, the court holds as follows with respect to each of plaintiff's specific allegations:

1. The choice of method used to fill job positions at Ft. Bragg is substantially objective, dictated by detailed and mandatory federal personnel and agency regulations. Not a shred of evidence was presented to the contrary by the plaintiff.

2. Job descriptions and minimum standards of eligibility were written using established OPM guidelines. The descriptions were specific and detailed. No evidence showed the descriptions to be inconsistent with the actual positions. Plaintiff failed to present any evidence to support her job-tailoring allegation. Indeed, the matter was never discussed in Blue's case and was mentioned only briefly during the trial of the other claims.

---

**156.** Likewise, any Conclusion of Law in this section of the opinion, if relevant, is incorporated within the court's previous conclusions as to plaintiff's basic disparate treatment and impact claims.

3. The staffing specialists did determine basic eligibility of the applicants, but they did so by competently comparing an applicant's SF–171 to the general OPM requirements. Contrary to plaintiff's argument, the court finds the specialists' determinations were not decisions of unbridled discretion. Although subjective in the sense that all comparisons of a candidate's prior experience, education, etc., with mandated job requirements requires the exercise of some discretionary professional judgment, the staffing specialists followed a formal, standardized procedure and no evidence was presented to show any deviation from that procedure, let alone discriminatory intent. In addition, a review of the record reveals not a single witness testified as to non-promotion because they were improperly determined to lack the basic eligibility requirements.

4. Once again, the court finds no evidence was presented to establish any undue influence on the part of a staffing specialist with respect to any rating and ranking panel. A specialist's duties while working with the panel are well defined and substantially limit his or her role once the panel convenes.

5. The court has previously rendered extensive findings with respect to the development and application of the HQC in Blue's claims for relief under MPA's 273–79 and 303–79. The gravamen of those findings hold true with respect to all promotion claims for relief heard by the court. The HQC were developed in a highly professional, thoughtful manner, were reviewed prior to job-posting for job-relatedness, and were, in fact, patently job-related. The criteria were often very specific and focused on necessary job skills and abilities, rather than personal traits or behavior. For example, HQC numbers 2, 3, and 4 in MPA 273–79 (DX210) all require particularized knowledge of dental equipment, material and procedures or dexterity skills necessary for the job. *See also, e.g.,*

DX207 at 3 and DX205 at 4. Whatever subjective criteria may have been used, there is no evidence the criteria were developed or used in a discriminatory manner. Further, to the exent any behavior or interpersonal skills were considered as HQC, *see* HQC # 1 in MPA 273–79, these criteria were limited in number and were reasonable in that they enabled the panels to carefully consider each applicant vis-a-vis the substance of the job, apart from the necessarily rigid, itemized criteria that otherwise were listed. *See Casillas v. United States*, 735 F.2d at 345.[157]

Furthermore, the rating and ranking process at Ft. Bragg involved the use of individualized position crediting plans by the panels. This is a far cry from those cases where the various participants in the promotion process evaluated the applicants according to their own individual beliefs and standards. *See, e.g., Jordan v. Wilson*, 649 F.Supp. at 1048. The panel members do not rely on their personal knowledge of the applicant to evaluate him; rather, they apply written job-specific standards to an employee's written application for promotion and his OPF. *Compare id.* The process is formal, not informal. It is standardized and widely-known, not discretionary and covert.

Again, at the risk of boring by repetition, plaintiff failed to produce any anecdotal evidence indicating even one rating and ranking panel whimsically ignored their written instructions or failed to carry out their responsibilities while in session.

6. Performance appraisals are by their very nature inherently subjective—more so than most other phases of a promotion process. Notwithstanding that fact, defendant's formal supervisory appraisal process places significant limits on a supervisor's ability to discriminate. *See generally* Ashe, Jr. and McRae, *Performance Evaluations Go to Court in the 1980's*, 36 Mercer L.Rev. 887 (1985). First, it involves the

---

**157.** To the extent any HQC were not absolutely necessary to the position, the court notes that an employer need not prove absolute or actual necessity for every factor taken into consideration in a promotion decision. Job relatedness is sufficient. Title VII is not a civil code of employment criteria. It was "not intended to diminish traditional management prerogatives." *Casillas*, 735 F.2d at 344 *quoting Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096.

use of a written, filed appraisal form containing written instructions for the appraiser. Second, the process attempts to quantify the evaluation process through the use of twenty specific factors and six possible grades per factor. Third, the rating is reviewed by an employee's second-line supervisor; thus, an unusually low or substantially different evaluation from that previously given the employee is much more likely to be questioned. Fourth, the appraisal is placed in the employee's OPF for his or her review. Fifth, the effect of the appraisal on the employee's changes for referral is minimized by its limited point value in the rating process. Under these circumstances, the court does not find the defendant's supervisory appraisal process excessively subjective as established. Nor has Blue presented any credible evidence of discriminatory application in her case or on a systemic basis.

7. The court finds it unnecessary to make any further findings or conclusions with respect to defendant's process of awards, training opportunities or detailing, as plaintiff presented no credible evidence to indicate she was discriminatorily denied any of the above. *See specifically* Findings of Fact § III #32 and #33. The respective processes, although involving some subjective judgments by supervisors and CPO staff, are generally governed by formalized procedures and standards and are controlled, in large measure, by legitimate fiscal restraints.[158]

 8. Contrary to plaintiff's assertion, this court does not find that defendant's disciplinary system left black employees at the mercy of white supervisors.

Disciplinary action at Ft. Bragg is governed by very formal procedures, which take into account and extensively limit a supervisor's ability to initiate and effect any "lone-ranger" type of discipline. Obviously, the system can be manipulated and a supervisor can discriminatorily mete out punishment if he is intent on so doing, but Blue produced no credible evidence in support of this allegation. Indeed, discipline as to her was "extremely lenient and fully justified" by her conduct. The record is literally void of evidence upon which this court can predicate a finding of excessive subjectivity leading to discriminatory discipline of black employees.[159] Individual incidents of discriminatory punishment very likely occur on a base as large and varied as Ft. Bragg, but there is no evidence of any systemic defect in the disciplinary process as established by the defendant.

47. Accordingly, plaintiff's excessive subjectivity claim based on a disparate treatment analysis must be DISMISSED. As with plaintiff's other claims, the lack of evidence to support this allegation is so substantial that a finding of frivolity is required.

 48. Although the court has found it appropriate to use disparate impact analysis as well, Blue completely fails to make out a *prima facie* case of excessive subjectivity based on adverse impact. Plaintiff has identified specific components of the process she deems to be at fault, but there is not the slightest showing of disparate impact on blacks and, *a fortiori*, a causal connection between the identified procedures and any impact. The record

**158.** The only possible exception to a finding of no discrimination in this area would have been in the claim of plaintiff Mitchell McKeller, who presented significant evidence of discriminatory denial of detailing.

**159.** As with plaintiff's disparate impact claim, there is no merit to plaintiff's post-hoc-suggestion that she was barred from presenting relevant evidence to support her excessive subjectivity claim. *See, e.g.,* Order of August 27, 1984, at 2 ("1. Plaintiff may present *any* anecdotal or statistical evidence which is directly relevant to any claim for relief ... 4. Plaintiffs [sic] may not present anecdotal evidence which is relevant only to establish a pattern or practice.

*excessive subjectivity* or disparate impact claim and which is *not* directly relevant to any individual plaintiff['s] claim[s] for relief....") (emphasis added). Further, plaintiff has failed to point to any evidence which was, in fact, proffered and barred. The only limitation placed on plaintiff's case-in-chief was that the evidence relate to a claim for relief of *the plaintiff*, not one of the other plaintiffs. Since plaintiff challenged numerous aspects of defendant's merit promotion process on excessive subjectivity grounds, the field was wide open to Blue for a presentation of evidence to support her broadside allegations. None was forthcoming.

reflects a total absence of statistical evidence in the trial of this case. No attempt was made to analyze the procedures identified for any possible adverse impact. No anecdotal or documentary evidence was offered, even in conclusory fashion, in an attempt to correlate adverse employment decisions to a particular phase of the merit promotion process. *See Shidaker v. Bolger*, 593 F.Supp. at 835. It is ridiculous to suggest that it is enough for a plaintiff, even a credible one, to take the witness stand and testify that "I am black; I was non-referred due to a discriminatory application of the HQC by a rating and ranking panel, therefore, the rating and ranking process is excessively subjective and violates Title VII." Considerably more than that is required to make out a *prima facie* case of disparate impact. Even if expert testimony is not required in every case, at

a minimum, some presentation of raw data and correlation of that data to the challenged practices by lay testimony is mandated. This case had none of the above.[160] Accordingly, plaintiff's excessive subjectivity claim based on disparate impact is DISMISSED as vexatious and meritless.

### D. *Retaliation Claim*

49. Blue also claims that her non-referral for promotion in both 273–79 and 303–79 was the result of retaliation by the defendant for her efforts to challenge defendant's racially discriminatory employment practices. Title VII protects employees against retaliation by an employer for participation in opposition to discriminatory employment practices. 42 U.S.C. § 2000e–3. The sequence of proof and burdens prescribed by *McDonnell Douglas*

---

**160.** A review of plaintiffs' pre-trial statistical presentation prepared in 1983 for the class certification hearing in this matter does not aid the plaintiff. First, although the presentation is part of the record in this case, there was no attempt to introduce the statistics into evidence at trial or to have the expert who prepared them testify as to their validity and meaning. Second, the statistics cover very few of the challenged practices in this claim and, to the extent those segments of the promotion process are covered, the statistical presentation is extremely general. However, assuming the statistics are evidence in that they are part of the court file, the court finds the evidence strongly favors the defendant.

Plaintiffs presented evidence attempting to show blacks are disfavored in the awards process. Plaintiffs' statistics were seriously and fatally flawed because (1) they included only one type of award—the QSI—while failing to review SSPA's and honorary awards and (2) plaintiffs failed to adjust for the fact that QSI's are not available to Wage Grade employees. Yet, plaintiffs' presentation showed QSI's as a function of defendant's *entire* work force. To put it charitably, this analysis was intellectually dishonest. Even with these defects, plaintiffs' evidence is still of no avail as it fails to show any legally significant disparity between blacks and whites with respect to receiving QSI's. All of the standard deviations, for the years 1976–1981, are less than two and most are substantially less than two. *Harris v. Marsh*, 100 F.R.D. at 323 and 326.

With regard to training, plaintiffs' statistics are based on the assumption that all employees require the same amount of training. This is illogical as common sense dictates that employees whose jobs entail greater responsibility will

require more training. *Id.* at 323. This faulty underlying premise renders plaintiffs' statistics essentially senseless as defendant's counter-presentation makes clear. *Id.* at 326–27. When blacks and whites who are similarly situated are compared, the difference between the training received by blacks and that by whites is not legally significant.

Finally, with respect to the only other segment of the process analyzed by plaintiffs' pre-trial, discipline, the court finds the statistics have little probative value. Plaintiffs' analysis represents only actions resulting in suspension or removal of an employee and fails to reflect written reprimands or written informal discipline, both of which combine to make up a significant portion of the discipline meted out at Ft. Bragg. In addition, as of the beginning of trial, no named plaintiff had suffered from suspension or removal. Furthermore, defendants' pre-trial statistics established that, on average, blacks were not more severely disciplined than whites. *See* Defendant's May 13, 1983, Opposition to Plaintiffs' Motion for Class Certification at 126–29. In fact, both plaintiffs and defendant's statistics show that the amount of discipline imposed on black employees between 1976 and 1982 was not very numerous at all—between .78% and 2.28% of the blacks in defendant's work force were disciplined—thus, meaning 98–99% of the blacks at Ft. Bragg were *not* disciplined. *Id.*

This pre-trial statistical analysis by the plaintiffs may not be "so incomplete [or misleading] as to be inadmissible as irrelevant," *Bazemore v. Friday*, —— U.S. —— n. 10, 106 S.Ct. 3000, 3009 n. 10, 92 L.Ed.2d 315 (1986), but the failure to include essential facts and variables in the presentation renders the evidence all but useless in a probative sense.

and *Burdine* govern retaliation claims. *Ruggles v. California Polytechnic State University,* 797 F.2d 782, 784 (9th Cir. 1986); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). The employee is initially required to establish a *prima facie* case of retaliation by a preponderance of the evidence. To do so, a plaintiff must show (1) that he engaged in statutorily protected activity; (2) that the employer took adverse employment action against him; and (3) a causal connection exists between the two. *Ross, supra; Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601–02 (11th Cir.1986); *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir. 1984); *Coleman v. Wayne State University,* 664 F. Supp. 1082, 1091 (E.D.Mich.1987). As in disparate treatment cases, the burden of establishing a *prima facie* case "is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Once a *prima facie* case has been presented, the employer must rebut the presumption of retaliation with a legitimate non-discriminatory reason for his actions. The employer is not required to prove the absence of retaliatory motive, but only to raise a genuine issue of fact as to whether retaliation for the protected activity occurred. *Ross, supra; Wrenn v. Gould,* 808 F.2d 493, 501 (6th Cir.1986). If the defendant carries his burden of production, then the court must inquire whether the stated reason is merely pretextual.[161] For the employee to disprove a legitimate nondiscriminatory explanation, he must show that the alleged retaliation would not have occurred "but for" the protected conduct. *Ross* at 365–66. The "but for" standard directs the factfinder's attention to the predominant reason for the employer's action and ensures that an employee will not be prejudiced as a consequence of exercising his right to protest perceived discrimination. *Id.*

50. Here, Blue clearly engaged in protected action by filing complaints of discrimination with her union and the EEO office at Ft. Bragg as early as 1978. Plaintiff contends her supervisors knew of her activities, disapproved and, thus, retaliated against her by failing to promote her. Blue's failure to promote constitutes an adverse employment action. Thus, any dispute as to whether plaintiff has made a *prima facie* case focuses on the third prong of the *Ross* test.

 A "causal connection" may be demonstrated by the proximity of the adverse action to the protected activity, provided, the employer, through the ADO, had knowledge or it can reasonably be assumed he had knowledge of the plaintiff's protected activities. *See McKenna v. Weinberger,* 729 F.2d at 791, *Judge v. Marsh,* 649 F.Supp. at 782. In this case, plaintiff's failure to promote under both MPA's was the direct result of the actions of the respective rating and ranking panels. There is no evidence to suggest otherwise. Therefore, plaintiff must show the panel members had prior knowledge of the EEO and union activities. This plaintiff has not shown.

The court has previously found a lack of evidence in either promotion claim with respect to the individual panel members. None of the panel members were mentioned by name in the litigation and none testified. There was no evidence to show the panels acted unreasonably or deviated from standard procedure in either merit promotion claim. Plaintiff failed to make

---

**161.** From an evidentiary standpoint, the fact that the court must determine the defendant's motive at the time of the alleged retaliatory conduct means the court can only consider as evidence information which the employer knew at the time. The *McDonnell-Douglas* scheme of proof does not sanction the use of subsequently discovered facts to justify that action. If an employer were able to discover subsequent facts about an employee and use those facts as a substantive defense to the allegation of retaliation, it would be very easy to cover up a discriminatory motive by offering post-event facts which, in actuality, played no role in the employment decision. Such a cover-up mechanism would be inimical to the policies underlying Title VII and would force an employee to have a spotless employment record in order to have any hopes of success on a retaliation claim. *Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244, 278 (N.D.Ind.1985). Notwithstanding the above, however, an employer is certainly free to attack the *credibility* of a witness through the use of any relevant information, regardless of when the information was uncovered.

any showing indicating their prior knowledge of her protected activities and not a shred of direct evidence exists to even suggest they knew.

In order to establish the requisite causal connection, plaintiff, at best, can rely on two possible inferences. First, Blue testified that "management" was well aware of her complaints. Indeed, from the ongoing nature of those complaints, this is doubtless true, if one defines "management" as the DENTAC Commander, Blue's OIC's, and her NCOIC's. If any of the panel members fell into one of these categories, plaintiff clearly would have made a *prima facie* case. The problem is none of the panel members fit within the "management" structure. All of the panelists were dentists and since none of their names were ever mentioned at trial, the court reasonably assumes they practiced at dental clinics other than DC–6. There is no evidence to suggest they discussed plaintiff and her union/EEO activities with management officials or other dentists from DC–6. In fact, there is little, if any, evidence to indicate that the dentists at the different clinics interacted—let alone regarding personnel or clinic-specific matters. In short, it is much more likely than not that the panel members who decided plaintiff's promotion applications never knew of plaintiff's protected activities.[162]

The second inference upon which plaintiff might rest her case is that the CPO staffing specialist, against regulations, informed the panels about plaintiff's on-going activities, presumably in an effort to retaliate and discriminate. No evidence was presented to suggest this occurred— not from a panel member, not from a *union observer*, not from any CPO official, and not even from the plaintiff. Given this lack of evidence, the court finds it impossible to assume that a staffing specialist deliberately violated agency regulations governing the panel process and, in effect, broke the law, by informing either panel of plaintiff's race discrimination complaints.

■ Thus, although "management" knew of Blue's involvement in the EEO administrative and agency grievance process, since plaintiff did not reach the "selection" stage of the merit promotion process, there is no evidence to show that those who knew played any part or affected any decision regarding plaintiff's failure to promote. Plaintiff's inferences, even if stacked together, fail to provide a bridge of support for plaintiff's *prima facie* case as their tenuous foundation, consisting of pure conjecture and speculation, collapses under the weight of plaintiff's preponderance of the evidence burden.[163] Accordingly, the court finds plaintiff has failed to establish a *prima facie* case of retaliation.

■ 51. Assuming, *arguendo*, that a causal connection existed,[164] defendant has

---

**162.** Nothing in plaintiff's OPF would have served to give notice of these activities to the rating and ranking panels.

**163.** An "inference" is a conclusion of fact drawn from a basis of general reasoning and experience. It suggests to the factfinder a possible conclusion to be drawn if the party presenting its case proves predicate facts but does not require the factfinder to draw that conclusion. *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985). An inference may be drawn and used only if it is rational. For an inference to pass muster in terms of the rationality of its conclusion of fact, that conclusion must be logically deduced from proof of the basic or evidentiary facts which underlie it. *See County Court of Ulster County v. Allen,* 442 U.S. 140, 156–57, 99 S.Ct. 2213, 2224–25, 60 L.Ed.2d 777 (1979); *Tot v. United States,* 319 U.S. 463, 467–68, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943); *Davis v. Allsbrooks,* 778 F.2d 168, 180

and 182 (4th Cir.1985) (Phillips, J., dissenting). Indeed, an inference violates the Due Process Clause if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the factfinder. *Franklin, supra.* In this case, plaintiff has failed to prove by a preponderance of the evidence even the predicate facts.

**164.** Like disparate treatment cases, after a trial has been held on a retaliation claim, *Aikens* suggests there is little need to determine whether plaintiff has made out a *prima facie* case; rather, the court should generally proceed to the question of discrimination *vel non. Suson v. Zenith Radio Corp.,* 763 F.2d 304, 307 (7th Cir. 1985); *Moffet v. Gene B. Glick Co., Inc.,* 621 F.Supp. at 277. Howver, the lack of a *prima facie* case in this instance is so transparent that a finding to that effect provides the analytically correct disposition of the claim. Even if a *pri-*

advanced legitimate non-discriminatory reasons for plaintiff's non-referrals. Further, for the reasons previously discussed in depth, *supra,* the court finds no evidence of pretext. Accordingly, plaintiff's retaliation claim with respect to her non-promotions in 273–79 and 303–79 is ordered DISMISSED. As with Blue's other claims for relief, the paucity of evidence on this claim establishes it as meritless and groundless.

E. *Plaintiff's Affirmative Action "Preference" Argument*

■ 52. One theme that pervaded plaintiffs' arguments before the court was the concept that defendant's Affirmative Action Plan (the AAP) required either the selection of or significant preference [165] for black applicant(s) to merit promotion positions where the AAP showed underrepresentation. *See* discussion *supra* at pp. 1224–1225. Taking the argument to its logical conclusion, plaintiffs claimed that a violation by the defendant of the provisions of the AAP constituted a *per se* violation of Title VII. For the reasons previously discussed, as well as those that now follow, this argument is summarily rejected.

■ First, the court begins with the dispositive proposition that "[Title VII] does not *require* any employer to grant preferential treatment on the basis of race or gender, but since 1978 [*Bakke*] the court has unambiguously interpreted the statute to *permit* the voluntary adoption of special programs to benefit members of the minority groups for whose protection the statute was enacted." *Johnson v. Transportation Agency, Santa Clara County, California,* —— U.S. ——, 107 S.Ct. 1442, 1458–59, 94 L.Ed.2d 615 (Stevens, J., concurring). Thus, although the defendant, like other federal agencies, is under an obligation to implement an AAP by authority of executive directives, defendant is not required to do so by Title VII. Accordingly, there is no Title VII cause of action for

the failure to implement or utilize an affirmative action program. *Ferguson v. Veterans Administration,* 723 F.2d 871, 872 (11th Cir.1984). As the Fourth Circuit held in *Page v. Bolger,* 645 F.2d 227, 233–34 (4th Cir.) *(en banc), cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981):

[It is argued that] a proven violation of the Postal Service's statutorily mandated 'affirmative program' designed to eradicate discrimination, would be made a violation of Title VII itself. Affirmative action undertakings by government employers would come in practical terms to define the standards for compliance with Title VII's antidiscrimination provisions. We do not think this could accord with Congressional intent.

(citations omitted). *See also Shidaker v. Bolger,* 593 F.Supp. at 838 ("[t]here is no obligation under Title VII requiring an employer to integrate its workforce or make ... preferential promotions...."). *But see Fang–Hui Liao v. Dean,* 658 F.Supp 1554 (N.D.Ala.1987) (employer required to adhere to its own AAP with a failure to do so being actionable).

Second, although AAPs were in effect at Ft. Bragg during all time periods relevant to this litigation, none of those plans mandated, required or provided for any race-based preference for black applicants. *See* DX159–161. No racial quotas were established. The plans reviewed, in depth, the statistical profile of the composition of defendant's overall workforce. The plans, using undifferentiated data, attempted to define those areas of the workforce where blacks were under-represented in proportion to their general representation in the community. Finally, the plans established certain broad annual or cyclical *objectives* in an effort to eliminate targeted underrepresentation.

Thus, the court finds the defendant voluntarily adopted an affirmative action plan with the goal in mind of more proportionately balancing the workforce at Ft. Bragg

---

ma facie case is assumed, however, this lack of evidence mandates a finding of no pretext.

**165.** A race preference is a decision rule that requires reference to the race of persons subject to the rule and some priority consideration for those persons when applying the rule.

through methods that included, *inter alia,* increased minority recruitment, education of managerial and supervisory personnel, and elimination of systemic obstacles to minority promotion. What the AAPs most definitely did not include was a statement of preference or priority for minority over non-minority candidates at any stage of the merit promotion process. Accordingly, even if Blue could assert a violation by the defendant of his obligations under Ft. Bragg's internal AAPs as a violation of Title VII, there was, in fact, no violation of the provisions of any AAP.[166]

In some cases, goals may not have been met,[167] but by definition goals are final objectives or ends to which all reasonable efforts are aimed. Often, goals are left unmet even after significant, long-term commitment, yet they remain as the final result to be achieved. A failure to meet one's final objective quickly and effortlessly does not equate to a failure to live up to the mandates of the plan establishing the goal. Following this logic, an employer would be forced, through threat of suit, to moderate all affirmative action objectives so as to be able to satisfy those goals quickly and with a minimum expenditure of time and resources. To do otherwise, to attempt to engage in long-range and meaningful remedial action would force an employer to run the risk of litigation because all expectations were not quickly realized. Such a scenario does little to foster the critical role of affirmative action in our society. Plaintiff's theory, then, in practice, is entirely at cross-purposes with the result she seeks to achieve.

Defects in the plaintiff's argument of preference run much deeper, however. Assuming defendant's *voluntary* AAPs contained a race-conscious preference or numerical quota with regard to promotions, which they do not, or as plaintiffs implicitly argue in the alternative—that the AAP

should have so contained this preference— the court finds such a preference would have been unconstitutional.

■ Governmental bodies, including the courts, may constitutionally employ racial classifications to remedy unlawful treatment of racial or ethnic groups subject to discrimination. *United States v. Paradise,* ── U.S. ──, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987); *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). In order to employ a race-conscious remedy, however, the program must be (1) designed to achieve a "compelling" or "significant" interest and (2) properly tailored to meet that interest. *Hammon v. Barry,* 813 F.2d 412, 420 (D.C. Cir.), *petition for reh'g. denied,* 826 F.2d 73 (1987). The government unquestionably has a compelling interest in (1) remedying "persistent or egregious discrimination" by a state actor, *Sheet Metal Workers,* 106 S.Ct. at 3050 and *Paradise,* 107 S.Ct. at 1065; (2) "dissipating the lingering effects of pervasive discrimination," *Sheet Metal Workers, supra;* and (3) breaking down historic patterns of racial segregation in the employer's workforce, *see Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), by "eliminating manifest racial imbalances in traditionally segregated job categories." *Johnson v. Transportation Agency, Santa Clara County, California,* ── U.S. at ──, 107 S.Ct. at 1450–51 *citing Weber,* 443 U.S. at 197, 99 S.Ct. at 2724. Absent one of these three circumstances, though, an employer is not free to utilize race-conscious affirmative measures. Racial preferences are the exception, rather than the rule. They may not be routinely employed, even voluntarily, simply to create a racially balanced and preferable work force. *See Sheet Metal Workers,* 106 S.Ct. at 3050; *Hammon v. Berry,* 813 F.2d at 422–23.[168]

---

**166.** Parenthetically, even if there was a violation, the court notes the impossibility of determining who would have benefitted had a "proper" amount of affirmative action been instituted. *See Baca v. Butz,* 394 F.Supp. 888, 894 n. 11 (D.N.M.1975).

**167.** Although the court assumes this is likely, plaintiff produced no evidence to this effect.

**168.** Because plaintiff's preference argument transparently lacks merit, it is unnecessary to probe any further into the myriad of opinions that have emanated from the Supreme Court, even over the last two years, on affirmative

In this case, neither Blue nor her co-plaintiffs presented any credible evidence showing either "persistent or egregious" discrimination by the defendant or "lingering effects" of historical discrimination at Ft. Bragg.[169] Further, plaintiffs failed to make any statistical presentation establishing a "manifest" or "conspicuous" statistical imbalance in the workforce at Ft. Bragg. The court recognizes that the imbalance necessary to justify a race-conscious remedy need not be great enough to support a *prima facie* case of discrimination against the employer. *Johnson,* 107 S.Ct. at 1452. However, where a job requires special training, a statistical comparison between the percentage of minorities in the workforce in that job with the percentage in the labor force qualified for the job is mandated and the result must show a "manifest imbalance." *Id.* at 1452–55.[170] Blue's dental assistant positions, for example, were not unskilled jobs. They required certain minimum specialized education and experience qualifications. In this regard, there is not the slightest evidence to support any finding of conspicuous imbalance in the workforce at Ft. Bragg with regard to dental assistant positions. Plaintiff attempted no such showing. Defendant's undifferentiated data forming the underlying predicate for the AAPs vitiated the efficacy of their projections of underrepresentation for any skilled position. And, when specific or qualified labor force data is used, it is clear that blacks are actually *favored* in many skilled positions, including, *inter alia,* dental assistant positions:

| Occupation | 1982 Ft. Bragg Representation | Specific Labor Force Data-Census 1980 | |
|---|---|---|---|
| | | FAYSMSA | N.C. State |
| Dental Assistant | 29.5% | 6.7% | 6.7% |
| Management Analyst | 11.8% | –0– | 2.4% |
| Pest Controller | 50.0% | 14.3% | 10.0% |

*See, e.g.,* May, 1983 Affidavit of Barbara Beringer at 4. Thus, under these circumstances, a stated preference in the AAPs, which there is not, or any *de facto* preference given to plaintiff, which there was not, would have violated the constitutional rights of the other non-minority applicants for those positions applied for by Blue.

Accordingly, for all of the above reasons, the court finds defendant's AAPs provide no preference or priority consideration for black applicants even in targeted positions designated as underrepresented. In addition, the court finds no evidence of discrimination contained within defendant's AAPs nor is there any basis upon which to infer discrimination from defendant's failure to fully meet all the objectives of each AAP. Finally, it seems to the court that the detail of the ambitious AAPs drafted and adopted by the defendant is, if anything, evidence of a lack of discrimination and systemic resistance to a qualified integrated workforce.

## VI. FINDINGS OF FACT AS TO DEFENDANT'S MOTION FOR SANCTIONS [171]

### A. *Sandra Blue*

1. All prior findings of fact and conclusions of law relating to plaintiff's claims at action. The basic principles stated above are sufficient for discussion purposes in this opinion. For a more thorough explanation of the 1985 Term opinions, *see, e.g.,* Sullivan, *Sins of Discrimination: Last Term's Affirmative Action Cases,* 100 Harv.L.Rev. 78 (1987).

**169.** Neither is there any evidence before the court suggesting even the existence of an agency study containing specific or detailed findings of prior discrimination.

**170.** General population or labor force statistics would constitute a sufficient comparative base for *unskilled* positions. *Johnson,* 107 S.Ct. at 1453 n. 10. *See also Hazelwood,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13; *EEOC v. Federal Reserve of Richmond,* 698 F.2d at 659–60.

**171.** This section of the opinion contains findings relevant to whether the plaintiffs are liable to the defendant for the sanctions requested *and,* if so, the reasonable fees, expenses and

bar are hereby incorporated by reference into this section of the court's opinion.

2. To place defendant's motion for sanctions in perspective, it is worth repeating that in the Final Pre–Trial Order, filed December 8, 1983, plaintiff specifically alleged racially discriminatory treatment and requested relief in five areas:

(a) Promotion (MPAs 285–78, 273–79, 274–79, 277–79, 303–79, 440–80 and 67–83);

(b) Denial of equal training and opportunities for detail;

(c) Discriminatory appraisals and evaluations;

(d) Discriminatory Discipline; and

(e) Harassment.

Final Pre–Trial Order at 23–24. *See also* Order at 8.

3. From subsequent pleadings, trial, and post-trial briefs and argument, it is clear that plaintiff failed to prosecute and, therefore, abandoned the following claims for relief:

(a) MPAs 285–78, 274–79, 277–79, 440–80 and 67–83;

(b) Denial of equal training and opportunities for detail; and

(c) Discriminatory discipline—although all of the primary allegations of improper discipline contained in pre-trial pleadings were introduced as "background" evidence at trial.

4. Defendant filed its initial motion for sanctions against Blue on April 17, 1984, requesting that costs and attorney's fees be assessed against the plaintiff for her "abuse of the judicial process resulting in monetary loss to the defendant, interference with defendant's preparation of their (sic) case, and the waste of judicial resources of the Court." In support of the motion, defendant's memorandum argues

that (1) plaintiff abandoned the above-mentioned claims, without justification and in bad-faith, after the signing of the Final Pre–Trial Order; and (2) the claims were meritless and frivolously filed in the first instance.[172] As examples of this pattern of conduct, defendant referred, *inter alia*, to plaintiff's abandonment of MPAs 285–78 and 67–83. It is clear from the timing and substance of the motion that it was never intended to contain an exclusive listing of all claims abandoned by the plaintiff nor could it have been since, at the time of the filing of the motion, plaintiff's claims were still being tried. Therefore, contrary to plaintiff's post-trial argument, the reference to 285–78 and 67–83, claims conceded by plaintiff at the beginning of her case to no longer be in issue, did not bar the defendant from thereafter seeking sanctions for claims subsequently determined to have been abandoned, *e.g.,* 274–79, 277–79 and 440–80.

5. Plaintiff filed a response to defendant's motion for sanctions on May 21, 1984, arguing that she did not raise any non-meritorious claim nor was any prosecuted or abandoned in bad-faith, vexatiously, willfully or wantonly. Specifically, as to 285–78, plaintiff contended that this claim for relief was vitiated by the court's back cut-off date of March 3, 1980. *See* fns. 18 and 22, *supra.* With regard to 67–83, plaintiff simply argued that she intended to present evidence on this claim solely during Phase II of the trial, as evidence of a pattern and practice of discrimination.

On June 1, 1984, the court held that it would reserve ruling on defendant's motion for sanctions until the conclusion of the trial so that the conduct of all parties might be assessed. The court, once again, reiterated its view that no claim for relief or defense abandoned in Phase I of the

---

costs incurred by the defendant which might subsequently be imposed on the plaintiffs as an appropriate sanction. As before, where necessary the court will refer to specific testimony of witnesses. The relevant transcript concerning sanctions is contained in twelve volumes with the following dates: March 27 and 28, April 8, 9 and 10, and July 8, 9, 11, 12, 29, 30 and 31, 1985. Since these volumes are not sequential, refer-

ences to specific testimony will be cited "Test. of ___ at Vol. *(date)*, p. ___."

**172.** Contrary to the defendant's argument, the burden of proof on both of these issues lies with the defendant. Unless proven otherwise, this court presumes counsel for plaintiff's file and prosecute claims in good faith, with a reasonable basis in law and fact.

trial would be resurrected in any other phase of the litigation. Order at fn. 2.

■■■ 6. After the March 4, 1985, Agreement was filed, an evidentiary hearing was held on defendant's motion for sanctions in connection with Blue's claims on April 8 and 9, 1985, in Wilmington. From the evidence presented at that hearing in combination with the exhibits and record in general, the court issues the remaining findings of fact.[173]

7. Blue presented a wide array of complaints in her lawsuit, some of which were fully pursued. However, two particular MPAs, 67–83 and 285–78, were explicitly dropped at trial; while three other issues, discriminatory denial of equal training and opportunities for detail, discriminatory discipline and the 85% Rule MPAs 274–79, 277–79 and 440–80 simply never were pursued, despite being listed as claims for relief in the Final Pre–Trial Order. In fact, all of these claims just vanished into thin air between the filing of the Final Pre–Trial Order and the beginning of plaintiff's trial on the merits in April of 1984. Not one of the claims is mentioned or alluded to in any manner in plaintiff's April 3, 1984, Pre-trial Brief. Counsel for defendant having relied on plaintiff's listing of claims for relief set out in the Final Pre–Trial Order was obviously stunned to learn, at the time of trial, that many of the claims they had exhaustively prepared to defend were suddenly no longer at issue.

### MPAs 274–79, 277–79 and 440–80

8. Prior to the April, 1985, evidentiary hearing on defendant's motion for sanctions, no excuse or justification for the abandonment of any claim was presented to the court in verified form. Indeed, no excuse, verified or otherwise, has *ever* been presented to the court with respect to the abandonment of MPAs 274–79, 277–79 and 440–80. These MPAs, like 303–79, ostensibly challenged, in pre-trial and trial documents, the basis of the defendant's 85% Rule limitation. In fact, even after the trial of plaintiff's claims began and it became apparent that plaintiff had shockingly abandoned these claims as ones for which relief would be requested, plaintiff continued to list the three MPAs as evidentiary predicates for her attack on the 85% Rule. *See* June 1, 1985, List of Witnesses of Plaintiffs and Plaintiff–Intervenors Who Were Affected by the 85% Rule at 1. Yet, despite this and all previous listings, no evidence was ever presented with respect to any of these claims at trial; incredibly, not even as background evidence in plaintiff's 303–79 claim.

Furthermore, as this court's prior findings make clear, no statistical study was

---

**173.** A concise clarification of what is in issue and what is not is appropriate at this juncture. Defendant's motion for sanctions vis-a-vis Blue relates solely to her untried, abandoned claims. Two issues must be addressed under this motion for each claim: (1) was it abandoned after the filing of the Final Pre–Trial Order in bad-faith and without justification or excuse; and (2) was it a frivolous, meritless or vexatious claim on the merits. An affirmative answer to either inquiry requires imposition of an appropriate sanction for that claim, including, *inter alia,* the possible assessment of defendant's costs, expenses and attorney's fees related to that claim, as well as the court's costs in hearing and deciding defendant's successful motion related to the claim.

As to those claims tried on their merits, however, *e.g.,* 273–79 and 303–79, despite this opinion's findings of frivolity and vexatiousness, defendant has never made a motion for attorney's fees and costs with respect to these claims under 28 U.S.C. § 1927, Fed.R.Civ.P. 11, the bad-

faith exception to the *American Rule or Christiansburg Garment Co. v. EEOC, supra.* Although defendant has repeatedly argued the frivolity and meritlessness of the tried claims, defendant apparently determined long ago not to file a motion for fees and costs on these completed matters until this court issued its final order on the merits of the claims.

Thus, under these circumstances, this opinion *will not, sua sponte,* assess fees and costs to the defendant for the tried claims, appropriate though that might be. Defendant is, however, free to move for such an award, if he believes it proper, within twenty (20) days of the date of service of this opinion. Upon the filing of said motion, supporting affidavits, and memorandum of authority, plaintiff will be allowed twenty (20) days to respond. Notwithstanding defendant's decision to delay his motion, the court *will* assess plaintiff with its own costs in trying her frivolous, baseless claims, to the extent such sanction is legally cognizable and appropriate.

prepared before trial with respect to plaintiff's 85% Rule attack. No credible anecdotal evidence was presented on the issue at trial. Thus, the trial record is void of evidence, and none was forthcoming at the sanctions hearing, which would establish any factual predicate for the disparate impact 85% Rule allegation embodied in plaintiff's pre-trial claims for relief under MPAs 274–79, 277–79 and 440–80. Like 303–79, this court has no alternative but to find that these claims for relief were filed without evidentiary support and are frivolous.

In sum, plaintiff listed 274–79, 277–79 and 440–80 as claims for relief in the December, 1983, Final Pre–Trial Order. Plaintiff's exhibit list, contained in this same Order, listed 79 documents, including sub-parts, as exhibits for trial related *solely* to MPAs 274–79, 277–79 and 440–80. Final Pre–Trial Order at 87(a)–93. Defendant, in response to plaintiff's explicit listing of these claims as ones for relief in the Order, as well as plaintiff's extensive listing of relevant exhibits above, countered with a listing of exhibits and witnesses necessary to meet those claims. Order at 118, 155–57 (*e.g.*, DX208, 209, 211 and witnesses (selectees) Della Craig, Barbara McCaskill, Geraldine Morris and Barbara Scott).

Without any notice to the defendant or the court, MPAs 274–79, 277–79 and 440–80 were abandoned at trial. No evidence was presented or proffered on the claims. Evidence with respect to these promotion claims was not even used as background material in the trial of a similar claim, MPA 303–79. Given the investigative time obviously mandated to prepare an effective defense to these charges, the court finds defendant was severely prejudiced in its ability to meet and defend other claims due to the time and resources necessarily devoted to preparing for these three MPAs—claims asserted without a good-faith factual basis and ones plaintiff long before trial decided to and did abandon without justification or excuse.

*MPA 67–83*

9. Unlike the previous three MPAs, Blue did provide an explanation as to why she abandoned MPA 67–83. Unfortunately for plaintiff, that explanation, like her testimony at trial, was implausible, contradictory and wholly incredible. Blue claimed that she dropped 67–83 because she was no longer interested in obtaining relief as she was leaving Ft. Bragg for California and did not want to return to civil service. Test. of Blue at Vol. April 9, pp. 225–35.

The first problem with this scenario is that Blue left Ft. Bragg in early June, 1983. The Final Pre–Trial Order, which included 67–83 as a claim for relief, wasn't filed until over six months later. Assuming one believes Blue, by her own testimony she allowed the defendant to continue to prepare for this claim as if it were viable, until trial in April, 1984, knowing that she was abandoning any request for relief under the MPA. According to Blue, defendant should have known she didn't want relief for 67–83 because this MPA was announced in 1983, the year she left Ft. Bragg. *Id.* at 225–26. ("You knew that I no longer worked at Ft. Bragg in June of '83 so that along (sic) would say I didn't want the job.").

Frankly, the court is amazed at plaintiff's audacity in asserting defendant should have known she wasn't interested in continuing this claim as one for relief, despite the fact that the MPA was so listed by her in the December, 1983, Final Pre–Trial Order.[174] Indeed, plaintiff's counsel didn't even bother to inform defense counsel of Blue's abandonment of the claim until they filed plaintiff's Pre–Trial Brief on April 3, 1984. Of course, Blue's fable regarding her failure to prosecute 67–83 depends on even greater defense powers of telepathy than heretofore assumed because, extending her argument to its logical conclusion, she should have, at minimum, abandoned all requests for reinstatement and promotion under any MPA, yet Blue continued to request such relief

---

**174.** MPA 67–83 was also listed as an exhibit for the plaintiff. Order at 99.

throughout these proceedings for 303–79 [175] and 273–79. Plaintiff's September 14, 1981, Complaint requests reinstatement and promotion in her prayer for relief at paragraph 4, and no pleading since that time has ever stated or implied otherwise. *See, e.g.,* plaintiff's November 19, 1984, Proposed Findings and Conclusions at 28.

Accordingly, assuming *arguendo,* that the court fully credits Blue's statement that she decided not to seek relief under 67–83 because of her relocation in California, such a finding must inexorably lead to the conclusion that plaintiff and her counsel were grossly negligent or deliberately indifferent to the continuing physical and fiscal costs of the defendant in reasonably preparing to meet this abandoned claim.

10. Notwithstanding plaintiff's expressions to the contrary, the court finds that Blue's hearing testimony concerning her reason for withdrawing 67–83 as a claim for relief amounts to nothing more than a post-hoc deceptive rationale for some other undisclosed reason for abandoning the claim—most likely because it, as with her other allegations, was frivolous. The court reaches this conclusion for the following reasons:

First, at the evidentiary hearing, plaintiff testified that she came to the realization she did not want to go back to work for the federal government shortly after she left Ft. Bragg. Test. of Blue at Vol. April 9, p. 219 (sometime between October and December, 1983). During the course of the sanctions hearing, this testimony underwent an insidious and less than subtle shift to state that she decided not to come back to Ft. Bragg only in the spring of 1984 when "I came [back] here for my trial." *Id.* at 238. This change in testimony occurred immediately after a recess and although the second answer comports much better with having withdrawn 67–83 shortly before trial, the court is left with the firm conviction that the second response is as made up as the first—this time, however, with the possible assistance of counsel while on recess. The court finds plaintiff's testimony on this point patently contradictory, leaving no credible justification in the record for abandoning 67–83.

Second, all of Blue's reasons, whenever expressed, for withdrawing her promotion claim under 67–83 must rationally apply with equal force to her promotion claim under 303–79. No substantial difference exists in the relief available under the two claims, both involving promotions to the *same* position.[176] If plaintiff no longer wanted the job, it is inconceivable that she would spend the time and effort contesting the 1979 promotion and not the 1983 promotion. Surely, Blue was not less qualified in 1983 than she was in 1979. Logically considering these circumstances, if Blue's asserted reason(s) for withdrawing 67–83 were true, they would have necessarily led to the same result in 303–79 and, quite probably, 273–79. This did not happen.

Third, Blue's testimony at the sanctions hearing was so contradictory that the court finds her testimony to be absolutely incredible.[177] For example, like her testimony concerning when she decided to abandon 67–83, plaintiff's testimony completely changed with respect to the nature and substance of the claim during a recess on the afternoon of April 9. Before the break, plaintiff testified that she had raised 67–83 *only* for background information. *See, e.g., id.* at 215–16. She claimed she *never* intended it be used as a basis for relief.

---

**175.** The job position announced in MPA 67–83 (PX230) is the same as that announced in 303–79, a GS–5 Dental Assistant for Oral Surgery.

**176.** The court might speculate that greater back-pay presents a justification, but if that were the case plaintiff would, at some point, have limited her request for relief solely to back pay. As noted, this plaintiff has never done. Aside from this defect in reasoning, there is the obvious point that should Blue prevail, she would be entitled to some back pay under both claims. Finally, even if this were the true reason for abandonment, defendant prepared equally for both claims and the fact that one claim is for a larger amount than another does not justify withdrawal of the smaller claim after the filing of the Final Pre-Trial Order.

**177.** Plaintiff's own Proposed Findings and Conclusions, filed May 31, 1985, recognizes and concedes this inherent flaw in her testimony at 10. ("Blue's testimony on this issue at trial was in conflict.").

Blue even said she told this to her lawyers in November or December, 1983, expressing to them that she never really wanted the job, but only wanted to use the claim as evidence to show a pattern of discrimination. *Id.* at 217–18.[178] When Blue was confronted by defense counsel with the December, 1983 Final Pre–Trial Order, establishing 67–83 as a designated claim for relief, Blue evasively testified that 67–83 was only included to demonstrate the manner in which promotion applications were processed. *Id.* at 219–24.

After the recess, however, Blue proceeded to Act II of her drama, surprising her audience by now testifying that she indeed had wanted relief for 67–83, but changed her mind after moving to California. *Id.* at 237–39. Of course, as this court has already found, *when* this change of heart occurred was also the subject of varying plots and themes, depending on the time of day of the performance.

Accordingly, the court finds plaintiff's anemic and inconsistent explanations for her abandonment of 67–83 to be pretextual; her real motivation in withdrawing the claim to be undisclosed, with the probability that it involved a recognition of the frivolity of the claim; and whatever the internal reason for abandonment, it was not one developed or executed in good-faith.

11. Turning to the substance of 67–83, plaintiff alternatively and inconsistently has argued that (1) she was discriminatorily denied the position and (2) the process of handling and reviewing her application was discriminatory.

Although Blue's testimony is far from a model of clarity, in this later attack it appears she claims her application was unfairly delayed by actions of her NCOIC, defense counsel and CPO; her application was improperly considered by the staffing specialist and the rating and ranking panel because they failed to give her full credit for her prior surgical experience; and that she was initially ranked unqualified only to

later be deemed qualified and reviewed. Upon a thorough review of all the evidence, the court finds plaintiff's disparate treatment claim for non-promotion in 67–83 meritless and frivolous.

MPA 67–83 was announced on December 30, 1982, with a closing date for applications of 4:00 p.m. on January 10, 1983. The job description states, in pertinent part:

Assists dentists in major oral and maxillofacial surgical procedures performed in hospital operating room and in the dental clinic. Performs recordkeeping and clinic maintenance duties. Assists oral surgeon while patient is under general anesthesia or intravenous sedation in operations ... Anticipates the surgeon's needs at each state of the operation ... Assists in monitoring patient ... Serves as first surgical assistant ... Receives and prepares patient for surgical procedure ... Maintains dental equipment ... Cleans and sterilizes materials, instruments and equipment...."

DX230 at 5.

The minimum standards of eligibility required are (1) year of qualifying experience at the GS–4 level or equivalent non-GS experience in dental assistance to general or specialized dentistry. *Id.* Following amended merit promotion procedures pursuant to the 1982 Recruitment and Placement Plan, HQC were no longer developed and in their stead were the KSA's. *See* discussion, *supra,* at 70–71. All applications were now rated according to the applicants' relative possession of the established KSA's for the position, in this case, the following:

1. Knowledge of major and maxillofacial surgical procedures.

2. Knowledge of materials and instruments used in major oral maxillofacial surgical procedures.

3. Ability to schedule patient for treatment to include maintaining patient records and daily treatment logs.

DX230 at 6.

12. Blue testified at the sanctions hearing that she wanted to file an application

---

**178.** No such delineation was made by the plaintiff in any pleading, let alone the Final Pre–Trial Order or her April, 1984, Pre–Trial Brief.

for 67–83 on January 10, 1983, but was unable to do so for the following reasons. First, plaintiff claimed her NCOIC, SGT. Jones, was confused by the new KSA system and that he delayed in filling out his section of her application form.[179] Test. of Blue at Vol. April 1, pp. 185, 194–96. Second, plaintiff testified she and her coworkers were confused by the new application process and, in order to receive assistance in properly completing the application, she went to CPO for guidance. Blue claims she discussed the KSA process with Jean Byrd, a staffing specialist, and that Byrd provided little or no assistance. This, plaintiff argues, delayed her application even further. *Id.* at 186–88.

Finally, Blue testified that she was scheduled for a deposition with regard to this lawsuit on the afternoon of January 10. She stated that prior to the deposition she informed defense counsel, CPT. Stephen Berry, of her desire to file her application by 4:00 p.m. and that he assured her it would be no problem in proceeding with the deposition. The deposition was not completed until after 4:00 p.m. and, therefore, Blue claims it was impossible for her to timely file her application. *Id.* at 181–85. Blue filed her application at CPO on January 11, 1983, at approximately 3:50 p.m.

13. Contrary to Blue's testimony, the court finds no excuse for plaintiff's untimely filing of her 67–83 application and, further, finds her testimony on all three points in severe contradiction with that of her opposing principals.

The job announcement states clearly the closing date of time for the position. Plaintiff was on express notice of when her application was to be filed, but through her own procrastination, she failed to timely do so. On January 5, 1983, Jones informed the personnel at DC–6, including plaintiff, about a number of current job openings, including the 67–83 position.[180] He told his employees to provide him with their applications before the afternoon of January 10 so that he could complete his appraisal for their filing by the 4:00 p.m. deadline DX230 at 12. At approximately 10:30 a.m. on January 10, Blue brought Jones her application *in blank*. Blue had not completed her part of the form and Jones informed her he would not conduct his appraisal prior to her completion of the application. *Id.* Understandably, Jones had no intention of signing or rating a blank application. He told Blue to get the completed form back to him by 2:00 p.m. because he had to teach a class at 3:30 p.m. *Id.* Blue did not do so until 1:30 p.m. on January 11, 1983. Jones promptly completed his appraisal and discussed it with the plaintiff. Jones denies he held up plaintiff's application in any manner and there is not the slightest evidence to suggest otherwise. From the speed with which Jones fulfilled his obligations on the 11th and the fact that he completed three other applications on January 10 for DC–6 employees, Blue's testimony that Jones did not understand the KSA process is without a basis in fact.

As for Jean Byrd, Blue called on January 7 to inform her of Blue's problems with the KSA format. Plaintiff asked to review her OPF. *Id.* at 11. Byrd assured Blue her OPF was available for review and explained that she should fill out the first part of the KSA application as if it were an SF–171. Byrd further explained the process of responding to each KSA and the use of supplemental sheets. *Id.*

Blue also told Byrd about her deposition on the 10th. Byrd assumed Blue was requesting an extension of time for her application and informed Blue she was without authority to grant such an extension. *Id.* The next time Byrd saw Blue was on the afternoon of the 11th at which time Byrd, after consulting with W. Thomas Dickerson

---

179. The new KSA process requires a supervisory appraisal with each application. For each KSA, the supervisor must appraise the employee's performance on a scale of 1 (lowest) to 4 (highest). The appraisal must be certified and should be discussed with the candidate. *See, e.g.,* DX230 at 16.

180. Blue claims Jones made this statement on the morning of January 10, not January 5. Test. of Blue at Vol. April 9, p. 195. The court credits Jones' version.

in CPO, told Blue that her application was untimely, *but* that Dickerson would confer with Berry to determine if it would be accepted for review or rejected on that basis. Byrd then dated and filed Blue's application. *Id.*

Byrd did not hamper Blue in the filing of her application nor did she delay its processing. To the contrary, Byrd provided plaintiff with the information requested on the 7th and acted reasonably when she saw her on the 11th. Not a shred of evidence was proffered from which the court can infer any discriminatory animus or action on the part of Byrd.

Finally, with respect to Berry, the court notes that even plaintiff testified Berry did not discriminate against her. Test. of Blue at Vol. April 9, p. 196. Blue's deposition on the 10th began at 1:00 p.m. and was completed at 6:00 p.m. Shortly *after* the start of the deposition, Blue informed Berry about the 67–83 deadline, DX230 at 7. Berry responded that plaintiff should have taken care of that responsibility prior to the deposition. *Id.* In response, Blue informed Berry that she could not do so because Jones was then at CPO learning how to complete the forms and he was not available until after 4:00 p.m. *Id.* This response simply was not true as Blue not only failed to recite her prior conversation with Jones regarding her blank application, but also misstated Jones' reason for absence on the afternoon of the 10th—teaching. Notwithstanding Blue's apparent lie to Berry, of which he may or may not have been aware, Berry informed Blue that he would not stop the deposition for her to file her application. *Id.* However, Berry did agree to provide her with a statement indicating she was in deposition until after the close of business on January 10. At the close of the deposition, Berry signed such a statement and suggested Blue have CPO contact him about the matter.

Once again, Berry's actions were reasonable and no evidence of discrimination on

his part exists in the record. Indeed, in spite of the fact that plaintiff unreasonably procrastinated in completing her application, delayed in properly submitting it to Jones for his approval, lied to Berry, and waited nearly an additional day after the deposition to file it with CPO, Blue's application was *accepted* as an exception to the timely filing requirement on January 18, 1983. Whatever actions plaintiff may have felt delayed her application, and there were none except for her own, the final result was that defendant accepted plaintiff's application for consideration. It is unfathomable to suggest that this scenario shows anything but proper or even preferential treatment for Blue. An objective color-blind eye could not find a hint of discrimination under these circumstances. Blue's application should have been rejected as untimely and, despite the fact that it was not, Blue claims discriminatory processing of the application.[181] This represents the height of frivolity.

14. Blue then claimed that, upon review of her application, the panel or the staffing specialist found her to be *unqualified* for the position. She testified that she was not given proper credit for operating room protocol and surgical experience and, as a result, she was sent a letter indicating she was rated "not qualified" and would not be referred for selection. Test. of Blue at Vol. April 9, p. 242–247. Plaintiff claimed that upon receipt of this notice, she saw Byrd at CPO and requested re-consideration, arguing she listed experience under each KSA. Upon reconsideration, Blue states she was deemed qualified and referred. *Id.* at 247–51.

The problem with this testimony is quite simple—none of it ever occurred. The uncontradicted paperwork contained in DX230 establishes a wholly different scenario. Whether Blue confused 67–83 with 303–79 or some other position is unclear, but whatever the cause, plaintiff was *never* found

---

**181.** Even if plaintiff sincerely believed Byrd and Jones discriminated against her, by accepting the application and sending it along with all the others to the rating and ranking panel, any intended discrimination was mooted. The pre-

filing discriminatory acts could not possibly have affected plaintiff's consideration for the position in 67–83 by the panel or the selecting official.

not qualified for the position and she was given full credit from the outset for operating room protocol and knowledge of basic surgical procedures.

Under the KSA system, basic eligibility is still determined by the staffing specialist and, in 67–83, Byrd determined all nine applicants, including Blue, to be qualified. DX 230 at 13. The panel convened on February 28, 1983, and rated each applicant to determine those who were "best qualified" and would be referred.[182] Two applicants, including the ultimate selectee, Linda Meagher, (white) received scores of 90 and one candidate received a score of 87. After that, scores ranged from 62 to 75, with plaintiff grading in at 70. *Id.* Thus, the break between 75 and 87 being clear, the first three applicants were initially designated for referral; the remaining six were not. All of the candidates were so notified.

Prior to this review being finalized, however, 67–83 was audited by CPO's Recruitment and Placement Division. During the audit, it was determined that the panel members may have been overly restrictive in their interpretation of the crediting plan and the panel was ordered re-convened on March 15, 1983. *Id.* at 179. The panel reviewed all nine applications and only three changes were made. *Id.* KSA # 3 had previously been interpreted by the panel as scheduling patients for oral surgery treatments to be performed in an operating room. However, the plan simply required experience in scheduling patients for oral surgery, regardless of location. Based upon this new interpretation of KSA # 3, the panel increased the ratings for three candidates—plaintiff, Yvonne Martin and Margaret Hutchinson. *Id.* No changes were suggested or made with respect to any other KSA. Because of these changes, the panel determined there was no longer a clear and significant gap between the candidates. Accordingly, the panel referred

all nine applicants for selection. *Id.* at 13, 164.

As a result of the second review, a letter was sent by Dickerson to the applicants on March 21, 1983, informing them of the procedural error, its correction, and their having been referred for interview. Blue received such a letter. *Id.* at 159.

Therefore, a review of the record establishes that plaintiff was treated the same as the other candidates by the rating and ranking panel and CPO. The documents contained in DX230 are dispositive. Plaintiff offered no evidence and none independently exists in the record to show any discriminatory conduct by or motive on the part of the panel or its individual members. Since all nine applicants were referred to the selecting official and that official is given no knowledge of the panel's deliberations, even if one assumed some action at the panel level was discriminatory, it could not have affected plaintiff's application.

15. Finally, with regard to selection, plaintiff never even suggests the selecting official, Dr. B. Michael Kulikowski, Chairman of Oral Surgery, discriminated against her. The selectee, Linda Meagher, along with one other applicant, received the highest score from the panel—thus, indicating her relative experience, education and knowledge. Dr. Kulikowski states that she was selected because

Mrs. Meagher is the best qualified for the position based on records review, job experience, technical knowledge and personal evaluation. She had one of the most competitive [OPFs] reviewed and the fact that she had the broadest and most indepth [sic] knowledge as well as a clinical and operating room assistant [sic] in Oral and Maxillofacial Surgery. Her performance, poise and professional demeanor at the interview were unanimously regarded as exemplary. Her background as related to the KSAOs for this

**182.** The panel only rated those applicants deemed qualified. If plaintiff had been found ineligible or not qualified, the panel never would have reviewed her application. Furthermore, if plaintiff had been declared not qualified, a notice indicating that finding would have been sent to Blue with a copy retained in

DX230. There is no such notice in the file. *See* DX230 at 139. Thus, contrary to plaintiff's testimony, the court finds plaintiff never received a notice that she was determined to be not qualified and, further, her conversation with Byrd regarding this matter never took place.

position was far superior to any other candidate.

*Id.* at 164–65. The opinions of the rating and ranking panel and Dr. Kulikowski are wholly supported by a comparative review of the applicant's background and KSA forms. *See generally* DX230 at 14–152. And, there simply is no comparison between the plaintiff and Meagher; the selectee possessed *vastly* superior knowledge, skills, and qualifications.[183]

16. Given all of the above, the court finds it inconceivable that a claim of racial discrimination could be leveled in this case. Not a scintilla of evidence can be garnered to support such an accusation. Of course, the fact that plaintiff never bothered to review DX230 or any OPF related to this claim may explain the reason it was filed, but that fact only heightens plaintiff's bad-faith in filing this frivolous and vexatious claim. With the evidence of fair dealing so overwhelming and the converse evidence of discrimination so noticeably absent, both plaintiff and, more appropriately, her counsel must take final responsibility for filing a claim that never even pretends to establish a *prima facie* case of discrimination under the standards previously enunciated

by the court.[184] Assuming, *arguendo*, one could posit some basis for a *prima facie* case, and the court finds none, defendant's documents alone establish beyond any doubt, a legitimate-non-discriminatory reason for the selection.[185] It also goes without saying that no evidence of pretext exists in this matter.[186]

■ Thus, the court finds that not only was 67–83 abandoned without notice, justification and excuse, it was also from its inception, a frivolous claim, filed without any basis in fact or law. This plaintiff and her counsel could easily have discovered if only they had ever bothered to look and objectively evaluate the evidence.

*MPA 285–78*

17. Plaintiff failed to pursue this claim at trial, but unlike all of her other abandoned claims, Blue was entirely correct in not prosecuting this allegation and the conduct of her counsel was above reproach. Pursuant to this court's ruling of December 8, 1983, Blue's claims for relief were limited to those which arose between March 3, 1980, and June 30, 1983. This 1978 claim, therefore, was time-barred and Blue was prohibited by court order from

---

183. At the sanctions hearing, plaintiff admitted she "didn't even look into" Meagher's qualifications before filing this claim. Test. of Blue at Vol. April 9, p. 206. However, plaintiff did attempt to mitigate this prejudicial concession by later claim first that she read Meagher's OPF, *id.* at 207, then backing off that claim to state, while she didn't read Meagher's OPF, she did read the other eight applicants, *id.* at 208–09, and finally, when caught in her own web of tales, plaintiff retreated to the position that she didn't read any of the applicants' OPFs, only an unknown CPO printout of the names of the applicants who were referred to the selecting official. *Id.* at 209–11.

184. Plaintiff could prove she was a member of a protected minority, applied and was qualified for the promotion, and that she was considered for, but denied the promotion. What plaintiff convincingly fails to support is any inference that (1) other employees of *similar* qualifications who were not members of the protected group were promoted at the time plaintiff was denied promotion, or (2) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *See Holmes v. Bevilacqua,* 794 F.2d at 146. In addition, there is no direct or circumstantial proof of discrimi-

nation from which plaintiff could overcome her failure to prove either of the above alternative elements.

185. Defendant's legitimate, non-discriminatory reason for the promotion action is glaringly obvious—the superior qualifications of the selectee. For example, Meagher had worked in oral surgery since 1975 and had significant operating room (OR) experience dating back to 1977. She had assisted in complex maxillofacial procedures and functioned as a scrub nurse in OR. The record is replete with outstanding job performances, letters of appreciation and the highest of supervisory appraisals.

186. No credible evidence exists to show any mishandling of plaintiff's application from its acceptance at CPO to her non-selection by the selecting official. No statistical evidence was presented, proffered, or so far as this court knows, ever prepared to support this claim. Further, the uncontraverted record negates any possible finding that plaintiff possessed better qualifications than the selectee. *See, e.g., Gariola,* 753 F.2d at 1287; *Young v. Lehman,* 748 F.2d at 198.

prosecuting it. Defendant was as aware of this fact as the plaintiff or at least he certainly should have been. It is not counsel for plaintiff's responsibility to assist the defendant in keeping track of the court's orders, their implications, and the progress of the litigation. Accordingly, any expense the defendant suffered in preparing a defense to this claim was through his own neglect and cannot be laid at the doorstep of the plaintiff. Defendant's motion for sanctions on this claim is DENIED.[187]

### Denial of Equal Training and Opportunity for Detail

18. Neither party addressed Blue's abandonment of this claim, either at the sanctions hearing or in their motions and briefs. Nonetheless, it is obvious from the Final Pre-Trial Order that it was a designated claim for relief not pursued at trial. However, since defendant has not pressed this issue, the court cannot project or speculate upon plaintiff's reasons(s) for withdrawing the claim. Accordingly, although it is deemed abandoned, no evidence exists to show that the abandonment was in bad-faith or otherwise unjustified. In addition, the record provides no basis for an in-

---

**187.** Since no evidence was tendered concerning the possible frivolity of the claim, the court finds defendant has failed to sustain its burden of proof in this regard and holds 285–78 not frivolous. Unlike the 85% Rule MPAs, the trial record alone does not provide a sufficient basis for determining the merits of this claim.

**188.** *Id.*

**189.** Q. Mrs. Blue, when you filed—in December of 1983, would You agree with me that your lawyers complained on your behalf about allegedly discriminatory discipline that was applied to you?
A. Would I agree to that?
Q. Would you agree with me?
A. I'm not sure. Are you saying did we talk about that?
Q. Well, did you have any idea what your lawyers were suing about in your case?
A. Yes.
Q. Well, tell me, aside from the promotions, what were they suing about?
A. Harassment and—and retaliation.
Q. Were they suing about discipline, that you had received discipline on a discriminatory basis?
A. Yes.

---

formed frivolity determination. Sanctions therefore will not issue in this matter.[188]

### Discriminatory Discipline

19. In the Final Pre–Trial Order, plaintiff alleged and sought relief for a claim of discriminatory discipline. Although the claim as denominated was sufficiently vague to cover a wide variety of sins, by December, 1983, pre-trial discovery had narrowed the potential parameters of the claim to those allegations regarding entries on Blue's SF–7 card by Cressler and Vincent, the proposed letter of reprimand by Ramos, and the disciplinary action (proposed or otherwise) taken against plaintiff by Sykes. All of these incidents were explored at length at trial as "background" evidence to Blue's promotion claims. However, as plaintiff concedes in her testimony, not until trial did she ever indicate to defendant that she was no longer seeking relief for these allegations of misconduct. The claim of racially-motivated discipline was raised as one for relief in all pre-trial filings and the December, 1983, Order. *E.g.*, Test. of Blue at Vol. April 10, p. 6 and 69–70.[189] It was treated as such by the

Q. So, —and that's the statement I started off with, is that in December of '83—
A. (Interposing) Unh-hunh.
Q. —Your lawyers sued claiming that—your lawyers claimed that you were being dis—you had been disciplined on the basis of—on an illegal discriminatory basis, right?
A. Yes.
Q. What relief in December of '83 did you hope to get?
A. I was hoping to get the harassment and what have you stopped.
Q. Okay. Well, let's res—I'd like you to restrict your comments to discipline.
A. Oh, discipline.
Q. What relief did you hope to get in December of '83 with respect to discipline?
A. For it to cease and—for the whole thing to stop. In other words, I didn't want any—I wanted it cleared up and I wanted the people to stop har—well disciplining me for no reason at all or for discrimination.
Q. Well, when you say that you wanted it cleared up, what do you mean?
A. Well, it was an ongoing process that Fort Bragg would discipline me for reasons that I felt wasn't right, was discriminatory.
Q. Did you want your records cleared somehow?
A. Yes.

defendant in his preparation for trial. It goes without saying that significantly different and enhanced resources are utilized in preparing for primary claims for relief than for background evidence. Therefore, although evidence was heard with respect to the discipline incidents at trial, the claim for relief was clearly abandoned and that withdrawal, having prejudiced the defendant at least in part, must have been made in good-faith and with justification for sanctions not to issue.

As in 67–83, plaintiff's only excuse for abandoning the claim for discriminatory discipline and neglecting to inform the defendant until trial was her move to California. This purported reason lacked credibility and pervasiveness when the court earlier considered it and no additional testimony in this phase of the sanctions hearing enhanced the rationality of the excuse. For all of the reasons previously addressed in the 67–83 discussion, the court finds plaintiff's abandonment of this claim, as one for relief, in bad-faith and without justification. Furthermore, for the reasons set forth in the previous sections of this opinion, the court holds the allegations of discriminatory discipline against Sykes, Ramos, Vincent and Cressler vexations, frivolous and groundless.

### Court Expenses in Trial of Frivolous Claims and Sanctions Hearing

20. The defense and trial of this action obviously involved considerable time at the expense of the taxpayers of the United States. Aside and apart from the time spent by the government in defending against Blue's claims, the court and its staff were put to substantial effort by the circumstances and magnitude of the claims. Recently, a number of federal courts have held that they possess the inherent power to impose sanctions where a party's frivolous or bad-faith conduct has resulted in unnecessary expenditures of time by the court. *See, e.g., Eash v. Riggins Trucking, Inc.,* 757 F.2d 557 (3d Cir.1985); *Olga's Kitchen of Hayward, Inc. v. Papo,* 108 F.R.D. 695 (E.D.Mich.1985); *Itel Containers International Corp. v. Puerto Rico Marine Management, Inc.,* 108 F.R.D. 96 (D.N.J.1985). Although the court's conclusions of law in regard to the source of this authority appear *infra,* it is sufficient, as an intro-duction to the following findings of fact, to state that Blue and her counsel must be held accountable for the waste of judicial resources her claims have caused. *Robinson v. Moses,* 644 F.Supp. 975, 982 (N.D.Ind.1986). This court stands ready and willing to hear any case. But, the increasingly crowded dockets of the federal courts cannot accept or tolerate the heavy burden posed by factually baseless and vexatious claims that drain judicial resources. *Id.*

In assessing costs for court time, two courts and one commentator have noted that a single hour spent by a federal judge on a case costs the government $600.00. *Thiel v. First Federal Savings & Loan Ass'n,* 646 F.Supp. 592, 598 (N.D.Ind.1986); *Robinson v. Moses, supra; Dominguez v. Figel,* 626 F.Supp. 368, 374 (N.D.Ind.1986); *Kearns v. Ford Motor Co.,* 114 F.R.D. 57,

\* \* \* \* \* \*

Q. And you would agree with me that you did seek relief for discipline up to December—including the December 8th order you sought relief, right? In December 8th—that's afterward, Mrs. Blue. You would agree with me that you did seek relief up to that time, right?

A. Yes.

Q. And would you agree with me that the Government only found out in—on April 2nd—April 3rd that you were seeking no relief for discipline, right?

A. Well, to my understanding—I don't know if I'm right or wrong—but my understanding is the discipline of the SF 7-card. This—see, there was more than just one type of discipline.

Q. Mrs. Blue, what I'm asking you is: you were not seeking any relief for any type of discipline—of any type of discipline when your trial started, right?

A. Right.

Q. And would you agree with me that the first time we became aware of that—"we" meaning the Government—was shortly after April 3rd of 1984?

A. Okay. Yes.

Q. And would you agree with me that we had no way of knowing that you were not going to pursue that discipline claim until April 3rd or shortly after April 3rd, '84, right?

A. Right....

67 (E.D.Mich.1987); Levin & Colliers, *Containing the Cost of Litigation*, 37 Rutgers L.Rev. 219, 227 (1985). Accordingly, these courts have imposed costs on the offending party using a lodestar approach of hours expended times $600 or, in the court's discretion, some lesser figure. *Thiel, supra* ($3,600 award on 6 hrs. × $600); *Robinson, supra* (same); *Dominguez* ($1,500 award reduced in court's discretion from lodestar computation of $3,450 based on 5.75 hours × $600); *National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543 (N.D.Cal.1987) ($15,000 award against defendant for "unnecessary consumption of the court's time and resources"); *Kearns, supra* ($10,000 award reduced from lodestar of $24,000 based on 40 hours × $600); *Itel Containers, supra* ($5,000 award); *Olga's Kitchen, supra* ($1,000 award). The court agrees with the lodestar approach to court expenses and the findings below form the predicate for imposition of such a sanction.

21. The court received evidence in connection with the claims of Sandra Blue on April 19–25 and August 27–September 4, 1984. Courtroom hours for these trial days totalled 72 hours. The following court personnel were present in Wilmington for every hour of trial time: the court's law clerk, a deputy clerk of court and the court reporter. The court and its law clerk spent, conservatively, 50 hours outside of court preparing for plaintiff's trial and researching issues in off-court hours during her trial. Numerous orders were drafted by the court with respect to the trial of plaintiff's substantive claims. The hours spent reviewing, researching, drafting and preparing the sections of this opinion related to plaintiff's claims at trial are nearly inestimable—literally hundreds. Accord-

ingly, a total of 250 hours represents a highly conservative estimate of the out-of-court hours spent by the court and its staff in considering Blue's substantive claims.

The court also received evidence in connection with defendant's motion for sanctions against Blue on April 9 and 10 and July 29 and 31, 1985.[190] Courtroom hours for testimony concerning Blue on these hearing days totalled approximately 10 hours.[191] The following court personnel were present in Wilmington for all in-court hearing time: the court's law clerk, a deputy clerk of court and the court reporter. Out-of-court pre-hearing and hearing time totalled approximately 10 hours.[192] The hours spent reviewing, researching, drafting and preparing the sections of this opinion related to defendant's motion for sanctions against Blue easily exceeded 100 hours.[193]

22. Without attempting to quantify to a mathematical certainty the hourly salary of each of the four court employees identified above,[194] the court finds that a reasonable and practical hourly rate for compensation of time expended by the court and its staff is $100 per hour. *Contrast Thiel* and *Robinson, supra.* Of this amount, for purposes of computation, the court finds $60 per hour to be a reasonable rate for time expended by the court and its law clerk and $40 per hour for time expended by the deputy clerk of court and court reporter.[195]

23. Absent contervailing considerations, the product of the hours expended by the court and its staff in this case times the reasonable hourly rate established above reflects the costs of the court in trying plaintiff's frivolous claims and deciding defendant's motion for sanctions against Blue. These calculations are as follows:

---

**190.** Only portions of each of these days can be attributed to the claims against Blue.

**191.** Approximately 1 hour of this time was devoted to testimony concerning MPA 285–78.

**192.** *Id.*

**193.** Approximately 1 hour of this time was devoted to drafting those paragraphs in this opinion dealing with 285–78 and plaintiff's denial of equal training and opportunities for detail.

**194.** Excluded from any of these calculations are the enormous number of hours expended by the court's secretary in preparing orders related to Blue's claims.

**195.** These rates obviously are vastly underestimated and, in the opinion of most, the court hopes, undervalued; however, that is meant to be the case.

**Trial of Substantive Claims**

In-court: 72 hours × $100 = $7,200
Out-of-court: 250 hours × $60 = $15,000
Total: $22,200

**Trial of Sanctions Motion**

In-court: 9 hours (10–1 for 285–78) × $100 = $ 900
Out-of-court: 108 hours (110–2 for 285–78
and training) × $60 ....... = $6,480
Total: $7,380

Total costs: $22,000 + $7,380 = $29,580

### Costs and Expenses of Defense Counsel and the Defense Litigation Team [196]

24. Defendant requests the following costs, expenses and attorney's fees with respect to its motion for sanctions against Blue:

I. Costs and Expenses
 A. Litigation Support Team Time
 1. [197] Before Final Pre-Trial Order $11,368.75
 2. After Final Pre-Trial Order 4,550.00
 B. Photocopying 108.00
 C. Travel and Per Diem 1,468.30
II. Attorney's Fees
 A. Peter B. Loewenberg
 1. Before Final Pre-Trial Order 3,383.25
 2. After Final Pre-Trial Order 4,350.00
 3. Pursuing Sanctions Motion 1,387.50
 B. Stephen L. Berry
 1. Before Final Pre-Trial Order –0–

 2. After Final Pre-Trial Order $–0–
 3. Pursuing Sanctions Motion 1,012.50
 Total: $27,628.30[198]

25. Defendant's lead counsel throughout these proceedings was Peter B. Loewenberg, Chief of the Civilian Personnel Branch of the Litigation Division of The Judge Advocate General's Office of the United States Army. Loewenberg is a 1972 graduate of New York University School of Law and has extensive experience in civil rights cases and class actions. He is a frequent lecturer on Title VII Litigation, a Diplomate of the Court Practice Institute of Chicago, and has worked for the Departments of Labor, Justice and Navy, with ten years active experience in employment law matters. Among the numerous reported cases in which he has been lead counsel for the government are the following: *Sherman v. Alexander*, 684 F.2d 464 (7th Cir.1982); *Simmons v. Brown*, 611 F.2d 65 (4th Cir.1979); *Goodman v. Schlesinger*, 584 F.2d 1325 (4th Cir.1978); *Norton v. Vartanian*, 31 FEP Cases 1259 (D.Mass.1983); *Rodriquez v. Gaylord*, 429 F.Supp. 797 (D.Hawaii 1977); and *Degrace v. Rumsfeld*, 21 FEP Cases (D.Mass.1979). *See* June 21, 1985, Affidavit of Loewenberg at 1–3.

**196.** Documentary evidence detailing defendant's costs and expenses is primarily contained in two black notebooks, filed June 21, 1985. Categorized by plaintiff identity, these notebooks include affidavits of defense counsel, members of the defense litigation team, charts analyzing by work categories the time expended by each member of the litigation team and a comprehensive statistical summary of costs, expenses and fees associated with each claim, broken down into trial phase times of before and after the Final Pre-Trial Order. Additional documentary evidence is found in numerous post-hearing affidavits and declarations of counsel. Finally, all of the members of the defense team, including counsel, testified at the sanctions hearing concerning their hours expended on the claims of each plaintiff, the tasks performed and the reasonableness of the hours allotted to those tasks.

The contested issues of fact and law resulting from defendant's motion for sanctions against Blue have been thoroughly briefed, with both sides submitting two primary briefs and numer-

ous single-issue briefs in support of their respective positions. Thus, there exists more than an ample record upon which to determine the costs, expenses and fees associated with the defense of Blue's abandoned claims.

**197.** The division of fees and costs between those occurring before the Final Pre–Trial Order and those occurring after the Order was felt necessary should the court hold a claim abandoned after the Order without justification and excuse, but not frivolous. In that case, defendant would be entitled to only the expenses incurred *after the filing of the Order* since a non-frivolous claim could be withdrawn, without sanctions, prior to the signing of the Order.

**198.** In determining the reasonableness of defendant's fee and costs request, the court is guided by the legal principles recently reviewed by this court in *Spell v. McDaniel*, 616 F.Supp. 1069 (E.D.N.C.1985), *aff'd in relevant part*, 824 F.2d 1380 (4th Cir.1987).

26. As lead counsel, Loewenberg was ultimately responsible for all aspects of this litigation. He assigned responsibility for some of the individuals' cases to his two co-counsel, COL. Robert B. Williams and CPT. Stephen L. Berry, yet even with those cases, Loewenberg retained authority to make tactical and litigative decisions. Loewenberg exercised this supervisory authority frequently and played some role in every case tried or heard at sanctions.

Among the major duties Loewenberg carried out were research and writing of the primary pleadings. While many of the subsequent pleadings and briefs were drafted by co-counsel, Loewenberg reviewed almost every pleading in this case, often making changes to them and frequently arguing defendant's position to the court. *Id.* at 3–4.

27. Shortly after its filing, this case became the major litigative effort in Loewenberg's office. He devoted substantially more time to it than any other single matter under his responsibility. From February, 1982 to July, 1985, Loewenberg spent at least 40% of all his time in this case. On an almost daily basis, counsel directed the work of an expertly assembled defense litigation team at Ft. Bragg.[199] For example, whenever Loewenberg reviewed an OPF, a member of the litigation team, Jerry Horne or Berry advised him on the materials contained therein. *Id.* at 4.

28. Loewenberg is an extraordinarily skilled trial attorney who enjoys an excellent reputation within the profession. Without exception, Loewenberg performed his tasks in this case in a highly professional and consummately competent manner.

His knowledge, not just of the complexities of Title VII law, but of the vast amount of factual material relevant to each claim, was superb and without equal in the litigation. In short, Loewenberg is an extremely skilled trial advocate.

■ 29. Neither the government's counsel, including Loewenberg, nor the defense litigation team maintained contemporaneous time records for this case. Government lawyers, as well as employees, are not required to do so by law or regulation and, since the government is their only client, such a requirement would be wasteful and unproductive. Unlike civil rights plaintiffs, defendants are not routinely entitled to recover attorney's fees if they prevail under 42 U.S.C. § 2000e–5(k) and § 1988. Thus, when litigation is filed against the government, it is hardly within the government's reasonable contemplation that the action filed is frivolous, or will be partially abandoned without excuse, that the government will years later seek fees for this abuse of the judicial process and that contemporaneous time records, not otherwise mandated, will be necessary as a condition precedent to any appropriate motion for attorney's fees. Accordingly, in the case at bar, contemporaneous time records of counsel and their staff are non-existent.[200]

However, counsel have methodically attempted to reconstruct their expenditures of time in this extended litigation, with the result being an extremely detailed, comprehensive, and reasonable reconstruction of the tasks performed in each case and the hours expended on those delineated func-

---

**199.** Members of the defense litigation team included, *inter alia,* Ruth A. Crumley, John S.W. Parham, Wade G. McDougald, Anne H. Endfinger, Sue B. McKenzie, Herman A. Britt, and Nancy Ransom. The conduct of this litigation support staff throughout the trial was impeccable. From the court's vantage point, they performed their respective jobs with exceptional poise, competence and professionalism.

**200.** Even if the roles were reversed and plaintiff was seeking fees and costs, the lack of contemporaneous time records would not justify an automatic reduction in hours claimed in plaintiff's fee petition. *Citizens Council of Delaware County v. Brinegar,* 741 F.2d 584, 597 (3d Cir.

1984); *Pawlak v. Greenawalt,* 713 F.2d 972, 979–80 (3d Cir.1983), *cert. denied sub nom. International Brotherhood of Teamsters v. Pawlak,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984); *Johnson v. University College of University of Alabama in Birmingham,* 706 F.2d 1205, 1207 (11th Cir.1983), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); *Williams v. Heard,* 568 F.Supp. 89, 90–91 (S.D.Tex.1983). It would and does mandate, however, closer scrutiny of the award application. *Yohay v. City of Alexandria Employees Credit Union, Inc.,* 827 F.2d 967, 974 (4th Cir.1987); *Spell v. McDaniel,* 616 F.Supp. at 1085 and cases cited therein.

tions. If anything, the hours claimed are overly conservative and often facially unassailable. This is also true for members of the defense litigation team. *See* additional findings and conclusions, *infra*. With rare exception, the reconstructed hours are fully supported by the court's intimate knowledge of the hours expended in the prosecution and defense of this case, the voluminous record and the performance of the defense team at trial.

As this court recently had occasion to explain:

"The first component of any court-awarded attorney's fee is the number of hours reasonably expended on the litigation. *National Association of Concerned Veterans*, 675 F.2d at 1323. Although counsel are entitled to full compensation for their efforts, "[i]t does not follow that the amount of time *actually* expended is the amount of time *reasonably* expended." *Copeland v. Marshall*, 641 F.2d at 891. Since the prevailing party is not entitled to those hours claimed that were not "reasonably expended," this Court's inquiry requires the resolution of two distinct yet related issues. The first concerns itself with how much time was actually spent on the litigation. The second focuses on the extent to which the commitment of time was reasonable in terms of the amount of time expended on each task. *Ramos v. Lamm*, 713 F.2d [546, 553 (10th Cir. 1983) ]; *Grendel's Den Inc. v. Larkin*, 582 F.Supp. 1220, 1225–26 (D.Mass.1984); *Wabasha v. Solem*, 580 F.Supp. 448, 458 (D.S.D.1984).

When reviewing the actual hours reported, the Court must distinguish between "raw" time and "hard" or "billable" time to determine the number of hours reasonably expended. *Ramos v. Lamm*, 713 F.2d at 553. "Billing judgment" is an important element of fee setting, whether the fee is set in the private sector by counsel or is established by court award; in either case, unnecessary or excessive hours must be excluded from the fee calculations. *Id.* *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. [354, 361 (D.D.C.1983), *reversed in part*, 746 F.2d 4 (D.C.Cir.1984) ]. As the Court of Appeals for the District of Columbia Circuit stated in *Copeland v. Marshall, supra*,

Compiling raw totals spent, however, does not complete the inquiry.... In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* are also not properly billed to one's *adversary* pursuant to statutory authority.

641 F.2d at 891 (emphasis in original).

In ascertaining which hours reported were reasonably expended, and thus billable, the Court must examine the total number of hours reported by each lawyer, the hours counsel allotted to specific tasks, whether those tasks would normally be billed to a paying client, and the potential duplication of services, particularly where multiple lawyers are involved. *Ramos v. Lamm*, 713 F.2d at 553–54. *See New York State Association for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983); *Johnson v. University College of University of Ala. in Birmingham*, 706 F.2d 1205, 1207–08 (11th Cir.1983), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); *Copeland v. Marshall*, 641 F.2d at 903; *Northcross v. Board of Education of Memphis*, 611 F.2d 624, 636–7 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980). These determinations must be made in the context of the specific case at bar; what is reasonable in one case may be excessive and unnecessary in another. The reasonableness of hours expended in a particular case depends upon the complexity of the case, the number of reasonable strategies pursued and the responses necessitated by the tactics of the opponent. *Ramos v. Lamm*, 713 F.2d at 554; *Wabasha v. Solem*, 580 F.Supp. at 458. If these factors demand an extraordinary number of hours to perform a task, then those hours are properly billable. *Id.*

Finally, the Court must "weigh the hours claims against [its] own knowledge, experience, and expertise of the time required to complete similar activities." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974), *See also Rajender v. University of Minnesota*, 546 F.Supp. 158, 165 (D.Minn.1982). In sum, the Court must carefully scrutinize the total number of hours reported by the prevailing party to arrive at the number of hours that can fairly and reasonably be charged to the losing party."

*Spell v. McDaniel*, 616 F.Supp. at 1084–85. With these principles in mind, the court continues with its findings of fact.

29. Loewenberg assumed responsibility for the *Blue* case. His pre-trial approach was to become totally familiar with all aspects of the specific personnel action challenged. Thus, if a promition was at issue, he analyzed the employment action at each step of the process by reviewing the MPA and all other relevant exhibits. Following the documentary review, Loewenberg would interview the necessary witnesses, gaining additional evidence and assessing the witness' potential trial capabilities.

He utilized this same methodology of preparation in all cases. The fruits of this painstaking labor were born at trial. One can hardly quarrel with such success. *Id.*

30. With respect to Blue's claims, Loewenberg interviewed 42 witnesses for trial.[201] These interviews, each specifically identified by date, took place, with one exception, between June 7, 1983, and January 16, 1984. The interviews totalled 47 hours and 10 minutes.[202] *Id.* at 4–6.

31. Loewenberg reviewed 7 MPAs, totalling hundreds of pages, spending 30 hours of time in the process. He reviewed all exhibits prepared for the trial of plaintiff's case, totalling 389, as well as numerous relevant documents not designated as exhibits, for a total expenditure of time of 22 hours, 15 minutes. Additional review of other files, such as the OPF's of the selectees, discipline reports, awards, appraisals, etc. and analysis of the facts gained from these documents totalled an additional 26 hours. *Id.* at 6.

32. Loewenberg read and studied Blue's deposition, as well as the depositions of 27 other witnesses and potential witnesses. Reconstructing his time spent on these depositions, counsel conservatively estimates an expenditure of 16 hours. *Id.* at 7. Since the court has read many of these same depositions, an obviously critical element of pre-trial preparation, and the court's review required substantially more than 16 hours of work, the court finds counsel's requested hours eminently reasonable. This same point can be made with respect to the MPA and exhibit findings in paragraph 31.

33. Defendant's expert, Dr. Beckett, was asked to perform an analysis and prepare exhibits in connection with each individual case. Loewenberg reviewed all of the charts by himself and later with Beckett. Counsel spent 45 minutes preparing,

201. Because the court has found that five claims were both abandoned in bad-faith and frivolously initiated (MPA's 274–79, 277–79, 440–80, 67–83 and Discriminatory discipline), the court does not propose to go through the contorted machinations required to divide defendant's fees and costs between those occurring prior to and subsequent to the Final Pre–Trial Order. Since the court has failed to find any improperly abandoned claim not frivolous, this differentiation of fees and costs is rendered unnecessary. *See* fn. 198, *supra*.

202. Although plaintiff has raised a number of objections to counsel's claimed hours and costs in her post-hearing brief, filed September 30, 1985, Blue presented no evidence at the hearing nor was any submitted in affidavit form contesting the factual allegations contained in Loewen-

berg's affidavit. In addition, plaintiff consciously chose not to cross-examine Loewenberg on his affidavit at the sanctions hearing. *See* Colloquy Between Counsel at Vol. July 31, 1985, p. 36. Prior to the July, 1985 hearing, the court ruled that affidavits would be accepted as accurate unless challenged. Accordingly, plaintiff waived her right to contest the facts alleged in counsel's affidavit. *See Spell v. McDaniel*, 616 F.Supp. at 1086 and 1102 *citing Blum v. Stenson*, 465 U.S. at 891 n. 5, 104 S.Ct. at 1545 n. 5 and *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d at 1326. Despite the waiver, however, the court holds that fundamental fairness mandates a review of plaintiff's objections on the merits, discussion of which occurs *infra*.

reviewing ahd revising Blue's promotion chart. *Id.*

34. Loewenberg reviewed and studied plaintiff's complaint, the Final Pre-Trial Order and various other pre-trial documents to determine exactly what incidents plaintiff was complaining about. As the court's opinion establishes, this proved to be an elusive and essentially fruitless task. Nonetheless, the job had to be performed by lead counsel and, given the ever-changing and general nature of the claims at bar, Loewenberg spent 5½ hours tracking down plaintiff's numerous complaints. *Id.* at 7–8.

35. Loewenberg worked on a generally proportional basis with respect to each of Blue's promotion claims, that is, he spent as much time preparing one MPA as another. Based on all of the above figures, Loewenberg expended a conservative total of 144 hours 40 minutes preparing for the trial of Blue's claims. Forty percent (40%)

of that time, or 57 hours and 52 minutes, was spent on readying a defense to plaintiff's seven promotion claims. Since the court has found that four (67–83, 274–79, 277–79 and 440–80) of those claims were abandoned without justification and frivolously initiated, counsel wasted 4/7 of his promotion preparation time, which equals approximately 33 hours. *Id.* at 8–9.[203]

36. Loewenberg spent the remaining 60% of his time in approximately the following proportions:

| | |
|---|---|
| Discipline | 15% |
| Denial of a quality step increase | 5% |
| Training and detailing | 10% |
| Appraisal and evaluation | 15% |
| Retaliation and harassment | 15% |

*Id.* at 9. Thus, with respect to Blue's bad-faith abandonment of her frivolous discriminatory discipline claim, counsel wasted 21.5 hours of the remaining 86 hours and 48 minutes.[204] *Id.* at 10.

**203.** The computations contained in counsel's affidavit were based on a finding in defendant's favor on five MPAs, the additional claim being 285–78. Since defendant has prevailed on only four, the court has adjusted the final computations to reflect this determination. Unlike defendant's precise, to the minute calculations, the court's figures will reflect general approximations, making for easier analysis and final computation.

The court further notes that the final figure of 33 hours and the methodology from which it was arrived, take into account plaintiff's objections related to witnesses, exhibit and MPA review, and research which focused on other claims. *See, e.g.,* Plaintiff's September 30, 1985, Brief in Opposition to Defendant's Motion for Sanctions at 23–29. By allowing compensation only for hours proportional to the number of claims found frivolous, plaintiff's concerns are satisfied. The court recognizes that an award on this basis proceeds on the somewhat unusual theory that counsel and his staff worked equally on all of Blue's claims. However, although that may not be precisely true, from the uncontraverted evidence submitted to the court by the defendant and a review of the trial record, the proportional theory is generally accurate for this case—certainly sufficiently reasonable for purposes of the fee and cost award. Plaintiff can make no showing of prejudice in this regard.

**204.** Counsel in his affidavit, claims an entitlement to substantially more hours of reimbursement. The court strongly disagrees. First, Loewenberg argues for the hours he expended on plaintiff's denial of a quality step increase.

However, plaintiff never listed this claim in the Final Pre-Trial Order as one for relief. In addition, defendant never presented the substance of this issue at the sanctions hearing nor in his pre or post-trial briefs. Any contention for compensation on this claim is, therefore, without support in the record. Second, the court found defendant failed to present any evidence on the training and detailing claim at the sanctions hearing and, accordingly, defendant's motion for sanctions on the claim is DENIED. Third, both the appraisal/evaluation and retaliation/harassment claims were, so far as the court was concerned, tried on their merits. Defendant has never suggested there was another aspect to these claims which was not tried. The issues were not presented at the sanctions hearing nor were they briefed by the defendant. Accordingly, even if a meritorious argument exists to support the motion for sanctions on the appraisal and retaliation claims, and the court's independent review of the record fails to so disclose, defendant has waived his right to contest the issues. Counsel's affidavit simply cannot form the predicate for a request for sanctions on a specific claim, particularly one not otherwise apparent from the record. This ruling, of course, does not preclude counsel from seeking costs and fees associated with these last two claims at a later date since the claims were found to be frivolous at trial. *Defendant has previously been given notice by the court in this opinion that he may file for fees and costs associated with the tried claims within twenty (20) days of the service of this order.* The findings of fact contained herein will make an award in response to any further defense motion a relatively easy and painless task.

37. Counsel also made 38 trips to Ft. Bragg, not including trial time. The average cost per trip was $291.66. Blue's case accounted for six (6) of the visits. Since defendant has established that 5 of plaintiff's 11 claims for relief in the Final Pre-Trial Order were frivolous and unjustifiably abandoned, defendant is entitled to compensation for 5/11 of $291.66 × 6 or approximately $787.50.

38. Loewenberg also assumed responsibility for the sanctions hearing of Blue. This time included reviewing MPAs, examining exhibits, researching issues, developing facts, reviewing depositions and all pertinent pleadings. This expenditure of time totalled 2 hours. Trial time for sanctions of Blue totalled 10 hours. Since defendant succeeded on all but one of the claims for which he actually moved for sanctions (285–78) and for which evidence was presented, counsel is entitled to 5/6 of 12 hours or 10 hours of compensated time [205] In addition, counsel expended 7 hours preparing his June 21 affidavit for fees and he is entitled to compensation for 6 of those hours.

39. Without engaging in extended fractional computations, the court finds that counsel's travel and *per diem* costs for his trips to Ft. Bragg in preparation for the sanctions hearings and his trips to Wilmington to conduct the sanctions hearing with respect to the *Blue* case totalled $150.00.

40. Counsel requests compensation at the rate of $75 per hour. In all cases involving an award of fees, the Fourth Circuit Court of Appeals has held that the guidelines established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) must be followed. *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir.

1978), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978). The utilization of the *Johnson* factors has been modified by the Supreme Court's recent decisions in *Hensley v. Eckerhart, supra; Blum v. Stenson, supra;* and *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986). *See also Daly v. Hill*, 790 F.2d 1071 (4th Cir.1986). The initial step in this evaluation is to determine the number of hours reasonably expended and multiply that number times the customary or market fee for similar work. *Pennsylvania v. Delaware Valley Citizens' Council*, 106 S.Ct. 3097–98; *Hensley v. Eckerhart*, 461 U.S. at 433–34, 103 S.Ct. at 1938–40; *Anderson v. Morris*, 658 F.2d 246 (4th Cir. 1981). In determining a reasonable hourly rate, the court should consider a number of factors, including the experience and skills of the attorney, the quality of the representation, the novelty and complexity of the litigation, and the results obtained. *Blum v. Stenson*, 465 U.S. at 898–900, 104 S.Ct. at 1548–50; *Daly v. Hill*, 790 F.2d at 1077–78. In addition, the court should consider, to the extent applicable, the remaining *Johnson* factors. *Blum v. Stenson*, 465 U.S. at 898–900, 104 S.Ct. at 1548–50. *See also Spell v. McDaniel*, 616 F.Supp. at 1100–1105.

Accordingly, the court makes the following findings with respect to Loewenberg's rate request.

(a) A recent (1986) North Carolina Bar Association Economic Survey of typical hourly rates for lawyers during 1985, based on their year of admission to the Bar, as applied to Loewenberg, would yield a mean rate of $83 per hour. Survey at 20.[206]

---

**205.** Counsel's June 21, 1985, affidavit does not include the additional hours expended or costs paid for the July, 1985 "damages" aspect of the sanctions hearings. Since the trial time for the July settings is a matter of record, the court has included those hours in the above calculation, *sua sponte.*

**206.** It must be emphasized first that these rates are for typical work conducted by attorneys in North Carolina, with absolutely no regard to the type of work performed or the skills required to perform it. *See Spell v. McDaniel*, 616 F.Supp. at 1103. Second, although the survey rates are for 1986 and, thus, outside the 1981–1985 time frame of this lawsuit, the rate change between 1984 and 1986 was minimal. Third, Loewenberg is not a North Carolina, but a District of Columbia lawyer, a metropolitan area where counsel fees are substantially higher than in most parts of this state.

(b) The reputation and experience of counsel, as previously noted, are exceptional.

(c) The litigation presented continually challenges issues of both fact and law. The record and this opinion reveal its complexity and magnitude.

In a factual sense, the inability to pin down plaintiff's elusive and contradictory testimony, in combination with the fleeting nature of the ever-changing landscape of the lawsuit, required great persistence, tenaciousness and flexibility on the part of defense counsel. The sheer enormity of the task of trying a case such as this is transparent. In a legal sense, many aspects of the law governing Title VII actions was and is in flux. *E.g.*, excessive subjectivity claims; affirmative action obligations. In addition, many evidentiary issues in the case raised difficult questions and required considerable time and thought by counsel and the court.

 In sum, despite its one-sidedness, this was a most difficult lawsuit. The court finds the relevant legal market in this action is complex civil rights litigation and that this market is subject to the same hourly rates that prevail in other complex federal litigation.

(d) Preparing for and trying the case at bar required extraordinary skill in a variety of areas: organization, investigation, legal research, briefing, oral advocacy, and examination of witnesses. Loewenberg possessed the requisite level of skill.

(e) Time limitations were consistently imposed by the court in this matter in an effort to keep the case moving forward. Counsel, therefore, was constantly working under the pressures of time.

(f) The results obtained in the litigation are undeniably and entirely favorable to the defendant. The quality of Loewen-

berg's representation could not have been better.

(g) Although the court is unaware of any award of fees within this district given to a defendant as a result of a frivolous case or abandoned claim of this magnitude, the rate requested by counsel is significantly *less* than that requested and received by counsel for prevailing plaintiffs in similar litigation. *See, e.g., Spell v. McDaniel*, 616 F.Supp. at 1105 ($100 to $125 per hour). Indeed, the rate requested is in line with the rate awarded in this district for non-complex, basic social security litigation. *See, e.g., Thornton v. Bowen*, 639 F.Supp. 154 (E.D.N.C.1986) ($65 per hour); *Butler v. Heckler*, 639 F.Supp. 14 (E.D.N.C.1985) ($75 per hour); *Wiggins v. Heckler*, 639 F.Supp. 126 (E.D.N.C.1986) ($70 per hour).[207]

 Furthermore, counsel's request is in line with or substantially lower than other awards in recent years to prevailing defendants in frivolous cases. *See e.g., Carter v. Rollins Cablevision of Mass., Inc.*, 634 F.Supp. 944, 947 (D.Mass.1986) ($100 per hour); *Della Pietra v. New York State Organized Crime Task Force*, 630 F.Supp. 986, 992 (W.D.N.Y.1986) ($75 per hour); *Hubby v. Historic Savannah Foundation, Inc.*, 623 F.Supp. 637, 644 (S.D.Ga. 1985) ($75–$100 per hour); *Goldrich, Kest & Stern v. City of San Fernando*, 617 F.Supp. 557, 566 (C.D.Cal.1985) ($90 per hour); *Wilson v. Continental Mfg. Co.*, 599 F.Supp. 284, 287 (E.D.Mo.1984) ($85 per hour determined to be reasonable rate, but reduced due to inability of plaintiff to pay); *Piljan v. Michigan Dept. of Social Services*, 585 F.Supp. 1579, 1582 (E.D.Mich. 1984) ($75 per hour held reasonable, but overall reduced to limit chilling effect).

Accordingly, bearing in mind all of the above factors, the court finds the hourly rate proposed by Loewenberg to be eminently reasonable and substantially undervalued.[208] Lawyers in this district of com-

---

**207.** The rate requested is also similar to fees awarded in the district for sanctions motions in the discovery context. *E.g., Hampton v. Wells*, No. 83–721–CIV–5 (E.D.N.C., November 7, 1983) ($64 per hour); *Howard v. Malcolm*, No. 85–123–CIV–3 (E.D.N.C., March 3, 1986) ($65 per

hour); *Id.* (August 26, 1986) ($65 per hour); *Id.* (December 15, 1986) ($65 per hour).

**208.** An on-the-record comment to the court by defense counsel indicated Loewenberg's position that attorney's fees sought by government counsel should not exceed the $75 per hour cap

parable or lesser qualifications and experience would receive a significantly higher fee for extended participation in a lawsuit similar to the one at bar.

42. The total amount of costs and attorney's fees which was needlessly incurred by Loewenberg because of plaintiff's five frivolous/abandoned claims is:

| | | |
|---|---|---|
| Trial preparation (54.5 hours × $75) | = | $4,087.50 |
| Travel and *per diem* for trial preparation | = | $787.50 |
| Sanctions hearing and preparation (16 hours × $75) | = | $1,200.00 |
| Travel for sanctions hearing and preparation | = | $ 150.00 |
| Total | | $6,225.00 |

43. CPT. Stephen L. Berry is a 1981 graduate of the J. Reuben Clark Law School. While at law school, Berry served as research assistant to former Solicitor General of the United States, Rex Lee, was bestowed the honor of Order of the Barristers, was a member of Moot Court Board and participated on the team that won a national moot court Constitutional Law competition. In January, 1982 he was commissioned as a Captain in the JAG Corps of the United States Army. His initial and only assignment was at Ft. Bragg.[209] Upon his arrival in North Carolina, Berry was immediately assigned to the *Harris v. Marsh* defense team. This litigation became Berry's primary assignment during his entire tenure at Ft. Bragg. Indeed, since July of 1983, it has dominated his daily agenda, consuming all but 10% of his work time. *See* June 21, 1985, Affidavit of Berry at 1–2. Duties and responsibilities assigned Berry in this action included, *inter alia,* researching and writing over 100 motions, briefs and pleadings; directly supervising the work priorities of the defense litigation team; obtaining services of expert witnesses and developing their testimony; preparing a defense for all plaintiffs' cases assigned to him; interviewing witnesses and arranging the logistics of their attendance at trial; reviewing and evaluating exhibits; and developing overall trial strategy with Loewenberg and Williams. *Id.* at 1–3.

44. Berry's participation in the pre-trial development of the Blue case was minimal, although he participated fully in her case at trial. Outside of the courtroom, and with respect to the motion for sanctions now at issue, Berry seeks compensation only for hours spent researching, preparing and revising defendant's response and April 17, 1984, motion for sanctions. This expenditure of time totalled 6 hours, but the motion concerned two other plaintiffs as well, thus, Berry requests compensation for only 2 hours against Blue. Berry also assisted during defendant's presentation at the sanctions hearings against Blue and is therefore entitled to 9 hours of compensable time as was Loewenberg.[210] Finally, Berry expended an addi-

mandated by the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. Although the court disagrees that counsel was so bound by the EAJA, it will not, *sua sponte,* impose a more appropriate hourly rate in this case.

**209.** Simultaneous with the close of evidence in this case in the summer of 1985, Berry completed his tour of duty with the Army and entered private practice in California. His specialized area of practice is employment law.

**210.** That a losing party should not be charged with litigation costs arising from excessive, unnecessary or duplicative time indulged in by prevailing counsel as a result of their lack of an organized subdivision of labor is beyond cavil. *Furtado v. Bishop,* 635 F.2d 915, 920 (1st Cir. 1980). The use of multiple counsel is not, however, unreasonable *per se. Johnson v. University College,* 706 F.2d at 1208; *Spell v. McDaniel,* 616 F.Supp. at 1093. Indeed, the retention of multiple counsel in a complex, lengthy and significant civil rights case, such as this one, is understandable and not alone a ground for reducing any hours claimed. *Spell, supra. See also Clifford v. Janklow,* 747 F.2d 1229, 1231 (8th Cir. 1984).

Thus, as this court stated in *Spell,* the proper focus is not on whether multiple counsel were employed *per se,* but on the reasonableness of the division of responsibility between counsel and the execution of that division. Reduction of hours is warranted only if counsel unreasonably duplicate each other's work. *Spell,* 616 F.Supp. at 1093. *See also Jones v. Central Soya Company, Inc.,* 748 F.2d 586, 594 (11th Cir.1984) (reduction "warranted only if the attorneys are *unreasonably* doing the *same* work"). In complex cases such as the one at bar, managable division of responsibility all but dictates the participation of multiple counsel at trial. An award for time expended by two or more coun-

tional 2½ hours preparing for the Blue sanctions hearings of which the court determines he is entitled to fees for 2 hours.

Accordingly, excluding April and September, 1984, trial time, Berry reasonably expended 13½ hours on the defense of Blue's frivolous/abandoned claims. *Id.* at 3.

45. Berry requests compensation at the rate of $75 per hour. Although Berry is not nearly as experienced or skilled a trial attorney as Loewenberg, his work in and out of the courtroom was certainly competent, diligent, and professional. The applicable *Johnson* findings with respect to Loewenberg apply equally to Berry as they relate to the nature and difficulty of this case, time pressures imposed by the court and results obtained. Berry possessed all the basic skills expected of a young trial lawyer in the areas of organization, legal research, briefing, oral advocacy and examination of witnesses. His apparent confidence and level of accomplishment in these areas grew as the litigation progressed.

The 1986 Bar Association Economic Survey, referred to in assessing Loewenberg's request, as applied to Berry, would yield a mean rate of $67 per hour. Survey at 18. However, considering the magnitude of the case, counsel with a similar background engaged in complex litigation have been awarded substantially higher fees by this court. *E.g.*, $100 per hour awarded to Messrs. Holt and Richardson in *Spell v. McDaniel*, 616 F.Supp. at 1105. The fact that Loewenberg decided to dramatically undervalue his services to the government in this fee request is not a reason to lower Berry's reasonable request just for appearances. Based on the aforesaid, the court finds Berry's request reasonable and will impose the suggested rate of $75 per hour.

46. Berry is also entitled to $60.00 in proportional costs for his travel to Wilmington for the sanctions hearings.

47. The total amount of costs and attorney's fees which was needlessly incurred by Berry because of plaintiff's five frivolous/abandoned claims is:

| | | |
|---|---|---|
| Sanctions hearing and preparation (13½ hrs. × $75) | = | $1,012.50 |
| Travel to hearing | | 60.00 |
| Total | = | $1,072.50 |

48. Ruth A. Crumley was employed at CPO during this litigation as the full-time coordinator of the Litigation Support Team since its inception in early 1983. Initially, team members were not assigned to assist counsel with any specific case. All team members participated in the preparation of all the cases. This was due to the deadlines imposed by the court for the exchange of exhibits and witness lists. Crumley's duties included, *inter alia*, supervising the work of all Team members, analyzing depositions, identifying potential claims, researching issues, developing facts, locating and organizing exhibits—a massive, unenviable task in this case and one performed expertly by Crumley and her co-workers, copying exhibits and locating witnesses. Beginning December, 1983, Team members were given specific case assignments. *See* June 21, 1985 Affidavit of Crumley at 1-2.

49. In an effort to accurately reconstruct her time expended on each plaintiff, Crumley, as did all Team members, reviewed her official time cards from July 5, 1983 to June 2, 1984. DX2431. Although she recalls no specific assignment in connection with Blue's claims, she initially participated in the preparation of all cases. Of the 1156 hours she worked on this litigation *before* the filing of the December and Janu-

---

sel is proper, provided it reflects the distinct contribution of each lawyer to the case. *Johnson v. University College, supra.*

Applying these principles to the case at bar, and Berry's hours particularly, the court finds defense counsel utilized a division of responsibility with little or no duplication of effort and charged for time of multiple counsel only in those instances where cooperative effort by counsel appeared reasonably necessary to efficiently achieve a productive result.

*See Spell,* 616 F.Supp. at 1094. Accordingly, given plaintiff's lack of objection to Berry's hours as duplicative, the court finds the use of multiple counsel at trial and sanctions hearing substantially justified. *Id. See also Berberena v. Coler,* 753 F.2d 629, 633-34 (7th Cir.1985). The fact that plaintiff was represented by multiple counsel at every hearing before the court, as well as at trial, supports this conclusion.

ary Pre–Trial Orders, Crumley conservatively estimates 8.25 hours were spent on work attributable to Blue's claims. Affidavit at 2. Most of these hours were expended in exhibit organization and witness location/preparation. *Id.* at Exhibit 1 attached to Affidavit. Crumley requests *no* additional time for hours expended after January, 1983—not even for the considerable hours spent in the courtroom or testifying during Blue's sanctions hearing. Nor is there any request for costs associated with Crumley's travel, lodging and meals in Wilmington. Thus, considerable billing judgment has been exercised in Crumley's fee request, as with all her Team members. Because the court's own trial records establish Crumley's entitlement to substantially more hours than claimed, the court will not reduce the few number of hours requested by Crumley despite the reconstructed records and inability to affirmatively identify each hour with a specific claim.

50. Defendant requests compensation for Litigation Team members at the rate of $25 per hour. This fee is comparable to an award in this district for paralegal work. *See, e.g., Bunn v. Bowen,* 637 F.Supp. 464, 472–73 (E.D.N.C.1986) ($35 per hour).[211] It is likewise comparable to awards for paralegal activity nationwide. *E.g., Alexander v. Hill,* 625 F.Supp. 567, 570 (W.D.N.C. 1985) ($25–$60 per hour); *EEOC v. Burlington Northern, Inc.,* 618 F.Supp. 1046, 1055 (N.D.Ill.1985), *modified sub nom. In re Burlington Northern Employment Practices Litigation,* 810 F.2d 601 (7th Cir. 1986) ($40 per hour); *Morgan v. Nevada Board of State Prison Commissioners,* 615 F.Supp. 882, 885–87 (D.Nev.1985) ($35 per hour); *Kyles v. Secretary of Agriculture,* 604 F.Supp. 426, 428 (D.D.C.1988) ($35 per hour). *See also Richardson v. Byrd,* 709 F.2d 1016, 1023 (5th Cir.1983); *Vaughns v. Board of Education of Prince George's County,* 598 F.Supp. 1262, 1283 (D.Md.1984), *aff'd,* 770 F.2d 1244 (4th Cir. 1985). Although most of the Litigation Team were not trained paralegals, they performed duties during this litigation sub-

stantially more complicated and detailed than many paralegals will ever attempt and, without exception, plaintiff's argument to the contrary notwithstanding, those duties were performed expertly. No justification exists to compensate these personnel at any lesser rate simply because they fail to possess a paralegal certificate. Academics is often no substitute for practical experience and that is the case here. Accordingly, Litigation Team members will be compensated at the requested rate of $25 per hour.

51. Assuming monetary sanctions issue, defendant is therefore entitled to the following compensation for Crumley's needless expenditure of time with respect to Blue's frivolous/abandoned claims: 8.25 hours $\times$ $25 = $206.25.

52. John S.W. Parham was employed at CPO during the litigation as a full-time member of the Litigation Support Team from its inception. His general duties were similar to those of Crumley minus her supervisory responsibilities. Parham's reconstructed records indicate that of the 1281 hours he worked *before* the filing of the Final Pre–Trial Orders, he expended 1.5 hours on Blue's claims reproducing exhibits. *See* June 21, 1985, Affidavit of Parham at 2 and Exhibit 1; DX2425; Test. of Parham at Vol. July 30, p. 80–81. Like Crumley, Parham does not claim any hours or costs for his time expended at the Blue sanctions hearings in Wilmington in April or July. Thus, the court will not reduce the claimed 2 hours and defendant should be reimbursed $37.50 (1.5 hrs. $\times$ $26) for Parham's services.

53. Wade G. McDougald was employed at CPO during the litigation as a full-time member of the defense Team from its inception. His duties were identical to those of Parham. McDougald's reconstructed records indicate that of the 1211 hours worked *before* the Final Pre–Trial Orders, he conservatively expended 9 hours on Blue's claims, primarily locating witnesses and reproducing, as well as organizing, ex-

---

**211.** In addition, the 1985 North Carolina Bar Association Economic Survey indicates the typical hourly rate during 1985 for paralegals was $30 per hour. Survey at 23.

hibits. *See* June 21, 1985, Affidavit of McDougald at 2 and Exhibit 1; DX2422. As with all the other Litigation Team members, McDougald claims no hours after the Final Pre-Trial Orders or for his time spent in Wilmington on Blue's sanctions hearings. Thus, the court will not reduce the requested hours which are patently reasonable.[212] Defendant should be compensated $225.00 for McDougald's time (9 hours × $25).

54. Ann Endfinger was employed at CPO during the litigation as a full-time member of the Litigation Support Team from its inception. Her general duties were similar to those of Parham and McDougald. Endfinger's reconstructed records indicate that of the 1,203 hours worked *before* the filing of the Final Pre-Trial Orders, she expended at least 7 hours on Blue's claim, primarily organizing exhibits and locating and preparing witnesses. *See* June 21, 1985, Affidavit of Endfinger at 2 and Exhibit 1; DX2428; Test. of Endfinger, Vol. July 30, p. 31. Like Crumley, Parham and McDougald, Endfinger requests no compensation for post-January, 1984 hours, including those clearly expended testifying in and preparing for the sanctions hearings in Wilmington. Accordingly, assuming monetary sanctions follow, defendant is entitled to compensation for all 7 hours × $25 per hour for a total of $175.00.

55. Herman Britt, Jr. was employed at CPO as a member of the Team from early 1983 until October, 1983. His duties were similar to those of Endfinger. *See* Test. of Britt at Vol. July 29, p. 38. Britt's recon-

structed records indicate that of the 667 hours he expended on this case, 10 hours were attributable to work performed in connection with Blue's claims, primarily researching issues, developing facts and reproducing exhibits. *See* June 21, 1985, Affidavit of Britt at 2 and Exhibit 1. Although Britt testified at the sanctions hearing in Wilmington, his testimony was not extensive and the court has no independent recollection of Britt's participation in any other manner in these hearings. Accordingly, since Britt cannot recall any specific assignments in this case, the court finds it must reduce Britt's request to excise any hours not expended on the five claims at issue. Defendant is entitled to compensation for 8 hours of work by Britt at $25 per hour for a total of $200.00.

56. Finally, completing the Litigation Support Team staff associated with Blue's claims, Sue B. McKenzie was employed with CPO as a member of the Team from its inception. Her general duties were similar to all of the other members of the Team. However, she spent 55% of her working time on the *Blue* case with 75% of that time devoted to the promotion claims. June 21, 1985, Affidavit of McKenzie at 2; Test. of McKenzie at Vol. July 29, p. 162–63. McKenzie, through reconstructed records, is able to further quantify her time from percentages to actual hours. She conservatively estimates she worked 437 hours on the five abandoned promotion claims (includes 285–78) and 164 hours on the four remaining non-promotion claims (discipline, training, QSI and appraisals). *Id.* *See also* DX2434.

---

**212.** Simply a review of the number of documents related to plaintiff's five abandoned/frivolous claims would justify the hours requested by all of the Litigation Team without any regard to the hours expended on depositions, witnesses and identification of claims. *Organization* and *reproduction* of the thousands of pages contained in these documents (those marked as exhibits and those relevant files which were not so identified, such as the appropriate OPF's of applicants and selectees in 274–79, 277–79, 440–80 and 67–83) must have consumed an enormous number of hours. Plaintiff's attack on the few number of hours requested by the Litigation Team is unexplainable. The requests are so facially reasonable, in light of the magnitude of Blue's claims, and the effort obviously necessary to defend them, that it is hardly surprising plaintiff has failed to come forward with any *evidence* suggesting the hours were not expended and instead relies on a wholly conclusory assault on the Team petition. Somebody on the defense staff must have performed the work necessary to prepare for the five abandoned claims. Since the total number of hours claimed to do the job is eminently reasonable, and the Team members all request compensation at the survey rate, plaintiff is hardly prejudiced if, in actuality, Ms. Endfinger photocopied for one less hour than she requested, while Mr. Parham picked up the slack.

McKenzie's affidavit is fully supported by her testimony at the sanctions hearing. McKenzie testified that she was orally assigned to work solely on the *Blue* case in early August, 1983.[213] Test. of McKenzie at Vol. July 29, p. 168. Her work included, *inter alia,* contacting witnesses, preparing exhibits, developing facts, analyzing the relevant depositions, and identifying selectees and panel members of the MPAs at issue. *Id.* at 165, 168–69. McKenzie spent approximately equal time on each promotion claim. *Id.* at 185. She read and analyzed every document in defendant's possession related to each MPA, including EEO files and discovery materials. *Id.* at 186–88.

Given the amount of documentary evidence admitted in Blue's case, simply reading and digesting the material, as this court has done, would account for a vast majority of the hours McKenzie claims she expended. Accordingly, the court finds the hours requested reasonable and defendant should be compensated for a total of 390

hours, (415 of 437 hours + 1/4 of 164 hours), or $9,750.00.

57. The only additional cost associated with Blue's abandoned claims requested by the defendant is $108.00 for photocopying 1,080 pages at $.10 per page. *See* Tab 15 of defendant's June 21, 1985, Fee and Cost Petition.[214] This request, even though it probably includes pages for MPA 285–78 is still entirely reasonable. Indeed, the request is extremely under-estimated if one considers that the five basic exhibits related to MPAs 274–779, 277–79, 440–80 and 67–83 total 750 pages and at least 3 copies of those exhibits were made by the defendant—two for the court and one for the plaintiff. (DX 208, 209, 211, 230 and 254).[215] This computation does not even begin to reflect the total number of exhibits and non-identified documents that were actually photocopied relevant to and necessarily obtained for use in Blue's claims. Therefore, the court finds no reduction in the photocopying request required and defendant is entitled to $108.00 reimbursement.[216]

---

**213.** A written assignment to that effect was not issued until December 1, 1983. Test. of McKenzie at Vol. July 29, p. 183–84.

**214.** This cost does not include expenses for equipment rental or labor in making copies. Labor is, of course, included in the individual Team members' hourly requests.

**215.** These exhibits constitute the relevant MPAs and the OPF of the selectee for 67–83.

**216.** Fed.R.Civ.P. 54(d) provides, in pertinent part, that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." An award of costs is within the sound discretion of the district court. *Hudson v. Nabisco Brands, Inc.,* 758 F.2d 1237, 1242 (7th Cir.1985); *Flint v. Haynes,* 651 F.2d 970, 973 (4th Cir.1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982). However, that discretion is not unfettered and courts may not, under Rule 54(d), "tax costs to reimburse a winning litigant for every expense he has seen fit to incur." *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964). Rather, proposed cost items should be carefully scrutinized and expenses not specifically allowed by statute should be taxed sparingly. *Id.*

Notwithstanding the above admonition, Rule 54(d) creates a presumption that the prevailing party receive costs specifically authorized by statute. *Hudson,* 758 F.2d at 1242. *See also*

Bartell, *Taxation of Costs and Awards of Expenses in Federal Court,* 101 F.R.D. 555, 559–561. In order to rebut this presumption, "the losing party must demonstrate that there has been some fault, misconduct, default, or action worthy of penalty on the part of the prevailing side." *Hudson, supra quoting Delta Airlines v. Colbert,* 692 F.2d 489, 490 (7th Cir.1982). Even a showing by the losing party that it has conducted the litigation in good faith is not sufficient to rebut the presumption. *Id.*

The statutory basis for an award of photocopying costs is 28 U.S.C. § 1920(4) which provides:

A judge or clerk of any court of the United States may tax as costs the following:

(4) Fees for exemplification and copies of papers necessarily obtained for use in this case.

Pursuant to this section, courts routinely tax the losing party fees for copies produced in the litigation "necessarily obtained for use in the case." *E.g., Dowdell v. City of Apopka,* 698 F.2d 1181, 1191–92 (11th Cir.1983); *Northcross v. Board of Education,* 611 F.2d 624, 639–42 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980); *EEOC v. Sears, Roebuck & Co.,* 114 F.R.D. 615, 625 (N.D.Ill. 1987); *Raio v. American Airlines, Inc.,* 102 F.R. D. 608, 611 (E.D.Pa.1984); *Kelley v. Metropolitan County Board of Education,* 558 F.Supp. 468, 479 (M.D.Tenn.1983); *Wuori v. Concannon,* 551 F.Supp. 185, 200–01 (D.Me.1982).

58. Based on the aforesaid findings of fact, assuming monetary sanctions issue for plaintiff's five abandoned/frivolous claims, the court finds defendant is entitled to the following fees and costs:

I. Costs and Expenses
 A. Litigation Support Team ........ $10,593.75
 B. Photocopying .................... 108.00
 C. Travel and Per Diem ............. 997.50
II. Attorney's Fees
 A. Peter Loewenberg ............. 5,287.50[217]
 B. Stephen Berry ................. 1,012.50
 Total: ........................... $17,999.25

59. Although offered the opportunity to do so, plaintiff *explicitly* waived any presentation of an inability to pay a sanctions award defense. Colloquy with Counsel at Vol. July 31, pp. 36–37. She did so with full knowledge of the amount of defendant's request. Blue is gainfully employed in the dental profession in California and has been since late 1983.

B. *Beulah Mae Harris*

60. Any prior findings of fact and conclusions of law relevant to this plaintiff's claims are hereby incorporated by reference into this section of the court's opinion.

61. Plaintiff was first employed at Ft. Bragg in July, 1968, as a GS–2 Supply Clerk. She received a promotion to GS–3 as a Military Personnel Clerk in February, 1970, and was promoted, without competition, to GS–4 in that same job series six months later. DX801 at 173–74. In 1981, plaintiff was again promoted, this time to GS–5 as a head Military Personnel Clerk in August, 1981. *Id.* at 4. Harris held this position until April, 1984, when she was terminated from government service at Ft. Bragg for unacceptable performance.[218] DX853.

62. During plaintiff's tenure at Ft. Bragg, she sought and applied for over 150 promotions. Test. of Harris at Vol. March 27, p. 83. Between March, 1974, and the summer of 1982 alone, Harris filed for 147 positions, with roughly 100 occurring since 1979. *Id.* at 94–95. In many cases, plaintiff was found either ineligible or unqualified (over 100). And, in those cases in which she was referred for interview, a number of the positions were filled by blacks or were cases in which she was nonselected by a black supervisor. *E.g.,* MPAs 444–81, 238–81, 163–81, 251–80 (black selectees); 163–81, 44–81 and 158–81 (black selecting official). *See* Defendant's May 13, 1983 Opposition to plaintiffs' Motion for Class Certification at 83–85 and n. 93. Between July, 1975, and July, 1983, plaintiff filed six formal complaints of discrimination. *See id.* at 97–99. Harris' active displeasure with the promotion process

---

Thus, regardless of whether plaintiff's claims are deemed frivolous or abandoned in bad faith, since Blue makes no attempt to rebut the presumption in favor of awarding statutory costs, defendant is entitled to recover his photocopy expenses as a prevailing party. The federal government may, absent statutory restriction, recover costs to the same extent as a private party. *United States v. Mitchell,* 580 F.2d 789, 793 (5th Cir.1978). *See also Reid v. United States,* 715 F.2d 1148, 1155 (7th Cir.1983); *Baez v. United States Department of Justice,* 684 F.2d 999 (D.C.Cir.1982) (*en banc*); *Swierkowski v. United States,* 620 F.Supp. 149, 152 (E.D.Cal. 1985).
Title VII contains no such restriction to the recovery of pure costs (as opposed to attorney's fees). 42 U.S.C. § 2000e–5(k). *See also EEOC v. Eagle Iron Works,* 424 F.Supp. 240, 250 (D.Iowa 1976); Note, *The United States as Prevailing Defendant in Title VII Actions: Attorneys' Fees & Costs,* 66 Geo.L.J. 899, 919 n. 97 (1978).

**217.** The primary reason counsel's fees are so low is that the bulk of the preparatory and investigative work was competently and professionally performed by the Litigation Team, particularly McKenzie. This allowed Loewenberg to more efficiently and effectively use and limit the non-trial time he allocated to Blue's claims. See *Jacobs v. Mancuso,* 825 F.2d 559, 563 (1st Cir.1987) ("the use of [paralegals and administrative staff] is to be encouraged by separate compensation in order to reduce the time of more expensive counsel"); *Spanish Action Committee v. City of Chicago,* 811 F.2d 1129, 1138 (7th Cir.1987).

**218.** The parties stipulated to the following facts: Harris challenged her firing before the Merit Systems Protection Board (MSPB); the hearing examiner sustained the firing; Harris appealed the decision to the full Board; the Board upheld the hearing examiner's decision; and Harris appealed that determination to the EEOC. Here is where the matter lay at the conclusion of the evidence in this case.

at Ft. Bragg finally resulted in her participation and intervention in the litigation *sub judice.* Along with the other intervenors, Harris' complaint-in-intervention was filed on August 25, 1983, and her amended complaint-in-intervention was filed on December 16, 1983.

63. In the Final Supplemental Pre–Trial Order, filed January 5, 1984, Harris specifically alleged racially discriminatory treatment and requested relief for ten (10) independent claims:

(a) Discriminatory denial of five (5) promotions: MPAs 64–81, 94–81, 210–81, 196–82 and 5–83;

(b) Discriminatory denial of training in 1980 and again in 1982;

(c) Unfair 1980 job classification on the basis of race;

(d) Harassment and retaliation; and

(e) Denial of equal employment benefits.

Supplemental Pre–Trial Order at 23. *See also* Amended Complaint-in-Intervention at 6. None of these claims ever came to trial, however, as Harris, *within four months* of asserting her claims in the Final Supplemental Order, moved to dismiss her action in its entirety.

*Bad Faith Abandonment and Withdrawal of Claims after Filing Final Pre–Trial Order*

64. On May 7, 1984, Harris, along with James L. Fleming and Jeanne Hendon, moved to withdraw as intervenors in the case at bar. Supporting Harris' motion was a memorandum of law and, in both documents, the *sole* justification for plaintiff's motion was one of convenience. In pertinent part, Harris' motion stated:

Since she has been allowed to intervene in this proceeding, Harris has been subjected to harassment and retaliation, including, but not limited to, her discharge in April, 1984. Harris has filed an appeal of her dismissal through the Merit Systems Protection Board and EEO charges alleging retaliation on a 1983 appraisal. If she is unsuccessful in her administrative challenges she intends to pursue her claims in court. If she is

successful or partially successful in her administrative proceedings, she will not pursue the pending claims in *Harris* in order to avoid further harassment. *If she has to pursue her claims regarding her 1983 appraisal and 1984 discharge in court she believes that it will be more convenient for the Court and all parties to dispose of all of her claims; including those now pending in Harris in one proceeding.* She, therefore, respectfully requests the Court dismiss her case without prejudice so that she might bring all of her claims before the court in one proceeding.

Motion at 3 (emphasis added). *See also* Memorandum at 3–4 ("By allowing Harris to withdraw without prejudice and to consolidate all of her claims in one proceeding ... the Court will allow for an efficient use of judicial resources and minimize the time and resources expended by both the plaintiff and defendant.").

The alleged concern underlying plaintiff's motion to withdraw was her stated belief that the discharge and retaliation claims which arose after June 30, 1983, related directly to the claims in this proceeding and, since the post June 30 claims could not be tried in *Harris v. Marsh,* a more efficient use of the court's resources and those of the parties would be to pursue all of the claims in one proceeding. *See* May 16, 1984, Affidavit of Beulah Mae Harris at 2 (Tab 207). This rationale for dismissal simply did not and does not withstand scrutiny.

On June 1, 1984, defendant filed his response to plaintiff's motion, not opposing the request for dismissal *with prejudice,* an alternative suggested by the plaintiff to her requested dismissal without prejudice, but vigorously asserting an entitlement to fees and costs as a sanction for Harris' filing of frivolous claims and for the post-Pre–Trial Order withdrawal of the claims in bad faith. As defendant stated in his response, Harris' claims in this proceeding challenged a number of aspects of defendant's merit promotion process as they impacted on her individually during her tenure at Ft. Bragg, *e.g.,* promotions, job clas-

sifications, training, and employment benefits. Indeed, the only claim ever raised in this litigation connected in any manner with plaintiff's discharge was a claim of "appraisal retaliation" and that claim was dismissed without prejudice in the fall of 1983 in resolution of a conflict of interest with plaintiff-intervenor Alicia Chisolm.[219] Thus, the claims raised in the case at bar could, at best, only have been asserted by plaintiff as background evidence in any independent lawsuit over her discharge.

Espousing the logic contained in defendant's response, the court, while granting plaintiff's alternative request for dismissal with prejudice, soundly rejected Harris' convenience rationale, stating:

> The Court finds that defendant is ready to proceed in plaintiff Beulah Mae Harris' asserted claims and would undoubtedly be prejudiced if witnesses became unavailable or if attorneys and litigation support personnel left or were transferred before the case was tried. In addition, an utter waste of resources of this Court and the parties would result if the trial of Ms. Harris' action was indefinitely delayed pending prolonged administrative processing of her unrelated retaliatory discharge and harassment claims. The Court will not tolerate such delays and finds unpersuasive plaintiffs' argument in support of her suggested alternatives to voluntary dismissal with prejudice [dismissal without prejudice or stay].

Order of June 8, 1984, at n. 2. Accordingly, plaintiff's claims were ordered dismissed pursuant to Fed.R.Civ.P. 41(a)(2), but as a term and condition of the dismissal, the court expressly reserved the right to render a later decision on defendant's motion for sanctions, fees and costs.[220]

As in Blue's case, after the March 4, 1985 Agreement was filed, an evidentiary hearing was held on defendant's motion for sanctions in connection with Harris' claims on March 27–28 and July 8–9, 1985, in Wilmington.[221] Additional relevant testimony was heard, in part, on April 8, July 12, and July 29–31, 1985, particularly with regard to defendant's fees, costs and expenses. From the evidence presented at the hearing in combination with the exhibits and record in general, the court issues the remaining findings of fact.

65. Having been rebuffed in her initial attempt to explain her surprise decision to withdraw from the lawsuit, Harris then embarked on a series of written and oral machinations aimed at explaining the May, 1984, decision to dismiss. The result, as shown below, is a tortured path of inconsistent, evasive and wholly incredible explanations for an untimely decision made to abandon and dismiss a host of patently frivolous claims. In viewing this scenario unfold, it must be remembered that Harris' decision to withdraw was not an isolated case, but rather was part of a process in which a number of plaintiffs sought to expeditiously get out of the lawsuit at the same time for various reasons. The mental impression vividly carved in the court's memory at the time was, quite bluntly, of the litigants deserting a sinking ship. Harris' subsequent actions did nothing to alter this disturbing picture and her ever changing testimony on the subject makes it impossible to credit her initial reason for dismissal, convenience—as one presented or argued in good faith.

66. After the court rejected Harris' convenience theory of withdrawal, she belatedly stated in a June 28, 1984, affidavit, that

---

**219.** *See* Plaintiffs' October 6, 1983, Supplemental Report to the Court on Conflicts of Interest. Order of December 8, 1983. The supervisor who allegedly rated Harris too low and discriminated against her was Chisolm.

**220.** Rule 41(a)(2) provides where a non-stipulated dismissal is requested after the issue is joined, the action "shall not be dismissed at the plaintiff's instance save upon order of the Court and *upon such terms and conditions as the Court deems proper.*" (Emphasis added).

**221.** Much of the delay in hearing evidence on this matter (between March and July) stemmed from the fact that the conflict of interest between Harris and Chisolm previously referred to erupted again in the sanctions hearing, forcing (1) counsel of record to withdraw from plaintiff's case, (2) the retention of new counsel, Mr. Cressie Thigpen of Raleigh, North Carolina, and (3) time necessarily required for Mr. Thigpen to become familiar with this action.

she was "simply financially unable to pursue both proceedings [the *Harris* case and her administrative complaint concerning her discharge] at the same time" because it would require that "she retain separate legal counsel." Affidavit 5. This affidavit was filed nearly two months after Harris made her motion to withdraw, six weeks after her initial affidavit supporting the motion to withdraw, and three weeks after the court's order allowing the conditional dismissal with prejudice. Aside from the fact this newly discovered reason suffers credibility problems from the onset since it was never mentioned prior to the court's refusal to adopt plaintiff's original reason for withdrawal, the evidence at hearing establishes, beyond any doubt, that plaintiff clearly was financially able to pursue both actions. And, even assuming *arguendo* that she was not able to do so, any financial inability to pursue the two independent causes could not possibly have developed until well after the motion to withdraw was filed, indeed not until just a few days prior to the filing of the June 28 affidavit.

67. At hearing, plaintiff made it apparent that her primary reason for requesting dismissal was a lack of financial resources, not, as originally stated, one of convenience. However, in direct contradiction to this motivation for withdrawal, Harris openly admitted her participation in this lawsuit was *never* contingent upon the payment of any attorney's fees to her Charlotte, North Carolina, counsel or the NAACP Legal Defense and Educational Fund, Inc. Test. of Harris at Vol. March 27, pp. 23–25 and 62–63. Plaintiff did not receive a bill from counsel nor was she ever pressured to contribute financially *in any manner* to this litigation. Any payments made on her part were therefore entirely voluntary.

In this regard, Harris initially testified that she had voluntarily donated between $500–$600 to a "Class Legal Defense Fund" (the Fund) established by some of the plaintiffs and intervenors to defray some of their costs of litigation. *Id.* at 24–25. Plaintiff stated she paid part of the money in cash and part by check, first testifying it was "mostly in cash" *id.* at 25, and later that one half was by check. Test. of Harris at Vol. July 8, p. 41. During the break in plaintiff's testimony between March and July, necessitated by plaintiff's retention of new counsel, defendant subpoenaed plaintiff's financial records, including statements of her checking and savings accounts. The subpoena, enforced over objection by order of this court, required Harris to disclose "any and all documents, memoranda or records relating to your payments whether voluntary or otherwise to the law firm of Chambers, Ferguson, Watt, Wallas and Adkins, the Class Legal Defense Fund, the NAACP Legal Defense Fund or Mr. Douglas Canders [her counsel with respect to the 1984 firing]." Unfortunetely for plaintiff, defendant's subpoena netted only two checks, written in 1983, totalling $35.00 to the Fund and none to either the NAACP or private counsel with respect to this litigation. DX852 (Check # 1923) and 852(d) (Check # 2237); Test. of Harris at Vol. July 8, pp. 42–45. The day after testifying to this effect, Harris did produce two additional checks, one written in 1981 and the other in 1982, totalling another $35.00 to the Fund. DX854; Test. of Harris at Vol. July 9, p. 20. No receipt was produced nor was there any other independent evidence to show an amount in cash paid to the Fund. Thus, plaintiff's documented contributions to the Fund totalled not $500–$600 as claimed, but a mere $70.00.

When confronted with this discrepancy, plaintiff stated that counsel for defendant obviously did not possess all her checks because she was certain she contributed more than $70.00 to the Fund. The problem with this excuse is that plaintiff was served with defendant's subpoena on March 27, 1985, and had until her testimony on July 8, over one hundred days, to find all her checks and disclose them to the defendant. At hearing, counsel for defendant was operating solely on the information provided him by the plaintiff. The result of plaintiff's disclosure therefore was either (1) Harris was negligent or deliberately indifferent in her compliance with the

subpoena or (2) the evidence simply didn't exist to support plaintiff's version of her contributions to the Fund. Since, even on post-testimony review of her records, plaintiff failed to disclose any further checks or receipts, the court must find plaintiff's original testimony that she contributed $500–$600 to the Fund, with half in check, incredible. Accordingly, considering plaintiff's participation in this litigation was never contingent upon her ability to pay any attorney's fees or expenses and the fact that her voluntary contributions over a three year period to the Fund totalled only $70.00, it is ludicrous to suggest she was financially unable to absorb the virtually negligible costs of continuing to pursue her claims in the case at bar.

68. This finding is fully supported by the fact that Harris' pursuit of the administrative complaint concerning her 1984 discharge was handled at *no cost* to her by a union attorney, Doug Canders. Test. of Harris at Vol. March 27, pp. 22–23 and 26. In fairness to the plaintiff, Julius Chambers, lead counsel for plaintiff in this action, was Harris' original counsel before the MSPB. When he was disqualified from participating in that proceeding, *see* Finding of Fact # 107, *infra*, Harris sought Canders' assistance. Notwithstanding that fact, Harris did initially owe Chambers $2,000.00 for work performed on her individual discharge claim prior to disqualification. *Id.* at 33. However, after payment of approximately $500.00, plaintiff testified

Chambers released her from any further financial obligation, essentially voiding the remainder of the $2,000 bill. *Id.* at July 9, p. 160. When this forgiveness of the debt occurred is unclear, but in any event, the record is void of any evidence suggesting plaintiff was pressured to pay Chambers while the debt was alive or that its existence was ever burdensome for Harris. Of course, once it was extinguished, any financial concerns with respect to either proceeding at issue vanished.

69. Even if plaintiff was responsible for making periodic contributions to either proceeding, which she clearly was not, and taking into consideration lodging and meal expenses for a trial in Wilmington, plaintiff was fully capable of financing those obligations.

First, Harris testified on more than one occasion that the decision to withdraw from the lawsuit had been a joint determination made between her and her husband because "they" could not afford to continue in the litigation. *See, e.g., id.* at 21 and 27.[222] Harris later tried to extricate herself from this testimony and have the court focus solely on her independent financial situation. The reasons for this change of testimony were obvious—Harris and her husband, even after plaintiff was fired from Ft. Bragg, possessed a combined annual income of over $30,000. *Id.* at 34–42. In addition, the family maintained substantial liquid and non-liquid assets.[223]

---

**222.** Q: Well, Ms. Harris, you state in your affidavit, that you signed under oath, that you could not pursue financially. Did you make any inquiry of your husband about whether you could pursue [the litigation] financially?

A: *Yes, I asked him.*

Q: And when you asked him you did not ask how much your income is?

A: No. When I was fired, I discussed the two law—this lawsuit and the fact that I am going to pursue my claim to be reinstated at Ft. Bragg. *We discussed it. So he just told me that I could not pursue both claims as the same time.*

Test. of Plaintiff at March 27, p. 21 (emphasis added).

Q: So, now, going back to your withdrawal, you—when you discussed this with your husband, you did not ask how much money do we have that we might be able to pay for this; did you!

A: No.

Q: What?

A: No, I did not.

Q: So I do not understand how, when you say that you are, financially, not able to pursue your claims, how do you know that?

A: As I told you before, *we discussed it, and he just simply told me that we could not pursue—that I was not able to pursue both claims.* *Id.* at p. 26–27 (emphasis added).

**223.** Another reason plaintiff tried to scamper away from her March 27 testimony was that it directly conflicted with information supplied by her husband's counsel to the court during an April 8, 1985, argument over whether his financial records should be subject to disclosure in this lawsuit. In arguing that his records were irrelevant, counsel stated:

[Mr. Harris] feels that from the get-go he *has known nothing about this lawsuit.* He has never financed any portion of it, never vol-

Plaintiff's testimony concerning the financial resources of both she and her husband can charitably be characterized as lacking in candor. Throughout her testimony plaintiff alleged she and her husband determined they could not afford to continue in this litigation, yet Harris stunningly professed, at least on initial examination, not the slightest knowledge of her husband's income or assets. *Id.* at 34–35. As an example, plaintiff testified she and her husband file a joint tax return, but "[h]e put[s] the paper down for me to sign and I sign [ ] it ... [I don't examine it.]." *Id.* at 35–36. *See also* Test. of plaintiff at July 8, p. 41 ("I sign the income tax form, but I don't go through it and read it."). On occasion the fog lifted from Harris' memory long enough for defense counsel to gain some basic knowledge about the family's finances, but even those momentary recoveries from plaintiff's self-serving amnesiatic state quickly clashed with the reality of the Harris' financial records.

Plaintiff's financial records and her credible testimony establish that (1) her husband's income as a Deputy Sheriff of Cumberland County, North Carolina, and his Army retirement (military pension) amounted to at least a net income of $1,800 per month in 1984, *id.* at 34 and Vol. July 8 at 34; (2) plaintiff's pre-termination salary at ·

Ft. Bragg was $768 per month, *id.* at 58; and (3) Harris' initial unemployment benefits from June, 1984, to August, 1984, were $396 per month and, starting in August, 1984, the benefits increased to $628 per month. *Id.* at Vol. March 27, p. 38–41.[224]

In addition, when she was discharged, plaintiff received a payment of $563.65 for unused leave from the government. *Id.* at Vol. July 8, p. 33.[225] With respect to assets, plaintiff testified on March 27 that she and her husband owned a rental property in Fayetteville in which the rent charged equaled their mortgage payment, *id.* at March 27, p. 166–67,[226] and two cars, a 1976 Lincoln Continental and 1983 Datsun, worth $12,000. *See id.* at July 8, p. 36 and July 9, p. 99. In response to counsel for defendant's questions, plaintiff emphatically stated that she owned no other property of any type.[227]

On July 8, 1985, upon renewed direct examination of defense counsel, plaintiff changed her testimony entirely. Instead of only two cars, it turns out plaintiff also owns a truck. *Id.* at July 8, p. 36. Instead of only one piece of additional rental property, it seems plaintiff and her husband also own property in Franklin County, North Carolina. *Id.* at 37. After announcing these recently recalled additional assets, defense counsel again gave plaintiff

---

unteered to, *never discussed that with his wife....*

He, at no point, volunteered to fund the lawsuit, *never talked to her about it, did not know what, if anything, she paid for the action.*

It was his impression, from the beginning of her lawsuit, that the lawsuit was being funded, if you will, or done free of charge by the NAACP Legal Defense Fund, and that *he had no financial obligation.*

Trans. of April 8, pp. 12–13 (emphasis added).

**224.** In 1983, the joint tax return of plaintiff and her husband indicated a total income of $38,439.23, with an adjusted gross income of $35,284.73. In 1984, the total joint income was listed as $30,409.87, with an adjusted gross income of $27,432.43.

**225.** Plaintiff initially testified she was paid annual leave of less than $500.00, but when confronted with the documents proving the $563.65 payment, Harris changed her testimony and agreed she did receive the larger payment. Test. of plaintiff at Vol. March 27, pp. 161–62.

**226.** Plaintiff testified that she and her husband bought the rental property in 1966 for approximately $9,500.00. She further testified that they have a thirty year mortgage on the property and continue to pay $200 per month on the remainder of the mortgage. Test. of plaintiff at Vol. March 27, pp. 167–68, 184–85. Assuming interest at the rate of approximately six percent, higher than the norm in 1966, plaintiff's payments should be only $56.96 per month. *See id.* The court finds plaintiff's testimony to the contrary incredible. *See* Test. of plaintiff at July 8, pp. 50–51 where Harris admits to a positive cash flow with respect to the rental property.

**227.** Q: Ms. Harris, do you own any other property?
A: No, I do not own any other property....
Q: Do you have any other real property at all?
A: No, I do not.
Test. of plaintiff at March 27, p. 169.

the opportunity to be forthright with respect to her resources, when he asked "Now, do you also—do you have any other property, and any other assets?", *id.*, to which Harris once again replied "No, I don't." *Id.* at 38. Notwithstanding that unambiguous statement, not two questions later, plaintiff was forced to admit that her husband also owned a boat docked at the Franklin County property, *id.*, and that he has a money market fund at NCNB worth $5,000. *Id.* at 40. Furthermore, plaintiff admitted she failed to recall a bank account in her name at the Ft. Bragg Credit Union. *Id.* at 81–87.

Thus, despite direct and repeated questioning in March, plaintiff failed to mention a bank account, lakefront property in Franklin County, a boat, and a truck. Her testimony with respect to her own and her family's finances was inconsistent and contradictory; her memory self-serving and evasive. The court finds that plaintiff blatantly testified in an untruthful manner in March when responding to defense counsel's questions in an effort to support her financial inability to proceed rationale for withdrawal. Given the break in trial, defendant, upon investigation, simply caught Harris in the act and once caught, plaintiff was forced to admit the numerous additional resources she and her husband possessed. The court finds Harris' testimony on the subject of her finances unacceptable and so lacking in credibility that it fatally taints the balance of her evidence.

An analysis of Harris' payments by check while she was still employed reveals a *significant unexplained* monthly surplus. *See* DX851. Even while on unemployment, given her husband's income and the bills for which he was responsible, Harris maintained sufficient resources to pay all of her expenses. *See* Test. of plaintiff at July 8, pp. 49–59; July 9, pp. 106–10.[228] Furthermore, once Harris was discharged, she had available to her a government retirement fund in the amount of approximately $10,500—a source of income plaintiff conveniently forgot to mention in her March testimony until questioned by defense counsel, and about which plaintiff professed some ignorance. *See id.* at March 27, p. 184. Had Harris really believed her complaints of discrimination valid, and had she maintained the desire to prosecute those claims, she surely would have at least considered utilizing a portion of the retirement money to pay for her minimal trial expenses, particularly when her unemployment compensation, not considering her husband's income and all their combined assets, was sufficient to meet her basic food, shelter and living needs. This she did not do nor did she consider.

All of the foregoing facts lead to the inexorable conclusion that if Harris believed her claims of discrimination meritorious, she had the resources to prosecute them. Perhaps more than any one statement, it was plaintiff's admission on July 8 that her visits to the *beauty shop* twice a month were more important to her than this lawsuit which most eloquently summarizes plaintiff's testimony and her tragically mistaken priorities. *Id.* at July 8, pp. 70–71.[229]

---

228. Plaintiff claimed she was responsible for a number of monthly bills and that she regularly paid these expenses out of her own funds, *e.g.*, the light and telephone bills. Test. of plaintiff at July 9, pp. 24–25. This testimony failed to withstand the scrutiny of defense counsel's examination. Harris stated her light bill payments were anywhere from $98 to $201 per month and that she paid the bills by both check and cash. *Id.* at 107. Yet, a review of plaintiff's financial records disclosed not a single check written to the light company in 1983 or 1984. When confronted with this undeniable fact, plaintiff opined that perhaps she made cash payments for all those months or maybe she did it by money order. *Id.* at 108. Then, despite having listed this as an on-going expense for which she was responsible, even after her termination from Ft. Bragg, *id.* at 21 and 24–25, plaintiff reversed her field to state that she really was not responsible for the light bill after she was fired. In fact, upon further probing by defense counsel, plaintiff admitted she never paid a telephone bill in 1984 either, let alone after April or May, 1984. *Id.* at 109. The testimony totally discredits plaintiff's version of her expenses and a review of her checking account records establishes her ability to easily provide for all her basic necessities as well as substantial discretionary purchases.

229. Q: Mrs. Harris, Betty Ambrose Beauty Shop, that's where you go to, and you go there about twice a month?

70. As if Harris' financial testimony did not contain enough flaws, it suffers from yet another defect—this one a mortal blow. Plaintiff's June 28, 1984, affidavit focuses on her inability to pursue both the litigation at bar and her administrative complaint challenging her April discharge. According to the affidavit, the two procedures created an insurmountable financial burden because each required the retention of separate legal counsel. Thus, plaintiff felt it necessary to file for withdrawal from the litigation on May 7, 1984. Upon review of the record, it is apparent the scenario plaintiff paints was factually impossible.

Plaintiff was terminated from Ft. Bragg in April, 1984. She challenged that firing before the MSPB, and counsel in this litigation continued to represent her in the administrative process. On June 19, 1984, defense counsel moved to have plaintiff's counsel, Julius Chambers, disqualified as her attorney because of the heretofore described conflict of interest with Harris' supervisor, Alicia Chisholm. Chisholm, also represented by Chambers, was the defendant's primary witness before the MSPB. The presiding official granted defendant's motion on June 21, 1984, and the administrative hearing was continued so that Harris could retain independent counsel. *See* June 29, 1984, Order of MSPB attached to Stephen L. Berry's August 9, 1985, Supplemental Declaration.

Thus, the reason provided by plaintiff in her June 28 affidavit for why she moved to withdraw from this lawsuit simply did not exist prior to June 21, 1984. Only at that time did plaintiff become aware of the need to "retain separate legal counsel." Clearly, this consideration played no part in plaintiff's May 7 decision to dismiss her claims. Any contrary assertion by Harris is belied by the facts and her June 28 affidavit suggesting otherwise is nothing short of perjurious.

71. Finally, with respect to plaintiff's financial status argument, the court notes that any meal, lodging and travel expense for trial of Harris' claims in Wilmington would have been minimal. The distance between Fayetteville and Wilmington is approximately ninety miles and can be traversed within 1¾ hours. Assuming plaintiff's trial would have extended a maximum of ten days, plaintiff could have traveled back and forth between home and court each day, sharing expenses with any witnesses doing the same, thus eliminating a lodging expense. Or, even with a lodging expense, a number of pleasant accommodations are available in Wilmington for $35 a night. Thus considering meals and lodging, plaintiff's total expenses at most would have been $600 for trial ($60 × 10 days). This sole litigation expense barely would have made a dent in plaintiff's $10,500 retirement account. It is, therefore, obvious Harris possessed the resources to continue her claims in this litigation. Pressing those claims to trial would not have been burdensome. Indeed, plaintiff amply demonstrated that point by attending portions of the Sandra Blue trial as a non-subpoenaed spectator *after her firing*. If plaintiff could come to Wilmington when it was unnecessary to do so, the court finds it inconceivable she could not have discovered a way to be present when it came time for her case to be heard.

In sum, Harris' argument that she moved to dismiss her claims in May, 1984, because of a financial inability to proceed to trial is simply the perpetration of a fraud upon this court. Nothing further from the truth could have been alleged and the court holds both plaintiff and her counsel responsible for what can only be charac-

A: Yes, I do.

. . . . .

A: Instead of going through [each check detailing her beauty shop payments], I can tell you I go—I try to go to the beauty shop every two weeks.
Q: All right. But my—
A: (Interposing) I always did that.

A: Okay. But my point is that that was more important than your staying in this lawsuit, am I right?
A: (Pause) Going to the beauty shop to me is—is important as eating every day.
Q: Okay. So, all I'm saying is, is it a fair statement to say that going to the beauty shop was more important than staying in this lawsuit? Is that fair?
A: That is—

terized as purposeful misstatements of fact designed to deceive both the defendant and this court. The foregoing findings of fact establish Harris' financial condition was never really a factor in her decision to withdraw from this lawsuit. And, assuming *arguendo* that it was a consideration, Harris possessed more than ample resources to pursue her claims to fruition.

72. One final point concerning plaintiff's decision to dismiss her claims must be highlighted. Along with the assertion of financial inability to proceed, plaintiff alleged a second new and theretofore unmentioned ground for withdrawal of her claims during the March, 1985, hearing. Plaintiff opined that the "stress" of proceeding in two different fora was too much for her to handle, thus necessitating the dismissal of her *Harris v. Marsh* claims so she could effectively concentrate on fighting her discharge. For the following reasons, the court finds this alleged motivation for withdrawal fictitious.

Harris never mentioned stress in her May 7 motion to dismiss, memorandum of law in support of the motion dismiss, May 16 affidavit or June 28 affidavit. Strangely enough, "stress" as a factor for withdrawal made its first guest appearance during plaintiff's hearing testimony on March 27, 1985. *Id.* at 19, 42–45. When questioned about the failure to note "stress" as a basis for withdrawal in any previous filings with the court, plaintiff claimed she told counsel to include it as a reason for seeking dismissal of her claims in the initial motion for withdrawal. Harris could not explain why "stress" was omitted nor could she explain why she had signed a verification of the motion and affidavits which did not include all of her reasons for seeking dismissal. *Id.* at 47–58; 67–73; 76–77. Thus, plaintiff was forced to admit that her prior May and June, 1984, filings were both inaccurate and incomplete. *Id.* at 77.

Assuming *arguendo* that Harris testified truthfully, then counsel for plaintiff were less than candid with the court and the defendant when they prepared and filed the 1984 pleadings. And, plaintiff was negligent in signing those same documents without assuring herself of their contents.[230] However, despite the court's substantial concern with the conduct of counsel in this case, the court does not believe counsel failed to include "stress" as a reason for withdrawal in the prior filings after being requested to do so by plaintiff. Rather, the court finds plaintiff's testimony on the matter inherently incredible.

It seems clear from all the testimony during the sanctions hearings that plaintiffs and their counsel attempted to invoke every conceivable reason to support their respective motions to dismiss. Physical and medical inability to proceed were suggested by other plaintiffs and there is no reason to believe had it been thought of as a possibility in this case, that it would not have been passionately argued in the relevant filings. Were there a legitimate medical basis for the claim, overwhelming stress causing severe physical or mental hardship would amount to a reasonable, good-faith basis for a motion to voluntarily dismiss. Yet, plaintiff never argued stress as a factor in any of her four filings nor indeed in any prehearing written document. The court finds it inconceivable that a legitimate argument, specifically requested by the plaintiff, was rejected by counsel and eliminated from any pre-hearing filing. This is particularly true when one considers the frivolous nature of the financial argument previously discussed.

Furthermore, no credible evidence of stress was presented at the sanctions hearing. Plaintiff's conclusory testimony that she was under "stress" at the time was unsupported by any other anecdotal or documentary evidence. Plaintiff did not even attempt to define "stress" or establish how her feelings differed from that of any normal litigant preparing for trial.

Under these circumstances, given Harris' demonstrated propensity to outlandishly alter her testimony, it is much easier to believe, and the court finds, that "stress" was

---

**230.** Of course, like her tax returns, plaintiff may simply have been following a pattern of conduct which discouraged her from reading formal legal documents.

never mentioned to her counsel in 1984 as a reason for withdrawal. It had nothing to do with her request for dismissal. Indeed, upon examination, Harris could not explain how pursuing the instant claims and her discharge claims together in one action at some future date would be any less stressful than continuing in the litigation *sub judice*. Yet, this was her favored resolution in May, 1984, when she alternatively sought dismissal without prejudice so she could bring all of her claims in one proceeding. *Id.* at 43–45.

Finally, the court notes that if the trial setting was one which caused plaintiff significant stress, it is, at best, ironic that Harris chose to travel to Wilmington to watch portions of the Blue trial as a spectator in order, as she stated, to "relax." *Id.* at 80–82.[231] The court finds it impossible to credit the testimony of a witness who, seeking dismissal from a massive lawsuit because she is too stressed to pursue her claims in court, decides to come enjoy the ambiance of the trial setting for a few days in order to get away from it all and relax. Such testimony is insulting to the intelligence.

73. Neither finances, stress nor convenience was the real motivating factor behind plaintiff's abandonment of her claims in this case. Harris' assertions to the contrary were contradicted by her own financial records, the sequence and timing of the events at issue, statements by her husband's counsel and, most convincingly, by her own conflicting, evasive, constantly changing testimony. Since plaintiff failed to honestly state her rationale for withdrawal, the court can only assume that an objective view of the trial proceedings to date and of her own case led plaintiff, with the advice and assistance of counsel, to seek dismissal of her claims with the knowledge that most, if not all, of her allegations were frivolous in nature. Even were this not the case, plaintiff has failed to establish any good-faith basis for dismissing her claims four months after the Final Pre–Trial Order was filed. In the interim, defendant suffered significant and needless litigation expenses preparing for a trial that was never to be. At a minimum, fairness demands defendant be reimbursed, if possible, for that wasted expenditure of time and resources.

### Frivolity of Claims

At the evidentiary hearing on sanctions, plaintiff was questioned at length concerning each of her claims for relief in this lawsuit. The questioning revealed plaintiff's total lack of credibility and demonstrated that most of her claims were manufactured of nothing more than whole cloth —indeed, they were often based on not the slightest investigated fact, but rather were predicated solely on plaintiff's grotesquely biased view of the workforce at Ft. Bragg. Harris has literally filled the administrative and judicial processes with frivolous claims, establishing her inability to distinguish a disappointing personnel action from intentional race discrimination. Instead of spending a significant amount of her time at work filing applications for promotions for which she did not qualify, initiating grievances without merit, and filing baseless charges of discrimination, perhaps plaintiff would have been better off to remember that the greatest deterrent to racism, whether perceived or existing, is excellence in performance. Unfortunately, this was a lesson plaintiff never learned or, if learned, was long ago forgotten.

**231.** Q: ... So after you were fired, how could you afford to spend time in Wilmington at the New Hanover County Courthouse watching the proceedings, if you had to devote your energy and resources to fighting your firing?
A: I do not devote twenty-four hours—eight hours a day, every day to that....
Q: So I take it, that it is a fair characterization to say that you did not devote all your resources and energy to pursue your firing?
A: No, you are not right. Because if I said I devoted my time to it, I do not do anything

twenty-four hours a day, or eight hours a day, all the time. There has to be some deferrment, [sic] you know. All work and no play.
Q: So you were down here in Wilmington playing?
A: No. Relaxing.

. . . . .

Q: Your testimony is you were relaxing while watching the proceeding, is that right?
A: Yes.

*MPA 64–81*

74. This was a GS–5 Military Personnel Clerk position. DX841. Harris applied for the position and was rated best qualified along with nine other applicants. *Id.* at 11. She was referred, interviewed and non-selected by a white selecting official, Roy V. Anderson. Test. of plaintiff at July 9, pp. 28–30. The selectee, Allen Todd, was also white. *Id.* at 30. Harris testified that her belief of discrimination in connection with this MPA was based (1) on a handwritten note which she allegedly saw prior to interview referring to 64–81 as "Mr. Todd's job," thus amounting to an invalid pre-selection and (2) the fact that she was "as qualified" as the selectee. *Id.* at July 8, pp. 166–69. Upon review, neither reason withstands scrutiny.

75. As to the pre-selection note, plaintiff initially claimed she saw the correspondence, but did not receive a copy. *Id.* at 166. Then, after defense counsel wondered why plaintiff did not obtain a copy of the note if it evidenced discrimination, Harris changed her testimony to state she did obtain a copy of the correspondence from "someone else," but she did not retain it for trial. *Id.* at 167.[232] Harris never presented the note at hearing nor was it listed as a pre-trial exhibit.

At the time of her interview, Harris was a union steward and part-time EEO counselor, yet despite reviewing what she claimed was direct evidence of discrimination by pre-selection, Harris inexplicably never filed a complaint about this incident until two years later when she sought to intervene in this litigation. Such conduct might be understandable had plaintiff been the type of person who hesitated to file complaints or make waves. However, by 1981, plaintiff had already filed at least two formal EEO complaints, applied for numerous merit promotion positions for which she did not qualify, and was preparing for class involvement in this litigation. With plaintiff's employment history, the court simply finds it impossible to believe that

plaintiff, physically possessing real evidence of at least a violation of defendant's merit promotion process, decided to forego a *legitimate* grievance concerning a promotion for which she longed, but was rejected. *Cf. Forrens v. United States*, 504 F.2d 65, 67 (9th Cir.1974); *United States v. Tweedy*, 419 F.2d 192 (9th Cir.1969) (beyond belief that defendants who received substantially longer sentences than anticipated through discussions with counsel would wait years before filing for habeas corpus relief).

Apparently, plaintiff also seized on this problem in her testimony because she subsequently attempted to suggest that she was "relying on the class action" to redress this and other claims raised in this lawsuit. However, Harris could not explain to the court why she pursued some matters herself and reserved others for the class action.

In sum, the court finds no credible evidence to support plaintiff's claim of pre-selection.

76. Assuming, *arguendo*, that Todd was pre-selected for the position, plaintiff's claim still is not one of race discrimination under Title VII. If pre-selection in fact occurred, Harris was treated no differently than the other referees, black and white. An action may well violate merit selection principles, yet have nothing to do with intentional discrimination. The court recognizes that evidence of irregular or suspect employment procedures may suffice to create a *prima facie* case of discrimination, but here plaintiff's own testimony militates against any such possibility. Plaintiff testified she previously worked with the selecting official, Anderson, and their working relationship was good. She received a "good" rating from him and "he treated me decent." *Id.* at 168. Plaintiff could posit no reason for why Anderson would discriminate against her, *id.* at 168–69, and never testified affirmatively that he did discriminate against her, just that she was discriminated against. Incredibly, when asked how

**232.** Plaintiff did not identify who gave her a copy of the note nor was any additional anec-

dotal evidence presented on the matter.

she was discriminated against, plaintiff responded "[i]t didn't have to be my race. It could have been sex, also." *Id.* at 169. Needless to say, neither Harris nor any other plaintiff in this lawsuit had previously suggested the possibility of sex discrimination as well as race discrimination. Given these circumstances, even if the note regarding pre-selection existed, it alone was not evidence of race discrimination.

77. Plaintiff also felt she was "as qualified" for the job as the selectee. Unfortunately for plaintiff she had not the slightest basis upon which to make such a comparison. Plaintiff admitted she never bothered to investigate the qualifications of any of the referees or the selectee. *Id.* at 172. She never reviewed DX841, the merit promotion folder at CPO, before filing her complaint in this case. *Id.* In fact, as a comparison of plaintiff's testimony between July 8 and 9 indicates, until the night of July 8, after defense counsel finished his examination of her, it is probable Harris never reviewed *any* of the relevant MPAs or files in her case. Indeed, Harris testified she had no idea who was referred for 64–81 and whether any of the other referees were black. *Id.* at 169.

This claim represents a paradigm of the ease with which plaintiff determined she could level charges of discrimination against any ADO purely on the basis of a disappointing personnel action. Despite having years to prepare her claims for trial and months to prepare for the sanctions hearing, plaintiff neither alleged, proffered nor supported her claim of race discrimination with any anecdotal, statistical or documentary evidence.[233] No one testified at the sanctions hearing on this claim except the plaintiff, and her testimony was wholly incredible. Harris, and apparently her counsel, even failed to perform the bare minimum—an objective review of DX841. If they had done so, they at least would have been aware of who was referred, the reasons for Todd's selection, and the fact that he possessed significant experience for the position which equalled and arguably exceeded plaintiff's qualifications for the job. *See* DX841 at 11 and 108–10. Indeed, the rating and ranking panel, about which plaintiff has no quarrel, gave Todd the second highest ranking (86.59), while rating Harris approximately 2.7 points behind Todd. *Id.* at 7–10. This rating, while not dispositive of plaintiff's claim since her allegations lay against the selecting official, at least should have signalled some cause for pause and further investigation before the filing of this claim. It obviously did not.

78. Plaintiff bases her claim of disparate treatment on the fact that she viewed and received a note indicating "pre-selection" for her position, yet she failed to retain the evidence, produce the note for trial, or complain to anyone in any manner about the incident for two years, during which time she felt free to complain about a phlethora of other alleged injustices. Harris further opines she was as qualified or better qualified than the selectee, yet she admits she knew nothing about the selectee's qualifications. She claims she was discriminated against on the basis of race by the selecting official, yet she cannot state any reason why he would do so, proffer any evidence to support her conclusion, or show why his selection on the basis of defined, written criteria of merit, DX841 at 11,[234] was pretextual, particularly in light of similar findings by the rating and ranking panel. In sum, plaintiff's evidence totally fails to support any inference of race discrimination. *See Holmes v. Bevilacqua,* 794 F.2d at 146.

---

233. MPA 64–81 created a new position and there were only two other employees assigned to the section where the position was to be filled. Both of the employees were military—one black and one white. Test. of plaintiff at July 9, pp. 30–31.

234. Anderson's reasons for selecting Todd included *inter alia,* his 26 years of experience in the area of personnel records and records maintenance, knowledge of personnel records regulations, extensive familiarity with Ft. Bragg's Personnel Reliability Program (PRP), and experience in auditing personnel records. All of these reasons square completely with the HQC for the position. DX841 at 2. Plaintiff produced no anecdotal evidence at hearing indicating her experience in these areas or comparing that experience with Todd's.

Based on the aforesaid, the court finds that 64-81 was, from its inception, a frivolous claim, filed in bad faith without adequate investigation and without a basis in law or fact.

### MPA 94-81

79. This was a GS-5 Management Assistant position. DX812. Harris applied for the position, was rated best qualified along with nine other applicants, referred, interviewed and non-selected by a white selecting official, Ms. Sara Wayne. Test. of Harris at July 8, pp. 173-75 and July 9, pp. 41-42. The selectee, Ruby L. Wells, was also white. *Id.* at 43.

Aside from believing she was "highly qualified" for the position, Harris admitted that the primary reason she brought suit in connection with this unsuccessful promotion attempt was that she "had a feeling" she was being discriminated against. *Id.* at July 8, pp. 175-79. Her "feeling" was premised on two grounds (1) seeing one black out of seven employees in the area where she interviewed for the position and (2) that Ms. Wayne acted "disinterested" during the interview. *Id.* Even if both of these perceptions were true, it is ludicrous to suggest they form the basis for a charge of discrimination without further investigation. Yet, when Harris was examined closely concerning her "feelings," she testified she had no idea which of the employees she observed, if any, actually worked for Wayne. *Id.* at 177. Nor did she know or bother to find out whether Wayne had ever promoted blacks when given the opportunity or how she treated black employees.[235] Further, plaintiff was unable to specify how many blacks were needed in the office before she would believe the area to be free of discrimination—although she suggested at least three out of seven (42%), even though the black population at Ft. Bragg is only 23%. *Id.* at 175-178.[236]

---

**235.** Wayne also testified in connection with the sanctions hearing on plaintiff Leonetta Bibby. There, Wayne indicated she received a thank you card from Bibby concerning the assistance she gave her during a period of time when Bibby experienced personal problems. In addition, Wayne had promoted Bibby and Harris admitted this fact in subsequent testimony. Test. of plaintiff at July 8, p. 193.

**236.** Because Harris' own words are the best evidence of the sophistic nature of her testimony, the court includes the relevant portions of her dialogue with defense counsel:

Q. (Mr. Loewenberg) Now, what made you think that Mrs. Wayne discriminated against you?

A. Well, when I went for the interview—for that job, there was only—I only saw one black in the office, and all the rest were white.
And, I felt like that I was qualified—highly qualified for the job.

Q. Now, wait just a second.
You believe that you were discriminated against because you looked at her office, and you saw that there was one black out of how many?

A. About seven (7).

Q. Out of seven people.
Well, how many blacks would it have taken for you to believe—that were in the office before you believed there wasn't any discrimination?

A. I don't know.

Q Well, you said there weren't—

A. (Interposing) If it was more than one.

Q. Out of seven?

A. Unh-hunh (yes).

Q. Well, would two have satisfied you?

A. Maybe three (3).

Q. Excuse me?

A. Maybe three (3).

Q. Maybe three?
Well, let me ask you, Mrs. Harris—I mean not that there has to be a black in every position at Fort Bragg, but if you take three out of seven, that's something like forty percent.
Since the population—black population at Fort Bragg is about twenty-three percent, why would you think that three blacks out of seven would satisfy you that there are enough?

A. That was my feelings. I don't know the statistics break-down at Fort Bragg.

Q. Well, you were—you were—you were an EEO counselor. You knew something about the statistics at Fort Bragg.

A. Not that much, not unless I was looking at it on paper, or something we studied about, and we didn't study that part—that little bit.

Q. Mrs.—Mrs. Harris, how did you know that, maybe, one or two or, maybe, half a dozen blacks, or whoever were just out of the office? How did you know that they just weren't there?

A. (No response.)

Q. Mrs. Harris?

A. I had been to the office before.

Q. You had been to the office before? How do you know that Mrs. Wayne had any role in the selection of those people?

A. I didn't.

Q. How do you know how many chances Mrs. Wayne had to select anybody?

In addition, with respect to her interview, Harris admitted she did not know who was referred for interview by the rating and ranking panel or who was, in fact, interviewed. *Id.* at 179. She simply felt Wayne "didn't ask many questions" and therefore was disinterested. *Id.* Yet, Harris never talked with any other interviewee to determine the number and type of questions Wayne asked during their respective interviews. *Id.* Incredibly, Harris even admitted that she did not know whether she was treated differently than any other referee by Wayne. *Id.*[237] And, as for relative qualifications, Harris knew nothing about the qualifications of the selectee or Wayne's stated reasons for the selection.

80. Once again, as in 64–81, plaintiff failed to file a complaint of discrimination following her rejection by Wayne in 94–81. Plaintiff provided no explanation for her failure to grieve this alleged unjust denial of promotion. *Id.* at 180.

81. Plaintiff presented no anecdotal, documentary or statistical evidence to support her claim. She neither alleged nor proffered any reason why Wayne would discriminate against her on the basis of race. Defendant's Exhibit 812, left uncontroverted by any credible evidence, establishes Wayne took into consideration appropriate merit factors in making her selection. DX812 at 3. Her determination is supported by the fact that Wells received the third highest ranking by the panel (77–48), while Harris received a rating of eighth (68–13). *Id.* at 4–9.[238] Accordingly, with continued reluctance, the court finds

A. (No response.)
Q. Mrs. Harris?
A. I had no way of knowing that.
Q. Well, you mean on the basis that there aren't enough people in the office—that there aren't three out of seven blacks in the office, do you believe that that—you accused Mrs. Wayne of discrimination on that basis?

. . . . .

A. I still felt that I was highly qualified for the position.
Q. Well, but, so is everybody else who was referred. There were like a dozen people who were highly qualified.
 I'm asking you the basis upon which—not the basis upon which you were disappointed, but the basis upon which you felt you were discriminated against?

plaintiff's disparate treatment claim for nonpromotion in MPA 94–81 was not adequately investigated and was, from its inception, an allegation of discrimination without the slightest basis in fact or law. In plaintiff's own words, the sum and substance of this claim was her "feeling" that she was discriminated against because there were not enough blacks in Wayne's work section. On this basis alone, she accused Wayne of discrimination and, in effect, engaged in a form of racial McCarthyism. Such conduct is intolerable and makes a mockery out of a process designed to remedy meritorious complaints of discrimination and eradicate racism. To unfairly charge a supervisor or selecting official with discrimination, without properly determining a basis for the claim, renders irreparable damage not only to the person wrongly charged, but to the entire process of redress. For this wholly frivolous claim, as with her others, plaintiff and her counsel must pay the price.

### *MPA 210–81*

82. The position at issue in this MPA was a GS–5 trainee for GS–7 Management Assistant. DX813. Plaintiff was rated best qualified for the position, along with nine other candidates, referred, interviewed and non-selected by a panel of two selecting officials. *Id.* at 5. Both officials were white and the selectee, Ruby Wells, was also white. Test. of plaintiff at July 9, p. 46.

A. I had the feeling I was discriminated against.
Q. I understand. I—I am asking for any more than your gut feeling. I am asking for anything beyond your gut feeling. What else was there?
A. (No response).

237. Q: ... So you don't know whether you were treated differently or not, isn't that true?
A: Yes.

238. Like 64–81, Harris' complaint is limited to an attack on her ultimate non-selection. She does not complain about the pre-selection process, nor is there any suggestion of a disparate impact or excessive subjectivity problem.

Aside from a conclusory claim that she was "well-qualified" for the job, Harris advanced only one reason for alleging discrimination in connection with this position —she felt the interview was too short:

Q: Tell me, Mrs. Harris—now you felt you were well-qualified for the position. What else leads you to believe you were discriminated against?

. . . . . .

A: . . . I went for the interview and the interview just didn't last—the interview lasted about five or ten minutes. The interview didn't even last long for that one.

. . . . . .

Q: So, what leads you to believe that because your interview was short, that you were discriminated against on the basis of your race? What led you to believe that?

A: It was just my feeling.

*Id.* at July 8, pp. 188–90. It is simply unbelievable that a person trained in EEO matters, as was the plaintiff, could assert a claim of intentional discrimination based on nothing more tangible than the length of an interview. Yet, that is the gravamen of this claim.

Harris stated she was interviewed by a panel of two people. *Id.* at 189. She had no idea how long the interviews of other candidates lasted, what questions they were asked or even who was interviewed. *Id.* at 189–90. For all Harris knew, her interview may have been the longest and most probing. More importantly, the selectee was already in the job series for the position at issue and had experience with the automated data system (ITTADS) employed in the job. *Id.* at 191; DX813 at 5. Harris admitted she did not possess this experience. *Id.* at July 9, pp. 46, 130–31, and 159. Plaintiff also conceded that she never reviewed Wells' qualifications before filing suit. Nor did she attempt to examine Wells' OPF. *Id.* at July 8, p. 191.

**239.** As with plaintiff's other claims, no EEO complaint or grievance was filed with respect to

83. In addition, the selecting officials' statement on the Referral and Selection Register indicates the consideration of relevant merit factors and a unanimous panel decision. DX813 at 5. The selecting officials' decision is supported by a review of the rating and ranking panel's work, which shows that Wells received the highest score (72–53) while plaintiff barely made the best qualified cut, ranking ninth with a score nearly nine points behind that of Wells (63–61). *Id.* at 7–15. Plaintiff produced no credible evidence to indicate any irregularity in either the rating and ranking or selection process. No evidence was proffered to show Harris was treated differently than any other candidate, that she was better qualified than the selectee or even as qualified, or that the selecting officials acted on the basis of racial animus. No statistical, anecdotal or documentary evidence of any type was introduced to establish the predicate for this claim, other than plaintiff's sorely lacking testimony.[239]

84. In sum, Harris would have the court ignore the fact that a better qualified applicant was selected and focus instead on her concerns about a "short interview." If this claim, so facially lacking a *prima facie* case, were deemed nonfrivolous, the court could only envision future claims in which complainants cite the type of chair they sat in, the size of the room, or the time of the day for their interview as the basis for their charge of unequal treatment. This claim is utterly meritless and the fact that it was ever filed by plaintiff and her counsel speaks volumes about the objectivity utilized and preparation undertaken prior to proceeding with this lawsuit.

*MPA 196–82*

85. This was another Management Assistant position in Sara Wayne's office. It was a GS–5 trainee for GS–7 position. DX843. Harris could recall virtually nothing about this position and how she was discriminated against in connection with it. At first, she claimed the selecting official,

this claim at the time of the incident.

Wayne, had discriminated against her during her interview. Test. of plaintiff at July 8, pp. 193–206. When plaintiff was informed by defense counsel that she never received an interview for this position because she was not rated highly qualified, and therefore not referred, *see* DX843 at 9, plaintiff changed her testimony. Harris then argued in wholly conclusory terms that she should have been referred for selection because she was qualified. Test. of plaintiff at Vol. July 8, pp. 207–09.

86. Harris' lack of knowledge about this complaint is significant. Like her other promotion claims, plaintiff did not raise a complaint about this alleged incident of discrimination until well over a year after the fact—in preparation for intervention after class certification was denied. Despite her allegedly strong belief that she was discriminated against and the many months she had to prepare her claims for trial and hearing, plaintiff failed to even remember if she was interviewed for this promotion. Yet, she was blithely willing to sit on the witness stand, under oath, and charge Wayne with race discrimination when the facts showed Wayne never even gained the opportunity to interview her for the position. When finally forced to admit she was not referred for selection, plaintiff conceded she had no idea who discriminated against her on this claim.[240] This says much about plaintiff and her claims.

87. The reckless disregard for the truth routinely displayed by Harris was exemplified when she testified further about this claim. For example, when plaintiff was unable to decide whether or not Wayne discriminated against her, she was shown DX843 and asked whether it refreshed her recollection. *Id.* at 206 and 213–14. Harris responded that she had never reviewed the MPA folder before. *Id.* at 214–15. Overnight, she apparently realized the consequences of this admission and, on the following day, testified she had in fact previously studied the MPA file, but had simply forgotten this during her earlier testimony.

*Id.* at July 9, pp. 147–49. The court finds this change of testimony wholly incredible.

In addition, when examined by her own counsel (after defense counsel's direct examination), Harris suddenly added as a reason for her belief of discrimination the fact that there were too few blacks in the management assistant and analyst job series. *Id.* at 49. When later questioned about this sudden revival of memory, it became obvious Harris' new rationale had been created on the spot with little or no forethought. Plaintiff was shown computer printouts provided to the court by her own counsel. DX850. These conclusively demonstrated that blacks were in fact well represented in management assistant jobs at the grade for which she had been applying. *See* Test. of plaintiff at July 9, pp. 139–41. Furthermore, after plaintiff was reminded that she had *never applied for a management analyst position,* Harris admitted that the two jobs were different. *See id.* at p. 159–60; *Compare* DX855 *with* DX843 at 14–15.

88. If possible, even more disconcerting than Harris' shifting testimony was her admission that she did not know the name or race of the selectee for the position. Needless to say, she knew absolutely nothing about the qualifications of the selectee or the selection process, as evidenced by the following graphic and highly disturbing testimony:

Q. Did you know the qualifications of the selectee?

A. *No, I did not.*

Q. Do you know who the selectee was?

A. *No.*

. . . . .

Q. (Mr. Loewenberg) You don't know the qualifications. Did you make any attempt to find out the qualifications of the selectee?

A. *No, I didn't.*

Q. Did you ever bother to ask your counsel what the qualifications of the selectee were?

A: I do not know.
Test. of plaintiff at July 8, p. 211.

---

**240.** Q: Who discriminated against you in this merit promotion announcement?

**1354**

A. *No.*

Q. Now, how many other people—how many people applied for this job, do you know—in 196–82?

A. *No, I don't.*

Q. Would it surprise you if I told you there were fifty—fifty-six (56) people who—who applied? Would that surprise you?

A. No it wouldn't.

Q. And would it surprise you to know that there were forty-three (43) people who were not referred?

A. No.

Q. What makes you think that you were singled out on the basis of your race, and the whites who were kept from being referred were done on some other basis?

What makes you think yours was on the basis of race and the other people were on some other basis?

A. *I didn't know anything about the other people.*

Q. Did you ever—

A. I didn't know that.

Q. Did you ever bother to ask who else had applied, and what was the basis of their rejection?

A. *No, I didn't.*

Q. Do you, in fact, have any basis to believe that you were treated differently in this case on account of your race?

A. I felt like I was treated differently because I didn't go on the interview.

Q. But, there were more whites that didn't go on the interview than blacks. Why—why—what makes you believe that not going on the interview was on the basis of race when more whites than blacks were not interviewed?

A. *I did not know that.*

. . . . .

Q. Did you make any attempt to find out?

A. *No, I didn't.*

. . . . .

Q. How do you know that they considered your race, or were even aware of your race?

A. *I don't.*

Q. (Mr. Loewenberg) Would it be a fair characterization, Mrs. Harris, to say that aside from your gut feeling, which I take your testimony to be, and the fact that you were not referred, you have no basis upon which to claim you were treated differently on account of your race?

MR. THIGPEN: Object to the form.

THE COURT: Overruled.

A. I still feel that I was treated different because I did not go to the interview.

Q. (Mr. Loewenberg) Would you—now, would you please tell me what besides your gut feeling leads you to believe that?

A. Because, I didn't go on the interview.

Q. Besides not going on the interview, when you realized—did you do any analysis to determine how many whites didn't go on the interview, or whether more whites were kept out of the interview than blacks?

A. *No, I didn't.*

Q. What was the reason that whites were not interviewed?

A. I don't know. I don't know if there was even any that wasn't interviewed.

Q. I'm sorry?

A. I don't know.

Q. Have you even ever bothered to look at this merit promotion announcement? Have you ever opened it up?

A. Repeat the question.

Q. And, the fact is that you have never, ever up to this day looked at this merit promotion announcement folder in which you were not referred and about which you filed suit, isn't that a fact?

A. Right, I had no way of looking at it.

Q. You—but, the fact is, Mrs. Harris, that your counsel had this folder for several years, and so you never asked your counsel to examine this—to look at this folder, yourself, did you?

A. *I don't recall.*

Test. of plaintiff at July 8, pp. 209–15 (emphasis added).

89. Given Harris' lack of knowledge about the selection process and the selectee in 196–82, and the fact that she was not referred for selection, plaintiff found it impossible to explain how and why she had claimed in various pre-trial trial pleadings, as well as other documents, that she was the victim of discrimination because a less qualified white applicant had been selected for the position. *See, e.g.,* plaintiff's June 28, 1984, Affidavit at 3; DX835(b) at 2a; DX835(c):

Q. (Mr. Loewenberg) Mrs. Harris, you've alleged that you—you've testified here today that you did not examine the—or know anything about the qualifications of the selectee in MPA 196–82, is that correct?

A. Yes, I did.

Q. Yes?

A. Yes.

Q. And, so, you have no idea whether that person is better qualified than you, or worse qualified than you, or about the same, am I right?

A. No.

Q. Well, "no," I'm not right, or "no," you have no idea?

A. No, I have no idea.

Q. So, I wonder why did you allege that you were the best qualified person for the job, and that a less well-qualified person got the job if, in fact, you have no idea what the qualifications of the selectee are?

A. I had no way of knowing what they —it was.

Q. (Mr. Loewenberg) Mrs. Harris, is this not your signature on the second page? (Hands document to witness)

A. (Witness peruses document)

Q. Mrs. Harris?

A. Yes, that's my signature.

Q. And, that's your letter, is it not?

A. Yes, it is.

Q. And, did you not—did you not allege in that letter that you were the most qualified candidate, but a white candidate with less qualifications was selected over me when, in fact, you had no

idea then or now what the qualifications of the selectee were?

Isn't that true?

A. I do not recall it.

Q. Do not recall what?

A. The qualifications of who got that particular job.

MR. LOEWENBERG: I'd like to move the admission of Defendants' 835–C.

THE COURT: All right. It's admitted.

Q. (Mr. Loewenberg) Now, Mrs. Harris, you just testified that you did not know the qualifications of the selectee, nor have you ever gone through the merit promotion announcement folder, nor have you gone through the official personnel folder of the selectee.

And, what I'm asking you is, you knew —you—you know that you did not know what those qualifications were; yet, you allege that yours are better without knowing, isn't that true?

A. Yeah.

Q. (Mr. Loewenberg) So, my question, Mrs. Harris, is, again—I thought you answered it, but I want to be sure— that you made the assertion that you were better qualified than the selectee; yet, you never ever made any attempt to check the qualifications of the selectee to make any comparisons. And, that's what you've testified to repeatedly here today, isn't that true?

A. (Pause, no response.)

Q. Mrs. Harris?

A. Yes.

Q. Is—is that true?

A. Yes.

*Id.* at 235–42. *See also* Test. of plaintiff on July 9, pp. 144–45.

90. Finally, once plaintiff remembered and understood that she had not been referred for interview, Harris attempted to claim she was treated differently because she was not rated highly qualified. Of course, the fact that plaintiff was not so rated is probative of no such inference since forty-two (42) other applicants, black and white, were rated similarly. See DX843. In addition, plaintiff failed to prof-

fer any credible evidence to suggest that the rating was erroneous, let alone discriminatory, or that the panel misapplied the HQC in Harris' case. She alleged that because she had been rated highly qualified for a previous similar position, 94–81, the failure to do so in this case was discriminatory. Yet, even assuming some error in her rating, one which she never identifies, at least one other white applicant for 196–82, Bessie Garner, was treated exactly the same as the plaintiff in connection with both 94–81 and 196–82. *Id.* at pp. 149–152. *Compare* DX843 at 4, 7, and 9 *with* DX812 at 3 and 5.[241]

91. Even a cursory review of the evidence in this case would have suggested, with an unusual amount of clarity, the meritlessness of this allegation. Neither plaintiff nor her counsel can be forgiven for forcing defendant to prepare for a totally vexatious and harassing claim. It is not asking too much for plaintiff to know who she is suing—and why—before she files suit. Here, not only did plaintiff not know the answers to these questions before filing suit, she didn't even know the answers after she dropped her lawsuit in the middle of trial. Plaintiff may continually equate employment disappointment with discrimination, but neither defendant nor the judicial process must pay for her extraordinary perceptions.

### MPA 5–83

92. This was the third GS–5 Management Assistant position Harris applied for in Wayne's office. Again, Harris accused Wayne of discrimination until she was shown she had never been referred by the rating and ranking panel for interview. Test. of plaintiff at July 8, pp. 242–46; DX842 at 5. Of course, this major discrepancy did nothing to alter plaintiff's belief of discrimination—she simply and conveniently switched targets and theories, con-

tinuing to assert a violation of her rights under Title VII.

Like MPA 196–82, Harris had absolutely no basis for bringing this claim. She contended on more than one occasion that a less qualified white had been selected for this position. *See, e.g.,* DX835(b) at allegation 7; DX835(c); plaintiff's June 28, 1984, Affidavit at 4. However, at hearing, plaintiff admitted she did not know (1) who applied for the position, (2) how many applicants received an interview, (3) the race of the selectee,[242] or (4) the selectee's qualifications. Test. of plaintiff at July 8, pp. 246–49. Plaintiff never even bothered to examine the selectee's OPF. *Id.* at 246. Thus, plaintiff was forced to admit that her pre-trial and trial pleadings stating she was more qualified than the selectee were based on inadequate investigation. *Id.* at 248–50.

93. Once Harris understood that she was not referred for interview, and Wayne therefore was not a legitimate ADO, she changed her testimony to contend she was discriminated against because she did not receive an interview. *Id.* at 246. Of course, when questioned about this late hour change in theory, plaintiff could not explain why the argument was *never* asserted in any pleading.

Furthermore, plaintiff presented no evidence to suggest how or why she was discriminatorily denied referral by the rating and ranking panel. In fact, aside from her oft-repeated conclusory statement, "I wasn't referred and therefore I felt like I was discriminated against," the record is void of any mention of her non-referral. As well, a review of the relevant documents provides no assistance to the plaintiff. Harris was one of twenty applicants not rated best qualified and referred. DX842 at 5. There is not a scintilla of evidence to suggest she was treated any differently than white applicants, *e.g.,* Bes-

---

241. Of course it almost goes without saying that plaintiff offered no evidence besides her own testimony to establish the foundation for this claim for relief. The record is void of any evidence tending to show racial animus on the part of the rating and ranking panel. And, the

HQC utilized were facially neutral, valid, job-related criteria.

242. Carol Tuggle, the selectee, is white, but plaintiff did not possess or testify to this information at hearing.

sie Garner. *Compare id.* at 3 *with* DX812 at 3 and 5.[243]

94. Accordingly, as with plaintiff's other four promotion claims, 5–83 amounts to a frivolous claim with plaintiff introducing not the slightest evidence to support a *prima facie* case of discrimination. It is just not enough to say that because plaintiff is black and her employer, as well as the selectee, are white, plaintiff's non-selection therefore amounts to race discrimination.

## DISCRIMINATORY 1980 JOB CLASSIFICATION

95. In this allegation, plaintiff contends she was paid less than a white male employee performing similar work. To establish a *prima facie* case of racial discrimination with respect to job classification and compensation, a plaintiff must prove she is (1) a member of a protected class and (2) paid less than a member of a different race for work requiring substantially the same responsibilities. *Uviedo v. Steves Sash & Door Co.,* 738 F.2d at 1431; *Lowery v. WMC–TV,* 658 F.Supp. 1240, 1263 (W.D.Tenn.1987). Although proof of a *prima facie* case is not onerous, plaintiff must show by more than a conclusory allegation that a "similarly situated" employee of another race was higher paid. *See generally Epstein v. Secretary of U.S. Department of Treasury,* 739 F.2d 274, 278 (7th Cir.1984); *Beall v. Curtis,* 603 F.Supp. 1563, 1581 (M.D.Ga.1985), *aff'd.* 778 F.2d 791 (11th Cir.1985); *Briggs v. City of Madison,* 536 F.Supp. 435 (W.D.Wis.1982); *Seymore v. Reader's Digest Association, Inc.,* 493 F.Supp. 257, 263 (S.D.N.Y.1980) ("[I]nferences of discrimination will not be drawn merely from the fact that plaintiff is Black."). Plaintiff's evidence must eliminate the factors of skill, effort, responsibility and working conditions from the compensation determination for it is only by doing so that plaintiff negates the most common defenses to a discrimination claim.

*Beard v. Whitley County REMC,* 656 F.Supp. 1461, 1472 (1987) *citing Briggs,* 536 F.Supp. at 445–46. To state the reverse proposition, by showing a significant difference in job responsibilities, skill level, experience or effort, a defendant rebuts one of the crucial elements in plaintiff's *prima facie* case—different pay for substantially similar responsibilities. *Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071, 1075 (5th Cir.1981). *See also Monroe–Lord v. Hytche,* 668 F.Supp. 979, 995 (D.Md.1987).

96. In 1980, plaintiff and a white male, identified only as Eldridge, worked as retirement clerks for the XVIII Airborne Corps. Test. of plaintiff at July 9, p. 65. Plaintiff testified that "[w]e [did] exactly the same work," but Eldridge was classified as a GS–5 while plaintiff remained a GS–4. *Id.* at 66–67. Because plaintiff felt she was being discriminated against, she requested her position be re-classified to a GS–5. The request eventually was denied. Therefore, plaintiff alleges race discrimination in the failure to re-classify her job and make her pay commensurate with that of Eldridge.

Standing alone, these facts might support a *prima facie* case of unequal job classification and pay under Title VII; however, further review of plaintiff's testimony establishes the meritlessness of this claim.

97. First, although plaintiff repeatedly testified in conclusory form that she and Eldridge performed the exact same work, Harris admitted, on questioning from her own counsel, that they had different job descriptions. *Id.* at 66. Critically, she further admitted Eldridge had more experience than she did. *Id.* at 68. As anyone in government service realizes, two employees can be assigned the same job responsibilities and perform the same duties, but one employee may legitimately be paid at a

---

**243.** Q: Besides not being referred what other reason do you have to believe you were discriminated against?
 A: The fact that I wasn't referred.
 Q: Besides that, any other—any other?
 A: The other reason is that the person that got it was white, and I was black.
 Q: Right.
 A: And, I felt like I was discriminated against.
Test. of plaintiff at July 8, p. 250.

higher grade or within grade level than the other, based solely on their relative years of experience in the position. *E.g.,* difference between salary of first and second year law clerks. By Harris' own admission, even assuming she and Eldridge performed similar work, his GS–5 classification was entirely appropriate based solely on their different levels of experience.

98. Second, when Harris complained to CPO that her job was graded too low, CPO promptly responded by auditing the position. The result of the audit was a determination that the job was properly graded. Harris *never* appealed this result to the OPM—the next step in the classification appeal process. Nor did she file an EEO complaint or any internal grievance about the audit. *Id.* at July 8, pp. 251–59. When questioned why she never complained further about this alleged act of discrimination, Harris explained that before she had the chance to appeal, Ft. Bragg moved her from the position at issue to another section in the same office. *Id.* at 258–59. Of course, as defendant points out, Harris' transfer to a new position in no way prohibited her appeal to OPM, and Harris as an EEO counsellor surely was aware of that fact. It likewise did not bar the filing of an EEO complaint. Accordingly, the court can only conclude that plaintiff felt significantly less strongly about the job classification incident and its origins when it occurred than she allegedly felt when she filed this lawsuit.[244]

■ 98. Third, at hearing, no evidence was introduced or proffered suggesting racial animus on the part of the CPO auditor, Georgia Wilkins, or any CPO personnel in this matter.[245] Neither did plaintiff allege discriminatory motive on the part of her supervisor with respect to this claim. To bring a Title VII action, and certainly to continue with one after discovery has

closed, plaintiff is required to possess at least a scintilla of evidence from which the factfinder can infer intentional discrimination on the basis of race, *see Jones v. Flagship International,* 793 F.2d 714, 723 (5th Cir.1986), yet plaintiff's testimony is void of any such evidence. Given plaintiff's utter lack of credibility, the uncontroverted evidence of record amply demonstrates that after plaintiff complained, her complaint was promptly considered, she accepted the audit determination in response, and the matter was resolved. Subsequently, when it came time to allege claims of discrimination for litigation *sub judice,* plaintiff recalled this incident and simply threw it in the pot.

Although it is possible that somewhere in this ill-starred litigation plaintiff may have been able to piece together at least a *prima facie* case for this claim, she totally failed to do so at the sanctions hearing. With no further documentary or anecdotal evidence presented on the issue, plaintiff's own testimony on direct and cross-examination doomed yet another of her claims to the frivolous category.

### DISCRIMINATORY DENIAL OF TRAINING IN 1982

■ 99. In order to establish a *prima facie* case of discriminatory training based on race, plaintiff must prove either (1) she was trained inadequately, while comparable white co-employees were trained properly or (2) comparable white employees received better training and, thus, increased employment opportunities over the plaintiff. *See Long v. Ford Motor Co.,* 496 F.2d 500, 506 (6th Cir.1974); *Seymore v. Reader's Digest Association, Inc.,* 493 F.Supp. at 264; *Taylor v. Safeway Stores,* 365 F.Supp. 468, 472 (D.Colo.1973), *aff'd in part and rev'd in part on other grounds,* 524 F.2d 263 (10th Cir.1975). *Cf.*

---

**244.** Plaintiff also testified that she declined to act on the audit results in early 1981 because "the class act had been filed." Unfortunately for plaintiff, when the audit was completed in March of 1981, the class action filing was still six months away. *See* Test. of plaintiff at July 8, p. 259.

**245.** Once again, plaintiff in her testimony raised the spector that sex discrimination was possibly at issue here, but, as before, this comment was thrown out as a complete afterthought, never having been raised or plead prior to that time. Test. of plaintiff at July 9, p. 68. Needless to say, no evidence was presented to support the allegation.

*Moore v. City of Charlotte, supra* (holding plaintiff proves a *prima facie* case of disparate discipline by showing (1) he engaged in prohibited conduct similar to that of a person of another race and (2) disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person). On this claim, plaintiff's evidence fails to suggest the existence of either alternative.

100. As demonstrated by the inversion of dates in both plaintiff's and defendant's post-hearing submissions, plaintiff's testimony concerning this allegation, her 1980 training claim, and their relationship, at best, was unclear. A review of the record establishes both the lack of connection between the two and the hopelessness of this claim. *See, e.g.,* Test. of plaintiff at July 9, p. 73. In 1982, plaintiff was an EEO counsellor. She requested the opportunity to attend a supervisor's school on post in order to complete her final course requirement for an EEO training program. *Id.* at July 8, p. 260. This request was denied. Since "[a]ll the other EEO counsellors were able to go, but I was never able," plaintiff alleges the training denial was racially discriminatory. *Id.* Problems with plaintiff's testimony and her conclusion abound.

101. To begin with, plaintiff never inquired into who refused to give her permission to attend the supervisory school. *Id.* at July 9, p. 61. She testified her supervisor, Alicia Chisholm, a co-plaintiff, told plaintiff she approved the request for training, but Harris testified she "really [didn't] know" if that was true. *Id.* at 61–62. *See also* Discussion at March 27, p. 122. Notwithstanding that conclusion, plaintiff presented not a shred of evidence to suggest Chisholm lied.[246] In addition, although Harris suspected the Chief of COM-PACT (white) eventually disapproved the training, she never attempted to determine whether he ultimately denied her request and, if so, why. *Id.* at July 9, pp. 60–62.[247] It is amazing that plaintiff could file a claim alleging discrimination, conduct discovery, prepare for trial, file a final pre-trial order, withdraw the claim, and prepare for a hearing on sanctions—all without ever taking the time to determine the initial question of who made the decision she alleges was discriminatory. The court continues to find it incredible that charges of discrimination have been leveled in this litigation without any knowledge of who rendered the employment decision at issue or why.

102. Plaintiff also conceded that other black, as well as white, EEO counsellors were permitted to attend the supervisory training program. *Id.* at July 8, p. 260. In fact, no testimony suggested the denial of training to any other black EEO employee. Given that circumstance, plaintiff was unable to articulate a credible reason as to why her denial of training was racially discriminatory. *Id.* at 260–61. When asked "what made you believe that your denial of training was based upon race," plaintiff replied, "[b]ecause I did not get to go, and I was—I wasn't given a reason why I wasn't—I would not go." *Id.* at 261. This anemic response, even if true, provides not the slightest basis for an allegation of race discrimination, particularly when other black EEO counsellors were provided the same training opportunity. Notwithstanding that fact, however, plaintiff subsequently did testify she was given a reason for her denial of training—her request met with a scheduling conflict. *Id.* at July 9, p. 61.

---

246. Chisholm testified in this proceeding with respect to plaintiff's harassment and retaliation claim. Unfortunately, no questions were asked of her with respect to the 1982 training claim. However, for purposes of her comment to Harris that she approved the training request, it is important to note the court found Chisholm's subsequent testimony, much of which contradicted other Harris assertions, entirely credible.

247. Q: And who either approved or disapproved of that?
A: I think it Miller Macondo, Chief of COMPACT, I can't—
THE COURT: I'm sorry. Your request was refused by whom?
A: By the chief of COMPACT, I presume. I don't know who refused it, but I wasn't in the building with the chief. I was in another building, but I know it came back refused.
Test. plaintiff at July 9, p. 61.

103. As with plaintiff's prior claims, no independent anecdotal, statistical or documentary evidence was tendered by plaintiff on this claim. Although clearly Harris' training request was denied, plaintiff has failed to proffer even the slightest evidence from which any factfinder could infer race discrimination was the cause. The court recognizes a plaintiff's failure to establish a *prima facie* case is not tantamount to a finding of frivolity. Title VII plaintiffs often lose at trial or on summary judgment, but that fails to prove their case lacked some merit. Here, however, as in the prior six allegations, the defects in plaintiff's claim run far deeper and the self-inflicted wounds prove fatal. Plaintiff lacks not only a *prima facie* case, but even a good-faith basis for suggesting racial animus on the part of any ADO, whomever that might have been.

## DISCRIMINATORY DENIAL OF TRAINING IN 1980 AND RETALIATION/HARASSMENT CLAIMS

104. Since these claims involve the same ADO's and testimony between the two interrelate, the court resolves both issues through combined findings. Of all of Harris' claims, these two present the closest question of frivolity and, in the end, although neither appeared to be a winner for the plaintiff at trial, the court fails to find either claim frivolous.

In early April, 1981, Major Michael Marshall (white), then Chief of COMPACT, requested plaintiff be relieved of her duties as EEO counsellor in order for her to pursue her regular duties at Ft. Bragg on a full-time basis. This request was honored and Harris was informed that her EEO duties were terminated, effective April 27, 1981. As a result of Marshall's action, plaintiff filed an EEO complaint against Marshall. An investigation of the complaint was conducted and, upon review by the United States Army Civilian Appellate Review Office (USACARO), Harris was reappointed as an EEO counsellor. In addition, USACARO recommended significant sanctions against Marshall, finding "[plaintiff's] complaint of reprisal is supported by the evidence." DX802 at 3–8.[248] As a result of this complaint, as well as her previous protected Title VII activities, plaintiff contends in this litigation that she was subjected to "harassment and intimidation" by Marshall and Sergeant–Major Ralph Jenkins (white) who served under Marshall.[249] Harassment, in this context, took the alleged form of denial of leave for additional training, arbitrary checks on plaintiff's leave status without similar review for white employees, complaints about plaintiff's excessive leave, calling plaintiff a "troublemaker" and making remarks about the type of car plaintiff drove which plaintiff interpreted as comments with racial undertones. Test. of plaintiff at July 9, pp. 62–65; 71–74.

In addition, plaintiff claims Alicia Chisholm was promoted over plaintiff to a supervisory position. Harris testified that after the promotion, she, Chisholm and a mutual friend, Geraldine Grooms, went to lunch at a club on Ft. Bragg. There, plaintiff claims Chisholm informed the group that she was given the promotion to "get" the plaintiff. Grooms corroborated plaintiff's version of the text of Chisholm's statement, though she differed substantially with Harris concerning Harris' reaction to it, *see infra* at p. 394.

Additional evidence advanced in support of this "conspiracy" theory, *see* Test. of plaintiff at July 8, p. 125, was an unsatisfactory job performance rating given plaintiff by Chisholm in 1983. *Id.* at 133–37, 146–47. As a result of this rating, plaintiff contends she was dismissed from Ft. Bragg. Accordingly, plaintiff argues "the

---

**248.** DX802, although tendered by the defendant, was not formally offered into evidence by the defendant. Plaintiff as well failed to introduce the exhibit. However, since the exhibit is that of the defendant and the court's use of the exhibit is solely in favor of the plaintiff, the court, believing the failure to introduce 802 was simply an oversight on the part of both parties, will, in fairness to plaintiff, consider the exhibit as admitted.

**249.** The USACARO report cites both Marshall and Jenkins for critical inconsistencies and contradictions in their statements to the investigating officer.

prophecy of Chisholm was in fact fulfilled and that it was done as a result of the combined actions of" Chisholm, Jenkins and Marshall. *See* plaintiff's August 16, 1985, Final Argument at 12.

With respect to the denial of training claim in 1980, it occurred before plaintiff filed her EEO complaint against Marshall in 1981; nevertheless, plaintiff suggests the feeling which led to the 1981 complaint existed in 1980. Plaintiff requested to attend certain courses at an on-base school. This request was denied. Plaintiff's immediate supervisors (both white) had approved the request, but plaintiff testified Jenkins denied it anyway. Test. of plaintiff at July 8, p. 262; July 9 at 58. The reason given by Jenkins for not approving the educational leave was that the workload in plaintiff's office was too heavy to then allow her to take time off for that purpose. *Id.* at 263–64; July 9 at 58–59. Plaintiff claims the articulated reason was spurious because Jenkins was located in another part of the building and was totally unfamiliar with her workload. *Id.* at 59. Further, it made little sense to Harris that Jenkins could overrule her frontline supervisors on the basis of workload considerations, as they were much more intimately aware of her workload than Jenkins. To plaintiff, Jenkins' rationale was particularly suspect because she was unaware of any white employees in her section who had been denied a request for training. *Id.* at 263–66; July 9 at 60.

105. Not surprisingly, defendant was able to point to glaring gaps and contradictions in plaintiff's testimony and her allegations. For example, with respect to Chisholm, Harris claimed that Chisholm had been rewarded with an "outstanding" job appraisal for firing her. *Id.* at July 8, pp. 148–49. Chisholm vigorously denied the allegation and when plaintiff was provided a copy of Chisholm's OPF, she failed to find the "outstanding" rating she claimed Chisholm had received from management. *Id.* at 158–59. *See also* Test. of Chisholm, July 9, p. 166 and 188.

In contrast to Harris, Chisholm was an extremely credible witness who strenuous-ly rebuffed unsubstantiated allegations that she had struck a bargain for her testimony. *Id.* at 201–02. She further denied ever making the lunch statement attributed to her by both plaintiff and Grooms. *Id.* at 164–66 and 187. Chisholm recalled that on the occasion in question, Grooms and Harris informed her they had heard she was being promoted so "Marshall could have a black on his side" and so she could "get rid of Harris" for him. *Id.* Chisholm responded at the time she was acting for no one, including Marshall.

In addition, Chisholm testified at hearing that her actions were not directed by either Marshall or Jenkins. She strongly denied the existence of any conspiracy to "get" the plaintiff. *Id.* at 167, 200–202. Chisholm claimed her rating of Harris was based solely on her poor performance. *Id.* at 167 and 194–95. Finally, she critically pointed out that Marshall was long gone from Ft. Bragg when the performance evaluation and subsequent firing occurred. *Id.* at 166–67. Indeed, this litigation was well under way when Chisholm, a co-plaintiff, rendered plaintiff's unsatisfactory job appraisal.

As for Grooms' testimony, what limited value her testimony possessed was generally vitiated by her extensive biases against Ft. Bragg. Grooms admitted on cross-examination she had filed numerous EEO complaints against management officials at Ft. Bragg and that she had recently sued the Army over alleged race discrimination. *Id.* at 235–39. Grooms claimed she "won" the lawsuit even though she received an unfavorable decision from the trial court, which was affirmed on appeal. *Id.* at 236. Having tried Grooms' lawsuit, the court is quite familiar with who was victorious and it most definitely was not Grooms.

Furthermore, Grooms testified Harris had reacted very seriously to Chisholm's comments at lunch, yet Harris herself testified she "laughed them off" at the time. *Compare* Test. of plaintiff at July 8, p. 126 *with* Test. of Grooms at July 9, p. 239–40. This significant contradiction, among others, in combination with Grooms' obvious

biases, cast serious doubt on her credibility as well as the story told by Harris.

In terms of the 1980 training claim, defendant argues substantial doubt was cast upon the genuineness of this claim by a host of factors. First, Harris admitted her immediate and second line supervisors (both white) approved the training. *id.* at 262–64. Second, Jenkins proffered a legitimate reason for the denial of training—Harris was needed on the job. *Id.* at 264; July 9, p. 158. There was no evidence to suggest any prior problems between Marshall and the plaintiff. Finally, Harris never filed an EEO complaint or grievance concerning the denial of this training until 1983. *Id.* at July 8, p. 267.

106. Were the gravamen of the claims at issue plaintiff's relationship with Chisholm and the existence of her "conspiracy" theory, the court would have little hesitancy in deeming them frivolous. Plaintiff's allegations against Chisholm are wholly unsupported by the credible evidence. More importantly, plaintiff's counsel have never adequately explained how they could ethically seek to represent both the plaintiff and Chisholm in this lawsuit. *See* Finding # 107, *infra.* It defies reason to suggest plaintiff should be allowed to sue defendant based on a co-plaintiff's alleged discriminatory acts and ongoing participation in a conspiracy against the plaintiff while both plaintiffs are represented by the same counsel.

Notwithstanding those comments, however, the gist of the 1980 training and 1981–83 harassment/retaliation claims is not any conduct of Chisholm, but plaintiff's relationship with Marshall and Jenkins. Even if the court finds fault with much of plaintiff's testimony, and it surely does, there are still some portions left uncontradicted with respect to these claims. In addition, the USACARO report strongly suggests, at a minimum, a severe personality conflict among the three. The court recognizes that a personality conflict, no matter how severe, does not, by itself, engender sufficient cause to file a lawsuit based on race discrimination. But the evidence introduced at hearing, if even partial-ly believed, creates a sincere doubt in the court's mind concerning a possible retaliatory motivation on the part of Marshall and Jenkins. And, retaliation for the exercise of Title VII rights, even if not racially based, provides a cognizable cause of action under Title VII. Plaintiff may not have pled this theory with any specificity, but the evidence suggests its possibility.

Therefore, the court finds plaintiff's 1980 training claim and her retaliation/harassment claim *not* frivolous. Defendant's motion for sanctions on the ground that these claims were frivolous is DENIED. However, this finding does not excuse plaintiff's bad-faith abandonment of the claims after the signing of the Final Supplemental Pre–Trial Order. Thus, plaintiff will be responsible for any assessment of costs and expenses, *infra*, for the effort expended by the defendant and the court on the claims after January 5, 1984.

107. Finally, the court turns to the actions of plaintiffs' counsel with respect to these claims. The court is cognizant of counsel's efforts before trial, at defendant's urging, to resolve the Harris–Chisholm conflict as it pertained to any claim for relief. In that regard, Harris voluntarily withdrew her 1983 discriminatory appraisal claim which clearly focused on Chisholm's rating of the plaintiff as her supervisor. *See* Order of December 8, 1983, at 3. On the basis of assurances of counsel contained in plaintiffs' reports to the court, the undersigned concluded in December of 1983, that all potential conflicts had been "satisfactorily resolved." *Id.* at 2. It is obvious such was never the case nor could it have reasonably been so considered.

The Harris–Chisholm conflict ran far deeper than simply plaintiff's appraisal claim. They both worked in COMPACT. They applied and competed for a number of the same jobs. Chisholm was promoted over Harris to a position Harris thought she was entitled. *See, e.g.,* Discussion of Issues at March 28, pp. 28–29. As Harris' testimony convincingly shows, she believed as early as 1982 that Chisholm was promoted to "get rid of her." Plaintiff's EEO complaint, filed August 31, 1983, makes

clear Harris considered Chisholm an integral part of the Marshall–Jenkins conspiracy, the goal of which was plaintiff's termination. DX840.[250] *See also* Test. of plaintiff at July 8, pp. 131–36 and 146–47.[251] Chisholm is specifically listed in the complaint as the ADO. DX840 at 1. Thus, the sizzling cross-connections between Harris and Chisholm should have been apparent to any objective eye early on in the litigation after intervention, whether through a review of DX840 or discussions with the plaintiffs.

Counsel were blind to reality if they assumed that dismissing Harris' 1983 appraisal claim eliminated the conflict. Harris continued with her 1980 training and 1981–83 harassment and retaliation claims, both predicated on the existence of a Marshall–Jenkins conspiracy formulated in retaliation for plaintiff's Title VII protected activities. When Chisholm assumed a supervisory role over Harris, plaintiff incorporated her into the conspiracy. Thus, at least by the time plaintiff filed her EEO complaint in August, 1983, matters had progressed far enough along that little effort was required to comprehend the conflicting relationship of the two plaintiffs. Defendants Exhibit 840 alone mandated withdrawal in this case from representation of one plaintiff or the other. Yet, despite repeated warnings to that effect from the defendant, counsel for plaintiffs failed to take heed. *See, e.g.*, Discussion of Issues at March 27, pp. 87–92 and 153; at March 28, pp. 6–35. Even as late as the eve of the sanctions hearing in March, 1985, defense counsel warned plaintiffs' counsel of the continuing conflict. *Id.* at 22. In response, counsel for plaintiffs requested a delay in the Harris and Chisholm sanctions hearings to discuss the matter fully with their clients and defendant agreed. *Id.* at 22–23. Incredibly, when the sanctions hearings started, counsel continued to represent both plaintiffs—until finally forced out by events at the hearing. *Id.* at 6.

■ A review of this disappointing record mandates a finding that counsel patently violated the bounds of ethical advocacy in their prosecution of these two claims after August 31, 1983, and their initial defense of sanctions. Any reasonable counsel long before trial would have recognized and appropriately responded to the obvious conflict of interest between Harris and Chisholm. Counsel's failure to do so, either through negligence or deliberate indifference, constitutes a violation of North Carolina Rules of Professional Conduct 5.1(A) and (B) and (C).[252] Such conduct is

---

**250.** Plaintiff's EEO complaint contains the following allegations:

That my Supervisor [Chisholm], in giving me the Unsatisfactory Performance Appraisal and denying me pay and benefits is carrying out the wishes of COMPACT Management to "have a Black on its side" as expressed by then COMPACT chief Major Michael Marshall....

DX840 at 2.

**251.** Q: But, you thought Mrs. Chisholm was a part of that conspiracy:

A: Yes, I thought she was part of it.

. . . . .

Q: So—and, you have testified here and at the MSPB that Mrs. Chisholm was—and, you have written it in that document about your appraisal—that Mrs. Chisholm was part of the conspiracy, am I right?

A: Yes.

Test. of plaintiff, p. 136 and 146.

**252.** Rules 5.1(A), (B) and (C) state as follows:

(A) A lawyer shall not represent a client if the representation of that client will be or is likely to be directly adverse to another client unless:

(1) The lawyer reasonably believes the representation will not adversely affect the interest of the other client; and

(2) Each client consents after full disclosure which shall include explanation of the implications of the common representation and the advantages and risks involved.

(B) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) The lawyer reasonably believes the representation will not be adversely affected; and

(2) The client consents after full disclosure which shall include explanation of the implications of the common representation and the advantages and risks involved.

(C) A lawyer shall have a continuing obligation to evaluate all situations involving potentially conflicting interests, and shall withdraw from representation of any party he cannot adequately represent or represent without using confidential information or se-

sanctionable under Local Rules of Practice and Procedure 2.10 and 15.00, E.D.N.C., incorporating the North Carolina Rules of Professional Conduct. *See also* American Bar Association Standards for Imposing Lawyer Sanctions §§ 4.33–.34 (1986).

In imposing the following sanction, the court has considered (a) counsel's conduct in the matter, (b) the importance of the ethical obligation breached, (c) the importance of specifically deterring such future conduct and (d) the need to impose the least punitive, yet appropriate sanction. Accordingly, counsel of record for the plaintiffs for the period August 31, 1983, to March 28, 1985, are hereby REPRIMANDED for their breach of ethical responsibilities and are individually FINED the sum of $250.00, to be paid within twenty (20) days of the date of service of this order by each lawyer without assistance or funds from his law firm or the NAACP, including the NAACP Legal Defense Fund.

### DISCRIMINATORY DENIAL OF EMPLOYMENT BENEFITS

108. Plaintiff's tenth and final claim listed on the Final Pre–Trial Order may be disposed of summarily. At hearing, plaintiff admitted that her equal benefits of employment contention was, in reality, not a separate claim for relief. She testified, as follows, that it was merely a restatement of all her other claims:

Q. [Loewenberg] All right. Finally you claim that you were denied equal benefits of employment.
What equal benefits of employment were you denied that you hadn't already discussed in these other causes of action?

A. I think the benefits of employment would be the same thing as we are already discussing—promotions.

Q. So, when you just threw that in—and you put it in—it's the same thing. It doesn't mean anything different.

A. No, it doesn't mean anything different. It's the same thing as promotion.

crets of another client or former client except as Rule 4 would permit with respect to a

Q. So, it's just a—it's—it is repetitive, correct?

A. I guess.

Q. [Mr. Loewenberg) Mrs. Harris, any work that was spent doing the—researching what equal benefits of employment were, separately from your other matters, would you agree with me that that was time that was wasted?

A. No, I would not agree.

Q. Tell me why, now.

A. Because equal benefits of employment is the same as promotions.

Q. Why list it twice—with a different phrase. Why list it twice?

A. I don't know why it's listed twice, but it is the same thing.

Q. Well, so you have no answer—you have no answer to give this court about why it was listed twice.

MR. THIGPEN: Objection.

THE COURT: Overruled.

A. I cannot remember why it was listed twice.

Test. of plaintiff at July 9, pp. 11–13.

Little more need be said about this claim. Plaintiff listed it as an independent claim for relief. As a result, defendant (and this court) spent time—wasted time—searching plaintiff's records and employment history to determine the predicate for a claim that never was. Plaintiff and her counsel are *per se* liable for abuse of the judicial process for knowingly asserting a non-existent claim.

*Court Expenses in Sanctions Hearing*

109. As previously stated, the court received evidence in connection with the defendant's motion for sanctions against Harris on March 27–28 and July 8–9, 1985. Additional relevant testimony was heard, in part, on April 8, July 12 and July 29–31, 1985. Courtroom hours for testimony concerning Harris on these days totalled approximately 23½ hours. The following court personnel were present in Wilming-

client.

ton for all in-court hearing time: the court's law clerk, a deputy clerk of court and the court reporter. Out-of-court pre-hearing and hearing time totalled approximately 15 hours. The hours spent reviewing, researching, drafting and preparing the sections of this opinion related to defendant's motion for sanctions against Harris easily exceeded 100 hours.

110. The hourly rates found appropriate in *Blue* apply here as well. Application of these rates to the Harris hearing follows:

### Trial of Sanctions Motion

| | | | |
|---|---|---|---|
| In-Court: | 23½ hours × $100 | = | $2,350 |
| Out-of-Court: | 115 hours × $60 | = | 6,900 |
| Total Costs: | | = | $9,250 |

111. Because plaintiff prevailed on the frivolity aspect of two claims out of ten, the court reduces the costs, for which plaintiff is liable by ten percent (10%), thus, establishing a total liability for court expenses at $8,325.

### Costs and Expenses of Defense Counsel and the Defense Litigation Team [253]

112. Defendant requests the following costs, expenses and attorney's fees with respect to its motion for sanctions against Harris:

I. Costs and Expenses
- A. Litigation Support Team Time
 1. Before Final Pretrial Order — $2,483.12
 2. After Final Pretrial Order — 3,481.80
- B. Expert Witness Time
 1. Before Final Pretrial Order — $1,256.70
 2. After Final Pretrial Order — 882.30
- C. Photocopying — 3,452.50
- D. Miscellaneous Logistical Expenses — 762.72
- E. Travel and <u>Per Diem</u> — 1,256.53

II. Attorney's Fees
- A. Peter B. Loewenberg
 1. Before Final Pretrial Order — –0–
 2. After Final Pretrial Order — –0–
 3. Pursuing Sanctions Motion — 2,886.97
- B. Robert B. Williams
 1. Before Final Pretrial Order — 7,440.63
 2. After Final Pretrial Order — 7,121.86
- C. Stephen L. Berry
 1. Before Final Pretrial Order — –0–
 2. After Final Pretrial Order — –0–
 3. Pursuing Sanctions Motion — 1,575.00

III. Law Clerk Fees
- A. Dan Smith
 1. Before Final Pretrial Order — –0–
 2. After Final Pretrial Order — –0–
 3. Pursuing Sanctions Motion — 300.00

Total: $32,899.63 [254]

113. Loewenberg did not maintain pri-file appropriate affidavits of costs with the court for computation purposes. Defendant did so, at least for their costs on July 31. However, shortly thereafter, plaintiff waived her right to further testify in the matter or present any evidence. *See* pleading filed August 19, 1985. Thus, no further hearing was required and evidence in this case was deemed closed. Although plaintiff failed to attend trial on July 31 without prior warning to the defendant, settlement of much of this case was finalized on that day and defense counsel, as well as some of their staff, were required to be in Wilmington for that purpose anyway. Accordingly, plaintiff's failure to appear on the 31st cost defendant very little time, money or resources, if any, and the court declines to impose the additional requested costs on the plaintiff for that morning. The calculations above do *not* include the requested costs of the 31st of July.

---

**253.** As with Blue, the contested issues of fact and law resulting from defendant's motion for sanctions against Harris have been thoroughly briefed, with both sides submitting a primary brief and numerous single-issue memoranda in support of their respective positions. Thus, in combination with defendant's extensive application for fees, costs and expenses, there exists more than an ample record upon which to determine an award associated with the defense of Harris' withdrawn and frivolous claims.

**254.** At the final hearing in this case on July 31, 1985, Harris failed to appear for trial on her inability to pay defense to defendant's motion for sanctions. Counsel for plaintiff moved at that time for a continuance of the proceedings, which was granted, contingent on plaintiff's payment of defendant's costs and expenses necessarily incurred by the re-scheduling. The court ordered defense counsel and their staff to

mary responsibility for preparation of the *Harris* claims. That obligation fell to Lieutenant Colonel Robert B. Williams, who estimates 50% of his time between February, 1983, and Harris' withdrawal in 1984 was spent on the *Harris* case. *See* June 21, 1985, Affidavit of Williams at 1–2; Test. of Williams at July 29, pp. 198–99. Williams graduated from law school in 1973 and, shortly thereafter, joined the United States Army. His positions in the Army have included, *inter alia,* defense counsel in Europe for 1½ years; criminal appellate counsel for the Government Appellate Division for 3 years; and counsel in the Litigation Division at the Pentagon for 4 years. *Id.* at 194–98.

114. Duties and responsibilities assigned Williams in the *Harris* case included interviewing witnesses, reviewing exhibits, coordinating strategy, collecting and classifying documents, establishing priorities for the defense team, and researching, as well as writing, briefs. Affidavit of June 21 at 2. A considerable portion of Williams' time in the litigation not solely related to Harris' claims, was consumed with expert witnesses—contracting for their services, determining their scope of work, arranging for accumulation of data for analysis, and presentation and review of the work in progress. *Id.*

115. In preparation for the *Harris* claims, Williams studied the relevant MPAs, of which there were 107. Positions applied for between 1978 and 1983, even if not alleged as a claim for relief, had to be reviewed for background evidence and statistical purposes. Williams' preparation of the MPAs was meticulous, yet within reasonable bounds. *See id.* at 3–5. On the average Williams expended one hour per MPA for a total of 107 hours. *Id.* Having reviewed and digested some of the MPAs in this case, the court finds Williams' expenditure of time reasonable in relation to the length and importance of the material in question. *See, e.g.,* DX812 (199 pages); DX813 (304 pages); DX842 (447 pages).

116. Preparing for plaintiff's trial, Williams also interviewed 17 witnesses, totalling 16 hours and 55 minutes worth of time. Affidavit of June 21 at 3–4 and Supplemental Declaration of July 11 at 2. Exhibit review, aside from the MPAs, totalled 36 hours, 15 minutes. This figure was arrived at by multiplying a conservative estimate of 15 minutes per exhibit times the number of exhibits identified by plaintiff and defendant in the Final Pre-Trial Order. Affidavit of June 21 at 5. Although plaintiff questioned counsel's lack of time breakdown per exhibit, no evidence was presented to suggest an improper or exaggerated expenditure of time in this regard. The sheer number of exhibits and pages contained within the listed exhibits establishes the reasonableness of Williams' request. *See, e.g.,* DX801 (347 pages); DX821 (182 pages). Finally, a review of plaintiff's two depositions, totalling 295 pages required an expenditure of 6 hours, while review and evaluation of plaintiff's numerous complaints, grievances and all resulting internal investigations required 28 hours. *Id.* at 5–6.

117. Based on all the above figures, Williams expended a conservative total of 194 hours and 10 minutes on the *Harris* case. Supplemental Declaration at 3.

118. Counsel also made 19 trips to Ft. Bragg between August, 1983, and June, 1984. The total cost of these trips was $3,790. Williams estimates that since plaintiff's case was only one of nine he was preparing, one-ninth the costs, or $421, should be allocated against the plaintiff. Affidavit at 6; Test. of Williams at July 12, p. 173; at July 29, pp. 214–15. In addition, counsel traveled from his new duty station at Ft. Leonard Wood, Missouri, to Wilmington to testify in the sanctions hearing on July 29–30 and, therefore, expended another $438.14 on this case. Supplemental Declaration at 1–2.

119. The court finds all of the above hours and costs expended eminently reasonable. Extensive billing judgment was exercised by counsel in preparing his request. Not a shred of evidence points to any excessive or unnecessary expenditure of time. Thus, all hours and costs requested are fully compensable. *See generally Daly v. Hill,* 790 F.2d at 1079–80.

120. Like Loewenberg and Berry, Williams requests compensation at the rate of $75 per hour. Williams' out-of-court work throughout this exhausting litigation was competent, diligent and professional. The applicable *Johnson* findings with respect to Loewenberg and Berry apply equally to Williams as they relate to the nature and difficulty of this case, time pressures imposed by the court and results obtained. Williams acted essentially as lead counsel in preparation of the *Harris* case and he should be compensated as such. Although Williams is not as skilled a trial attorney as Loewenberg, in the court's view he was clearly the chief administrator and logistician of the defense trial team. And, in this case, that position required extraordinary organizational and inter-personal skills. Williams possessed both in ample quantity.

The 1986 North Carolina Bar Association Economic Survey, referred to in assessing Loewenberg and Berry's requests, as applied to Williams, would yield a mean rate of $78. Survey at 20. Based on the court's previous findings, no more need be said concerning the $75 per hour request—it is patently reasonable.

121. The total amount of attorney's fees needlessly incurred by Williams because of plaintiff's frivolous and abandoned claims is $14,562.49. The government is also entitled to recoup its costs related to Williams' travel, totalling $859.14.

122. Loewenberg assumed primary responsibility for the sanctions hearing in this case. The switch between Loewenberg and Williams was necessitated by Williams' transfer to a new position in Missouri. In preparation for and trial of Harris' claims at sanctions, Loewenberg seeks reimbursement for 9 hours and 45 minutes worth of time expended reviewing MPAs and depositions, examining exhibits, researching pleadings and issues, and talking with potential witnesses or other sources of information. *See* June 21, 1985 Affidavit at paras. 6 and 8; Supplemental August 9, 1985, Affidavit, of Loewenberg at p. 4. Loewenberg also seeks compensation for his in-court time during the sanctions hearing—a total of 23½ hours.[255] *Id.* at para. 6; Supplemental Affidavit at paras. 5 and 9. Finally, counsel requests reimbursement for preparation of the written final arguments in the case, his attorney's fee petition, and other pleadings related to a preliminary injunction issued against the plaintiff designed to prevent the disposal of her $10,500 retirement income, totalling 7 hours 15 minutes. *Id.* at paras. 6, 8 and 13.[256]

123. The court finds counsel's request reasonable and supported by the record, which is void of any evidence suggesting an inaccuracy, except for the final computation, in Loewenberg's affidavits. Accordingly, the government is entitled to compensation for Loewenberg's expenditure of 40½ hours on this case, for a total of $3,037.50.

124. Loewenberg is also entitled to travel costs related to the sanctions hearings in this matter. Proportional expenses associated with five trips to Wilmington for the conduct of the hearings, factually uncontested by the plaintiff, total $354.05. *Id.* at para. 7; Supplemental Affidavit at paras. 7 and 10.

125. The government is further entitled to recoup $275.00 for research and drafting work performed by a law clerk assigned to Loewenberg's Pentagon office (8 hours ×

255. Loewenberg's request in this category totals approximately 20 hours; however, the court's review of time from the transcript and the clerk's docket book reflect the more accurate expenditure of 23½ hours. Counsel will be compensated for the additional time *sua sponte.*

256. Plaintiff objected to the filing of any affidavits by the defendant after the close of testimony on July 31, 1985. That objection was overruled by the court since fairness obviously dictated defendant be allowed to supplement his original June 21 materials with final cost and time expenditures for the July hearings. Order of August 23, 1985. However, plaintiff was allowed to file affidavits in opposition to defendant's supplemental filings, *i.e.,* to contest any expenditure of time deemed unreasonable or excessive. *Id.* at 2–3. Despite that opportunity, plaintiff filed no affidavits and cannot now be heard to complain about defendant's supplemental request.

$25). *Id.* at para. 11; August 9, 1985, Affidavit of Daniel J. Smith.[257] Plaintiff did not contest this expense and the rate requested, as well as hours expended, were reasonable in relation to the task assigned. *See, e.g., Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836, 846 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985); *Save Our Cumberland Mountains, Inc. v. Hodel,* 622 F.Supp. 1160, 1168 (D.D.C.1985) ($30 per hour); *Uzzell v. Friday,* 618 F.Supp. 1222, 1229 (M.D.N.C.1985) ($25 per hour); *Kirksey v. Danks,* 608 F.Supp. 1448, 1459 (S.D. Miss.1985) ($30 per hour); *Vaughns v. Board of Education of Prince Georges County,* 598 F.Supp. at 1283 ($40–50 per hour).

126. Berry requests compensation for twenty-one hours related to defendant's motion for sanctions against Harris: five hours for drafting defendant's original motion for sanctions in 1984; eight hours preparing for plaintiff's sanctions hearing; and eight hours for in-court time on March 27, 28, 1985. *See* June 21, 1985, Affidavit of Berry at 3. Although present for trial in Wilmington in July, 1985, Berry filed no supplemental affidavits requesting compensation for in or out-of-court time during that period.

Plaintiff does not factually contest Berry's request. However, this court must review any application for fees to determine its reasonableness despite the lack of formal evidentiary objection. *See Spell v. McDaniel,* 616 F.Supp. at 1085 and 1102. Although Berry is clearly entitled to compensation for his initial research and motion in 1984, the remainder of his request presents a closer question.

Defendant admits that the Harris trial was primarily Williams' responsibility, while the sanctions hearing was primarily Loewenberg's responsibility. Thus, one would assume Berry played little or no role in the preparation of any aspect of plaintiff's claims. Were that assumption correct, Berry's request might be deemed du-plicative. However, such is not the case, for notwithstanding the formal alignment of counsel, Berry's presence at the March and July hearings was critical to the defense. Berry was actively involved, and indeed was defendant's counsel of record in plaintiff's discharge claim before the MSPB. Because Williams attended none of the 1985 hearings, Berry's knowledge of this part of Harris' case was, quite probably, vital to Loewenberg. And, in preparing for plaintiff's MSPB proceedings, Berry must have become intimately familiar with much of plaintiff's employment history and many of her other claims for relief. As such, even though Berry was not formally assigned to the Harris case, absent objections to the contrary, the court finds Berry's request reasonable and will allow full compensation. The court will not, however, extend reimbursement *sua sponte* for the July hearings.

Accordingly, the government is entitled to recoup Berry's expenditure of twenty-one hours to the tune of $1,575. Travel costs in the amount of $43.34 is also recoverable.

127. As with *Blue,* each member of the Litigation Support Team has filed a verified declaration of their estimated time expended in the *Harris* case. Attached to the declarations are charts categorizing the hours by function. Although the time records are reconstructed, they obviously are extraordinarily conservative estimates. No request appears facially excessive or unreasonable. Plaintiff failed to produce the slightest evidence factually attacking the credibility of the Team request. Team members were fully cross-examined by plaintiff's counsel without success. The court finds their testimony amply supports the filed declaration and charts. *See, e.g.,* Testimony of Crumley on July 29, at 9–10, 15–22; Testimony of Ransom at 66–67, 71–76; Testimony of McDougal at 111–19; Testimony of McKenzie at 173–75; DX2420–42.

---

**257.** Subtracted from defendant's request is one hour expended by Smith in preparing his affidavit for fees. The affidavit was unnecessary and, even if useful, should have taken a few minutes to prepare.

In addition, billing judgment was once again properly exercised. No courtroom hours, despite many, or travel costs are requested for any Team member. Accordingly, finding it unnecessary to go into further detail regarding the Team request, the court holds the following hours reasonable and compensable:

| | | |
|---|---|---|
| Jerry W. Horne | — 4.5 hours | |
| Ruth A. Crumley | — 11 hours | (primarily for exhibit organization and witness preparation) |
| John S. Parham | — 2 hours | (exhibit reproduction) |
| Wade G. McDougald | — 12 hours | (primarily for exhibit organization, reproduction and witness location) |
| Ann H. Endfinger | —182 hours | (primarily for deposition analysis, issue research, witness preparation and exhibit organization)[258] |
| Sue B. McKenzie | — 7 hours | (primarily exhibit reproduction and issues research) |
| Herman A. Britt | — 13 hours | (primarily exhibit reproduction and issues research) |
| Nancy S. Ranson[259] | — 27 hours | (primarily witness location, exhibit organization and reproduction) |
| Total: | 258.5 hours | |

Accordingly, defendant should be reimbursed $6,462.50 (258.5 × $25) for Litigation Team service.[260]

128. Defendant claims $3,452.50 in photocopying costs associated with Harris' claim for 34,525 copies at $.10 per page. *See* Tab 15 of defendant's June 21, 1985, Fee and Cost Petition. This request, although high, is reasonable given the number of exhibits and non-identified documents relevant to Harris' case. After all, since 1979, Harris applied for well over 100 positions at Ft. Bragg. Her numerous grievances and complaints produced reams of written reports, studies and correspondence. And, plaintiff's exhibit list set forth in the final pre-trial order contained 115 exhibits, totaling thousands of pages. Considering plaintiff has not objected to defendant's request, the court finds no reduction in the photocopying request required. Defendant is entitled to compensation in the amount of $3,452.50. *See* fn. 217, *supra*.

129. Defendant also seeks reimbursement for plaintiff's prorated share of defendant's miscellaneous logistical expenses, *e.g.*, mailing costs, telephone, copy equipment rental, charts and graphic aids, and special courtroom equipment such as storage shelves, exhibits carts and cabinets. The total cost to defendant of these expenses was $28,984.24, with plaintiff's prorated share amounting to $762.72. *See id.* at Exhibit 3. Although plaintiff does not contest this request, the court reduces the amount sought to $500.00 to account for any unnecessary or non-compensabile expense included with this broad category. *See Spell v. McDaniel,* 616 F.Supp. at 1095 and 1113–14; *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 382–83 (D.D.C. 1983), *aff'd in relevant part, rev'd in part,* 746 F.2d 4 (D.D.C.1984); *Pinshaw v. Monk,* 565 F.Supp. 44, 46 (D.Mass.1983); *Kelley v. Metropolitan County Board of Education,* 558 F.Supp. at 479–80; *Wuori v. Concannon,* 551 F.Supp. at 200–01; *Tasby*

---

**258.** Like McKenzie in *Blue's* case, Endfinger had primary and specific assignments with respect to the *Harris* case.

**259.** Reimbursement for time expended by Ransom was not requested in *Blue,* therefore, some explanation of her role on the Team is now required. Ransom was employed with CPO as a member of the Team from its inception. She left for another position in late 1984. Her general duties included, *inter alia,* making folders for and reproducing exhibits, alphabetizing witness lists, typing correspondence, taking witness interview notes, locating witnesses, and setting Team appointments. June 21, 1985, Affidavit of Ransom at 1–2. Ransom's reconstructed records indicate that of the 1199 hours she worked prior to the filing of the final pre-trial order, she expended at least seventeen hours on Harris' claims and another ten hours out of 951 hours worked after the final pre-trial order. *Id.* at 2.

**260.** The slight discrepancy between this final figure and defendant's request relates to (1) minor computative errors by the defendant and (2) defendant's use of a lower hourly rate for Ransom based on her average salary for 1983. The court finds Ransom's salary base an irrelevant yardstick by which to compute litigation fees and, further, sees no justifiable reason to distinguish reimbursement for Ransom's services from recoupment for every other Team member's performance.

*v. Wright,* 550 F.Supp. 262, 263 (N.D.Tex. 1982).

130. Finally, defendant petitions for recoupment of $2,139.00 in expert witness fees for his statistician, Dr. Beckett. This summer, the Supreme Court held in *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* — U.S. ——, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), when a prevailing party seeks reimbursement for fees paid to its expert witnesses, a federal court is bound by the $30 per day limit of 28 U.S.C. § 1821(b), absent contract or explicit statutory authority to the contrary. 107 S.Ct. at 2499. *See also LaVay Corp. v. Dominion Federal Savings & Loan,* 830 F.2d 522, 528 (4th Cir.1987); *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 801 F.2d 908, 911 (7th Cir.1986). Although it is unclear whether *Crawford* reaches the assessment of expert witness fees under 42 U.S.C. § 1988 and *Christiansburg, see* 107 S.Ct. at 2499 (Blackmun, J., concurring) and at 2500 n. 1 (Marshall and Brennan, JJ., dissenting), the question has long been dispositively answered in this circuit. In *Wheeler v. Durham City Board of Education,* 585 F.2d 618, 624 (4th Cir.1978), the Fourth Circuit Court of Appeals held that "fees and expenses of outside non-legal consultants and experts" are not recoverable by the prevailing party, no matter how essential their services to the successful preparation and trial of a complex case. This ruling recently was explicitly re-affirmed in *Davis v. Richmond, Fredericksburg & Potomac Railroad Co.,* 803 F.2d 1322, 1328 (4th Cir.1986).

Accordingly, defendant's motion for $2,139.00 in expert witness fees and associated costs is DENIED.

131. Based on the aforesaid findings of fact, assuming full monetary sanctions issue for plaintiff's ten withdrawn and eight frivolous claims, the court finds defendant is entitled to the following fees and costs:

| I. Costs and Expenses | | |
|---|---|---|
| A. Litigation Support Team | | $ 6,462.50 |
| B. Photocopying | | 3,452.50 |
| C. Miscellaneous Logistical Expenses | | 500.00 |
| D. Travel and Per Diem | | 1,256.53 |
| II. Attorney's Fees | | |
| A. Peter Loewenberg | | 3,037.50 |
| B. Robert Williams | | 14,562.49 |
| C. Stephen Berry | | 1,575.00 |
| III. Law Clerk Fees | | |
| A. Dan Smith | | 275.00 |
| | TOTAL: | $31,121.52 |

However, because plaintiff prevailed on the frivolity aspect of two claims, the court reduces the potential sanctions award by ten percent to a total of $28,009.37.

132. Although offered the opportunity to do so, Harris, like Blue, *expressly* waived any right to raise an inability to pay a sanctions award defense. *See* Plaintiff's uncaptioned August 19, 1985, pleading (Tab 480). From the record, it is clear plaintiff's waiver was voluntarily, knowingly and intelligently executed. It is, therefore, accepted by the court and binding on the plaintiff.[261]

## VII. CONCLUSIONS OF LAW AS TO DEFENDANT'S MOTION FOR SANCTIONS

Even though the subject of sanctions is a distasteful one for any court, increasing abuses of the judicial system have forced both judges and legislatures to turn toward sanctions as a means of improving the efficiency and fairness of the litigation process. Unfortunately, however, no integrated code or statutory scheme of sanctioning power exists to supply coherent guidance to the lower federal courts. *Oliveri v. Thompson,* 803 F.2d 1265, 1271 (2d Cir. 1986), *cert. denied sub nom. County of Suffolk v. Graseck,* — U.S. ——, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1986). Indeed, the sources for imposing sanctions are diverse, overlapping and often require unclear or inconsistent standards of application. *Id.* As such, it is not surprising that defendant

---

**261.** Collateral consequences ensue from Harris' waiver of an inability to pay defense. By abandoning this defense, plaintiff in effect contradicts the financial reason set forth in her June, 1984, affidavit for withdrawal. Considering the sanctions defendant seeks are many times the amount plaintiff claims to have paid *voluntarily* to pursue her EEO claim and this litigation prior to her motion to withdraw, Harris' waiver of an inability to pay defense is tantamount to a complete renunciation of the financial distress complained of in 1984 and at hearing in 1985.

has variously argued the following theories for the imposition of sanctions in this case: (1) *Christiansburg Garment Co. v. EEOC, supra,* and 42 U.S.C. § 2000e-5(k); (2) the bad-faith exception to the "American Rule"; (3) 28 U.S.C. § 1927; (4) Fed.R. Civ.P. 11; and (5) Fed.R.Civ.P. 16. What follows is a basic discussion of the standards for imposition of sanctions under each theory and a determination of (1) which of plaintiffs' claims, if any, fall within the asserted theory and (2) the appropriate sanction to be imposed in light of that finding.

Before undertaking this one last task, a procedural concern must be dispensed with in the case of Beulah Mae Harris. Unlike Blue, none of Harris' claims went to trial and all were dismissed *with prejudice* under Rule 41(a)(2) of the Federal Rules of Civil Procedure. The initial question then is whether Rule 41(a)(2) alone provides a basis for the imposition of attorney's fees against Harris or, if not, whether it even allows for such a finding under other statutory or regulatory authority.

 Rule 41(a)(2) specifies voluntary dismissal can be effected only "upon court order and upon such terms and conditions as the court deems proper." Dismissal on motion is within the sound discretion of the court, reviewable only for abuse of discretion. Wright & Miller, *Federal Practice and Procedure:* Civil § 2364 (1971). The purpose of the rule is "primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions." *McCants v. Ford Motor Company, Inc.,* 781 F.2d 855, 856 (11th Cir.1986) *quoting Alamance Industries, Inc. v. Filene's,* 291 F.2d 142, 146 (1st Cir.), *cert. denied,* 368 U.S. 831, 82 S.Ct. 53, 7 L.Ed.2d 33 (1961). The court, without objection by the plaintiff, accepted Harris' alternative voluntary dismissal with prejudice, conditioned on the court's determination of defendant's motion for sanctions. The issue is whether Rule 41(a)(2) authorizes such a ruling.

 There is no doubt that 41(a)(2) empowers a court to award costs and fees as a condition of voluntary dismissal and

numerous courts have done so where the dismissal has been *without prejudice. John Evans Sons, Inc. v. Majik–Ironers, Inc.,* 95 F.R.D. 186, 191 (E.D.Pa.1982); Wright & Miller at § 2366 and cases cited therein. The purpose of awards in such cases is to compensate the defendant for having incurred the expense of trial preparation without the benefit of a final determination of the controversy on its merits. *Cauley v. Wilson,* 754 F.2d 769, 772 (7th Cir.1985); *Evans, supra.* However, this consideration is not present and fees (as opposed to costs) generally are not awarded when a plaintiff obtains a dismissal *with prejudice* because the defendant cannot be forced to defend again. *Evans, supra; Smoot v. Fox,* 353 F.2d 830, 833 (6th Cir. 1965), *cert. denied sub nom. League of Women Voters v. Smoot,* 384 U.S. 909, 86 S.Ct. 1342, 16 L.Ed.2d 361 (1966). Thus, it is clear that Rule 41(a)(2) *alone* does not provide an independent basis for the imposition of fees against Harris.

Notwithstanding this restriction, however, numerous federal courts have held that Rule 41(a)(2) authorizes an award of fees upon a dismissal with prejudice where there is independent statutory or regulatory authority to do so. *See, e.g., Smoot v. Fox, supra; Lawrence v. Fuld,* 32 F.R.D. 329, 331–32 (D.Md.1963); Wright & Miller at § 2366. Others have assumed or held that fees can be awarded under "exceptional circumstances." *E.g., Mobile Power Enterprises, Inc. v. Power Vac, Inc.,* 496 F.2d 1311, 1312 (10th Cir.1974); *Gilbreth International Corp. v. Lionel Leisure, Inc.,* 587 F.Supp. 605, 614–15 (E.D.Pa.1983); *Evans, supra. See also Krasnow v. Sacks & Perry, Inc.,* 58 F.Supp. 828 (S.D.N.Y.1945). In agreement with the above authority, the court holds that Rule 41(a)(2) provides for imposition of attorney's fees against Harris if there exists an independent statutory or equitable basis upon which to do so given the frivolity and vexatiousness of her claims alleged and continued. *Cf. Colombrito v. Kelly,* 764 F.2d 122, 134–35 and n. 8 (2d Cir.1985) (holding fee award permissible if litigant made a practice of bringing potentially meritorious claims, then dis-

missing them with prejudice, resulting in the infliction of substantial litigation costs on the opposing party and the judicial system).

A. *Christiansburg Garment Co. v. EEOC and 42 U.S.C. § 2000e–5(k)*

1. Title VII provides that "the court, in its discretion, may allow the prevailing party, *other than the* Commission or the *United States, a reasonable attorney's fee as part of the costs....*" 42 U.S.C. § 2000e–5(k) (emphasis added). Clearly, to one degree or another, defendant is the prevailing party on all claims in the action. However, prevailing plaintiffs and prevailing defendants are not treated identically on applications for attorney's fees.

In order to effectuate the congressional policy of encouraging plaintiffs to act as private attorneys general and to vigorously enforce the Civil Rights Act, fee awards to successful plaintiffs have now become routine. *Albemarle Paper Co. v. Moody,* 422 U.S. at 415, 95 S.Ct. at 2370; *Robinson v. Lorillard Corp., supra.* This same objective counsels against routinely awarding attorney's fees to prevailing defendants,

which would result in a chilling effect on civil rights actions and an unhealthy deterrent to the vigorous private enforcement of civil rights laws. *Christiansburg,* 434 U.S. at 422, 98 S.Ct. at 700–01.

By the same token, Congress, in enacting § 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), also intended to discourage harassing and groundless Title VII litigation. "[W]hile Congress wanted to clear the way for suits to be brought under the [Civil Rights] Act, it also wanted to protect defendants from burdensome litigation having no legal or factual basis." *Id.* at 420, 98 S.Ct. at 700. Accordingly, in *Christiansburg, supra,* the Supreme Court held that successful defendants in Title VII actions are entitled to attorney's fees where the suit is "frivolous, unreasonable, or without foundation." *Id.* at 421, 98 S.Ct. at 700. *See also Arnold v. Burger King Corp.,* 719 F.2d 63 (4th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed. 2d 51 (1984).

Without question, based on the court's prior findings, most of Blue's and Harris' claims are frivolous, unreasonable and without foundation.[262] The question, how-

---

**262.** In deciding whether an action is frivolous or without foundation, district courts have been provided few definitive guidelines for the exercise of their discretion. *Christiansburg* made no attempt to quantify the evidence an unsuccessful plaintiff must produce to avoid an award of attorney's fees to the prevailing defendant. *Arnold v. Burger King Corp.,* 719 F.2d at 65. The few general pronouncements of the Supreme Court emphasize the necessity of using fee awards for defendants sparingly, given the broad remedial purposes of Title VII and the potential chilling effect of such awards on plaintiffs. *Id.*

The court cautioned against *post hoc* reasoning which presumes that because plaintiff failed to prevail on the merits of his claim, the action must have been frivolous. 434 U.S. at 421–22, 98 S.Ct. at 700–01. By the same token, plaintiff's honest belief in the worth of his case does not render it meritorious. *Id.* District courts need not find "subjective bad faith" to label a claim frivolous. *Id.* Thus, plaintiff's motive for bringing an action is not critical to determining frivolousness and a plaintiff acting in good faith may nevertheless be assessed fees if his complaint is groundless. *Brown v. Farleigh Dickinson University,* 560 F.Supp. 391, 404 (D.N.J. 1983).

Although case law reflects widely divergent factors affecting the finding of frivolousness, it

is increasingly clear that courts are not hesitating to impose fees on unsuccessful plaintiffs, even those proceeding *pro se,* for the prosecution of civil rights suits that are wholly groundless in law or fact. Where no credible evidence is produced pre-trial or at trial to substantiate discrimination claims, findings of frivolity are deemed justified. *See, e.g., General Camera Corp. v. Urban Development Corp.,* 734 F.2d 468 (2d Cir.1984); *Bernstein v. Menard,* 728 F.2d 252 (4th Cir.1984); *Arnold v. Burger King Corp., supra; Lewis v. Brown & Root, Inc.,* 711 F.2d 1287 (5th Cir.1983); *Durrett v. Jenkins Brickyard, Inc.,* 678 F.2d 911 (11th Cir.1982); *Harris v. Plastics Manufacturing Co.,* 617 F.2d 438 (5th Cir.1980); *Faraci v. Hickey–Freeman Co.,* 607 F.2d 1025 (2d Cir.1979); *Wilson v. Continental Manufacturing Co.,* 599 F.Supp. 284 (E.D.Mo. 1984); *Steinberg v. St. Regis/Sheraton Hotel,* 583 F.Supp. 421 (S.D.N.Y.1984); *Brown v. Farleigh–Dickinson University, supra; Kaimowitz v. Howard,* 547 F.Supp. 1345 (E.D.Mich.1982); *Spence v. Eastern Airlines,* 547 F.Supp. 204 (S.D. N.Y.1982). "Plaintiffs in civil rights cases cannot with impunity make shotgun charges, naming every person connected with the defendant, unless there is some minimal basis for the claim." *Kaimowitz,* 547 F.Supp. at 1351. As the prior findings of this court establish, without the slightest doubt, most of Blue's and Har-

ever, is whether the United States may be awarded statutory attorney's fees as the prevailing party-defendant in a Title VII case pursuant to the *Christiansburg* interpretation of 42 U.S.C. § 2000e–5(k).

2. Plaintiff argues that § 2000e–5(k) is explicit in its prohibition against fee awards to the United States. And, on its face, the statute appears clearly to preclude such an award. Defendant does not directly respond to the argument that solely for being the prevailing party, the United States cannot recover under *Christiansburg*. Rather, defendant argues that a fee award in this case is not premised on the government simply winning the lawsuit and plaintiffs' claims being frivolous. If an award is to issue, defendant contends, it will do so as a *sanction* for bad-faith litigation on the part of plaintiffs and their counsel. Although the court agrees with defendant that § 2000e–5(k) does not preclude an award of fees predicated on plaintiffs' bad-faith, this argument avoids the initial and much more difficult question of whether the *Christiansburg* "frivolity" standard applies to cases where the government prevails. It is this issue which the court first tackles.

3. Surprisingly, the court's research has disclosed only one federal decision authoritatively treating and deciding the matter. In a recent Fifth Circuit Court of Appeals opinion, *Butler v. United States Department of Agriculture*, 826 F.2d 409 (5th Cir.1987), a unanimous panel held that attorney fees could *not* be awarded in favor of the government under § 2000e–5(k) as interpreted in *Christiansburg*. Id. at 413. In *Butler*, a United States Magistrate, after trial, awarded the government $8,855.33 in fees as the prevailing party, finding no evidence to support plaintiff's claim of retaliatory discharge. Relying on what she perceived to be congressional intent as reflected in its silence when enacting 42 U.S.C. § 2000e–16 in 1972, the magistrate concluded that the exclusionary language expressed in § 2000e–5(k) does not apply when the United States is a prevailing de-

fendant. *Id.* at 412. As quoted in *Butler*, the magistrate explained:

42 U.S.C. § 2000e–5(k) specifically excludes only the United States or the Commission from receiving an award of attorney fees. At the time of the original enactment of this section of Title VII, a federal employee had no right to sue the United States or any of its agencies based on discrimination in employment. Hence, the language of this portion of Title VII, when originally enacted, dealt only with the United States or EEOC as a party plaintiff. When Congress amended certain sections of the Act in 1972, it is noteworthy that Congress did not amend § 2000e–5(k). Rather, Congress, in waiving the sovereign's immunity to employment discrimination suits, chose to make the head of the department, agency or unit the appropriate party defendant rather than the United States, 42 U.S.C. § 2000e–16(c), *Hall v. Small Business Administration*, 695 F.2d 175 (5th Cir.1983); *Newbold v. United States Postal Service*, 614 F.2d 46 (5th Cir.1980) [*cert. denied*, 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980) ]. Because 42 U.S.C. § 2000e–5(k) refers to an award of attorney's fees to the prevailing "party" and because it is not possible for the United States to be a party defendant to a Title VII lawsuit under the terms of 42 U.S.C. § 2000e–16(c), any award of attorney's fees to a prevailing defendant is not an award of attorney's fees to the United States.

*Id.* Like the Fifth Circuit, this court finds the magistrate's reasoning has a "certain allure and appeal." *Id.* In fact, it is persuasively supported by a cogent law review article on the subject, Note, *The United States as Prevailing Defendant in Title VII Actions: Attorney's Fees and Costs*, 66 Geo.L.J. 899, 910–913 (1978) [hereinafter referred to as "Note"]. However, like the Fifth Circuit, the court finds it impossible to accept the magistrate's argument.

Resort to legislative history is not required to resolve a non-existent ambiguity

ris' claims patently lacked the requisite minimal basis.

in statutory language. *Butler*, 826 F.2d at 412. "A statute must be interpreted according to its plain language unless a clear, contrary legislative intention is shown." *Id. citing Alabama v. Marshall*, 626 F.2d 366, 368–69 (5th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). *See also Ernest & Ernest v. Hochfelder*, 425 U.S. 185, 200–01, 96 S.Ct. 1375, 1384–85, 47 L.Ed.2d 668 (1976). Section 706(k) contains no ambiguity in its exclusion of the United States as a prevailing party. The language of the exclusion is precise, explicit, and not subject to varying interpretations. *Butler, supra.*

Furthermore, an examination of the legislative history does not reflect a "clear contrary legislative intention." The magistrate noted that when Congress made Title VII applicable to the government as an employer, it designated the head of the responsible agency as the appropriate defendant. *Id.* From this, the magistrate inferred congressional intent to distinguish the agency head from the United States in the attorney's fee provision. *Id.* Although such inference is permissible, an equally compelling reading of this tenuous history is that Congress simply intended to centralize all Title VII litigation against the top administrators, avoiding the inevitable disruption of operations inherent in suits involving low-level supervisors. *Id.* at 412–413.

More persuasively, the magistrate found support for her conclusion in the structure of and amendments to Title VII. The language barring the United States from recovery of attorney's fees was adopted as part of the Civil Rights Act of 1964. Because federal employees at the time were not covered by Title VII and could not bring suit, congressional exclusion of the United States from receipt of attorney's fees contemplated only those situations in which the United States was the plaintiff. *See* Note at 911. When Congress amended Title VII in 1972 to bring federal employees within its coverage, no change was made in the language of § 706(k) to reflect the new role of the United States as defendant. *Id.* Since awards to the United States as defendant are consistent with the

purpose underlying attorney's fee awards to prevailing defendants generally, and since nothing in the legislative history of Title VII clearly indicates a congressional intent to treat the federal government differently from other defendants, the magistrate reasonably concluded that the failure to amend § 706(k) simply was an oversight. Id. at 413. *See also* Note at 913; *Burgess v. Hampton*, 73 F.R.D. 540, 543–44 (D.D.C. 1976).

As the Fifth Circuit points out, however, the problem with this theory is that the legislative history neither establishes the "inaction" in 1972 was the result of congressional lapse nor does it show a deliberate intent to exclude the United States from the statutory recovery of fees. *Butler, supra.* Perhaps it was oversight, but "[o]n that we do not speculate, leaving that luxury to others." *Id.* at 413. The legislative reports for the 1972 amendments are concerned only with extending the protections of Title VII to federal employees. *Id.* On this basis, the court cannot conclude that ambiguous legislative history overcomes the plain meaning of the words Congress has used in the statute. *See United States v. Rodgers*, 461 U.S. 677, 708, 103 S.Ct. 2132, 2150, 76 L.Ed.2d 236 (1983); *Hicks v. Cantrell*, 803 F.2d 789, 792 (4th Cir.1986).

The court recognizes that from a policy perspective it can be articulately argued that congressional intent to define frivolous suits applies equally to public and private defendants. *See* Note at 912 ("Denying recovery of attorney's fees to the Government as a prevailing defendant would force taxpayers, rather than bad faith plaintiffs, to bear the costs of frivolous suits brought against the United States.") Nonetheless, as *Butler* suggests, there are valid contrary arguments, not the least of which is the comparison between the financial resources of most federal employees and those resources of the federal government. 826 F.2d at 413.

In sum, the mere fact that Title VII did not originally apply to the United States as an employer does not change the plain meaning of § 2000e–5(k). *Id.* Moreover,

the court is not convinced of the existence of any silent intent to change the meaning of this section when Congress enacted § 2000e–16. *Id.* As such, however tempting contrary policy considerations may be, judicial redrafting of the statute is unwarranted. Accordingly, like *Butler*, this court concludes that it is bound to apply the language of § 2000e–5(k) as it finds it and defendant's motion for attorney fees based on *Christiansburg* is DENIED. *Id.* at 414.

4. However, this holding does not end the inquiry into the limits of § 706(k). Defendant's primary argument for the imposition of fees against the plaintiffs directly (as opposed to counsel) is that plaintiffs initiated, maintained after discovery, and withdrew after trial their respective claims in bad-faith. Thus, as a *sanction*, the government should be awarded its fees under what amounts to the "bad-faith exception" to the American Rule.

Under what is known as the American Rule, parties to litigation normally pay their own attorney's fees regardless of the lawsuit's outcome. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). There are, however, certain exceptions to this general rule. One of these exceptions is where the court determines that the unsuccessful party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 258–59, 95 S.Ct. at 1622. *See also Sierra Club v. United States Army Corps of Engineers*, 776 F.2d 383, 390 (2d Cir.1985); *Shimman v. International Union of Operating Engineers, Local 18*, 744 F.2d 1226, 1229–1230 (6th Cir.1984). The award of fees pursuant to this exception is an exercise of a federal court's "inherent equitable powers" and may be made against the losing party or the attorney for the losing party. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Oliveri v. Thompson*, 803 F.2d at 1272; *Eastway Construction Corp, v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985).

The rationale for fee-shifting in instances of bad-faith is essentially punitive. *Hall v.*

*Cole*, 412 U.S. at 5, 93 S.Ct. at 1943. It is assumed that the assessment of fees in such cases will deter abusive litigation in the future, thereby avoiding harassment of opposing parties and protecting against abuse of the judicial process. *Copeland v. Martinez*, 603 F.2d 981, 984 (D.C.Cir.1979). Given this reasoning, a determination that § 706(k) fails to authorize attorney's fees to the United States as a prevailing defendant does not prevent federal courts from invoking their historic equitable powers to assess fees against a party and/or his counsel who has acted in bad-faith. *Butler*, 826 F.2d at 414; *Copeland*, 603 F.2d at 986. *See also Grubbs v. Butz*, 548 F.2d 973, 976 n. 15 (D.C.Cir.1976); *Burgess v. Hampton, supra;* Note at 914–15.

It might be argued that *Christiansburg* indirectly supports the view that § 706(k) forecloses judicial use of the bad faith exception to render awards to the United States since the Court recognized the possibility that *explicit language* in a statute authorizing fee awards might indicate congressional intent to define all the circumstances appropriate for such awards and hence preempt a court's equity power. Note at 916 *citing Christiansburg*, 434 U.S. at 419 n. 13, 98 S.Ct. at 699 n. 13. However, references in *Christiansburg* to both the bad-faith exception and § 706(k) demonstrate the Court considered them separate and distinct grounds for fee awards. *Id.* at 916 and n. 85 *citing* 434 U.S. at 421–24, 98 S.Ct. at 700 and 701. Because of the presumption against construing legislation to abrogate common law rights, *see Isbrandsten Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952), if Congress intended to restrict judicial use of the bad-faith exception by enacting § 706(k), its intent must be manifest. Here, far from being manifest, the legislative history of the 1972 amendments is all but void of any evidence Congress even considered the subject. *See Copeland v. Martinez*, 603 F.2d 987–89; Note at 913 and 915–16.

In addition, an award of fees for bad faith conduct is wholly consistent with the purposes of § 706(k). As the Court in

*Copeland* stated, "[t]he policy question in this case is, simply stated, whether the social benefits of deterring vexatious suits against the government outweigh the social costs arising from the risk that some meritorious suits will be discouraged as well." 603 F.2d at 990. Like the Court of Appeals for the District of Columbia, this court believes any argument suggesting the prosecution of meritorious claims might be "chilled" by the likelihood of their being mischaracterized as ones initiated in bad faith is "largely overdrawn." *Id.* This alleged chill would occur only if (1) plaintiffs with meritorious suits reasonably believed that (2) federal courts were likely to so misconceive their suits as to find them not only meritless, but vexatious, harassing, and in bad faith as well. *Id.* at 990–91. The court finds either possibility remote. *Id.* Accordingly, as the court in *Copeland* found:

> It is the need to preserve the integrity of the judicial process which ultimately, in the face of inconclusive statutory language and legislative history, convinces us that Congress would not have wished to foreclose recovery here. Litigation brought merely to harass is a wholly unredeemed burden and affront to the judiciary. While its unfairness when the defendant is the United States is somewhat more diffuse than the imposition on a private defendant in the same circumstances, it is not more sufferable. We think it unlikely in light of the purposes of the "bad faith" exception, that Congress intends through § 706(k) to remove the court's discretion to award attorney's fees in such circumstances as these.

*Id.* at 991–92.

5. In conclusion, although the plain language of 42 U.S.C. § 20004–5(k) forbids an award of attorney's fees to the United States as prevailing defendant, it does not preclude an award of fees to the United States in circumstances where plaintiff's suit is brought or tried in bad faith. Discussion and application of the bad faith exception to the American Rule follows:

## B. *Bad Faith Exception to American Rule*

 6. The bad faith considered by the courts construing this exception generally falls within one of two categories: (1) bad faith occurring during the course of the litigation, or (2) bad faith in bringing an action or causing it to be brought. *See Nepera Chemical, Inc. v. Sea-Land Service,* 794 F.2d 688, 701–02 (D.C.Cir.1986); *Shimman,* 744 F.2d at 1230. Although courts vary widely in their definitions of and requirements for a finding of bad faith, several broad principles emerge from synthesis of a majority of recent cases:

(a) An award of fees is proper only if the conduct, claim or defense was both "without color" and taken "wantonly, for purposes of harassment or delay, or for other improper reasons." *See Sierra Club,* 776 F.2d at 390; *Eastway Construction,* 762 F.2d at 253.

(b) A claim is "without color" when it lacks any legal or factual basis. *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980) (*per curiam*).

(c) While there is no precise definition of the second prong of the above test, evidence of wantonness, harassment or improper purpose may occur either before or during trial. *Sierra Club, supra.*

(d) "Bad faith" has both an objective and a subjective meaning: a litigant or his counsel engage in bad faith by acting in reckless or callous disregard for the law as well as by acting consciously or deliberately in the teeth of what they know to be the law. *See, e.g., In re TCI, Ltd.,* 769 F.2d 441–42 (7th Cir.1985); *EEOC v. Sears, Roebuck & Co.,* 114 F.R.D. 615, 630 (N.D.Ill. 1987). *Cf. United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.2d 677 (1984) (applying objective standard for good faith exception to Exclusionary Rule); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (applying objective standard for good faith immunity defense to civil damages claims against government officials).

(e) The test is conjunctive and a single frivolous or meritless claim alone will not

suffice. *Colombrito v. Kelly,* 764 F.2d at 133.

(f) Finally, there must be "clear evidence" of both prongs of the test, and a district court's determination of bad faith must be supported by a "high degree of specificity" in its factual findings. *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 344 (2d Cir.1986). *See also Beaudry Motor Co. v. Abko Properties, Inc.,* 780 F.2d 751 (9th Cir.1986); *Glick v. Koenig,* 766 F.2d 265 (7th Cir. 1985).

■ 7. Courts consistently have recognized attorney's fees as awardable where a meritless claim or defense is maintained in bad faith. *Shimman,* 744 F.2d at 1230 and n. 6. Circumstances indicative of bad faith are present when a party initiates an action unfounded at its inception or recklessly maintains an action long after it becomes clear that the claims at issue are no longer colorable. *See, e.g., Nepera Chemical,* 794 F.2d at 702, and n. 105; *Nemeroff v. Abelson,* 704 F.2d 652, 659–60 (2d Cir.1983) (Nemeroff II). In *Nemeroff II* for example, the court concluded the attorneys maintained the suit in bad faith because they persisted in the litigation despite the fact that, after a long period of discovery, they could find no non-party witnesses to support their case and because the records upon which they relied could not support an inference of wrongdoing. A case maintained solely on the basis of unsubstantiated rumors and mere speculation, the court held, was one maintained in bad faith. *Id.* at 658. *See also Black Musicians of Pittsburgh v. Local 60–471, American Federation of Musicians,* 442 F.Supp. 855, 859 (W.D.Pa.1977) (EEOC held to have brought action in bad faith where there was little evidence of discrimination, EEOC knew the problems asserted could be attributed to the parties claiming discrimination, no evidence existed of disparate employment opportunities and EEOC knew the statistics offered in their own case in chief were, at best, inconclusive or favored the defendant).

■ Thus, although a post-trial or summary judgment finding of meritlessness will not support a finding of bad faith in and of itself, that an attorney or party filed such a suit is evidence which must be considered along with any other facts. *Sierra Club,* 776 F.2d at 391; *McCandless v. Great Atlantic & Pacific Tea Company, Inc.,* 697 F.2d 198, 201 (7th Cir.1983). By recklessly pursuing litigation well beyond the stage at which it becomes apparent that a claim is meritless, however, the line separating "mere" frivolousness and bad faith is crossed. *See, e.g., Dow Chemical,* 782 F.2d at 345 ("[t]he appropriate focus for the court in applying the bad faith exception to the American Rule is the conduct of the party in instigating and maintaining the litigation, for an assessment of whether there has been substantive bad faith as exhibited by, for example, *its pursuit of frivolous contentions ...*") (emphasis added); *Dreiling v. Peugeot Motors of America, Inc.,* 768 F.2d 1159, 1165 (10th Cir.1985) (bad faith found where plaintiff continued to assert claims with knowledge there was no factual or legal basis for liability and did so long after it would have been reasonable and responsible to have dismissed the claims); *O'Rourke v. City of Norman,* 640 F.Supp. 1451, 1470 (W.D.Okl. 1986) (bad faith found where no credible evidence offered at trial to support broad *Monell* allegations against municipal defendant and half the trial spent on plaintiff's "dogged insistence in pursuing this frivolous claim"); *Davidson v. Allis–Chalmers Corp.* 567 F.Supp. 1532, 1539–40 (W.D.Mo.1983) (prosecution of meritless claim beyond discovery tantamount to bad faith). In this circumstance, courts presume bad faith because no legitimate, good faith basis could reasonably exist for a party to continue to prolong litigation long after any realistic prospect of prevailing on the merits has ended. *See Perichak v. International Union of Electrical Radio & Machine Workers, Local 601, AFL–CIO,* 715 F.2d 78, 83 (3d Cir.1983); *ITT Industrial Credit Co. v. Durango Crushers, Inc.,* 832 F.2d 307, 308 (4th Cir.1987) (fee award affirmed where claim "so patently without merit that the 'inescapable conclusion' is that it was filed in bad faith").

■ Bad faith, of course, becomes all the more obvious with the passage of time after it becomes reasonably apparent that a claim or defense is frivolous. The same is true as the number of frivolous contentions at issue increase. And, when a claim or defense objectively is meritless from its inception, yet pursued through time consuming litigation, or never is investigated minimally to determine its merits, a finding of bad faith is all but mandatory.[263]

■ 8. Applying these standards to the claims at issue, the court finds the following claims either were initiated in bad faith or maintained so long after it became apparent they were meritless that a finding of bad faith is required:

a. Blue's 1979 discriminatory appraisal claim;

b. Blue's disparate treatment promotion claims under MPAs 273–79 and 303–79;

c. Blue's disparate impact claim under MPA 303–79;

d. Blue's excessive subjectivity claim; and

e. Blue's retaliation claim.

In addition, the court finds the following claims were (1) either initiated or maintained and prolonged in bad faith *and* (2) abandoned or withdrawn at trial without just cause and in bad faith after the filing of the Final Pre–Trial Orders:[264]

a. Blue's promotion claims under MPAs 274–79, 277–79, 440–80 and 67–83;

b. Blue's discriminatory discipline claim;

c. Harris' promotion claims under MPAs 64–81, 94–81, 210–81, 196–82 and 5–83;

d. Harris' 1982 denial of training claim;

e. Harris' 1980 job classification claim.

9. The allegations before the court in this case form no ordinary lawsuit. This litigation is not your "garden-variety" employment discrimination dispute. Plaintiffs issued the gravest of charges against a litany of civilian and military personnel at Ft. Bragg, often impugning their honesty, morality, and professional integrity. Yet, neither Blue nor Harris came forward with any credible facts to lend the slightest support for the claims listed above. Evidence at trial and hearing established the following:

(a) Testimony of both plaintiffs often was inconsistent, contradictory, and at times, patently perjurious;

(b) Complaints and allegations often were exaggerated or drastically expanded upon in relation to those which had been pled;

(c) Charges of discrimination were leveled against ADO's without the slightest attempt being made beforehand to determine their truth or falsity; at times, even on the witness stand, plaintiffs seemed to care little whether they in fact were true or false;

(d) Personal attacks were made on defense witnesses' motives and integrity without foundation in fact;

(e) Unsubstantiated, wide-ranging charges of conspiracy were leveled against Army and civilian officials;

(f) Pre-trial, let alone pre-filing, investigation on nearly every claim alleged by plaintiffs and their counsel was wholly

---

**263.** "About half the practice of a decent lawyer is telling would-be clients that they are damned fools and should stop." Elihu Root *quoted in* A. Kaufman, *Problems in Professional Responsibility,* (1976) *cited in McCandless,* 694 F.2d at 201–02. *See also Steinle v. Warren,* 765 F.2d 95, 102 (7th Cir.1985); *Blair v. Shenandoah Women's Center, Inc.,* 757 F.2d 1435 (4th Cir.1985).

**264.** The court recognizes plaintiffs must be given some leeway to dismiss claims once their frivolous nature becomes obvious from discovery. The same is true of defendants and meritless defenses. But, assuming *arguendo,*

plaintiffs' claims in this instance were not frivolous at inception, although many transparently were, dismissal must occur when meritlessness becomes apparent and certainly no later than the close of discovery. Withdrawal after the Final Pre–Trial Order is filed is neither timely nor fair. *See EEOC v. Sears, Roebuck & Co.,* 114 F.R.D. at 632 (EEOC "properly dropped [ ] claims after discovery disclosed the claims to be inadequately supported by available or attainable evidence, and sufficiently before this case came to trial."); *EEOC v. Tarrant Distributors, Inc.,* 750 F.2d 1249, 1251 (5th Cir.1984).

inadequate and, in many cases, seemingly non-existent—this despite plaintiffs' extraordinarily long-term access to defendant's documents and files;

(g) On numerous occasions, plaintiffs radically changed their testimony after consultation with counsel at recess;

(h) Answers by plaintiffs to examination by defense counsel frequently were deliberately evasive;

(i) Plaintiffs' version of events was often in severe conflict with that of all other witnesses—black and white—who testified, and thus, was extraordinarily incredible;

(j) Years after the lawsuit was initiated, plaintiffs time and again failed to know who they were suing or why;

(k) Statistical evidence of value never was garnered for disparate treatment claims and, as for impact claims, plaintiffs never even requested an analysis; and

(l) Claims were abandoned or withdrawn at trial without the slightest advance notice to defendant or the court.

10. Although none of these factors alone on any one claim would be sufficient to support a finding of bad faith, the synergistic effect of all the factors in combination with the number of frivolous claims alleged and maintained is devastating.[265] The conclusion to be drawn from this disgraceful scenario is inescapable: the claims listed above either were filed or, shortly thereafter, maintained and prolonged in bad faith. In addition, many of the claims were withdrawn or abandoned on the same basis. Whether plaintiffs' respective purposes were entirely vindictive, that is to damage the reputation of ADO's and sub-

ject them to personal harassment, is not a question free from doubt.

Clearly, however, plaintiffs were motivated by this thought at least in part and on a not infrequent basis in the litigation. To file serious, stigmatizing charges of the magnitude plaintiffs have done in this case, often without a semblance of inquiry on their part to determine if the allegation was well-grounded in fact or if the person they charged was at fault, mandates the imposition of substantial sanctions against plaintiffs personally. *See Kendrick v. Zanides*, 609 F.Supp. 1162, 1172–73 (N.D.Cal.1985); *Neidhardt v. D.H. Holmes Co., Ltd.*, 583 F.Supp. 1271, 1276–77 (E.D.La.1984).[266] This conclusion is solidly reinforced by consideration of plaintiffs' testimony and their behavior on the witness stand.

11. As for plaintiffs' counsel, they had the responsibility to ascertain and assess the facts in light of the generally discernible legal standards for determining unlawful discrimination under Title VII. Counsel, experienced in the field, have been trained to make this legal analysis and reach a rational conclusion about the merits of plaintiffs' numerous claims. If this had been done to any professional degree, it is inconceivable that many of plaintiffs' claims would have been filed and clearly none would have been maintained after the close of discovery. *See Davidson v. Allis–Chalmers Corp.*, 567 F.Supp. at 1541–42. Where counsel make little or no effort to sift through and file only those claims with potential merit or, once filed, expeditiously withdraw claims that obviously have failed to develop,[267] counsel must share plaintiffs'

---

**265.** The fact that the court found two of Harris' ten claims and two of Blue's eleven claims not frivolous is inconsequential. "It would be strange if by the happenstance of including one colorable (though losing) claim amidst an ocean of frivolous ones, a litigant could ward off sanctions." *Hamer v. Lake County*, 819 F.2d 1362, 1369 (7th Cir.1987) *quoting Hill v. Norfolk & Western Railway Co.*, 814 F.2d 1192, 1200 (7th Cir.1987).

**266.** " '[S]moke alone is not enough to force the [defendant] to trial to prove that [his] actions were not' improper." *Raskiewicz v. Town of*

*New Boston*, 754 F.2d 38, 46 (1st Cir.1985). Here, of course, we do not even see the smoke. *See id.*

**267.** Although plaintiffs' counsel expended a great deal of effort at securing defendant's documents and files, the litigation established their wholesale failure to read, digest, and analyze the material handed to them. Simply seeking discovery and organizing it in notebooks, no matter how massive that task, is no substitute for reviewing and applying the material disclosed. A failure to do the latter is inexcusable.

responsibility for blindly and recklessly abusing the judicial system. *Id.* at 1542; *In re TCI, Ltd.,* 769 F.2d at 445–46; *EEOC v. Sears, Roebuck & Co.,* 114 F.R.D. at 630.

■ In reality, what occurred in this case is that plaintiffs and their counsel requested and expected class certification. When the class action failed to materialize, plaintiffs were stunned and horribly unprepared to proceed through the pretrial to trial on their individual claims. All potential charges (and claimants) were thrown up against the wall, regardless of whether they had been investigated, with the hopes that some might stick. The only prospects for Blue's and Harris' success at trial was that the court would reject defendant's overwhelming evidence, accept what little favorable evidence might be uncovered, find the incredible plaintiffs' credible, and infer discrimination at every turn to fill in evidentiary gaps wide enough to drive the proverbial truck through. No reasonable attorney could possibly have hoped to prevail in this case. It is one thing to engage in erroneous post-hoc reasoning that suggests failure to prevail implies frivolity and bad faith; it is quite another altogether to decline to sanction the exhaustive pursuit of a case hopeless from near inception. *EEOC v. Union Camp. Co.,* 536 F.Supp. 64 (W.D.Mich.1982).[268]

Here, plaintiffs cried discrimination, and counsel, despite a stunning paucity of evidence, filed suit, hoping defendant would surrender rather than go to trial. When defendant refused to bow down and fought back, plaintiffs went to trial, glaringly unprepared and without a case, apparently hoping to teach the defendant a lesson and force a favorable settlement. Neither occurred. A better case for an award of attorney's fees against counsel could not be made. *Id. See also Oliver v. Thompson,* 803 F.2d at 1273 (sanctions proper when counsel's actions are so completely without merit as to require the conclusion

that they must have been undertaken for some improper purpose).

Accordingly, for all of the above reasons, severe monetary sanctions in the form of defendant's attorney's fees and this court's costs will be assessed against plaintiffs and their counsel for all claims prosecuted and maintained and withdrawn or dismissed in bad faith.

### C. *28 U.S.C. § 1927*

■ 12. Unlike 42 U.S.C. § 2000e–5(k), which shifts attorney's fees from one party to another, § 1927, entitled "Counsel's liability for excessive costs," imposes liability for misconduct on "any attorney or other person admitted to conduct cases in any court." *Oliveri v. Thompson,* 803 F.2d at 1273. The statute provides that counsel "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorney's fees reasonably incurred because of such conduct." 28 U.S. C. § 1927. For many years, § 1927 imposed a burden only for excess costs and expenses and, as a result, generated very little litigation. *Oliveri, supra, citing Roadway Express v. Piper,* 447 U.S. 752, 759–64, 100 S.Ct. 2455, 2460–63, 65 L.Ed.2d 488 (1980) (holding attorney's fees not included as part of "costs" under § 1927 and could only be imposed pursuant to the bad faith exception to The American Rule).

However, in response to the Supreme Court's opinion in *Roadway Express,* Congress amended § 1927 in 1980 to expressly include attorney's fees among the category of expenses that a court might require an attorney personally to satisfy. As explained in the legislative history to the 1980 amendments, the statute is now designed as a sanction against dilatory litigation practices. It requires, as a deterrent, the attorney be held personally liable for any excess costs, fees or expenses attributable to his misconduct. *In Re Ruben,* 825 F.2d

---

**268.** When defendants are forced to defend a lawsuit groundless from the beginning, they are not the only victims in the case. "The entire public inevitably suffers when a vindictive plaintiff squanders limited judicial resources by prosecuting frivolous lawsuits." *American Family Life Assurance Co. v. Teasdale,* 733 F.2d 559, 570 (8th Cir.1984) *quoted in Bond v. Keck,* 629 F.Supp. 225, 227 (E.D.Mo.1986).

977, 983 (6th Cir.1987) *citing* H.R.Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2716, 2781–82. *See generally* Annot., *What Conduct Constitutes Multiplying Proceeding Unreasonably And Vexatiously So As To Warrant Imposition Of Liability On Counsel Under 28 U.S.C.S. § 1927 For Excess Costs, Expenses And Attorney Fees,* 81 A.L.R.Fed. 36 (1987). And, since the 1980 amendment, significantly greater use of § 1927 has occurred in the lower federal courts.

■■■ 13. Pursuant to § 1927, three substantial requirements must be met before liability may be imposed: (1) a multiplication of proceedings by an attorney; (2) conduct that can be characterized as unreasonable and vexatious; and (3) a resulting increase in the cost of the proceedings. *Baker Industries v. Cerberus, Ltd.,* 764 F.2d 204, 214 (3d Cir.1985) (Higginbotham, J., dissenting); *Campana v. Muir,* 615 F.Supp. 871, 874 (M.D.Pa.1985). Elements one and three are easily definable, requiring only that the proceedings be prolonged or extended resulting in an increase in the costs of the litigation over those which properly should have been incurred. *Id.* at 879–80.

Element two, on the other hand, has engendered numerous interpretations. With circuit authority and panels within circuits hopelessly split, some courts require a showing of bad faith similar to that required in their circuit under the bad faith exception to the American Rule. *E.g., Oliveri v. Thompson,* 803 F.2d at 1273; *Baker Industries v. Cerberus Ltd.,* 764 F.2d at 215 and n. 3. Others require a showing of at least reckless conduct. *E.g., United States v. Austin,* 749 F.2d 1407 (9th Cir. 1984). Still others require only some undefined degree of culpability which can be discerned solely from the lack of a legal or factual basis for the claim or defense. *E.g., Knorr Brake Corp. v. Harbil, Inc.,* 738 F.2d 223, 227 (7th Cir.1984).[269]

■■■ However, this court finds, as the Sixth Circuit Court of Appeals recently has held, that the "bad faith" requirement in any form, is limited to the court's inherent powers and that the "unreasonable and vexatious" requirement of § 1927, as amended, is a different and lower standard. *Jones v. Continental Corp.,* 789 F.2d 1225, 1228 (6th Cir.1986) *citing Lewis v. Brown & Root, Inc.,* 711 F.2d 1287, 1292 (5th Cir.1983), *aff'd in part on reconsideration,* 722 F.2d 209 (5th Cir.), *cert. denied,* 467 U.S. 1231, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984). Liability under § 1927 "does not require a finding of recklessness, subjective bad faith or conscious impropriety; an attorney does not have *carte blanche* to burden the federal courts by pursuing claims that he should know are frivolous." *Haynie v. Ross Gear Div. of TRW, Inc.,* 799 F.2d 237, 243 (6th Cir.1986), *cert. dismissed,* — U.S. ——, 107 S.Ct. 2475, 96 L.Ed.2d 368 (1987). The standard for § 1927 determinations is wholly *objective,* and although simple inadvertence that frustrates the trial judge does not support § 1927 sanctions, if an attorney's *negligence proximately causes* the filing or maintenance of a *frivolous* claim or defense, liability may be imposed. *See In re Ruben,* 825 F.2d at 984; *Haynie, supra; Jones v. Continental Corp.,* 789 F.2d at 1230. This standard is consistent not only with the language of § 1927, but also with its history and purpose.

Section 1927 requires that proceedings be multiplied "unreasonably and vexatiously." The statutory language is conjunctive. "Unreasonable" behavior implies an incorporation of pure negligence concepts. After all, negligence is a matter of risk, and quintessentially is defined as "conduct which involves an *unreasonably* great risk of causing damage" or, more fully, conduct "which falls below the standard established by law for the protection of others against *unreasonably* great risk of harm." Prosser, *Law of Torts* § 31 at 145 (4th ed. 1971) citing Terry, *Negligence,* 29 Harv.L.Rev. 40

---

**269.** The Fourth Circuit's standard for imposing liability under § 1927 is unclear. No recent published opinion discusses the issue. However, in an unpublished 1985 opinion, the court implied that a finding of bad faith is not required for § 1927 liability. *Wham v. United States of America,* Slip Op. No. 84–1958 at 4–5 (4th Cir.1985 [770 F.2d 162 (table)]).

(1915) and Restatement of Torts § 292.[270] If unreasonable conduct were all the statute required, standards for § 1921 would be relatively simple.

However, vexatiousness must also be defined and considered *in pari materia* with the unreasonableness requirement. Vexatious behavior generally is defined as conduct "without *reasonable* or probable cause or excuse." Black's Law Dictionary at 1736 (4th ed. 1968) (emphasis added). Legal actions without sufficient grounds are often called "vexatious" and the word is frequently used as a synonym for frivolous behavior. *See Christiansburg*, 434 U.S. at 421, 98 S.Ct. at 700; *Carrion v. Yeshiva University*, 535 F.2d 722, 727 (2d Cir.1976).[271]

■■■ Combining these two definitions, then, when an attorney's negligence proximately causes the filing or maintenance of a frivolous claim or defense, thereby unnecessarily multiplying the proceedings resulting in an increase in the costs of litigation to the opposing party and the court, § 1927 has been violated. *See Jones v. Continental Corp.*, 789 F.2d at 1230 ("when an attorney knows or *reasonably should know* that a claim pursued is frivolous ... a trial court does not err by assessing fees attributable to such actions against the attorney."); *Lewis v. Brown & Root, Inc.*, *supra.* With this definition, "trial judges, applying the collective wisdom of their experience on the bench, [should be able to agree on conduct which falls] short of the obligations owed by a member of the bar to the court and which, as a result, [causes] additional expense to the opposing party." *In re Reuben*, 825 F.2d at 984.

To hold that subjective bad faith or reckless and wanton behavior remains as neces-

sary under amended § 1927 as under *Roadway Express* (the bad faith exception to the American Rule) assumes the amendment added nothing to the "inherent powers" recognized in that case. *See Jones v. Continental Corp.*, 789 F.2d at 1230. Penalizing an attorney for bad faith conduct clearly was available long before the amendment or *Roadway Express.* Thus, this court assumes that Congress intended a meaningful change when it amended § 1927 to allow for attorney's fees. *See id.*

■■■ In addition, the policy underlying § 1927 is that in a system requiring each party to bear its own fees and costs, courts must ensure that each party truly does bear its costs and does not foist expenses off on an adversary. *In re TCI, Ltd.*, 769 F.2d at 446. One substantial cost of litigation is research. A competent, professional attorney ascertains the facts and reviews the law to determine whether his client possesses a cognizable claim for relief. *Id.* This often is a costly enterprise. However, defense against claims, particularly ones as extensive as those at bar, is also costly.

"It would warp the system if a lawyer for a would-be claimant could simply file a complaint and require the adversary to do both the basic research to identify the claim and then the further work needed to craft a response. Suits are easy to file and hard to defend. Litigation gives lawyers opportunities to impose on their adversaries costs much greater than they impose on their own clients. The greater the disparity, the more litigation becomes a predatory instrument rather than a method of resolving honest disputes."

*Id.* Accordingly, the best way to control and reduce unreasonable and vexatious tactics in litigation is to ensure that those who

---

**270.** Since "unreasonable" behavior is not defined in the statute, it must be construed according to its plain meaning in everyday use. Negligence generally is defined as "the failure to exercise such care as would normally be expected of a *reasonable* man." The Random House College Dictionary at 891 (1972) (emphasis added). As such, unreasonable behavior in this context must be deemed negligent.

**271.** Contrary to those courts requiring reckless behavior under § 1927, this court simply does

not equate vexatiousness with recklessness. First, nothing in the general definition of the word suggests such a result. Second, to so define vexatiousness in the context of § 1927 would lead to the irrational result of Congress placing two distinctly different degrees of culpability side by side in the same sentence—negligence and recklessness. The court does not presume Congress intended such a questionable and inconsistent result.

create costs bear them. *Id.* Lawyers who litigate in a negligent, careless manner must face the consequences of their actions. Counsel must understand that when they yield to the temptation to file or litigate meritless pleadings, whether because of the press of time, inability to do the work required, or to appease clients, their adversary's fees, unreasonably caused, become a cost of *their* business. *Id.* If a competent attorney would find no basis to file or maintain a claim or defense, then it does not chill zealous advocacy to penalize the assertion of a frivolous contention. *See id.* at 447; *Jones v. Continental Corp.,* 789 F.2d at 1230.

14. Having held that § 1927 liability does not require a finding of bad faith, the next question is whether imposition of fees against counsel in this case is precluded for the same reasons an award under *Christiansburg* is barred. For a variety of reasons, the court finds it is not.

First, an award under *Christiansburg* and 42 U.S.C. § 2000e-5(k) is primarily against the plaintiff and only secondarily, if at all, against plaintiffs' counsel. Under 28 U.S.C. § 1927, however, the award is imposed solely against counsel, plaintiff not being assessed a cent. Second, an award under § 2000e-5(k) is given to defendant because he *prevailed* in the litigation. Section 1927, on the other hand, does not distinguish between winners and losers or plaintiffs and defendants. The statute is indifferent to the merits of the dispute. It is concerned only with regulating the abuse of court processes. *Roadway Express,* 447 U.S. at 762, 100 S.Ct. at 2462. In this sense, dilatory or unreasonable practices of counsel for civil rights plaintiffs opposing governmental defendants are as objectionable as those conducted against non-governmental defendants. Imposition of fees under § 1927 is ordered as a *sanction* for negligent and vexatious conduct of counsel, not just because the claims ultimately were determined to be without merit.[272]

Third, the language of § 706(k) expressly excludes fees to the United States as a "prevailing party," but it says nothing about fees to the United States due to a violation of § 1927. The court recognizes this interpretation rests on a slim reed since § 1927 did not include attorney's fees when the 1972 amendments to Title VII were passed, but nevertheless, the court must interpret the statutes as it finds them. A specific statute requiring the imposition of fees for unreasonable and vexatious conduct of counsel cannot be controlled or nullified by a general fee-shifting statute that does not address and never considered the issue. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.,* — U.S. at —, 107 S.Ct. at 2499. Finally, purely as a matter of policy, § 706(k) never was intended to act as a shield behind which plaintiffs' counsel forever could imperviously hide while negligently filing and maintaining causes of action against the federal government at taxpayers' expense. Fees may not be allowed because a claim, in the end, turns out to be frivolous. But, if competent counsel, acting reasonably, could have prevented those unnecessary costs defendant and the court were forced to expend, then counsel's negligent conduct should be subject to regulation through the use of § 1927.

15. Applying the above standards to the case *sub judice,* the court finds plaintiffs' counsel liable for defendant's attorney's fees, costs and expenses, as well as the court's expenses, for the negligent filing and maintenance of all of Blue's and Harris' claims deemed frivolous in the preceding subsection of this opinion. Given the detailed findings of fact spread throughout this opinion, a rehash of the same determinations and arguments previously made would serve no useful purpose. It suffices to say that these findings amply establish the negligence of counsel. Just as examples, counsel failed to request even

---

272. Claims can be deemed frivolous at the end of trial through no fault of counsel when reasonably anticipated testimony of plaintiffs and witnesses fails to materialize. Further, often meritless employment discrimination claims are filed and pursued by *pro se* plaintiffs—suits to which § 1927 does not apply.

the most basic of statistical analyses to support Blue's disparate impact claims; failed to perceive a blatant ethical conflict in Harris' case; failed to objectively view many of the relevant documents related to both plaintiffs' promotion claims; drafted Harris' September 29, 1983, EEO complaint which alleged discrimination against selecting officials to positions Harris was never even referred; assisted plaintiffs in blatant changes of testimony during recesses; filed documents with the court asserting what amounted to non-existent claims for relief, *e.g.*, Harris' denial of employment benefits claim; and abandoned or withdrew claims for relief without the slightest advance notice to either defendant or the court months after the trial began. This list, of course, is not exhaustive; indeed, it is but the tip of the iceberg. Nevertheless, these examples are sufficient, standing alone, to establish counsel's liability for multiplying the proceedings unreasonably and vexatiously proximately resulting in significant excess costs, expenses and fees to the defendant and the court.[273] *See Haynie v. Ross Gear Div. of TRW, Inc., supra; Lewis v. Brown & Root, Inc., supra.*

16. Assuming, *arguendo*, that § 1927 required a finding of reckless or wanton conduct, the findings of bad faith by the court in the previous section of this opinion suffice to provide a basis for liability pursuant to § 1927 under this standard as well. *See Dreiling v. Peugeot Motors of America, Inc.,* 768 F.2d at 1165; *O'Rourke v. City of Norman,* 640 F.Supp. at 1470–71, *Davidson v. Allis–Chalmers Corp., supra.*

D. *Fed.R.Civ.P. 11*

17. Rule 11, as amended in 1983, provides in pertinent part:

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information and belief found after reasonable inquiry it is well grounded in

fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

▮ The rule has been amended to impose a more stringent and precisely defined certification requirement on attorneys and parties who sign pleadings, motions and other litigation papers, and to mandate the imposition of sanctions, including attorney's fees, upon those who violate the rule. *See Eastway Construction Corp. v. City of New York,* 762 F.2d at 253. Signature now constitutes a five fold certification that an attorney or party (1) has read the document, (2) that to the best of his knowledge, information and belief he has found after reasonable inquiry, (3) it is well grounded in fact, (4) is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and (5) that it is not interposed for any improper purpose such as harassment and delay. *See Thomas v. Capital Security Services, Inc.,* 812 F.2d 984, 988 (5th Cir.1987); *Wold v. Minerals Engineering Co.,* 575 F.Supp. 166, 167 (D.Colo.1983); Schwarzer, *Sanctions Under the New Federal Rule 11,* 104 F.R.D. 181, 184–85 (1985). Simply stated, Rule 11 imposes an obligation upon counsel to certify that any pleading, motion or document filed with the court is factually sound and substantiated by the existing state of the law or a good faith argument for the extension thereof. *Goldman v. Belden,* 580 F.Supp. 1373, 1381 (E.D.N.Y.1984).

Prior to the 1983 amendments, the standard for imposing sanctions under Rule 11 was whether the action was commenced in "good faith" or the motion was filed with "good ground to support" it. *See Eastway, supra.* The new standard, which applies to any filing *after* August 1, 1983, in a pending case, is far stricter and requires the imposition of sanctions for failure by

---

**273.** Many of the court's conclusions with respect to the "frivolousness clause" of Fed.R.Civ.

P. 11, *infra,* apply equally herein.

the signer of the document to make reasonable prefiling inquiry into the facts and law of the matter filed. *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.,* 809 F.2d 451, 453 (7th Cir.1987). The amendment is a response to the Advisory Committee's concern with the rising number of civil lawsuits, the increased costs and delay in litigation, the perceived ineffectiveness of the predecessor rule in preventing dilatory and abusive practices, and the unwillingness of courts to impose heretofore discretionary sanctions. Amendments to Federal Rules of Civil Procedure, 97 F.R.D. 165, 190–94 (1983) (purpose of amendment listed in letter accompanying proposed amendment, sent to Members of Standing Committee on Rules of Practice and Procedure, March 9, 1982); Advisory Committee Note to Rule 11, 97 F.R.D. at 198–201. *See also Brown v. Federation of State Medical Boards of the United States,* 830 F.2d 1429, 1435 (7th Cir.1987); *Golden Eagle Distributing Co. v. Burroughs Corp.,* 801 F.2d 1531, 1536 (9th Cir.1986); *Blair v. Shenandoah Women's Center, Inc., supra.*

■■■■■■ 18. There should be no mistake about the proposition that Rule 11 now imposes a significant presignature obligation on counsel and that a wider range of impermissible motivation and conduct was carved out by the 1983 amendments. In essence, the new language represents an attempt to increase litigators' responsibility to keep frivolous and ill-founded claims and defenses out of court. Subjective bad faith is no longer the crucial inquiry; subjective good faith no longer the safe harbor it once was. *Brown supra; Eastway, supra.* Rather, the test under current Rule 11 is an *objective* one of reasonableness under the circumstances. *Brown, supra; Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1127 (5th Cir.1987); *Oliveri v. Thompson,* 803 F.2d at 1275; *Stevens v.*

*Lawyers Mutual Liability Insurance Co. of North Carolina,* 789 F.2d at 1060 (4th Cir.1986); *Hashemi v. Campaigner Publications, Inc.,* 784 F.2d 1581, 1583 (11th Cir.1986); *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 829 (9th Cir.1986); *Eavenson, Auchmuty & Greenwald v. Holtzman,* 775 F.2d 535, 540 (3d Cir.1985); *Moore v. City of Des Moines,* 766 F.2d 343, 346 (8th Cir. 1985); *Eastway,* 768 F.2d at 253–54.

■■■■■ The combined effect of the requirements under amended Rule 11 is to impose a "stop and think" obligation upon counsel and signing parties. Before a litigation document is filed, its basis in law and fact must be considered. If counsel or parties initiate litigation or interpose defenses without first considering the plausibility of their contentions,[274] such conduct, even if not intentionally executed in bad faith, nevertheless is sanctionable.

■■■■■ 19. Rule 11 contains two independent grounds for sanctions. Each is concerned with eliminating abuses in the federal courts. The first is the "frivolousness clause." *Zaldivar,* 780 F.2d at 830. *See also Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1080 (7th Cir. 1987). This portion of Rule 11 is composed of two subparts: (1) whether the party or attorney made a reasonable inquiry into the facts and (2) whether the party or attorney made a reasonable inquiry into the law.[275] *See Thomas v. Capital Security Services, Inc.,* 812 F.2d at 988. A violation of either subpart constitutes a violation of Rule 11. *Brown, supra.*

■■■■■ To determine whether an attorney or party made a reasonable inquiry into the facts of a case, courts should consider: whether the signer of the documents possessed sufficient time for investigation; the extent to which the attorney had to rely on his or her client for the factual foundation underlying the pleading, motion, or

---

**274.** As Judge Knapp insightfully noted in *Wells v. Oppenheimer & Co.,* 101 F.R.D. 358, 359 n. 3 (S.D.N.Y.1984), "[h]aving been many years at the Bar before being on the Bench, we know from our own experience that there is no position—no matter how absurd—of which an advocate cannot convince himself."

**275.** A third subpart necessarily subsumed by a combination of the first two is whether the party or attorney reasonably applied the law to the facts before filing.

other paper; whether the case was accepted from another attorney; the complexity of the facts; and the need for discovery to develop the factual circumstances underlying the claim. *Id.; Thomas,* 812 F.2d at 988; *Marshall Durbin, Tupelo, Inc. v. United Food Workers,* 660 F.Supp. 234, 239 (N.D.Mass.1987); *Nassau–Suffolk Ice Cream v. Integrated Resources,* 114 F.R. D. 684, 689 (S.D.N.Y.1987); *Lyle v. Charlie Brown Flying Club,* 112 F.R.D. 392, 400 (N.D.Ga.1986). When an attorney can get information necessary to certify the validity of a claim in public fashion and need not rely on the client, he must do so. *See Whittington v. Ohio River Co.,* 115 F.R.D. 201, 206 (E.D.Ky.1987); *Continental Airlines, Inc. v. Group Systems International Far East, Ltd.,* 109 F.R.D. 594, 597 (C.D.Cal.1986). To decide if the attorney may rely solely on his client, he should determine if the client's knowledge is direct or hearsay and check closely the plausibility of the client's account—particularly if the information is secondhand. *See Nassau–Suffolk Ice Cream, supra, citing* Note, *The Dynamics of Rule 11: Preventing Frivolous Litigation by Demanding Professional Responsibility,* 61 N.Y.U.L. Rev. 300, 319 (1986). When an attorney must rely on his client, he should question him thoroughly, not accepting the client's version on faith alone. *Id.; Fleming Sales Co. v. Bailey,* 611 F.Supp. 507, 519 (N.D.Ill. 1985). In sum, if all the attorney has is his client's word that facts do or do not exist, when a reasonable inquiry would reveal otherwise, he has not satisfied the obligation of Rule 11. *Coburn Optical Industries v. Cilco, Inc.,* 610 F.Supp. 656, 659 (M.D.N.C.1985); Schwarzer, 104 F.R.D. at 187.

■ Furthermore, a claim may not be asserted against a defendant or a charge leveled against a specific individual in the hope that discovery will turn up something against the named party. Suspicion, rumor and surmise will not do when reputations and careers are at stake. *See Whittington,* 115 F.R.D. at 206–07; *City of Yonkers v. Otis Elevator Co.,* 106 F.R.D. 524, 525 (S.D.N.Y.1985); Schwarzer, *supra.* The cost of determining whether a defendant or agent of the defendant should be named in a pleading must be borne by the plaintiff. That burden cannot be shifted to the official to prove himself out of the case after the charging document is filed. Even if counsel subjectively believe in the existence of a factual dispute concerning defendant's liability, a *reasonable* factual basis must exist for the charge. "There is no room for a pure heart, empty head defense under Rule 11." Schwarzer, *supra.*

■ 20. To determine whether the attorney in question made a reasonable inquiry into the law, the court should consider: the amount of time the attorney had to prepare the document and research the relevant law; whether the document contained a plausible view of the law; the complexity of the legal questions involved; and whether the document was a good faith effort to extend or modify the law. *Brown, supra; Thomas, supra. See also Whittington,* 115 F.R.D. at 207–08.

■ 21. The other prong of Rule 11, the "improper purpose" clause, *Zaldivar,* 780 F.2d at 831, prohibits the filing of any document for purposes of delay, harassment or increasing the costs of litigation. Like the frivolousness clause, whether a party acted with an improper purpose is based on an objective standard, although subjective bad faith may be important when the suit is objectively colorable. *Brown, supra, citing In re TCI, Ltd.,* 769 F.2d at 445. "The Rule effectively picks up the torts of abuse of process (filing an objectively frivolous suit) and malicious prosecution (filing a colorable suit for purpose of imposing expense on the defendant ...)." *Szabo Food Service,* 823 F.2d at 1083. Thus, subjective bad faith is relevant where claims maliciously are prosecuted but not in situations where a party repeatedly has pursued or prolonged implausible claims. *Brown, supra, citing Hill v. Norfolk & W. Railway,* 814 F.2d 1192, 1202 (7th Cir.1987). *Cf. Garrett v. County of San Francisco,* 818 F.2d 1515, 1521 (9th Cir.1987).

■ 22. Finally, an attorney or signing party not only must conduct a reason-

able investigation into the facts and law before filing, but continually must review and reevaluate his position as the case develops. *Robinson v. National Cash Register Co.*, 808 F.2d at 1127; *Sherman Treaters Ltd. v. Ahlbrandt*, 115 F.R.D. 519, 524 (D.D.C.1987); *Lyle v. Charlie Brown Flying Club, Inc.*, 112 F.R.D. at 400; *Blackwell v. Amchem Products, Inc.*, 108 F.R.D. 287, 290 (S.D.Ga.1985); *Woodfork v. Gavin*, 105 F.R.D. 100, 104 (N.D. Miss.1985). This *continuing obligation* requires abandonment of claims or defenses as soon as it becomes apparent it is unreasonable to pursue them. *Thomas*, 812 F.2d at 989; *Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 789 (5th Cir.1986); *Whittington*, 115 F.R.D. at 208. *But see Oliveri v. Thompson*, 803 F.2d at 1274–75 (finding no continuing obligation under Rule 11).

Cases involving the concept of a lawsuit becoming frivolous are legion. *E.g., Markel v. Scovill Manufacturing Co.*, 657 F.Supp. 1102–1112 (W.D.N.Y.1987); *Thompson v. Aland*, 639 F.Supp. 724, 731 (N.D.Tex.1986); *Rand v. Anaconda–Ericsson, Inc.*, 623 F.Supp. 176 (E.D.N.Y.1985); *Northern Trust Co. v. L.A. Muller*, 616 F.Supp. 788 (N.D.Ill.1985); *Miller v. Hotel & Restaurant Employees & Bartenders Union*, 107 F.R.D. 231 (N.D.Ga.1985); *City of Yonkers, supra; In re Olympia Brewing Co. Securities Litigation*, 613 F.Supp. 1286 (N.D.Ill.1985); *Woodfork v. Gavin, supra; Doe v. Thomas*, 604 F.Supp. 1508 (N.D.Ill.1985); *Robinson v. C.R. Laurence, Co.*, 105 F.R.D. 567 (D.Colo.1985). The message of these and numerous other cases is clear—if counsel or a party delay in dismissing or abandoning claims or defenses once it is reasonably apparent they have become frivolous, the Rule 41 escape hatch closes and sanctions must issue. *See Albright v. Upjohn Co.*, 788 F.2d 1217 (6th Cir.1986); *Huettig & Schromm, Inc. v. Landscape Contractor Council of Northern California*, 582 F.Supp. 1519 (W.D.Cal. 1984), *aff'd*, 790 F.2d 1421 (9th Cir.1986).

■ 23. Applying these standards to the case at bar, the court finds transparent violations of Rule 11 at every turn in this litigation starting at its inception. By August 25, 1983, the date of Harris' intervention in the lawsuit, it should have been reasonably apparent that a large portion of both Blue's and Harris' claims were without factual basis. Discovery as to the claims of both women (Harris being a putative class member) had been open for nearly two years. Defendant had produced an enormous amount of discovery—much of it clearly unrebutted by any credible evidence in plaintiffs' possession. Depositions of most major actors on both side had been taken. Plaintiffs were aware of defendant's vastly superior statistical evidence. Counsel, certainly by this time (and with respect to Blue, well before) had no reasonable basis upon which to rely on either plaintiff. Significant gaps and inconsistencies existed in plaintiffs' respective versions of events mandating that counsel question their perception of discrimination. When conspiracy theories abound and every negative employment decision, whether effected by black or white, military or civilian personnel, is questioned on a racial basis, counsel have an obligation to inquire behind their client's claims. Here, access to investigate plaintiffs' stories was virtually unchecked. Yet, Harris' claims were filed, and Blue's continued, apparently without any objective thought as to their merit.

Even after Harris intervened, plaintiffs and their counsel had four more months to review the claims in preparation for a Final Pre–Trial Conference and Order. Once again, all claims, without deviation, were included in the filed orders. This was done despite the fact, for example, that plaintiffs had not the slightest statistical evidence to support Blue's disparate impact claims—contentions that by any reasonable legal standard mandated detailed statistical analysis. Claims for relief were included in the Final Pre–Trial Orders that Harris later claimed were non-existent or Blue claimed were only for background purposes. Promotion claims were included for both plaintiffs based on allegations of discrimination by selecting officials and possession of inferior qualifications by selectees, yet at the time plaintiffs knew nothing about either

the selectees or the selecting officials—indeed, in Harris' case she was never even referred for selection to some of these positions.[276]

In sum, for purposes of Rule 11, overwhelming documentary and anecdotal evidence existed long before the Final Pre-Trial Orders were signed by counsel, establishing plaintiffs' possessed few, if any, meritorious claims. Plaintiffs do not contend they had insufficient time to investigate their claims, either prior to their filing or continuing with them through the Pre-Trial Orders. Accordingly, although Rule 11 does not require exhaustive research, it is obvious counsel for plaintiffs failed to make the minimal objective inquiry incumbent on a competent attorney. *See Brown*, 830 F.2d at 1436.

24. In addition, although Harris did not sign the Supplemental Final Pre-trial Order with respect to her claims, her May and June, 1984, affidavits were filled with misstatements of fact. Objectively and subjectively, those documents were filed in bad faith. Therefore, at least with respect to the costs defendant suffered investigating and rebutting the reasons for withdrawal stated therein, Harris is personally liable under Rule 11.

25.

"Mounting federal caseloads and growing public dissatisfaction with the costs and delays of litigation have made it imperative that the federal courts impose sanctions on persons and firms that abuse their right of access to these courts. The rules, whether statutory or judge-made, designed to discourage groundless litigation are being and will continue to be enforced in this [district] to the hilt."

*Dries & Krump Manufacturers v. International Association of Machinists*, 802 F.2d 247, 255 (7th Cir.1986). Telling would-be litigants that they do not have a claim is

an essential part of a lawyer's job. Until far too late, counsel for plaintiffs ignored this responsibility. As a result, plaintiffs and their counsel's obduracy prolonged a host of claims that should never have been filed. The claims contained in the 1983–84 Final Pre-Trial Orders, as set forth on pages 440–41 of Subsection VII (B) of this opinion, were neither cognizable at that time nor generally plausible as original matters. Plaintiffs and their counsel were given ample opportunity at sanctions hearings and through post-hearing briefs to demonstrate some reasonable basis or substance for their claims after defendant met his burden of going forward to show frivolity. *See Donaldson v. Clark*, 819 F.2d 1551 (11th Cir.1987) (holding due process requires that counsel and parties have fair notice of possible imposition of Rule 11 sanctions and of the reasons for their imposition); *Markel v. Scovill Manufacturing Co.*, 657 F.Supp. at 1111. The result—defendant's evidence was left virtually unrebutted by any credible showing of plaintiffs or their counsel, thus allowing defendant to meet his burden of proof to establish Rule 11 violations.

Accordingly, consideration of appropriate sanctions against plaintiffs' counsel and Harris follows the next subsection of this opinion. Sanctions will issue for the needless fees, costs and expenses incurred by defendant and this court as a result of the August, 1983, Complaint-in-Intervention, the December, 1983, and January, 1984, Final Pre-Trial Orders, the December, 1983, Amended Complaint-in-Intervention, Blue's April, 1984, pre-trial briefs and Harris' April–June, 1984, motion to dismiss, related memoranda and affidavits.[277]

26. For the reasons previously stated in subsection VII(C) of this opinion, the court finds no statutory bar to the imposition of sanctions under Rule 11 against plaintiff's counsel in a Title VII case where the United States is a prevail-

---

276. "It is not permissible to file suit and use discovery as the sole means of finding out whether you have a case. Discovery fills in the details, but you must have the outline of a claim at the beginning." *Brown*, 830 F.2d at 1435 n. 4 *quoting Szabo Food Service*, 823 F.2d at 1083.

277. Although most of Blue's claims were objectively without merit at inception or shortly thereafter, Rule 11 sanctions may only be imposed with respect to documents filed after August 1, 1983, thus, the need to focus on the December, 1983 Pre-Trial Order.

ing defendant. Furthermore, because assessment of any fees and costs against Harris personally is ordered under Rule 11 as a sanction for her violation of a rule of court enacted to regulate the conduct of parties before it, § 706(k) does not preclude an award against the plaintiff.

### E. *Fed.R.Civ.P. 16*

27. Like Rule 11, Rule 16 was amended in 1983, transforming a relatively simple grant into a comprehensive scheme with seven discreet subsections in an effort to "meet the challenges of modern litigation." Advisory Committee Notes, 97 F.R.D. at 207. The purposes of the new rule are to reduce the time between the institution of a case and trial, and to improve the quality of justice by fostering better case preparation. *Id.* In an effort to achieve these goals, Rule 16(e) mandates that any pretrial conference be followed by a pretrial order. This order *"shall* control the subsequent course of the action unless modified by a subsequent order." Local Rule of Practice & Procedure 25.00, E.D.N.C.

 Thus, Rule 16, as amended, places great significance on the signing and filing of a final pre-trial order. Indeed, it may be modified only "to prevent a manifest injustice." Fed.R.Civ.P. 16(d). It is a document binding on all parties and the court. *See Breneman v. Kennecott Corp.,* 799 F.2d 470, 473 (9th Cir.1986). Counsel and litigants are entitled to rely on the representations contained therein in final preparation for trial. It is not a meaningless piece of paper, idly entered, which cavalierly can be disregarded by counsel without consequences and peril. *See Forstmann v. Culp,* 114 F.R.D. 83, 85 (M.D.N.C.1987); *Gestetner Corp. v. Case Equipment Co.,* 108 F.R.D. 138, 141 (D.Me.1985) (holding the same with respect to Rule 16(b) scheduling orders). Claims for relief listed in a final pre-trial order are ones which plaintiff must reasonably believe have merit.

 Rule 16(f) expressly provides for the imposition of sanctions. It lists four kinds of behavior that will trigger such an order: (1) a party or attorney's failure to obey a scheduling or pre-trial order; (2) an attorney or party's failure to appear at a pre-trial conference; (3) being substantially unprepared to participate in a pre-trial conference; and (4) failure to participate in good faith. In this case, plaintiffs and their counsel arguably violated (3), but the court does not rely on this factor. Rather, the violation of (4) is so unquestioned that resort to (3) is unnecessary. If an allegation or contention is offered in a final pre-trial order without a reasonable factual or legal basis, much like Rule 11, it violates Rule 16. A meritless or frivolous claim, asserted with knowledge that opposing counsel will heighten his final preparation for trial of the claim on the basis of its appearance in the final pre-trial order, is not one alleged in good faith. Thus, with respect to final pre-trial orders, there is no reason to suggest the standards for professional responsibility and, therefore, liability under Rule 16 differ from those previously set forth for Rule 11.[278] Improper motive, bad faith, even reckless behavior, is not a prerequisite for finding a violation of the rule.

28. Once a violation of Rule 16 is found, specific sanctions under Rule 16(f) include, *inter alia,* sanctions available pursuant to Fed.R.Civ.P. 37(b)(2)(B)(C) and (D) and assessment of all reasonable expenses and fees incurred due to noncompliance with the rule. Advisory Committee Notes to the rule indicate the imposition of sanctions is meant to "reenforce the rule's intention to encourage forceful judicial management." Wright, Miller and Kane, *Federal Practice & Procedure:* Civil § 1524 (1986 Supp.); 97 F.R.D. at 213. Accordingly, the court should design an appropriate sanction to fit the violation. 97 F.R.D. at 213.

 29. For the reasons set forth in the previous subsections of this segment of the court's opinion, the court finds plain-

---

**278.** However, the coverage of Rules 11 and 16 are by no means co-extensive. Rule 11 deals with all motions, pleadings and documents signed by an attorney or party in a lawsuit;

Rule 16 relates to all aspects of pre-trial management, including numerous procedures and discussions not necessarily memorialized in a writing.

tiffs' counsel violated Rule 16(d) and (e) with respect to both Final Pre–Trial Orders. The violation, failing to participate in the final pre-trial conference and its concomitant final order(s) in good faith, is as substantial as the number and breadth of ill founded claims contained therein. As a result, absent any countervailing mitigating factors, counsel should be held responsible for defendant's post Final Pre–Trial Order fees, expenses and costs, as well as those of the court in dealing with plaintiffs' frivolously listed claims. Determination of the sanctions award follows. Conclusion of Law 25, *supra* at 469, likewise applies here.

### F. Determination of Mitigating Circumstances and Appropriate Sanctions

Due to the impact sanctions may have on a party or an attorney's career and their personal well-being, sanctions should not be lightly imposed. *See Brown*, 830 F.2d at 1437 *citing Robinson v. National Cash Register Co.* 808 F.2d at 1131. Thus, the basic principle underlying the imposition of sanctions, whether based on the bad faith exception, § 1927, Rule 11 or Rule 16, is that the least severe sanction adequate to serve the purpose should be utilized. *See Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir.1987).

Although courts always should bear in mind this basic principle, sanctions must be assessed in light of the above theories' several related purposes. *In re TRI, Ltd., supra.* One of the goals is to impose costs on the careless, reckless, or indifferent lawyer or party. Thus, compensation is a main thrust of Rule 11. *See Brown supra; Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986) ("Counsel who puts the burden of study and illumination on the defendants or the court must expect to pay attorney's fees ..."). "Although denominated as a sanctions provision, in reality [Rule 11] is more appropriately characterized as a cost-shifting technique...." Nelken, *Sanctions Under Amended Federal Rule 11—Some "Chilling" Problems in the Struggle Between*

*Compensation and Punishment*, 74 Geo. L.J. 1313, 1324 (1986) *quoting* Miller & Culp, *Litigation Costs, Delay Prompted the New Rule of Civil Procedure*, Nat'l L.J., Nov. 28, 1983, at 25.

Compensation, although an important consideration, is not the only purpose underlying the above rules. An even more important policy is deterrence. *Brown, supra; Anschutz Petroleum Marketing v. E.W. Saybolt & Co.*, 112 F.R.D. 355, 357 (S.D.N.Y.1986). In this sense, the rules provide for sanctions, not simply fee shifting. They aim to deter and, if necessary, punish improper conduct rather than merely to compensate the prevailing party. *Mercury Service, Inc. v. Allied Bank of Texas*, 117 F.R.D. 147, 157 (C.D.Cal.1987). The key to invoking sanctions is the nature of the conduct of counsel and the parties, not the outcome. Schwarzer, 104 F.R.D. at 185. *See also Anschutz, supra.* Presumably, sanctions in an appropriate case deter both the individual attorney (and party) and other members of the bar (or public) from taking the same frivolous or reckless course of action. *Brown, supra. See also Eastway Construction Corp. v. City of New York*, 821 F.2d 121, 122 (2d Cir.1987); *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir.1987).

Of course, a district court has the discretion, upon consideraiton of all of the above principles, to fashion a sanction for purposes of deterrence which awards part, but not all, of the opposing party's fee request. *Anschutz, supra.* Adequate deterrence may permissibly fall short of full compensation. *Id.*

In applying the above principles to any case, the Seventh Circuit Court of Appeals in *Brown, supra*, recently held that a "substantial" award of sanctions must (1) be supported by a statement of reasons and (2) quantified with some precision in terms of the perceived misconduct and the sanctioning authority. 830 F.2d at 1438. *See also Matter of Yagman*, 796 F.2d 1165, 1184 (9th Cir.1986). This, the court has attempted to do in sections VI and VII of its opinion. Nonetheless, the court finds it

important to hold that in this case the concepts of compensation and deterrence neatly merge. The wholesale, long-term waste of physical, mental and financial resources engendered by the extraordinarily reckless, frivolous conduct of both plaintiffs and their counsel mandate a substantial monetary sanction against both. A mere slap on the wrist or minor fine is unacceptable for reasons of both general and specific deterrence.

In addition, from a compensation aspect, the expenses of trial for defendant and this court, heretofore doled out at the taxpayers' expense, should be reimbursed to the extent such an award does not (1) exceed the amount reasonably necessary to meet the concomitant goal of deterrence, (2) impose an undue financial hardship on plaintiffs and counsel, and (3) result in the imposition of a sanction disproportionate to the misconduct found. Here, defendant's requested fees and costs (and the court's costs) are so conservatively estimated that the final figures, if assessed against parties and counsel capable of complying with the judgment, provide for both adequate deterrence and reasonable, if not total, compensation.

30. Based on the court's prior findings of fact, the following figures emerge as the putative award in this case:

| | Harris | Blue |
|---|---|---|
| Defendant's Fees, Costs and Expenses | $28,009.37 | $17,999.25 |
| Court Costs | $ 8,325.00 | $29,580.00 |
| Additional Considerations | $250 fine per counsel for ethical breach | Defendant can move for trial fees |
| Subtotals | $36,334.37 | $47,579.25 plus possible trial fees |
| Total: | $83,913.62 | plus Harris fine and additional Blue fees |

▮▮▮▮▮ Assuming proper assessment of fees between counsel and plaintiffs based on the theories of liability supporting each, the final question this court must face prior to issuing judgment, is whether any equitable considerations mitigate the

potential $83,000 plus award. Although equitable considerations are not relevant to the initial decision to impose sanctions as a matter of law, in appropriate cases they act as ingredients in the discretionary aspect of fashioning an award. *Brown*, 830 F.2d at 439. Factors to consider include the ability of the sanctioned party to pay the award, whether the party seeking fees prolonged the litigation, and the relative financial conditions of the parties. *See Brown, supra; Oliveri v. Thompson*, 803 F.2d at 1281; *Munson v. Friske*, 754 F.2d 683, 697 (7th Cir.1985); *Arnold v. Burger King Corp.*, 719 F.2d at 68; *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 916–17 (11th Cir.1982); *Tedeschi v. Smith Barney, Harris Upham & Co.*, 579 F.Supp. 657 (S.D.N.Y.1984), *aff'd*, 757 F.2d 465 (2d Cir.1985). Here, none of these considerations need long detain the court.

First, both plaintiffs, knowing they might be liable for the full amount of defendant's requested fees, costs and expenses, waived any "inability to pay" defense. Since the court's award against plaintiffs, personally, is less than defendant's request, there is no evidence to suggest plaintiffs would be unduly burdened by paying the award. *See Munson v. Friske, supra* ("when a court determines that a plaintiff can afford to pay the award, the congressional goal of discouraging frivolous litigation demands that the full fees be levied."). Second, although defendant might be accused of a bit of overkill in its case-in-chief against Blue, this court cannot say that defendant, in any measurable manner, needlessly protracted the litigation. Indeed, from the outset, defendant sought in every way possible to limit the scope, time and expense of the litigation. Third, although the government is arguably a financially secure litigant,[279] so too are counsel for plaintiffs' lawfirm and the NAACP. Given the hundreds of thousands, indeed probably millions of dollars poured into this litigation by plaintiffs, the court would be hard pressed to decrease the award it is considering on the

279. Given this country's astronomical trade and budget deficits, as well as the recent stock market shock, this finding of fact may well be deemed "clearly erroneous" on appeal.

basis of comparative finances between litigants. After all, this is hardly the typical *pro se* or individual plaintiff versus corporation case. And, the government, whose litigation efforts are funded solely by tax dollars, is not a profit-making enterprise.

Finally, in terms of imposing fees directly on plaintiffs' counsel, no evidence is before the court suggesting their inability, either individually or collectively, to pay the sanctions which will issue. To the court's knowledge all are employed either in excellent firms or public service organizations. From the first motion for sanctions, defendant has made it painfully obvious that fees and expenses were sought against counsel as well as plaintiffs, yet counsel presented no evidence indicating a limited ability to meet any award ordered. In addition, plaintiffs' counsel, *particularly* Mr. Chambers, are experienced attorneys who specialize in employment discrimination litigation. As such, there is no excuse for counsel's abysmal failure to file, prepare, and try only non-frivolous claims in this case. *See Brown*, 830 F.2d at 1439; *Huettig & Schrom, Inc.*, 790 F.2d at 1427.

31. Accordingly, noting the complete absence of any mitigating factor, sanctions in the full amount determined by the court ($83,913.62) shall issue. Blue is liable for sanctions under the bad faith exception to the American Rule. Harris is similarly liable, as well as for her 1984, affidavits under Rule 11. Counsel for plaintiff are liable under the bad faith exception, 28 U.S.C. § 1927, Rule 11 and Rule 16. Considering the relative degrees of conduct and fault, as well as the nature of plaintiffs' testimony at trial and hearing, assessment between counsel and plaintiffs is as follows:

(1) Plaintiff Sandra Blue is ORDERED to pay $8,000.00 in defendant's attorney's fees, costs and expenses for her claims. She is further ORDERED to pay $5,000.00 in court expenses. In addition, if defendants receive a further award for trial fees,

she may be subject to a percentage of that award;

(2) Plaintiff Beulah Mae Harris is ORDERED to pay $15,000.00 in defendant's attorney's fees, costs and expenses for her claims. She is further ORDERED to pay $2,000.00 in court costs; and

(3) Plaintiffs' counsel are ORDERED to pay $9,999.25 in defendant's attorney's fees, costs and expenses for Blue's claims; $24,580.00 in court costs for Blue; their share, as determined by the court, of any additional trial fees awarded defendant in *Blue;* $13,009.37 in defendant's attorney's fees, costs and expenses for Harris' claims; and $6,325.00 in court costs for Harris. *See Campana v. Muir*, 615 F.Supp. at 881–82.

Thus, the total award against plaintiffs' counsel, barring any additional fees, is $53,913.62. This amount is to be paid in the following manner:

(a) As lead counsel for most of this litigation, J. LeVonne Chambers is assessed the amount of $30,000. Geraldine Sumter, as primary trial counsel for plaintiffs, is assessed the sum of $12,500.00. Gilda Glazer and Penda Hair, as counsel who participated in the preparation of this case for trial, pre-trial motions, and who appeared at the Final Pretrial Conferences as well as early in the trial proceedings, are assessed $5,000.00 each. The remaining sum of $1,413.62 shall be assessed directly against Chambers' former and Sumter's present Charlotte law firm, Ferguson, Stein, Watt, Wallas & Adkins, as a number of other lawyers with the firm participated in this case in varying minor ways. *E.g.,* Ronald L. Gibson. To the extent the Charlotte firm wants to cover three quarters (¾) of the sanction assessed against each individual lawyer, it may do so. However, one quarter (¼) must be paid by the lawyers individually and no monies may or shall be paid by the NAACP or its Legal Defense Fund.[280]

---

**280.** Contributions are made to this organization and its litigation branches by members of the public who expect their money to be used by staff lawyers in a reasonable manner to pay for meritorious cases. The NAACP is an historic institution that has contributed substantially to the racial progress of this country. It continues to serve this vital purpose and the court does not propose to see any money diverted from its crucial mission.

(b) If counsel feel the above percentages do not accurately reflect their respective roles in this case or that sanctions should issue upon a different ratio, counsel may move to reconsider this portion of the court's opinion within twenty (20) days of the date of service of the order. Defendant shall respond within twenty (20) days and a hearing, if necessary, will be held.

(4) All monies due either the defendant or this court shall be paid within thirty (30) days of the date of service of this order.

## VIII. CONCLUSION

Judgment shall enter for defendant on all of plaintiff Blue's claims. Fed.R.Civ.P. 52(a) and 58. Pursuant to Fed.R.Civ.P. 41(a)(2), plaintiff Harris' claims are DISMISSED. Blue is ORDERED to pay defendant $8,000.00 in fees and costs and and this court $5,000.00 in expenses. Harris is ORDERED to pay defendant $15,000.00 in fees and costs and this court $2,000.00 in expenses. Plaintiffs' counsel are ORDERED to pay defendant $23,008.62 and this court $30,905.00 as set forth in the preceding section of this opinion. Plaintiffs' counsel are also REPRIMANDED and FINED the sum of $250.00 each for breach of professional responsibility. All monies are to be paid within thirty (30) days of the date of service of this order. All motions to reconsider any aspect of this order, pursuant to Fed.R.Civ.P. 60, shall be filed within twenty (20) days of the date of service of this order. Response briefs are due twenty (20) days thereafter. Finally, defendant may file for additional trial fees in the *Blue* case, as set forth in this order, within twenty (20) days of the date of service of this opinion; plaintiff's response is due within twenty (20) days thereafter. Hearings will be scheduled if needed.

SO ORDERED.